Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Corinne F. Johnson (SBN 287385)
Jessica M. Levy (SBN 368289)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
bchisholm@altber.com
dleonard@altber.com
cjohnson@altber.com
jlevy@altber.com

*Attorneys for All Union and Non-Profit Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,

Defendants.

Case No. 3:26-09976

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY UNDER 5 U.S.C. §705**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

GLOSSARY ..... vi

INTRODUCTION ..... 1

BACKGROUND ..... 3

I. USDA Announces Its Reorganization Plan And Delays Implementation ..... 3

II. Congress Prohibits The USDA Reorganization ..... 4

III. USDA Is Now Implementing The Reorganization Of Specific Components Where Plaintiffs Represent Employees And Rely On Services ..... 6

A. Food and Nutrition Administration ..... 7

B. Research, Education, and Economics Mission Area ..... 9

C. Forest Service ..... 11

D. Foreign Agricultural Service ..... 12

E. Rural Development Mission Area ..... 13

F. Farm Production and Conservation Mission Area ..... 14

G. Offices of General Counsel and Civil Rights ..... 14

PROCEDURAL HISTORY ..... 14

ARGUMENT ..... 15

I. Plaintiffs' APA And Ultra Vires Claims Are Likely to Succeed ..... 16

A. USDA's Actions Exceed Authority and Are Contrary to Law ..... 16

B. USDA's Actions Are Also Arbitrary and Capricious ..... 18

C. USDA's Actions Are Final for Purposes of the APA ..... 21

II. USDA's Actions Will Cause Plaintiffs Imminent, Irreparable Harm ..... 22

III. The Balance of Equities and Public Interest Support A Preliminary Injunction And Section 705 Stay. ..... 24

IV. Plaintiffs Request Targeted Relief To Preserve The Status Quo And Prevent Harm to Plaintiffs ..... 25

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

*AFGE v. OMB*,
806 F.Supp.3d 1093 (N.D. Cal. 2025) ........ 23

*AFGE v. Pierce*,
697 F.2d 303 (D.C. Cir. 1982) ........ 18

*AFGE v. Trump*,
139 F.4th 1020 (9th Cir. 2025) ........ 23, 24

*AFGE v. Trump*,
784 F.Supp.3d 1316 (N.D. Cal. 2025) ........ 23

*AFGE v. Trump*,
No. 3:25-cv-03698-SI (N.D. Cal.) ........ *passim*

*AFSCME v. OMB*,
807 F.Supp.3d 1004 (N.D. Cal. 2025) ........ 5

*AFSCME v. OMB*,
813 F.Supp.3d 944 (N.D. Cal. 2025) ........ 5, 24

*Alaska Airlines v. Brock*,
480 U.S. 678 (1987) ........ 16, 17

*Am. Mining Cong. v. EPA*,
965 F.2d 759 (9th Cir. 1992) ........ 20

*Ariz. All. for Retired Americans v. Mayes*,
2026 WL 2277101 (9th Cir. Aug. 7, 2026) ........ 25

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 21

*California v. Trump*,
963 F.3d 926 (9th Cir. 2020) ........ 16

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) ........ 17, 18

*DHS. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........ 18, 19, 20

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ........ 24

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) ........ 25

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112 (9th Cir. 2008) ........ 23

*Helman v. Dep't of Veterans Affs.*, 856 F.3d 920 (Fed. Cir. 2017) ........ 18

*Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025) ........ 15

*INS v. Chadha*, 462 U.S. 919 (1983) ........ 16, 17

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ........ 24

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ........ 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........ 19

*Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845 (9th Cir. 2017) ........ 16, 17

*Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025) ........ 25

*NTEU v. FLRA*, 414 F.3d 50 (D.C. Cir. 2005) ........ 7

*S.F. Herring Ass'n v. Dep't of Interior*, 946 F.3d 564 (9th Cir. 2019) ........ 21, 22

*Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020) ........ 16

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........ 15

**Federal Statutes**

5 U.S.C.
§ 704 ........ 21
§ 705 ........ 1, 15, 25

7 U.S.C.
§ 2011 .......... 7
§ 5693 .......... 12
§ 6971(d)(2) .......... 9
§ 6971(f)(2) .......... 9

16 U.S.C.
§ 472a .......... 11
§ 528 .......... 11
§ 551 .......... 11
§ 1609 .......... 11
§ 1642 .......... 11

40 U.S.C.
§ 71(b) .......... 4

42 U.S.C.
§ 1786(c) .......... 8

Pub. L. No. 113-235, Div. A (2014)
§ 719(a) .......... 18

Pub. L. No. 119-37, Div. B (2025) .......... 5
§ 120 .......... 6
§ 252 .......... 17
§ 257 .......... 17
§ 716 .......... 1, 2, 5, 16
§ 771 .......... 16
§ 779 .......... 5
139 Stat. 518 .......... 5, 17

Pub. L. No. 119-74, Div. C (2026)
§ 421 .......... 5, 16

Pub. L. No. 119-75, Div. H (2026)
§ 101 .......... 6

Pub. L. No. 119-86, Div. B (2026)
§ 101 .......... 6
§ 102 .......... 6

Pub. L. No. 119-103, Div. A (2026)
§ 101 .......... 6
§ 103 .......... 6

**Other Authorities**

7 C.F.R. § 2.67(a) .......... 9

160 Cong. Rec. H9307 (Dec. 11, 2014) .......... 18

S. Rep. 119-46 (2025) .......... 17

# GLOSSARY

| | |
|---|---|
| Administrative Procedures Act | APA |
| Alliance of Crop, Soil, and Environmental Science Societies | Alliance |
| American Federation of Government Employees | AFGE |
| American Federation of State, County and Municipal Employees | AFSCME |
| American Geophysical Union | AGU |
| Beltsville Agricultural Research Center | BARC |
| Continuing Resolution | CR |
| Farm Production and Conservation | FPAC |
| Food and Nutrition Administration | FNA |
| Fiscal Year | FY |
| National Federation of Federal Employees | NFFE |
| National Institute of Food and Agriculture | NIFA |
| National Treasury Employees Union | NTEU |
| Natural Resources Defense Council | NRDC |
| Office of the Assistant Secretary for Civil Rights | OCR |
| Office of the General Counsel | OGC |
| U.S. Department of Agriculture | USDA |
| U.S. Forest Service | USFS |
| Office of Management and Budget | OMB |
| Office of Personnel Management | OPM |
| Retailer Operations and Compliance | ROC |
| Western Watersheds Project | WWP |

## INTRODUCTION

Defendants United States Department of Agriculture ("USDA") and Secretary of Agriculture Brooke Rollins are engaging in an unprecedented reorganization of the USDA, closing offices and relocating components across the country and requiring employees to move hundreds or thousands of miles if they want to keep their jobs. As a result, thousands of experienced and knowledgeable USDA employees are being forced to choose between their careers and their families, communities, churches, and the lives they have built. USDA knows and intends this will cause significant attrition among USDA staff, depriving the agency of a wealth of knowledge and experience as well as the ability to perform its statutorily authorized and mandated functions. Plaintiffs seek a preliminary injunction and stay under 5 U.S.C. §705 that halts USDA's closure of offices and large-scale forced relocation of staff, which are unlawful and imminent and will cause Plaintiffs irreparable injury.

USDA first announced its Reorganization Plan ("Plan"), under which it will restructure and downsize the agency across certain mission areas and agencies, in July 2025. The impacted components provide important statutorily authorized services including administration of food and nutrition assistance to low-income women and children, protection and management of national forests and other public lands, and important agricultural, scientific, and economic research and programs for the benefit of the nation. After its announcement, USDA sought congressional authorization for the reorganization through the appropriations process, which Congress rejected.

When it rejected USDA's requests for approval, Congress also enacted Fiscal Year 2026 appropriations statutes that are replete with provisions that specifically prohibit USDA from moving forward with its Reorganization Plan. In particular, section 716 of the Fiscal Year 2026 Appropriations Act for USDA states that "[n]one of the funds" appropriated by the act or previously appropriated "shall be available for obligation or expenditure through a reprogramming, transfer of funds, or reimbursements" that "relocates an office or employees," "reorganizes offices, programs, or activities," or "eliminates a program, project, or activity" "unless the Secretary of Agriculture … notifies in writing and receives approval from the Committees on Appropriations of both Houses of Congress at least 30 days in advance." Pub. L. No. 119-37, §716(a), 139 Stat. 495,

544 (2025); *see also infra* at 16 (collecting statutory provisions).

Notwithstanding Congress's directives that no reorganization may occur without further approval, USDA began implementing the Plan in the spring and summer of 2026, rolling out this implementation in stages by component agencies and mission areas. The current actions that Plaintiffs challenge require the closure and relocation of offices at the Food and Nutrition Administration ("FNA," formerly the Food and Nutrition Service); Forest Service; Research, Education, and Economics mission area; Foreign Agricultural Service; Rural Development mission area; Farm Preservation and Conservation ("FPAC") mission area; Office of the General Counsel ("OGC"); and Office of Civil Rights ("OCR"). Across these eight components, thousands of USDA employees are being forced to relocate from the D.C. area, where their offices are currently based, to other parts of the country, or to relocate from one state to another.

Plaintiffs[1] are a coalition of labor organizations, non-profit groups, and local governments that are directly impacted by the implementation of USDA's Reorganization Plan and seek to halt the closures and forced relocations. USDA's actions violate its appropriations acts' specific statutory prohibitions. They are also arbitrary and capricious, because USDA admits that it decided to close offices and require relocations without having conducted any analysis of the impact of forced attrition on agency functions and ability to meet statutory mandates. As a result of these unlawful actions, USDA employees face two imminent requirements: 1) decide by a short deadline whether to accept relocation; and 2) appear for work in the new location, often in a different state. Employees who refuse to relocate will be terminated. Deadlines to appear to work in new locations begin September 21, 2026, and continue thereafter.

If permitted to go forward, the office closures and forced employee relocations reflected in

[1] Plaintiffs are the American Federation of Government Employees ("AFGE"); American Federation of State County and Municipal Employees ("AFSCME"); National Federation of Federal Employees ("NFFE"); National Treasury Employees Union ("NTEU") (together, "Union Plaintiffs"); County of Santa Clara, CA; Martin Luther King, Jr. County, WA; City of Baltimore, MD; City and County of San Francisco, CA, Prince George's County, MD (together, "Local Government Plaintiffs"); Alliance of Crop, Soil, and Environmental Science Societies ("Alliance"); American Geophysical Union ("AGU"); Coalition to Protect America's National Parks ("Parks Coalition"); Natural Resources Defense Council ("NRDC"); and Western Watersheds Project ("WWP") (together, "Non-Profit Plaintiffs").

this Reorganization Plan will cause dramatic attrition, resulting in irreparable harm to thousands of USDA employees and their families as well as disruption and inability of USDA components to perform their statutory functions. These actions are causing and will cause irreparable harm to Union Plaintiffs, which represent members at all USDA components at issue in this motion, and Local Government and Non-Profit Plaintiffs, which rely on the services these components provide.

After USDA announced it would implement the Plan in the spring and summer of 2026, Plaintiffs swiftly challenged the Plan as part of ongoing litigation in this Court, *AFGE v. Trump*, No. 3:25-cv-03698-SI (N.D. Cal.). On July 1, 2026, Plaintiffs moved to file a Second Supplemental Complaint adding claims arising from USDA's Reorganization Plan and sought a preliminary injunction. The Court set the motions for hearing on September 1, and on September 2 denied Plaintiffs' motion to supplement (and therefore denied the injunction motion as moot). *Id.* Dkt. 486 at 1 ("[T]he Court concludes that the claims plaintiffs seek to bring regarding the USDA reorganization involve new and distinct causes of action that should be the subject of a separate lawsuit."). Plaintiffs therefore file this new case with this renewed preliminary injunction motion and respectfully request that this Court set a hearing on shortened time.

## BACKGROUND

### I. USDA Announces Its Reorganization Plan And Delays Implementation

In July 2025, USDA publicly announced plans to engage in a large-scale reorganization of the department. Levy Decl. Ex. B. USDA released a Secretary Memorandum ("Memorandum") that set forth, at a high level, its plan to restructure USDA, primarily by closing offices and relocating employees away from Washington, D.C. and regional offices to new "hub" cities. *See id.* at 1 ("These actions constitute the USDA Department Reorganization Plan."); *infra* at 6-14.

While disclaiming "large-scale" staff reductions, the Memorandum and accompanying press release admit "this reorganization is another step of the Department's process of reducing its workforce." Levy Ex. B. at 2; Johnson Decl. Ex. A at 3. Internal documents and communications between USDA and the Office of Management and Budget ("OMB"), only recently made public via litigation in this Court, reveal USDA's intention to use forced relocations to cause substantial workforce reduction. Levy Decl. Ex. A at 18 (USDA to OMB: "USDA is anticipating that *a*

*significant number of employees will decline geographic reassignments* out of the [national capital region] or existing regional or state offices to the five target hub locations.").[2] USDA's public disclaimer that it did not intend large-scale attrition contradicts those internal statements.[3]

USDA had good reason to know that forced relocations would cause significant attrition. In 2019, when USDA attempted to relocate two research agencies (Economic Research Service and National Institute of Food and Agriculture) to Kansas City, *75%* of the transferred employees left the agencies rather than relocate. Soriano Decl. ¶19, Ex. B; Dodson Decl. ¶29. The agencies' functions deteriorated markedly as a result. Dodson Decl. ¶23, Ex. C at 19-20; Soriano Decl. ¶21.

After announcing the planned reorganization, USDA solicited public comments and sought congressional approval through the appropriations process in August and September 2025. Numerous comments highlighted the inevitable attrition and decline of agency functions that the Reorganization Plan would cause. *See* Levy Decl. Ex. G at 3 (listing comments from agency alumni, employees, unions, former chiefs, Congress, tribes, local governments, academics, and citizens). Many commenters warned that reorganization would lead to workforce attrition and "reduced operational capacity," including "erod[ing] the Forest Service's capacity to manage public lands and resources," "stifl[ing] scientific progress," and causing "profound ecological and scientific consequences" from closing research facilities. *Id.* at 3-4, 8. USDA issued a December 2025 report summarizing the comments but not responding to them. *Id.* at 3-30.

## II. Congress Prohibits The USDA Reorganization

After USDA announced its plans in 2025, the Senate Agriculture Committee held a hearing on the proposed reorganization and numerous Congressmembers sent USDA letters expressing concerns about the forced relocations. Evers Decl. ¶5, Exs. A-D. USDA presented Congress with

[2] USDA often refers to the D.C. area as the "national capital region" or "NCR." 40 U.S.C. §71(b).

[3] OMB and USDA's communications also discussed "aggressively" offering voluntary retirement incentives to encourage employees to quit, and stated that USDA "does not plan to backfill most of these positions." Levy Decl. Ex. A at 7, 18. They also discussed cutting FNA staff and services. *Id.* at 22 (describing plans to "deemphasize the food stamp program"); Johnson Decl. Ex. B (referring to "planned reduction in FNS workforce"). Those communications occurred prior to the announcement of the Plan, in the context of approvals of USDA's Agency RIF and Reorganization Plan, which is the subject of separate litigation in this Court. The documents were obtained in that litigation. *See AFGE v. Trump*, No. 3:25-cv-03698-SI.

a 2026 budget designed to drastically reduce agency staffing, consistent with the Reorganization Plan's workforce reduction goal. Levy Decl. Ex. Q at 1 (proposing a $6.7 billion cut).

Congress reached an impasse on budget negotiations, resulting in a government shutdown on September 30, 2025. During the shutdown, agencies like USDA were prohibited from reducing staff. *See AFSCME v. OMB*, 807 F.Supp.3d 1004 (N.D. Cal. 2025); *AFSCME v. OMB*, 813 F.Supp.3d 944 (N.D. Cal. 2025). Congress ended the shutdown in November 2025. Pub. L. No. 119-37, 139 Stat. 495 (2025) ("Continuing Resolution" or "CR"). The CR unambiguously rejected USDA's proposed staffing cuts and funded the agency above or near 2025 levels. *Id.* Div. B (USDA); Levy Decl. Ex. C at 8 ($335 million increase from FY2025).

In addition, Congress expressly forbade USDA from reorganizing without approval, providing that "[n]one of the funds" appropriated by the act or previously appropriated "shall be available for obligation or expenditure through a reprogramming, transfer of funds, or reimbursements" that "*relocates an office or employees*" or "*reorganizes offices, programs, or activities*" "unless the Secretary of Agriculture … notifies in writing and receives approval from the Committees on Appropriations of both Houses of Congress at least 30 days in advance." Pub. L. No. 119-37, §716(a), 139 Stat. at 544 (emphases added). Several other provisions in the act also prohibited aspects of the Reorganization Plan without further approval. *E.g.*, *id.*, 139 Stat. at 518, 555, 558, 545 (§771: no use of funds "to close or consolidate … any existing Agricultural Research Service laboratories and facilities; §779: "close Natural Resources Conservation Service or Rural Development mission area field offices or … relocate any field-based employees"; §716(b): "reduce[] … numbers of personnel by 10 percent"; p. 518 "close Farm Services Agency county offices"). Congress enacted similar appropriations conditions for the Forest Service in January 2026. Pub. L. No. 119-74, §421, 140 Stat. 5, 163 (2026) ("None of the funds made available in this Act, in this and prior fiscal years, may be reprogrammed without the advance notification and approval of the House and Senate Committees on Appropriations").[4]

[4] Congress defined "reprogramming" for USFS as "all proposed reorganizations or other workforce actions detailed below which affect a total of 10 staff members or 10 percent of the staffing of an affected program or office," which includes "proposed reorganizations, workforce restructure,

These prohibitions were originally enacted to last through the end of FY2026 on September 30, 2026. Congress recently extended these provisions through December 11, 2026. Continuing Approps. and Extensions Act, 2027, Pub. L. No. 119-103, §§101, 103, 140 Stat. 987 (2026).

In addition to these USDA-specific restrictions, the CR that ended the shutdown included a time-limited provision prohibiting agencies from imposing reductions-in-force ("RIFs") or "any similar reduction of positions at any department, agency, or office of the Federal Government." Pub. L. No. 119-37, §120, 139 Stat. 495, 500-01. That provision effectively prevented USDA from moving forward with its staff-reducing reorganization through April 30, 2026.[5]

### III. USDA Is Now Implementing The Reorganization Of Specific Components Where Plaintiffs Represent Employees And Rely on Services

In February 2026, USDA reiterated its intent to reduce staff through forced relocation. USDA requested the Office of Personnel Management's ("OPM") authorization to offer retirement incentives in connection with its Reorganization Plan (so relocated employees would choose to retire rather than relocate). Schwarz Decl. Ex. 1. USDA's (nonpublic) request told OPM that it was undertaking a "planned large scale, department-wide restructuring effort" in which least 5,000 employees would be "involuntarily separated, downgraded, transferred, or reassigned" through the Reorganization Plan. *Id.* at 1. USDA also identified additional "relocation" as a personnel reduction action that would be necessary if OPM did not authorize retirement incentives. *Id.*

Then, starting in April 2026, shortly before the CR's government-wide prohibition on reducing agency positions was set to expire, USDA announced that it would begin to implement reorganizations at several of its component agencies. USDA made further announcements of implementation for additional components in June 2026.

For each component, USDA set forth its decision in a letter to Congress that described the specific reorganization actions (including office closures and employee relocations) that USDA will implement at that component. Johnson Decl. Ex. E. USDA has confirmed that "[t]he most

---

reshaping, transfer of functions, or bureau-wide downsizing and ... *closures, consolidations, and relocations of offices, facilities, and laboratories*." Levy Decl. Ex D at 8 (emphasis added).

[5] Section 120 initially lasted through January 31, 2026. Pub. L. No. 119-37, §120. Congress extended the section's effective date to February 13 and then April 30, 2026. Pub. L. No. 119-75, Div. H, §101, 140 Stat 173; Pub. L. No. 119-86, Div. B, §§101-102, 104 Stat. 773, 809 (2026).

accurate and up to date reorganization plans are set forth in the notifications that USDA has provided to Congress." *Id.* Ex. H ¶4. At the time, USDA conceded that the reorganization actions in those letters fell within the appropriations acts' prohibition on reorganization without further committee approval. *Id.* Ex. E at 1.

Most of the congressional notifications were not public. USDA made available only limited information about the reorganization to federal employee unions and on USDA's public website as it announced each implementation decision. The unions have slowly obtained more information as USDA has engaged in "impact and implementation" ("impact") bargaining over the effects of USDA's decision to close offices and relocate employees. *E.g.*, Kotyk Reply Decl. ¶¶5-12. Impact bargaining permits bargaining over procedural issues such as the form and timing of relocation notices, but not over the underlying decision. *See NTEU v. FLRA*, 414 F.3d 50, 52–53 (D.C. Cir. 2005). USDA has refused to bargain over the fact of the reorganization, including the decision to reorganize, the closure of offices, and the relocation of employees. Dodson Reply Decl. ¶¶5-10; Vaughn Reply Decl. ¶¶17; Mei Reply Decl. ¶¶6-9; Kotyk Reply Decl. ¶¶5-12.

The component-level reorganizations USDA is now implementing follow the same general pattern: closing D.C offices and relocating the majority of D.C. area employees to "hub" cities and, for some agencies, closing regional and research offices and relocating those employees as well. Employees who are being relocated receive management directed reassignment ("MDR") letters that direct them first to decline or accept reassignment, generally within 30 days, and then (if they have accepted) to report to their new locations, by specific deadlines. *E.g.*, Dodson Decl. Ex. B. Employees who decline relocation will be involuntarily separated from employment on or near the reporting date. *Id.* ¶11, Ex. B; Levy Decl. Ex. R at 3. Each of the specific USDA components at issue, and their relocation status and deadlines, are described below.

### A. Food and Nutrition Administration

1. <u>Current Workforce and Imminent Relocations</u>. The FNA administers 16 statutory nutrition assistance programs. Long Decl. ¶5. For instance, the SNAP Program provides food benefits to 38 million low-income Americans monthly. *Id.*; 7 U.S.C. §2011. The WIC program provides food assistance to 7 million low-income pregnant and postpartum women, infants, and

children, including 40% of infants in the United States.[6] Long Decl. ¶5; 42 U.S.C. §1786(c). FNA staff work closely with a wide range of stakeholders including states, local governments, clinics, schools, and tribal nations to implement these 16 programs. Among other things, FNA staff allocate funding and provide oversight and support, technical assistance, quality control, on-site visits, legal compliance, evaluations, and policy expertise for the state and local agencies that administer the benefits. *E.g.*, Mei Decl. ¶7.

FNA currently consists of a National Office in the D.C. area, seven Regional Offices (whose staff are located throughout the states in each region), and the mostly remote Retailer Operations and Compliance ("ROC") Office. Rosenthal Decl. ¶4; Mei Decl. ¶¶4-12. About 870 of the roughly 1,200 current FNA employees are Regional Office or ROC staff. Rosenthal Decl. ¶14. Those offices are already severely short-staffed: FNA lost about one-third of its workforce in 2025 due to USDA's other downsizing actions. *Id.* This staffing shortfall is already impeding FNA's ability to administer its programs. *Id.* ¶32; Mei Decl. ¶29; Long Decl. ¶19.

On April 30, 2026, USDA provided congressional notice and publicly announced it would begin restructuring FNA. Johnson Decl. Ex. E at 28; Rosenthal Decl. ¶18. USDA is closing all Regional Offices and relocating and consolidating their employees into five new "hub" cities (Kansas City, Dallas, Indianapolis, Raleigh, and Denver). Johnson Decl. Ex. E. at 28-29; Rosenthal Decl. ¶¶18-19.[7] The new hub cities are, for the most part, located far away from where most regional employees and offices are currently distributed (and the states and local communities they serve). Mei Decl. ¶¶16, 18; Garrett Decl. ¶¶10-12. FNA has made clear that it will issue all Regional Office and ROC employees MDR letters this fall. Lenggenhager Decl. ¶12;

2. <u>Effects of Relocations and Closures</u>. Plaintiffs NTEU and AFGE represent almost all FNA Regional Office and ROC employees. Lenggenhager Decl. ¶¶8-10; Salvatore Decl. ¶4. NTEU surveyed all FNA employees in May 2026, after USDA announced the reorganization. Rosenthal Decl. ¶24. *81%* of respondents stated they are unlikely to relocate—and therefore will

[6] These programs disproportionately help people of color. Long Decl. ¶5 n.5 (29% of SNAP recipients are Black and 30% are Hispanic; 40% of WIC recipients are Latino and 22% are Black).

[7] ROC employees are required to relocate to within commuting distance of four new office locations. Rosenthal Decl. ¶18.

lose their federal careers. *Id.* ¶26. Any substantial staff losses will immediately and drastically degrade the already understaffed FNA's ability to administer food benefit programs, including disrupting distribution of funds, increasing emergency response times, and causing other backlogs and delays. *Id.* ¶¶31-46, Ex. A; Mei Decl. ¶¶26-37; Garrett Decl. ¶¶10-18. Even if FNA were to backfill vacated positions—which it does not intend to do, *infra* at 20—that would be ineffective. Rosenthal Decl. ¶33; Mei Reply Decl. ¶13. FNA has a highly experienced workforce operating in positions that require unique skillsets, and many employees must train for years to develop the expertise needed to be proficient. Mei Decl. ¶¶34-35; Garrett Decl. ¶17; Salvatore Decl. ¶¶19-20.

**B. Research, Education, and Economics Mission Area**

1. Current Workforce and Imminent Relocations. USDA's Research, Education, and Economics mission area houses several agencies conducting agricultural, economic, and scientific research that are slated for forced relocations this fall. Johnson Decl. Ex. E at 1-2.

The Agricultural Research Service is USDA's chief scientific in-house research agency. 7 U.S.C. §6971(d)(2). It includes the Beltsville Agricultural Research Center ("BARC"), which is the nation's premier agricultural research facility and among the world's largest and most diversified agricultural research complexes. The BARC campus in Maryland spans over 6,000 acres and includes 400 research laboratories, greenhouses, crop fields, and barns, around 330 scientists and other research staff, and hundreds of ongoing research projects. Mitchell Decl. ¶¶5-9.

The Economic Research Service is USDA's social science research agency. 7 C.F.R. §2.67(a); Dodson Decl. ¶2. Its economists and staff work on a broad range of economic and policy topics with a focus on rural America, including agricultural market analysis, data, and projections. Dodson Decl. ¶3. The agency is operating under a severe staffing shortage, having lost about 29% of its staff in 2025. Levy Decl. Ex. H at 3. Most of the Service's 200 employees work in the D.C. area or remotely, with the remainder in Kansas City. Dodson Decl. ¶6.

The National Institute of Food and Agriculture ("NIFA") funds and oversees USDA's external agricultural research, including at land-grant universities. 7 U.S.C. §6971(f)(2); Soriano Decl. ¶¶3, 21. It manages $1.3 billion in grants annually. Soriano Decl. ¶6. It lost about 35% of its staff in 2025. *Id.* ¶16. Its 320 employees are located in 46 states. *Id.* ¶5.

On April 23, 2026, USDA provided congressional notice and publicly announced the Research, Education, and Economics reorganization. Johnson Decl. Ex. E at 1-2. USDA is closing BARC and relocating all research staff to more than a dozen different locations across the country, including Albany, CA; Ames, IA; Stoneville, MI; Grand Forks, ND; and Wyndmoor, PA. *Id.*; Mitchell Reply Decl. ¶17. The large majority of BARC staff received MDRs in June and July requiring them to report to new locations by September 21 or on or before October 5. Millner Reply Decl. ¶4; Mitchell Reply Decl. ¶¶16-17; Johnson Decl. Ex. H ¶110. The remainder will receive MDRs later. Mitchell Decl. ¶15. USDA is relocating almost all Economic Research Service and NIFA employees not currently working in Kansas City, MO to that location. Dodson Decl. ¶7; Soriano Decl. ¶¶8-11. Most received MDR letters in June to report to Kansas City by September 21 or October 5. Dodson Decl. ¶¶10-13; Soriano Decl. ¶¶9, 15.

2. Effects of Relocations and Closures. Plaintiff AFGE represents almost all of the Economic Research Service and NIFA employees, and many BARC employees, whose jobs are being relocated. Dodson Decl. ¶7; Soriano Decl. ¶11; Mitchell Decl. ¶15; Johnson Decl. Ex. H ¶110. Many of those employees cannot relocate due to their personal situations and therefore will lose their jobs.[8] Mitchell Decl. ¶¶22-25; Dodson Decl. ¶15. AFGE surveys found that about 70% of Economic Research Service and 55-75% of NIFA respondents are unlikely to relocate. Bewick Reply Decl. ¶¶11-12; Dodson Decl. ¶15. Consistent with those results, USDA reported that 36% of employees issued MDRs this summer (many who are at Research, Education, and Economics mission area) have already declined to relocate. Johnson Decl. Ex. I ¶6. That preliminary number significantly understates the total employees who will ultimately be unable to relocate. K. Johnson Decl. ¶¶6-11. With such a decrease in experienced staff, the agencies' productivity will plummet and cannot be immediately restored. Dodson Decl. ¶¶16-39; Mitchell Decl. ¶¶28-32; Mitchell Reply Decl. ¶21; Soriano Decl. ¶¶19-24; Bewick Reply Decl. ¶16.

---

[8] For instance, employees are unable to relocate due to elder care or childcare responsibilities, military spouses who cannot move, reasonable accommodations, and, for veterans, the difficulty in transferring medical care within the VA system. Soriano Decl. ¶18; Mitchell Decl. ¶22. For BARC scientists, many of the new locations are not conducive to their research. Millner Reply Decl. ¶7

### C. Forest Service

1. Current Workforce and Imminent Relocations. The Forest Service manages 193 million acres of national forests and grasslands. Kotyk Decl. ¶¶5-6; 16 U.S.C. §§528, 1609. The agency's responsibilities include preparing forest management plans, protecting ecosystems and wilderness areas; facilitating public recreation, including maintaining 150,000 miles of trails; conducting timber sales; conducting research into "protecting, managing, and utilizing forest … resources"; and protecting national forests from fire. Iverson Decl. ¶¶6, 12; Kotyk Decl. ¶¶5-6, 10; Prendeville Decl. ¶¶23, 25; 16 U.S.C. §§472a, 528, 551, 1642.

The Forest Service is organized into nine Regional Offices and a D.C. headquarters. Kotyk Decl. ¶¶7-8. Each Regional Office oversees the forests in its region, coordinating policies and providing expertise and technical assistance for forest- and district-level staff and state forests. Ehrman Decl. ¶¶4-7; Wormstead Decl. ¶¶3-7. Regional Office personnel include many highly technical and specialized positions, including fire management teams, that handle the most complex forestry issues. Iverson Decl. ¶¶4, 6, 10. The agency also maintains many research offices, which conduct location-specific research on invasive species, climate change, weather patterns, and vegetation that the agency uses to make land management decisions. Koytk Decl. ¶¶11-12; Prendeville Decl. ¶¶5-17. The Forest Service has recently lost thousands of employees, compromising its land management and fire protection functions. Prendeville Decl. ¶¶20-21; Medley Decl. ¶¶4-6; Levy Decl. Ex. H at 3.

On March 31, 2026, USDA announced the Forest Service reorganization and sent preliminary notices to affected employees. Ehrman Decl. ¶8, Ex. A; Kotyk Decl. ¶¶14-18[9]. USDA is relocating the agency's headquarters and staff from D.C. to Salt Lake City; closing all Regional Offices; and closing at least 23 research locations and consolidating research operations in Fort Collins, CO. Levy Decl. Ex. I; 3rd Kotyk Decl ¶¶8-13. Some regional positions will be relocated to new, smaller "state" offices; other functions will be consolidated into a few distant "service centers." Ehrman Decl. ¶8, Ex. A. To date, the agency has stated that 500 employees in the

[9] The Forest Service provided oral notice to congressional committees. Johnson Decl. Ex. D at 2.

Region 6 (Pacific Northwest), 8 (Southern), 9 (Eastern, Great Lakes), and D.C. offices are being relocated. Kotyk Decl. ¶¶14, 18; Levy Ex. J.[10] The Forest Service issued MDRs to some D.C. employees in July, requiring them to relocate to Salt Lake City by September 21. 3rd Kotyk Decl. ¶14. It is issuing MDRs to GS-14 and GS-15 employees in September, and to GS-13 and lower employees throughout the fall. *Id.*

2. <u>Effects of Relocations and Closures</u>. Plaintiff NFFE represents Regional Office and research employees being relocated or at risk of mandatory relocation. 3rd Kotyk Decl. ¶¶10, 12. The relocations will result in high attrition: NFFE's survey found 52% of respondents were unlikely to relocate. Kotyk Reply Decl. ¶22; Ehrman Decl. ¶11; Prendeville Decl. ¶22. Regional Offices are thus facing a significant loss of institutional knowledge and specialized expertise that will impede their primary functions, including permitting and wildfire prevention and response efforts. Ehrman Decl. ¶¶9-16; Iverson Decl. ¶¶6-11; Wormstead Decl. ¶¶4-15. Loss of D.C. staff will disrupt crucial nationwide projects such as aerial retardant maps, Kotyk Decl. ¶¶49-51, and relocation of researchers will halt critical applied, location-specific research, Prendeville Decl. ¶¶21-30. Even if USDA were to hire replacements—which it will not, *see infra* at 20—these losses will take years to recover from. Kotyk Reply Decl. ¶¶15-19; Ehrman Reply Decl. ¶12.

### D. Foreign Agricultural Service

1. <u>Current Workforce and Imminent Relocations</u>. The Foreign Agricultural Service is USDA's foreign affairs and trade arm. Bradley Decl. ¶8. Its mission is to enhance export opportunities for U.S. farmers and producers and improve global food security. *Id.* ¶39; 7 U.S.C. §5693. Employees work on trade policy, foreign affairs, global market analysis, and market development programs. Bradley Decl. ¶8. The agency has lost many staff since 2025, and the large majority of its employees are located in D.C. Bradley Decl. ¶¶11, 37; Levy Decl. Ex. H at 3.

On June 17, 2026, USDA announced it was reorganizing the Foreign Agricultural Service by moving it from D.C. to Kansas City. Johnson Decl. Ex. E at 32 (congressional notification).

---

[10] The agency has stated that employees in other Regional offices currently "are generally expected to remain in their commuting area." Kotyk Decl. ¶18. But the new state offices and service centers are located outside any reasonable commuting area of many Regional Offices. *Compare id.* ¶8 *with* Levy Decl. Ex. I; *e.g.*, (Region 5: Vallejo, CA to Placerville, CA).

MDR letters have not yet been issued but are forthcoming: USDA has already notified more than 100 employees that they will receive MDR letters this fall. Bradley Reply Decl. ¶¶23-30.

2. Effects of Relocations and Closures. Plaintiff AFSCME represents most Foreign Agricultural Service employees being relocated. *Id.* ¶¶27-28; Bradley Decl. ¶2. Attrition will be high: In response to a survey, 70% of respondents said they could not leave D.C. Bradley Reply Decl. ¶39; *see* Bradley Decl. ¶28 ("Their families are here, their kids' schools, their doctors, their houses of faith, their community groups, their friends—the list goes on."). Losing these employees will be "catastrophic to the work of [the agency]," Bradley Decl. ¶37, and those experienced, knowledgeable employees cannot be replaced, Bradley Reply Decl. ¶¶51-53.

### E. Rural Development Mission Area

1. Current Workforce and Imminent Relocations. The Rural Development mission area works to improve the economy and quality of life in rural America. Vaughn Decl. ¶7. The Rural Utilities Service provides financing for infrastructure improvements to rural communities such as water and waste treatment, electric power, and internet, *id.* ¶8; the Rural Business and Cooperative Service provides financial assistance, technical support, and resources to help rural businesses, *id.*; and the Rural Housing Service provides loans and financing for rural housing, Kelley Decl. ¶13. Rural Development has lost up to 30% of staff since 2025. Vaughn Decl. ¶26; Levy Decl. Ex. H at 4. On June 17, 2026, USDA announced the agency's reorganization, including relocation of most D.C. employees to St. Louis or Dallas/Ft. Worth. Johnson Decl. Ex. E at 37.

2. Effects of Relocations and Closures. Plaintiff AFSCME represents most Rural Development employees being relocated to Dallas/Ft. Worth, Vaughn Decl. ¶¶3-6, 15, 17; and Plaintiff AFGE represents employees being relocated to St. Louis, Kelley Decl. ¶¶14-15. Many employees will be forced to leave their jobs rather than relocate: 64% of AFSCME Rural Development survey respondents said they will leave USDA; 72% said relocation would disrupt medical care; 56% said it would interrupt their spouse/partner's job. Vaughn Reply Decl. ¶¶22, 24. The relocations will force out employees with decades of experience and irreplaceable institutional knowledge. *Id.* ¶36. This loss of staff will delay the processing of grants and loans for small business and rural infrastructure, hurting communities across the country. Vaughn Decl. ¶¶34-36.

**F. Farm Production and Conservation Mission Area**

FPAC mission area subagencies administer programs that provide income support, loans, and disaster response to farmers and ranchers; the Federal Crop Insurance Program; and programs to improve conservation and provide technical assistance to farmers. Hoekema Decl. ¶8; Rubardt Decl. ¶16. Those agencies are already operating at severely reduced staffing levels. Levy Decl. Ex. H at 3-4. USDA announced reorganization of the FPAC mission area on June 17, 2026. Hoekema Decl. ¶18. USDA is relocating its FPAC Business Center and other headquarters staff from D.C. to various "hub" locations. Johnson Decl. Ex. E at 34; Hoekema Reply Decl. ¶¶18-21; 3rd Hoekema Decl. ¶4. Plaintiff AFSCME represents D.C. employees at the FPAC Business Center and other subagencies. Hoekema Decl. ¶¶3-6. Attrition from experienced employees being unable to relocate will result in reduced agency productivity. *Id.* ¶15.

**G. Offices of General Counsel and Civil Rights**

Professional staff (including attorneys) in these offices currently work across the country. USDA provided congressional notification of the reorganization of these offices on April 30, 2026, and June 17, 2026. Johnson Decl. Ex. E at 9, 42. USDA is closing OGC offices in Temple. TX, Little Rock, AR, Albuquerque, NM, Portland, OR, and San Francisco, CA, and relocating employees to Kansas City, MO and Davis, CA. *Id.* at 18; Kelley Decl. ¶22. USDA issued MDRs to at least 19 OGC staff requiring them to report by September 21, 2026. Johnson Decl. Ex. H ¶110. USDA is relocating OCR staff from the D.C. area to Raleigh, NC, and Fort Collins, CO. Johnson Decl. Ex. Eat 43. MDRs are forthcoming this fall. Mitchell Reply Decl. ¶22. Plaintiff AFGE represents OGC and OCR employees who are being relocated. Kelley Decl. ¶¶18-23.

**PROCEDURAL HISTORY**

Most Plaintiffs are parties to a pending case challenging Executive Order 14210, OMB and OPM's February 2025 implementing memorandum, and the resulting March and April 2025 Agency RIF and Reorganization Plans ("ARRPs"). *AFGE v. Trump*, No. 3:25-cv-03698-SI, Dkt. 486 at 1-2. As described *supra*, on July 1, 2026, the plaintiffs in that case moved to file a supplemental complaint to add claims challenging USDA's Reorganization Plan and implementing actions and for a preliminary injunction. *Id.* On September 2, 2026, the Court denied leave to

supplement and ruled that the new claims challenging the implementation of USDA's Reorganization Plan should have been brought in separate litigation. *Id.* at 1; *see also id.* at 4 ("the proposed supplemental claims would inject factually and legally distinct issues into this already complicated litigation"); *id*. at 5 ("plaintiffs' proposed new claims about the USDA reorganization do not belong in this case and should be filed as a separate action"). The Court therefore denied the motion for a preliminary injunction as moot. *Id.* at 5.

In briefing the then-pending preliminary injunction motion, USDA made factual admissions relevant to Plaintiffs' present claims. First, USDA repeatedly admitted that an "objective" of its relocations is to cause "downsizing." *AFGE v. Trump*, No. 3:25-cv-03698-SI, Dkt. 457 at 31-32. Second, USDA admitted that it had not considered the impact of attrition on agency functions at the time of its decisions to move forward with the Reorganization Plan. *Id.* at 32-33; Johnson Decl. Ex. H ¶120. Third, USDA revealed hiring plan information that it contended will offset attrition, but those plans show that USDA will not fill all vacancies, will not fill the same positions as are being vacated, and will not hire equally experienced and qualified individuals. *See infra* at 20-21. Fourth, USDA submitted information about the acceptance rate for MDR letters issued to date (a small subset of the employees being relocated), revealing a substantial 36% attrition rate. Johnson Decl. Ex. I ¶6. As the plaintiffs explained in response, this substantially understates the true attrition rate, including because USDA requires employees to "accept" relocation in order to request a hardship exception or reasonable accommodation (requests that either remain pending, have been denied, or resulted only in a few months extension). K. Johnson Decl. ¶¶6-11.

Consistent with the Court's order, Plaintiffs now assert their challenge to the USDA reorganization in this separate case. Where possible, Plaintiffs have refiled the declarations and evidence previously relied upon, while updating the most recent facts.

## ARGUMENT

Plaintiffs are likely to succeed on the merits and have shown likely irreparable harm and that the balance of equities and public interest support a stay and injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025); 5 U.S.C. §705.

## I. Plaintiffs' APA and Ultra Vires Claims are Likely to Succeed

### A. USDA's Actions Exceed Authority and Are Contrary to Law

In the fiscal year 2026 appropriation acts for USDA and the Forest Service, Congress expressly prohibited both agencies from using appropriated funds to relocate offices or employees or to reorganize offices, programs, or activities without further congressional notice and approval. Pub. L. No. 119-37, Div. B, §716, 139 Stat. 495, 544-45 (2025) ("Section 716"); Pub. L. No. 119-74, Div. C, §421, 140 Stat. 5, 163 (2026) ("Section 421"); Levy Decl. Ex. D at 7-9 (Explanatory Statement). Congress also specifically prohibited using funds to close or consolidate the resources or locations of any Agricultural Research Service laboratories and facilities without further congressional notice and approval. Pub. L. No. 119-37, Div. B, §771, 139 Stat. 495, 555 (2025) ("Section 771"). Congress recently extended these provisions through December 11, 2026. Pub. L. No. 119-103, §§101, 103. As USDA has acknowledged to Congress, Sections 421, 716, and 771 apply to USDA's implementation of its Reorganization Plan, for which USDA seeks to use appropriated funds to relocate employees, reorganize programs and offices, and close offices, including the BARC facility. *E.g.*, Johnson Decl. Ex. E at 1-2, Ex. J.

Congress holds the Article I authority to determine how administrative agencies use the funds it appropriates. *Sierra Club v. Trump*, 963 F.3d 874, 887 (9th Cir. 2020), *judgment vacated for mootness*, 142 S.Ct. 46 (2021). Restrictions in appropriations acts are judicially enforceable through Administrative Procedure Act ("APA") and ultra vires claims. *Id.* at 890-93; *California v. Trump*, 963 F.3d 926, 944 (9th Cir. 2020), *judgment vacated for mootness* 142 S.Ct. 46 (2021). USDA's only defense of its violation of these statutory provisions has been to contend that along with the express prohibition on reorganizing, Congress also included a committee-approval clause that is unconstitutional under *INS v. Chadha*, 462 U.S. 919 (1983). However, the notice and approval provision is severable from the remainder of the statute.

The severability standard requires courts to assess whether severance will leave in place an operable provision that "will function in a *manner* consistent with the intent of Congress." *Alaska Airlines v. Brock*, 480 U.S. 678, 685 (1987); *see also Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 862 (9th Cir. 2017). Unlike in the typical "legislative veto" case, where Congress grants the

executive branch affirmative authorization to act and attempts to reserve the right to veto a specific exercise of that authorized power, *e.g.*, *Chadha*, 462 U.S. at 923; *Alaska Airlines*, 480 U.S. at 682; *Zinke*, 877 F.3d at 856, the statutory text here expressly *limits* executive authority by prohibiting the use of funds for specified purposes, and then contemplates that congressional committees might later approve actions that are otherwise prohibited. By severing the "notice and approval" provision, the Court would leave the statute functioning in the same manner as it currently does—prohibiting the use of funds for certain activities—unless Congress (now through bicameralism and presentment) authorizes funds for the executive branch's desired use.

USDA previously argued that the approval requirement should be severed while leaving the notice requirement intact. *AFGE v. Trump*, No. 3:25-cv-03698-SI, Dkt. 457 at 25. That interpretation would invert the statute's plain meaning—converting a clear *prohibition* on executive actions in the absence of legislative action into an affirmative *authorization* of the same executive actions in the absence of legislative action. Such an interpretation is entirely inconsistent with Congress's fundamental objective to restrain executive actions to reorganize. *See City of New Haven v. United States*, 809 F.2d 900, 905-08 (D.C. Cir. 1987) (rejecting severability "completely at odds with Congress' expressed intention to control rather than authorize presidential deferrals").

Congress's intent to restrain USDA's ability to reorganize is apparent not only from the text of Sections 421, 716, and 771 but also from the rest of the appropriations acts, in which Congress rejected USDA's attempt to reorganize itself through budget cuts and included provisions restricting the use of funds for actions in USDA's announced Reorganization Plan, like closing BARC. 139 Stat. 518, 558; Levy Decl. Ex. E at 94-95 (Explanatory Statement "rejects research terminations and laboratory closures proposed in the President's budget request" for the Agricultural Research Service and "supports the continued operation of [BARC]"); S. Rep. 119-46 at 13 (2025) ("remind[ing]" agencies that "no reprogramming shall be implemented without … advance approval"). When Congress intended to require only notice, it said so. *E.g.*, Pub. L. No. 119-37, §§252, 257, 139 Stat. 620 ("report and wait" provisions).

The history of the "notification and approval" clauses like Sections 716 and 421 in USDA's appropriations over time also demonstrates that Congress specifically rejected USDA's view that it

can proceed with relocating employees and closing offices only upon notification. For years, Congress included notice-only conditions on using funds for reorganizing, but in 2015 added "approval" to USDA's authorizations because notice was insufficient.[11] Congress has also repeatedly rejected USDA's requests to delete these very approval provisions.[12]

The text, structure, and history of the FY26 appropriations acts distinguish this case from *AFGE v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982), which held a committee approval mechanism unconstitutional and found the approval clause was not severable. *Pierce* relied on the unique history of the statute at issue, which showed that neither the Senate nor the House intended to prohibit reorganization actions. The severability inquiry is specific to each statute. *See Helman v. Dep't of Veterans Affs.*, 856 F.3d 920, 935 (Fed. Cir. 2017); *City of New Haven*, 809 F.2d at 909. Here, severing the statute to keep the prohibition on USDA and Forest Service reorganizations allows the provision to operate in the manner consistent with the intent of Congress.

Because Congressional intent would be best served by severing the notice and approval clauses and leaving in place the statute's prohibitions, USDA's implementation of its Plan exceeds authority granted by Congress and is contrary to law under the APA and ultra vires.

### B. USDA's Actions Are Also Arbitrary and Capricious

The APA requires federal agencies to engage in "reasoned decisionmaking." *DHS. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). It is blackletter administrative law that

[11] *See* Pub. L. No. 113-235, Div. A, §719(a), 128 Stat. 2130 (Dec. 16, 2014) (FY2015). The FY2015 Explanatory Statement noted the approval requirement was added because agencies had been "violat[ing] long-standing notification requirements." 160 Cong. Rec. H9307, H9308 (Dec. 11, 2014), 2014 WL 7005990. For the Forest Service, Congress similarly added the "approval" requirement in 2020 in response to the fact that "agencies funded by this Act are continuing to work to implement Executive Order 13781, a Comprehensive Plan for Reorganizing the Executive Branch, and have included in the fiscal year 2020 budget request funding for these activities." Johnson Decl. Ex. L at 5. Before 2020, approval was automatically granted after 30 days. By *removing* the automatic approval provision in 2020, *id.* at 6, Congress made clear that Forest Service reorganizing is prohibited absent affirmative approval.

[12] USDA previously proposed that Congress delete Section 716 to provide USDA with greater "flexibility," with USDA merely "informing the Congress in sufficient time of any reprograming plans," Levy Decl. Ex. M at 7, and proposed a FY2026 budget without Sections 421 or 716's language, *id.* Ex. N; Johnson Decl. Ex. M at 29a-137. Congress rejected that approach and enacted Sections 716 and 421 and added Section 771. For Fiscal Year 2027, USDA again proposed removing Sections 421, 716, and 771, *see* Johnson Decl. Ex. N at 36-7, 36-22 to 36-23, *and id.* Ex. O at 29a-133-40, but Congress rejected that proposal and extended all provisions.

agencies must consider all "important aspect[s] of the problem" before acting. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Further, agencies cannot rely on "post hoc rationalizations" to justify their actions. *Regents of the Univ. of Cal.*, 591 U.S. at 23. USDA's own documents and admissions conclusively establish that its actions closing offices and forcing employee relocation are arbitrary and capricious in violation of the APA.

First, USDA *admits* that workforce reduction is an objective of the relocations in its Reorganization Plan. *E.g.*, *AFGE v. Trump*, No. 3:25-cv-03698-SI, Dkt. 457 at 31 ("USDA has consistently represented … that its reorganization plans include … downsizing."). Second, USDA *admits* that it did not consider the impact such attrition would have on the agencies' functions, and indeed previously argued that "*USDA was not required to assess any impacts of attrition.*" *Id.* at 32-33 (emphasis in original).

These admissions are entirely consistent with the record. USDA stated to OPM in February 2026 that it intended to use the forced relocations to cause attrition. Schwarz Decl. Ex. 1. USDA also possessed substantial knowledge from past experience with forced relocations about the extent of likely attrition and corresponding negative impact on agency functions, *and* received a mountain of comments from Union Plaintiffs and others regarding those likely impacts. *Supra* at 4. Yet USDA failed to address the impacts of attrition on agency operations, to adjust its reorganization plan at all, or to explain to Congress, in announcing its actions, how it would protect agency functions from being impacted by the intended attrition. Levy Decl. Ex. G; Johnson Decl. Ex. E. Nowhere did USDA address how the intended attrition would affect agency functions, because USDA simply (and admittedly) did not analyze the issue.

There can be no real dispute that where an agency reduces thousands of positions held by experienced staff, the impact of those reductions on the agency's ability to perform statutory functions is an important aspect of the problem. *State Farm*, 463 U.S. at 43. USDA's admission that no analysis has been done establishes a quintessential APA violation.

USDA's assertion that it will hire replacement employees *after* MDR letters are issued and positions vacated is no substitute for performing that analysis before taking such drastic action. The APA requires reasoned analysis to be performed at the time the agency decision is made, not

after the fact. *Regents*, 591 U.S. at 23; *State Farm*, 463 U.S. at 50. USDA certainly could have reasonably considered the impacts of likely attrition at the time of its decision to move forward with component-level reorganizations. USDA knew which offices it was relocating, which employees worked there, and that significant attrition was likely to occur. USDA could, at the very least, have *asked the employees* if they would relocate in order to estimate which positions would be lost and what effect that would have on agency operations (as the unions have done). USDA also received many comments on the Reorganization Plan that provided evidence of the impact of attrition on agency functions, which USDA could have followed up on or analyzed. Levy Decl. Ex. G at 4, 7, 17. USDA's failure to address or respond to that information further demonstrates its failure to consider relevant factors. *Am. Mining Cong. v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992).

Although USDA offers the post hoc justification that USDA's staffing plan contemplates hiring replacement workers, USDA performed no analysis of whether that plan would actually mitigate the impacts on agency functions caused by relocations and attendant attrition. USDA's staffing plan on its face is unlikely to do so. Even setting aside the inevitable delays in hiring to backfill positions, USDA's staffing plan does not say the agency will replace employees (let alone all employees) at all component agencies. For example, USDA's staffing plan states that USDA does not intend to hire at FNA—thereby entrenching any staffing losses from the relocations and office closures. *See* Johnson Decl. Ex. F at 14 ("FNS does not anticipate hiring in FY 2026"). Beyond FNA, USDA also expressly "expects to reduce the number of onboard employees" at the Forest Service in 2026. *Id.* at 17. Other components are slated for "nominal" hiring, which is not sufficient to address attrition from the relocations. *Id.* at 13 (support offices), 14-15 (FPAC Business Center), 19 (Economic Research Service), 20 (NIFA).

USDA also plans to hire into different positions rather than replace the experienced staff who leave. For instance, Forest Service hiring "will be focused on" increasing logging and mineral production "to support the Administration's priorities," rather than replacing positions in research or environmental compliance. *Id.* at 17-18.[13] Rural Development hiring will focus on expanding

[13] The Forest Service will also hire seasonal firefighter and other jobs. Johnson Decl. Ex. F at 17.

fossil fuel and mineral production and reducing energy costs, not replacing lost positions. *Id*. at 18. Foreign Agricultural Service will hire to align with the Secretary's trade plan, while remaining "net neutral," thereby ensuring staffing reductions from attrition remain unfilled. *Id*. at 20-21.

USDA is also planning to hire less qualified individuals. USDA admits it intends to fill vacated slots with early career staff—that is, new hires in the first to fifth years of their careers. Johnson Decl. Ex. H ¶6 (OMB/OPM direction that at least 31% of new hires must be early career employees); Johnson Decl. Ex. G at 2 ("many … positions" vacated by relocation will be filled through "early career" hiring). Early career employees lack the experience, skills, expertise, or training to replace the highly experienced staff who will be forced out by the relocation.[14]

USDA entirely failed to consider an important aspect of the problem before acting to close offices and relocate employees, so its actions are arbitrary and capricious and violate the APA.

**C. USDA's Actions Are Final for Purposes of the APA**

The APA provides for judicial review of final agency action. 5 U.S.C. §704. Agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is action "by which rights or obligations have been determined, or from which legal consequences will flow.'" *S.F. Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 568 (9th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 156, 178 (1997)). USDA's closure of offices and forced relocation of employees under to the Reorganization Plan, as described in the congressional notifications for each component, are final agency actions.

USDA has reached the end of its "decisionmaking process" regarding the closures and relocations at each challenged component. USDA admits that its 2026 congressional notifications "reflect the most accurate and current reorganization plans" for each component. Johnson Decl.

[14] Salvatore Decl. ¶¶12, 19-20, Garrett Decl. ¶¶15-17, Mei Decl. ¶¶34-36, Rosenthal Decl. ¶13; Mei Reply Decl. ¶13 (FNA positions require specialized expertise, years of training, significant institutional knowledge, and deep relationships with stakeholders); Prendeville Decl. ¶¶11, 22; Erhman Reply Decl. ¶¶4-9; Wormstead Reply Decl. ¶¶4-6 (Forest Service regional positions are highly specialized, with many years of experience, formal and on-the-job training, and professional certifications; experienced researchers' scientific expertise, professional relationships, and institutional knowledge cannot be recreated); Bradley Reply Decl. ¶¶ 50-55 (Foreign Agricultural Service employees require specialized skills in foreign affairs and economics; the pool of qualified employees is in D.C.); Vaughn Reply Decl. ¶¶33-36 (Rural Development); Dodson Decl ¶¶25, 30 (Economic Research Service); Millner Reply Decl. ¶¶8-10, Lamas Decl. ¶17 (BARC).

Ex. H ¶26. Those letters informed Congress of USDA's final decision to move ahead with the identified agency-specific closures and relocations. *After* deciding to take these actions, USDA engaged in impact bargaining with the unions (which is unnecessary unless the decisions to implement closures and relocations had already been made). *Supra* at 7.

USDA "does not suggest it is still in the middle of trying to figure out its position" with respect to these decisions. *S.F. Herring Ass'n*, 946 F.3d at 578. Most tellingly, USDA admits that it is *already implementing* the closures and relocations identified in the congressional notifications, including by issuing more than 700 MDR letters this summer. *See AFGE v. Trump*, No. 3:25-cv-03698-SI, Dkt. 457 at 5; Johnson Decl. Ex. H ¶¶110-12. Although its prior assertions are overstated, USDA has claimed to be "*mid-way through*" "*taking steps to implement its plans*" and that the "*reorganization … is already well under way.*" *AFGE v. Trump*, No. 3:25-cv-03698-SI, Dkt. 457 at 41, 43 (emphases added). "[A]n agency engages in 'final' action … when it 'state[s] a definitive position in formal notices, confirm[s] that position orally, and then send[s] officers out into the field to execute on the directive.'" *S.F. Herring Ass'n*, 946 F.3d at 579. That is exactly what USDA is doing. Finally, legal consequences clearly flow from the closures and relocations, because they result in the mandatory relocation or discharge of thousands of federal employees.

## II. USDA's Actions Will Cause Plaintiffs Imminent, Irreparable Harm

The Reorganization is causing and will cause irreparable harm to employees represented by Union Plaintiffs and to Local Government and Non-Profit Plaintiffs that rely on USDA's services. First, many of the employees USDA is relocating are unable to do so, for reasons both personal and financial: Relocating would disrupt ongoing medical care for employees or their families, including oncology treatment and specialized infant care. Bocian Decl. ¶¶14-19; Vaughn Decl. ¶23; Dodson Decl. ¶31. It would split the families of employees with federal employee spouses, military families, and partners whose jobs prevent them from relocating. Bradley Reply Decl. ¶46; Salvatore Decl. ¶10; Mei Decl. ¶38. Employees also have family obligations, including caring for elderly parents and joint custody arrangements, that they cannot leave. Bocian Decl. ¶20; Mitchell Decl. ¶22; Bradley Decl. ¶48. Employees also cannot relocate due to financial burdens, including incurring out-of-state tuition costs and being forced to sell homes that they cannot replace.

Mitchell Decl. ¶22; Vaughn Decl. ¶22. USDA employees represented by Union Plaintiffs at each USDA component at issue therefore face the impending loss of their jobs, wages, and health benefits because they cannot uproot their lives and relocate across the country. Kotyk Decl. ¶¶30-35, 41-42; Lenggenhager Decl. ¶12; Bradley Decl. ¶¶28-33; Kelley Decl. ¶27.[15]

The harms caused to these employees are irreparable. *See AFGE v. Trump*, 139 F.4th 1020, 1040 (9th Cir. 2025) (backpay "cannot account for harms resulting from loss of income in the interim or for gaps in health- and childcare that accompany job loss"); *AFGE v. Trump*, 784 F.Supp.3d 1316, 1356 (N.D. Cal. 2025) (quoting *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008)), *vacated and remanded on other grounds*, 155 F.4th 1082 (9th Cir. 2025); *AFGE v. OMB*, 806 F.Supp.3d 1093, 1098 (N.D. Cal. 2025).

These harms are also imminent. USDA has begun to issue MDR letters giving employees 30 days or less to decide whether to relocate. *Supra* at 7, 10, 12, 14. Employees then must promptly report to their new locations. *Id.* The earliest reporting date is September 21, 2026, and many more MDRs are to be issued imminently, with resulting deadlines throughout the fall. *Id.*; 3rd Kotyk Decl. ¶14; Lenggenhager Decl. ¶12.

USDA is closing entire offices and relocating—and thus forcing attrition of—substantial numbers of employees, making the harm particularly irreparable because it will likely be impossible to return the agency to its current state at end of this case. *See AFGE v. Trump*, 784 F.Supp.3d at 1356. USDA's own evidence shows at least one in three employees will leave USDA rather than relocate, and Plaintiffs' evidence shows the percentage will be even higher. Johnson Decl. Ex. I ¶6; K. Johnson Decl. ¶¶3-11. These agencies are already struggling because of their severe staffing losses since January 2025, with many teams operating with skeletal crews who are unlikely to relocate. *Supra* at 9-14; *e.g.*, Mei Decl. ¶¶29-30. Staff are already near their breaking point, working under constant pressure and facing burnout and severe stress to meet their mission. Soriano Decl. ¶16, 24. The employees represented by Union Plaintiff who do relocate will face crushing workloads at what will be acutely understaffed agencies. *E.g.*, Mitchell Decl. ¶30.

[15] USDA employee members of Non-Profit Plaintiffs Alliance and AGU are also being required to relocate or lose their jobs and face the same harms. Cudahy Decl. ¶8; Schultz Decl. ¶7.

The substantial attrition that will result from forced employee relocations will necessarily disrupt the services provided to Local Government and Non-Profit Plaintiffs, causing further irreparable harm. Thousands of members of NRDC, WWP, and the Parks Coalition live near and recreate in national forests and rely on the habitat protection, forest management, and wildfire response services of Forest Service offices that are closing.[16] *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (environmental injury "by its nature" is irreparable). Local governments will have to expend resources to cover disruptions to food benefit programs that will result from FNA staff reductions and to address deficiencies in Forest Service wildfire and forest management.[17]

### III. The Balance of Equities And Public Interest Support A Preliminary Injunction And Section 705 Stay.

The equities and public interest merge when the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *AFSCME*, 813 F.Supp.3d. at 967 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see AFGE*, 139 F.4th at 1030 ("[T]he government does not suffer by a temporary preservation of the status quo.").

The public interest will suffer from the loss of so many dedicated, experienced, and knowledgeable federal employees. The degradation of agency functions will cause severe harm to the public, including by delaying food assistance benefits for children, seniors, families, and

---

[16] Molvar Decl. ¶¶4-7, 15-19, 24-28; Neubacher Decl. ¶¶3-9, 25-26; Iverson Decl. ¶¶15-17; Trujillo Decl. ¶¶5-7; Lovitt Decl. ¶¶3-11; Weatherly Decl. ¶¶2-9. Loss of research due to attrition will interfere with Non-Profit Plaintiffs' core business activities that rely on that research, as well as with their members' research. Neubacher Decl. ¶¶16-18, 22-23; Rath Decl. ¶¶3-13; Woodard Decl. ¶¶12-23, 33-34; Cudahy Decl. ¶¶9-10.

[17] Williams Decl. ¶¶20-38 (Santa Clara relies on FNA services for 130,000 SNAP recipients, agricultural research, and Forest Service fire response/prevention); Leach Decl. ¶¶11-24 (Baltimore relies on FNA for 180,000 SNAP/WIC recipients and public land support from Baltimore urban forest station); Crispen Decl. ¶¶3-7 (San Francisco faces increased mutual aid response costs if Forest Service fire capacity diminishes); Rubardt Decl. ¶¶7-10, 17-18 (King County: 1 million clients at county nutrition programs rely on FNA services; Forest Service manages 350,000 national forest acres in county); *see* Moki Decl. ¶¶5-14); Fair Decl. ¶¶6-17 (Prince George's County relies on BARC's economic stimulus and environmental mitigation).

expectant mothers, Mei Decl. ¶29; disrupting or aborting crucial research, including on fire prevention and climate adaption, Prendeville Decl. ¶30, and on cyclospora and other food-borne illnesses, Millner Reply Decl. ¶5; and undermining the provision of rural utilities services, Vaughn Decl. ¶26, and the agricultural reports and trade programs on which farmers rely, Bradley Decl. ¶41; Dodson Decl. ¶25. To the extent USDA claims it has spent money on this reorganization, the human impacts of the reorganization on employees and their families, Plaintiffs, and the public far outweigh any financial harms to USDA from maintaining the status quo.

## IV. Plaintiffs Request Targeted Relief To Preserve The Status Quo And Prevent Harm to Plaintiffs

Plaintiffs seek a stay under 5 U.S.C. §705 and a preliminary injunction halting USDA from closing offices or relocating employees of the FNA; Forest Service; Foreign Agricultural Service; Research, Education, and Economics, Rural Development, and FPAC mission areas; OGC; and OCR, *other than* closures or relocations solely within the D.C. area. *See* Prop. Order. This targeted relief will preserve the status quo and focuses narrowly on the imminent actions that will cause irreparable harm to Plaintiffs: office closures and long-distance forced relocations that are intended to and will drive massive attrition. Such relief is necessary to "provide[] complete relief to the parties before the court," including because Plaintiff Unions represent employees being relocated at all components and Local Government and Non-Profit Plaintiffs rely on the services of USDA components. *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1028 (9th Cir. 2025). Such an injunction is also prohibitory, because it seeks to "maintain the status quo." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc), *overruled on other grounds Ariz. All. for Retired Americans v. Mayes*, 2026 WL 2277101 (9th Cir. Aug. 7, 2026). The status quo here is *before* USDA's implementation of the Reorganization Plan began and employees were required to relocate. *Id.* at 685-86. Moreover, as explained above, the vast majority of MDRs have not been issued and no employees are required to report or be separated before September 21, 2026.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion.

DATED: September 8, 2026

Respectfully submitted,

Barbara J. Chisholm
Danielle E. Leonard
Corinne F. Johnson
Jessica M. Levy
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
bchisholm@altber.com
dleonard@altber.com
cjohnson@altber.com
jlevy@altber.com

By: /s/ *Corinne F. Johnson*

*Attorneys for All Union and Non-Profit Plaintiffs*

Elena Goldstein (*pro hac vice app. forthcoming*)
Tsuki Hoshijima (*pro hac vice app. forthcoming*)
Andrea Matthews (*pro hac vice app. forthcoming*)
Gregory M. Cumming (*pro hac vice app. forthcoming*)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
egoldstein@democracyforward.org
thoshijima@democracyforward.org
amatthews@democracyforward.org
gcumming@democracyforward.org

By: /s/ *Tsuki Hoshijima*

*Attorneys for All Union Plaintiffs*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: /s/ *Rushab Sanghvi*

*Attorneys for Plaintiff American Federation of*

*Government Employees, AFL-CIO (AFGE)*

Teague Paterson (SBN 226659)
Matthew Blumin (*pro hac vice app. forthcoming*)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/ Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Yvette M. Piacsek (*pro hac vice app. forthcoming*)
General Counsel
National Federation of Federal Employees, IAM, AFL-CIO
1225 New York Ave. N.W., Suite 450
Washington, D.C. 20005
202-216-4428
ypiacsek@nffe.org

By: */s/ Yvette M. Piacsek*

*Attorneys for National Federation of Federal Employees, IAM, AFL-CIO (NFFE)*

PARAS N. SHAH (*pro hac vice app. forthcoming*)
General Counsel
KATHRYN W. BAILEY (*pro hac vice app. forthcoming*)
Assistant Counsel
NATIONAL TREASURY EMPLOYEES UNION
800 K Street, NW
Suite 1000
Washington, DC 20001
(202) 572-5500
paras.shah@nteu.org
kathryn.bailey@nteu.org

By: */s/ Paras N. Shah*

*Attorneys for National Treasury Employees Union*

*(NTEU)*

David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE
CITY AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

By: */s/ David Chiu*

*Attorneys for Plaintiff City and County of San Francisco*

Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900
Kavita.Narayan@cco.sccgov.org
Meredith.Johnson@cco.sccgov.org
Raphael.Rajendra@cco.sccgov.org
Hannah.Godbey@cco.sccgov.org

By: */s/ Tony LoPresti*

*Attorneys for Plaintiff County of Santa Clara, Calif.*

Sharanya Mohan (SBN 350675)
Kayla Svihovec (*pro hac vice app. forthcoming*)
Toby Merrill (*pro hac vice app. forthcoming*)

PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org
kayla.svihovec@publicrightsproject.org
toby@publicrightsproject.org

By: /s/ Kayla Svihovec

*Attorneys for Plaintiffs Baltimore, MD, Chicago, IL, Martin Luther King, Jr. County, WA, Prince George's County, MD*

Christopher Sanders (WA SBN: 47518 (*pro hac vice app. forthcoming*))
General Counsel & Chief Legal Advisor to King County Executive Girmay Zahilay
Mika Rothman (WA SBN: 55870 (*pro hac vice app forthcoming*))
Deputy General Counsel to King County Executive Girmay Zahilay
Erin King-Clancy (CA SBN: 249197, WA SBN: 57259)
Senior Deputy Prosecuting Attorney
Office of King County Prosecuting Attorney Leesa Manion
401 5th Avenue, Ste. 800
Seattle, WA 98104
(206) 477-9483
ChrSanders@kingcounty.gov
mrothman@kingcounty.gov
EClancy@kingcounty.gov

By: /s/ Erin King-Clancy

*Attorneys for King County*

Ebony M. Thompson (*pro hac vice app. forthcoming*)
Baltimore City Solicitor
Christopher Sousa (SBN 264874)
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (443) 610-8859
christopher.sousa@baltimorecity.gov

By: /s/ Christopher Sousa

*Attorneys for Plaintiff City of Baltimore*

Anthony D. Jones (*pro hac vice app. forthcoming*)
Prince George's County Attorney
Prince George's County Office of Law
1301 McCormick Drive, Suite 4100
Largo, Maryland 20774
Tel: (301) 925-5225
adjones@princegeorgescountymd.gov

By: */s/ Anthony D. Jones*

*Attorney for Plaintiff Prince George's County*