Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Corinne F. Johnson (SBN 287385)
Jessica M. Levy (SBN 368289)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
bchisholm@altber.com
dleonard@altber.com
cjohnson@altber.com
jlevy@altber.com

*Attorneys for All Union and Non-Profit Plaintiffs*

[Additional counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,

Defendants.

Case No. 3:26-cv-09976

**DECLARATION OF GENNY KOTYK**

Case 3:25-cv-03698-SI Document 140-33 Filed 07/01/25 Page 1 of 12

Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 3:25-cv-03698-SI<br><br>**DECLARATION OF GENNY KOTYK** |

**DECLARATION OF GENNY KOTYK**

I, Genny Kotyk, declare as follows:

1. I am over 18 years old and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am employed by the U.S. Forest Service, which is a part of the U.S. Department of Agriculture, as a Forester at the George Washington and Jefferson National Forest in Virginia.

3. I also serve as the President of the Forest Service Council of the National Federation of Federal Employees ("Council" or the "Union"). NFFE represents approximately 18,000 of the roughly 29,000 total Forest Service employees. There are NFFE Local Lodges across all sectors of the Forest Service, including the Washington Office and each of the nine Regional Offices. The Forest Service Council is an umbrella body that guides and supports these Locals, and that represents their interests, particularly on issues with national scope.

4. Prior to serving as Council President, I served as Vice President, and I have been part of the Council multiple times over the last six years. In my capacity as President, and because of my years of service on the Council, I am familiar with the organizational structure of the Forest Service, and I have insight into the jobs performed by NFFE members in all components of the Forest Service.

5. The Forest Service is charged with protecting and maintaining our country's national forests and national grasslands for the long-term benefit of present and future generations. These forests and grasslands are used every day for outdoor recreation, livestock grazing, timber harvesting, watershed protection, and habitat protection. There are 154 National Forests and 20 National Grasslands, and in total, the Forest Service manages 193 million acres of national forests and grasslands.

6. Congress has charged the Forest Service with specific mandates, such as protecting our national forests from fire and destruction, for instance by conducting fuel reduction projects, and assisting with state, local, private, and tribal forest stewardship, including by obtaining and approving statewide forest resource plans. The Forest Service is also required to do significant inventory projects and collect substantial data. For example, the Forest Service must conduct

surveys for the Forest Inventory and Analysis Program, report annually on reforestation activities, and conduct a Renewable Resource Assessment of U.S. forests and rangelands every ten years.

7. The Washington Office is the headquarters for the Forest Service. Staff in the Washington Office work on the overall planning of Forest Service programs, formulate policy affecting national forests, develop legislative proposals and responses to legislative changes, public reporting including as required by statutes and regulations, interagency collaborations, and environmental coordination. For example, when Congress passes legislation affecting the Forest Service, employees in the Washington Office are the first to interpret the legislation and formulate Forest Service-wide policies for implementing the directives. Or, for example, when new climate factors prompt the need for changes in wildfire policy, the Forest Service's national approach is developed by Washington Office staff.

8. There are nine Regional Offices that cover the National Forests and National Grasslands by geographic region. The Regional Offices are in Missoula, Montana; Lakewood, Colorado; Albuquerque, New Mexico; Ogden, Utah; Vallejo, California; Portland, Oregon; Atlanta, Georgia; Milwaukee, Wisconsin; and Juneau, Alaska. Regional Office staff are responsible for oversight of the steady-state forest projects occurring within the 193 million acres of land within our National Forest System. Regional Office staff are highly specialized and technically skilled, and they work on topics ranging from ensuring compliance with the National Bridge Inspection Standards to overseeing forest health projects that protect against invasive species. Regional Offices ensure consistency across national forests and ranger districts, and they are a crucial part of ensuring compliance with both federal laws and state laws.

9. Many members of the Washington Office and Regional Office staff are red-card certified, meaning they are certified to provide fast-paced incident response during emergencies in the national forests and grasslands, typically involving wildfires. These higher level and more seasoned career positions, typically have higher level fire qualifications that help run our incident management teams, such as planning, logistics, supplies, and coordination.

10. The ranger district staff are the employees with whom the public typically first interfaces, and there are usually multiple ranger districts within each National Forest or National

Case 3:25-cv-03698-SI Document 440-33 Filed 07/01/26 Page 4 of 12

Grassland. The ranger district staff and National Forest staff work to maintain and construct trails, operate campgrounds, manage vegetation and wildlife habitats, and perform other tasks for the upkeep of these lands. Ranger district and National Forest staff rely on more technical experts employed at the Regional Office level for assistance and oversight of many tasks.

11. The Forest Service also has a Research and Development branch. Research and Development staff operate at the forefront of scientific developments related to health and use of our nation's forests and grasslands.

12. These researchers write and publish thousands of peer reviewed articles every year, which are publicly available free of cost for use by academics, industry stakeholders, states, private foresters, and anyone else who may be interested. The branch is organized into five Research Stations – Northern Research Station, Rocky Mountain Research Station, Pacific Northwest Research Station, Pacific Southwest Research Station, and the Southern Research Station – that cover different geographic areas. Within each of these Stations, there are multiple forestry science laboratories, offices, institutes, and experimental forests. In total, there are approximately 80 locations across the country with active Forest Service research.

13. Forest Service employees work together across the divisions in order to fulfill the Service's mission. For example, Research and Development employees working on the Forest Inventory and Analysis program collect, process, analyze, and report on data on the extent and condition of forest resources in the United States. After one of these scientists collects data about certain conditions in a forest (e.g., metrics on carbon storage), employees in the Washington Office aggregate and formulate that data in publishable forms that are useful for policymakers and industry stakeholders. As another example, national level employees in the Washington Office develop wildfire crisis strategies based on data collected by the Research and Development branch, and Regional Office staff orchestrate and coordinate the implementation of those strategies across the national forests and ranger districts.

**Forest Service Reorganization Plan**

14. On March 31, 2026, USDA and the Forest Service announced that they were moving forward with a "sweeping restructuring" of the agency that would move the headquarters

to Salt Lake City, Utah, close all Regional Offices, transition to a state-based model, and consolidate all Research Stations into a single research organization in Fort Collins, Colorado.

15. The March 31 announcement did not contain further information regarding the timeline or deadlines for implementation, stating: "The Forest Service will provide employees and partners with detailed transition guidance as different milestones approach."

16. That same day, March 31, 2026, the Forest Service sent letters of intent to approximately 6,500 employees across the Washington Office and all Regional Offices, notifying them of the reorganization and its likely impact on their jobs. The Forest Service gave the Union copies of the templates for these letters, which I have reviewed.

17. The March 31 letters of intent did not provide clarity with respect to many substantial aspects of the Reorganization. Only one letter (which I understand that the Forest Service sent to 105 non-bargaining unit employees), informed those employees that they will not be relocated and will remain in the National Capital Region. All of the other letters told employees they were being considered for mandatory relocation but did not tell any employees exactly where or when they will be relocated or consolidated into a new office.

18. For instance, the March 31 letters sent to Washington Office employees in the National Capital Region informed them that they will be relocated, with possible new duty stations including: Salt Lake City, Utah; Fort Collins, Colorado; Albuquerque, New Mexico; Boise, Idaho, or a new Operational Service Center in an unidentified location, a national forest, or a new State Office. Letters sent to Regional Office employees and other employees who report to Region 6 (Portland, Oregon), Region 8 (Atlanta Giorgia), or Region 9 (Milwaukee, Wisconsin), informed these employees that they would be relocated, with possible new duty stations including Salt Lake City, Utah; Fort Collins, Colorado; and Alburquerque, New Mexico. The March 31 letters sent to Regional Office employees in other regions informed them that "[s]ome employees may receive directed reassignments to a new location, however most employees are generally expected to remain in their commuting area."

19. USDA has recently claimed publicly that only 500 of the 6,500 Forest Service employees who received letters of intent will be required to relocate. I am aware that USDA

Deputy Secretary Vaden responded to congressional inquiries on June 1, 2026 and stated: "Approximately 6,500 employees received prenotification letters alerting them that they are potential affected by the reorganization. However, the Agency expects fewer than 500 employees to be subject to relocation." I am skeptical of the accuracy of this representation, and am concerned that USDA is undercounting the likely impact.

20. On June 12, 2026, the Forest Service confirmed to the Union that the Reorganization will close all nine Regional Offices and consolidate the functions currently being performed at the regional office level into new national structures or redistributed to field units. The Forest Service also informed the Union that the Reorganization may result in some Washington Office employees receiving changes to their position title, series, grade, duty station, and/or organizational assignment.

21. At the same time, the Forest Service confirmed to the Union that the Research Stations will be consolidated into a single research organization located in Fort Collins, Colorado. As of the date of this declaration, the Forest Service has told the Union that some research facilities related to the stations will be reduced and moved, but the Forest Service has not identified which ones this will be. I am aware that there is a list on the Forest Service's public website of twenty Research and Development facilities slated to be retained and fifty seven Research and Development facilities being evaluated for closure.

22. On June 12, 2026, the Forest Service confirmed that they will use a combination of a "Direct Match" process and "Management Directed Reassignment" process to relocate Forest Service employees within and outside of their commuting areas.

23. If the employee is being relocated outside of their commuting area (defined as within 50 miles of their current duty station), the employee will receive a Management Directed Reassignment letter. Based on our current information from the Forest Service, I understand that employees who receive a Mandatory Directed Reassignment outside their commuting area will have ten days to accept or decline their offer. A failure to respond will be treated as a declination. Employees who decline will be involuntarily separated from the Forest Service, although they may change their decision up to their effective date of separation.

24. If the employee is being relocated within their commuting area (applicable for certain regional office employees), the employee will receive a Direct Match. Based on our current information from the Forest Service, I understand that employees who receive a Direct Match to a position within their commuting area will have three business days to accept or decline their offer.

25. Employees may be matched, however, to a position up to two grade levels below their current grade. If the employee is matched to a position that has the same grade and step as their current position, and the new position doesn't require a modification of qualifications, the employee will be required to accept that new position or they will be involuntarily separated (if they do not retire or resign first). If an employee is matched to a position with a lower grade or step level than they hold in their current position, the employee will receive a voluntary offer of placement. Employees who receive voluntary offers may decline the offer and continue to receive other Direct Matches. Ultimately, however, they will need to accept a new position or they will be involuntarily separated.

26. The Forest Service has confirmed that it will offer opportunities for employees to participate in voluntary retirement or separation under the Voluntary Early Retirement Authority (VERA) or the Voluntary Separation Incentive Payment (VSIP) at multiple stages of the reassignment process.

27. The Forest Service has told the Union that Management Directed Reassignments and Direct Match Reassignments will be issued to employees starting in summer 2026, but we do not have confirmation of the actual date those letters will be sent.

**Attrition Survey and Impacts of the Reorganization**

28. After USDA and the Forest Service announced that it was implementing this Reorganization, NFFE surveyed bargaining and non-bargaining unit employees to collect their views on the Reorganization and its expected impacts. NFFE leadership collected responses through May 28, 2026, before compiling and analyzing them. I have reviewed the questions, responses, and analysis done by others on my team, and the following summaries are correct to the best of my knowledge.

29. Approximately 83% of the respondents are opposed to the Reorganization Plan, 11% of respondents felt neutral, and only 6% supported the plan.

30. A majority of respondents indicated they will not be willing to relocate. Specifically: (1) Only 7.4% of all respondents answered that they would be willing to relocate if required. (2) 57.3% of respondents answered that they would not be willing to relocate, and (3) 35.3% were unsure.

31. Approximately 39% of respondents expected their position description, duties, or grade to be affected.

32. The survey also asked respondents about what relocation concerns they had, and these questions allowed respondents to select multiple options. Employees had many concerns, ranging from family obligations to new housing costs.

33. Approximately 75% of respondents were concerned about housing costs, and approximately 72% of respondents were concerned about moving costs that exceed agency reimbursement.

34. Respondents were also concerned about new commuting costs from the Reorganization Plan, with about 68% of respondents expressing concern about commuting distance, and about 63% of respondents noting concerns about commuting costs.

35. Approximately 58% of respondents were concerned about family obligations, and approximately 45% of respondents noted concerns the Reorganization Plan would have on their medical doctors or treatment.

36. About 75% of respondents were concerned about the impact that the Reorganization Plan would have on their position's workload.

37. The Forest Service is already suffering from a significant staffing shortage. I am aware of an Office of the Inspector General Report that found the Forest Service lost almost 6,000 employees in 2025 alone due to deferred resignations and other staff reduction efforts.

38. The predictable attrition resulting from the Reorganization, as reflected by the fact that more than half of respondents reported they would not relocate, will devastate the Forest Service's capacity to carry out its missions.

39. The survey also invited open-ended responses about the USDA Forest Service 2026 reorganization.

40. Many survey respondents described how they will be forced to leave the Service if required to relocate, taking decades of experience and institutional knowledge with them, and likely resulting in many of the projects they were working on being discontinued.

41. One respondent shared that both they and their partner work for the Forest Service, and because they were both hired as remote employees, they are supervised out of different regions. They are worried the Forest Service Reorganization “will split our family by forcing us to report to different duty stations.”

42. Another respondent explained how family obligations, including elder care, require them to stay where they are, so if they are assigned a duty station outside their commuting area, they will have to decline the reassignment, and consequently, will lose their position.

43. Respondents shared their concerns not only for the personal impact that the Reorganization would have on them, but also for the negative effects it would have on the Forest Service’s mission. One respondent described the Reorganization as “a thinly veiled attempt to further demoralize our work force and dismantle our ability to care for the land and serve the people” that would do “[c]allous and irreversible damage” to the mission to which they dedicated decades of their professional life.

44. Employees are also worried about the effects on the Service’s work from the loss of colleagues who are unable to relocate or otherwise forced out by the changes to the Washington Office and closure of the Regional Offices. For example, one respondent spoke specifically to their worry that the Reorganization will result in the loss of “technical support experts that regional offices have provided for review and consultation,” including “geotechnical, dam, [and] transportation” experts “and facilities engineers.”

45. Survey respondents also shared the view that the Reorganization is an “existential” threat for Research and Development. One respondent shared that the Forest Service “cannot continue our century long place-based, foundational research on natural resources without a distributed network of sites.” This sentiment was echoed by others. One respondent commented:

"The geographical locations of Forest Inventory and Analysis, (FIA), field office locations are critically located to most effectively complete the mission of FIA, in accordance with the US Farm Bill. The cost of transfer(s) of station and a ten-fold increase in Official Travel, will far exceed the very minimal cost of our office lease." Another respondent explained how their "position is very specialized to the research watershed location for which [they] work," and they are much more likely to seek new employment in their area than participate in the Reorganization.

46. One respondent described how they work on hydropower projects relating to water management, distribution, electricity generation, and wildfire prevention and suppression, and work with state and local stakeholders to address biohazardous materials – projects that are "impossible to do [] from Colorado." In this employee's view, consolidating the research into Fort Collins and requiring scientists to leave their localized work "will have severe and potentially deadly consequences."

47. The responses recorded in the survey are consistent with my own experience and understanding of the Forest Service.

48. The Forest Service relies on employees at all levels. Staffing reductions at any level will severely disrupt the ability for projects to be carried out successfully from start to finish.

49. For example, every year, Washington Office staff are responsible for putting together aerial retardant maps (maps that guide the aerial application of fire retardant substances on trees and grasses across the national forests and grasslands). In order to produce accurate maps, the Washington Office staff rely on the Regional Office staff to coordinate the process. Regional Office staff (across all nine regions) have the knowledge of who at all of the national forests need to be consulted, from the archeologists who will identify historic or pre-historic sites that should not be sprayed with retardants to the biologists who will identify endangered species habitats that should not be sprayed with retardants. The national forest and ranger district staff do the work to identify the locations that both need retardant and cannot have retardant, but it is the Regional Office employees who process that data, standardize it across the national forests, apply relevant buffer metrics to ensure legal compliance, add in any state specific legal requirements that may apply (e.g. a state's endangered species act), and present that data back to the Washington

Office staff. Loss of Washington Office employees will mean there may not be a person issuing the initial call for such a map or publishing the compiled version for use. Loss of the Regional Office employees will mean the map will not be accurately filled out because it is far too much for the (already stretched thin) Washington office employee to know who at the national forest level will have the right data for each of the more than 150 national forests, or what state specific details need to get added. The result of either staff loss will be that aerial retardant is sprayed in too many or too few places, risking, for instance, the loss of endangered species habitat, or wildfires that catastrophic.

50. As another example, the Forest Service is required by Congress to maintain a continuous inventory of the nation's forests and rangelands, which in turn feeds a national assessment of renewable resources that the agency must update every ten years. This inventory is produced by the Forest Inventory and Analysis program, which is housed in the Forest Service's Research and Development branch and carried out through its research stations. Research and Development field crews, working with state cooperators and contractors, measure a national network of permanent sample plots on a recurring cycle across all land ownerships, and the research stations run the national sampling design and compile the plot data into the state and national inventory datasets. The program's Washington Office staff then aggregates those outputs into the Congressionally mandated products, including the Renewable Resource Assessment. On national forest lands, National Forest and ranger district staff support access to and remeasurement of the plots that fall within their units, and Regional Office and National Forest staff are among the principal users of the published inventory data, applying it in regional and forest planning. The Reorganization will consolidate all of the research stations into a single organization in Fort Collins, Colorado, and reduce or close dozens of Research and Development facilities; combined with attrition from the relocation of the Washington Office and the closure of the Regional Offices, this will create gaps in the distributed field network and in the national aggregation, publication, and application functions on which these statutorily required and vitally important inventories depend.

51. Additionally, for instance, the Forest Service must identify and report to Congress each year the amount, and location of, National Forest lands that need reforestation. The Forest Service must also examine reforested lands after the first and third growing seasons and certify stocking and growth in a report to Congress. All levels of the Forest Service work together, with the National Forest employees identifying and certifying lands need reforestation and the progress of reforested lands, the Regional Office employees consolidating and verifying the data, and the Washington Office producing the actual reports that are submitted to Congress. The loss of Regional Office and Washington Office employees will disrupt the creation of these reports, and this will have harsh consequences for the reforesting program. The reports are submitted with the President's budget and underlie the Forest Service's ability to continue getting funds for reforestation, a critical aspect of maintaining our National Forest lands.

52. These are just a few examples of the harms that will result from the loss of staff resulting from the Forest Service's Reorganization Plan.

53. Based on my experience and understanding of the Forest Service, I understand the relationships and importance of this agency and the services it provides to local communities in and near our National Forests, the Regional Offices, and the Research Stations, as well as the many members of the public and non-profit organizations who share the Forest Service's mission of protection and preservation of these public lands. National Forests and National Grasslands are used every day for outdoor recreation, livestock grazing, timber harvesting, watershed protection, and habitat protection. Local communities and the members of the public will also be harmed by this Reorganization and the corresponding impact on the services that the Forest Service provides.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed June 30, 2026, in Lexington, Virginia.

Genny Kotyk