BRETT A. SHUMATE
Assistant Attorney General
BRAD P. ROSENBERG
Chief Litigation Counsel
TAYLOR PITZ (CA Bar No. 332080)
Trial Attorney
Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-5200
Taylor.N.Pitz@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>Defendants. | Case No. 3:26-cv-09976-VC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: September 29, 2026<br>Time: 10:00 am PT<br>Judge: Hon. Vince Chhabria<br>Place: San Francisco Courthouse<br>Courtroom 3, 17th Floor |

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

BACKGROUND .......... 2

I. Factual Background .......... 2

A. The Department of Agriculture .......... 2

B. Reorganization Efforts .......... 2

C. FY 2026 Appropriations Process .......... 6

II. Procedural History .......... 8

STANDARD OF REVIEW .......... 8

ARGUMENT .......... 9

I. Plaintiffs' Claims Are Unlikely to Succeed on the Merits. .......... 9

A. Plaintiffs' claims fail for threshold reasons. .......... 9

i. Plaintiffs have not challenged reviewable final agency action. .......... 9

ii. Plaintiffs' claims are precluded. .......... 11

iii. USDA's organizational decisions are committed to agency discretion. .......... 15

B. Plaintiffs cannot prevail on their ultra vires challenge. .......... 15

C. USDA's reorganization efforts are lawful .......... 16

i. USDA has properly invoked statutory and regulatory authority. .......... 16

ii. Plaintiffs lack a cause of action to challenge Appropriations Act restrictions. .......... 17

iii. Plaintiffs' cited Appropriations Act restrictions are invalid. .......... 19

iv. Plaintiffs propose severing too much. .......... 23

D. USDA's reorganization comports with the APA .......... 26

i. USDA's reorganization is reasonable and reasonably explained .......... 26

ii. Plaintiffs' arguments do not establish otherwise .......... 28

II. Plaintiffs Cannot Establish Irreparable Harm ........ 32
III. An Injunction Is Contrary to the Public Interest and the Balance of the Equities ........ 33
IV. Plaintiffs' Requested Relief Is Overbroad ........ 35
V. Defendants Request a Stay of Relief. ........ 35
VI. Plaintiffs Should Be Ordered to Post Security In Connection With Any Relief ........ 35
CONCLUSION ........ 35

# TABLE OF AUTHORITIES

## CASES

*AFGE v. Ezell*,
2025 WL 470459 (D. Mass. Feb. 12, 2025) .......... 14

*AFGE v. OPM*,
771 F. Supp. 3d 1127 (N.D. Cal. 2025) .......... 14

*AFGE v. Pierce*,
697 F.2d 303 (D.C. Cir. 1982) .......... 20, 23, 24

*AFGE v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) .......... 13, 14

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987) .......... *passim*

*Am. Foreign Serv. Ass'n v. Trump*,
768 F. Supp. 3d 6 (D.D.C. 2025) .......... 14

*Axon Enters., Inc. v. FTC*,
598 U.S. 175 (2023) .......... 12

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 11

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .......... 17

*California v. Trump*,
963 F.3d 926 (9th Cir. 2020),
*judgment vacated for mootness*, 142 S. Ct. 46 (2021) .......... 18

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .......... 32

*City of Angoon v. Hodel*,
803 F.2d 1016 (9th Cir. 1986) .......... 28

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) .......... 10

*Ctr. for Food Safety v. EPA*,
757 F. Supp. 3d 997 (N.D. Cal. 2024) .......... 26, 28, 32

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019) .......... 15

*Dep't of State v. AIDS Vaccine Advoc. Coal.*,
146 S. Ct. 19 (2025) .......... 18

*Elgin v. DOT*,
567 U.S. 1 (2012) ........ 13, 14

*Env't Prot. Info. Ctr. v. Carlson*,
968 F.3d 985 (9th Cir. 2020) ........ 9

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........ 26, 28

*Fed Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ........ 15

*Feldman v. Bowser*,
315 F. Supp. 3d 299 (D.D.C. 2018) ........ 17

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ........ 9

*Gen. Land Off. v. Biden*,
722 F. Supp. 3d 710 (S.D. Tex. 2024) ........ 18

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 18

*Greater Bos. Legal Servs. v. DHS*,
2022 WL 138629 (D. Mass. Jan. 14, 2022) ........ 10

*Guerrero v. Clinton*,
157 F.3d 1190 (9th Cir. 1998) ........ 11, 18

*Hansen v. Nat'l Comm'n on Observance of Int'l Women's Year*,
628 F.2d 533 (9th Cir. 1980) ........ 18

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........ 14

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) ........ 9

*INS v. Chadha*,
462 U.S. 919 (1983) ........ 19, 24

*Jones v. U.S. Secret Serv.*,
701 F. Supp. 3d 4 (D.D.C. 2023) ........ 10

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) ........ 35

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........ 15

*Lorillard v. Pons*,
434 U.S. 575 (1978) .......... 25

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 18

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 9, 10

*Maryland v. USDA*,
2025 WL 1073657 (4th Cir. Apr. 9, 2025) .......... 14

*McMahon v. New York*,
145 S. Ct. 2643 (Mem.) (2025) .......... 11, 33

*Myers v. United States*,
272 U.S. 52 (1926) .......... 20

*N.Y. Republican State Comm. v. SEC*,
799 F.3d 1126 (D.C. Cir. 2015) .......... 12

*New Mexico v. Musk*,
824 F. Supp. 3d 80 (D.D.C. 2026) .......... 13

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 9

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 9, 10, 11

*NRDC v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) .......... 11, 18

*NTEU v. Trump*,
770 F. Supp. 3d 1 (D.D.C. 2025) .......... 14

*Nyunt v. Chairman Broad Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .......... 12

*Oakland Tribune, Inc. v. Chron. Publ'g Co.*,
762 F.2d 1374 (9th Cir. 1985) .......... 33

*OPM v. AFGE*,
145 S. Ct. 1914 (Mem.) .......... 33

*Or. Nat. Desert Ass'n v. Bushue*,
594 F. Supp. 3d 1259 (D. Or. 2022) .......... 33

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) .......... 32

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 33

*Shelly v. Green*,
666 F.3d 599 (9th Cir. 2012) .......... 32

*Sierra Club v. Trump*,
963 F.3d 874 (9th Cir. 2020),
*judgment vacated for mootness*, 142 S. Ct. 46 (2021) .......... 18

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .......... 9

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 12

*Trump v. AFGE*,
145 S. Ct. 2635 (2025) .......... 10

*Trump v. California*,
609 U.S.----, 2026 WL 2473573 (2026) .......... 35

*Trump v. Sierra Club*,
588 U.S. 930 (2019) .......... 19

*United States v. Fausto*,
484 U.S. 439 (1988) .......... 12, 13

*United States v. Marshall Durbin & Co. of Haleyville*,
363 F.2d 1 (5th Cir. 1966) .......... 16

*United States v. Munsingwear*,
340 U.S. 36 (1950) .......... 18

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
259 F.2d 921 (D.C. Cir. 1958) .......... 33

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) .......... 28

*Winter v. NRDC*,
555 U.S. 7 (2008) .......... 8, 32, 33

*Wunderwerks, Inc. v. Dual Beverage Co.*,
2021 WL 5771138 (N.D. Cal. Dec. 6, 2021) .......... 9

**CONSTITUTION**

U.S. Const. art. I, § 2, cl. 2 .......... 20

U.S. Const. art. II, § 2, cl. 2 .......... 20

**STATUTES**

5 U.S.C. § 551 .......... 11

5 U.S.C. § 701 .......... 14

5 U.S.C. § 704 ..... 11
5 U.S.C. § 1204 ..... 33
5 U.S.C. § 3502 ..... 16
5 U.S.C. § 5596 ..... 13
5 U.S.C. § 7105 ..... 13
5 U.S.C. § 7123 ..... 13
5 U.S.C. § 7512 ..... 12
5 U.S.C. § 7514 ..... 12
5 U.S.C. § 7701 ..... 12, 13, 32
5 U.S.C. § 7703 ..... 13
5 U.S.C. §§ 7101-7135 ..... 13
7 U.S.C. § 2201 ..... 3, 16
7 U.S.C. § 2257 ..... 7, 19
7 U.S.C. § 2263 ..... 7, 19
28 U.S.C. § 1331 ..... 12
31 U.S.C. § 1341 ..... 17
31 U.S.C. § 1349 ..... 17
31 U.S.C. § 1350 ..... 17
31 U.S.C. § 1351 ..... 17
Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. No. 113-235, 128 Stat. 2130 (2014) ..... 7
Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015) ..... 7
Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135 (2017) ..... 7
Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348 (2018) ..... 7
Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019) ..... 7

Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, 133 Stat. 2534 (2019) ........ 7

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020) ........ 7

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49 (2022) ........ 7

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022) ........ 7

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25 (2024) ........ 7

Thomas R. Carper Water Resources Development Act of 2024, Pub. L. No. 118-272, 138 Stat. 2992 (2025) ........ 27

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) ........ 7

Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extension Act, 2026, Pub. L. No. 119-37, 139 Stat. 495 (2025) ........ 8, 25

Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5 (2026) ........ 8

Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, 140 Stat. 987 (2026) ........ 8, 25

**LEGISLATIVE HISTORIES**

Review of the USDA Reorganization Proposal, Hearing Before the Committee on Agriculture, Nutrition, and Forestry United States Senate, S. Hrg. 119-132 (July 30, 2025) ........ 6

H.R. Doc No. 83-111 (1953) ........ 16

**RULES**

Fed. R. Civ. P. 65(c) ........ 35

**REGULATIONS**

5 C.F.R. § 302.102(a) ........ 16

5 C.F.R. § 335.102(a) ........ 16

5 C.F.R. part 351 ........ 16

5 C.F.R. § 1201.115 ........ 13

*Revision of Delegations of Authority*,
46 Fed. Reg. 47747 (Sep. 30, 1981) .......... 17

**OTHER AUTHORITIES**

CBS News, *Why did the government shutdown? Here's what's behind the funding lapse* (Oct. 1, 2025),
https://perma.cc/86Y8-4GY7 .......... 6

*The Constitutional Separation of Powers Between the President and Congress*,
20 Op. O.L.C. 124, 1996 WL 876050 (May 7, 1996) .......... 22

CRS, *About Congressional Research Service (CRS) Products*,
https://www.congress.gov/help/crs-products .......... 21

CRS, *The Role of the Office of Management and Budget (OMB) in Budget Development: In Brief* (updated Feb. 26, 2024) .......... 7

CRS, *Statutory Mechanisms for Agency Oversight after* INS v. Chadha, (June 2, 2026),
https://perma.cc/6KL3-XH5N .......... 22

CRS, *U.S. Department of Agriculture (USDA): Structure and Proposed Changes* (Apr. 14, 2026)
https://perma.cc/LY3P-GGBY .......... 16, 21

GAO, *About*, https://www.gao.gov/about .......... 21

GAO Decision B-332704 (June 30, 2022),
https://www.gao.gov/assets/730/721417.pdf .......... 21

GAO, Decision, B-334306 (Aug. 15, 2023) .......... 21

GAO, *Impact of Chadha on the Appropriation Process* (Mar. 1, 1984) https://www.gao.gov/assets/123542.pdf .......... 21

GAO, *Principles of Federal Appropriations Law*, ch. 2, GAO-16-464SP (4th ed. Mar. 2016),
https://www.gao.gov/assets/gao-16-464sp.pdf. .......... 21

Office of Inspector General, Sec. Mem. 1927 Oct. 5, 1977) .......... 17

OMB Letter to Congress (May 2, 2025),
https://perma.cc/XZ3A-RM9Z .......... 6, 7

*Presidential Signing Statements*,
31 Op. O.L.C., 23, 24, 2007 WL 5964723 (2007) .......... 21

Secretary's Memorandum No. 1446, Supplement 1 (Apr. 3, 1961) .......... 17

USDA, *Frequently Asked Questions USDA Reorganization* (Oct. 29, 2025) .......... 27

USDA, *General Information*,
https://perma.cc/7CQR-RHF5 .......... 2

USDA OGC, *Memorandum re: USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture* (July 19, 2019)...................... 23

USDA OIG, Inspection Rep. 91801-0001-23; *USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture* (Aug. 1, 2019) . 17

USDA, *Rollins, Vaden, and Forst Announce Disposal of Dilapidated USDA Facilities* (Feb. 25, 2026), https://perma.cc/2FW7-38D9........................................................................ 34

USDA, *Secretary Rollins Announces USDA Reorganization, Restoring the Department's Core Mission of Supporting American Agriculture* (July 24, 2025), https://perma.cc/SB9Z-2HWL........................................................................................ 2

USDA, *USDA Reorganization,* https://perma.cc/87WQ-J7PV .................................................. 28

## INTRODUCTION

The U.S. Department of Agriculture ("USDA" or "the Department") is in the process of implementing a comprehensive reorganization to modernize the Department, optimize its resources, and improve its delivery of services to communities across the nation. The reorganization contemplates substantial changes to USDA's organizational structure, facilities footprint, and delivery of services. A relatively small but important part of that reorganization involves the relocation of agency employees to facilitate those structural changes; however, USDA currently estimates that a maximum of just 2.1% of the Department's workforce will be subject to relocation outside their existing commuting area.

Plaintiffs oppose the Department's relocation of employees as a policy matter and have invoked Administrative Procedure Act ("APA") and *ultra vires* theories of relief, asking this Court to superintend the administration of a Cabinet department—from where its offices sit to where its employees report for duty. But neither the APA nor principles of equity contemplate such sweeping relief, and Plaintiffs have failed to establish any of the four preliminary injunction factors.

To start, Plaintiffs have failed to show a likelihood of success on the merits. Their claims are unreviewable because Plaintiffs have brought a prototypical programmatic challenge that fails to satisfy the APA's final agency action requirement. Further, because Plaintiffs' action is, fundamentally, a personnel one, district court jurisdiction is precluded by the Civil Service Reform Act, and Plaintiffs' claims should be channeled through the framework contemplated by that statute. Moreover, Plaintiffs lack a cause of action to challenge appropriations act restrictions, and the restrictions they seek to enforce are unconstitutional under controlling, 40-year-old Supreme Court precedent, and therefore, have no legal effect. In any event, USDA's reorganization is reasonable and reasonably explained, which is all the APA requires.

Merits aside, the equitable factors bar preliminary relief. Plaintiffs' claimed irreparable harms can be remedied through the CSRA's remedial scheme or are otherwise speculative. Further, Plaintiffs' delay in seeking relief both undermines those claims and renders an injunction contrary to the public interest. To enjoin USDA now would not only require the agency to unwind the steps it has already taken at considerable expense, but would impair agency functions and implicate

serious separation of powers concerns.

For all these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

## BACKGROUND

### I. Factual Background

#### A. The Department of Agriculture

Established in 1862, USDA is known as "The People's Department," a title reflecting its mission to serve farmers, ranchers, landowners, and rural communities. Secretary Memorandum: SM 1078-015, *Department of Agriculture Reorganiztion Plan* at 1 (July 24, 2025) ("Sec. Mem."). The Department is made up of 29 component agencies with nearly 100,000 employees who serve the American people. USDA, *General Information*, https://perma.cc/7CQR-RHF5.

#### B. Reorganization Efforts

Over the past year, USDA has begun planning and implementing "a major organizational realignment that will reshape how the Department is structured and improve how it provides services to the public." Decl. of Mary Pletcher Rice ¶ 19 ("Rice Decl."). On July 24, 2025, the Secretary of Agriculture ("Secretary") announced the Department's intent to reorganize. *See* USDA, *Secretary Rollins Announces USDA Reorganization, Restoring the Department's Core Mission of Supporting American Agriculture* (July 24, 2025), https://perma.cc/SB9Z-2HWL. Her announcement proposed "a phased plan to relocate much of its Agency headquarters and [National Capital Region ("NCR")] staff out of the Washington, D.C. area to five hub locations": Raleigh, North Carolina; Kansas City, Missouri; Indianapolis, Indiana; Fort Collins, Colorado; and Salt Lake City, Utah. *Id.* "In selecting its hub locations, USDA considered where existing concentrations of USDA employees are located and factored in the cost of living." *Id.* The Secretary made clear, however, that "all critical functions of the Department will continue uninterrupted," noting that it was "the height of fire season," and USDA had "exceeded hiring goals," and preserved hiring ability. *Id.*

The Secretary concurrently issued Secretary Memorandum: SM 1078-015. The Memorandum "serves as a framework for the Department's reorganization, rather than an implementation plan," Rice Decl. ¶ 27, and it "authorize[d] and direct[ed] the actions necessary to effectuate the

consolidation, unification, and optimization of functions within the [Department] to achieve improved effectiveness and accountability, enhanced services, reduced bureaucracy and cost savings for the American people," Sec. Mem. The Memorandum was "issued under the authority of Reorganization Plan No. 2 of 1953 (5 U.S.C. app.; 7 U.S.C. 2201 note)." *Id.* at 1. And it explains that four main principles should animate the Department's reorganization: (1) ensuring the size of USDA's workforce aligns with financial resources and priorities; (2) bringing USDA closer to its customers by relocating resources outside of the NCR; (3) eliminating management layers and bureaucracy; and (4) consolidating support functions. *Id*. at 2-4. The Memorandum specifies that the "Deputy Secretary will lead the implementation of the USDA Reorganization Plan and may make changes or adjustments to the plan as needed." *Id.* at 4.

On August 29, 2025, USDA issued National Consultation Right memos to Dr. Everett Kelley, National President of the American Federation of Government Employees ("AFGE") and Randy Erwin, National President of the National Federation of Federal Employees ("NFFE")—two of the Plaintiff unions here—requesting their review and comment on the Secretary Memorandum. *See* Rice Decl. ¶ 37; Exs. 1-2 to Rice Decl. AFGE provided a response on September 26, 2025. Rice Decl. ¶ 37; Ex. 3 to Rice Decl. USDA also accepted public comments on the proposed reorganization from August 1 through September 30, 2025. *See* USDA, *Reorganization Summary and Analysis of Feedback* at 3 (Dec. 8, 2025). The Department received over 46,845 comments, and it analyzed those comments and published a summary December 8, 2025. *See id.*

And although in early 2025, USDA had been concerned about right-sizing its workforce in light of the fact that many of its temporary funding sources were expiring, by the end of 2025, USDA had largely achieved its workforce goals through voluntary measures such as Deferred Resignation Programs ("DRPs"), Voluntary Early Retirement Authorization ("VERA"), and Voluntary Separation Incentive Payments ("VSIP"), Rice Decl. ¶ 21. Accordingly, when USDA developed a draft Annual Staffing Plan for Fiscal Year 2026 ("ASP") in December 2025, it did not contemplate further workforce reductions. *See* Ex. 10 to Decl. of Timisha Fitzgerald Walker ("Walker Decl."). Instead, the ASP "forecast[ed] a modest increase in staffing as opposed to any further decreases in staffing." Rice Decl. ¶ 28. USDA's actual hiring in FY 2026 has tracked that

forecast, and as of August 8, 2026, USDA's total workforce has 3,281 more employees than it did in January 2026. *Id.* ¶ 42. USDA's hiring actions during that time have been "aligned to support USDA's statutory obligations, mission-critical functions, and address emerging priorities." *Id.*

Beginning in spring 2026, USDA commenced its phased, component-level implementation of the reorganization. "The development of the component agency and staff office reorganization plans has been a deliberate and iterative process," and those plans "have been refined over time in response to operational assessments in consideration of feedback from internal and external stakeholders including public comments received." *Id.* ¶ 27. "As reorganization planning has progressed, several adjustments have been made to ensure the reorganization aligns with mission needs and operational realities, accords with the Department's [NCR] space strategy, and considers potential attrition and its impact on agency functions" reflecting "a thoughtful and evolving approach rather than a static directive." *Id.* ¶ 46. For example, although the Department originally contemplated disposing of the George Washington Carver Center ("GWCC") in Maryland, it subsequently determined that facility should be retained "to better support long-term operational requirements in the NCR." *Id.* ¶ 47; *see also id.* ¶¶ 46-53 (citing examples).

As USDA components have begun implementing reorganization plans, they have provided Congress with multiple reorganization-related notifications. Congressional notifications to date include those addressing the Food and Nutrition Administration ("FNA"); the Research, Education, and Economics ("REE") Mission Area, which includes the Agricultural Research Service ("ARS"), Economic Research Service ("ERS"), National Agricultural Statistics Service ("NASS"), and National Institute of Food and Agriculture ("NIFA"); the Foreign Agricultural Service ("FAS"); the Farm Production and Conservation Mission Area, which includes the Farm Service Agency ("FSA"), Natural Resources Conservation Service ("NRCS"), Risk Management Agency ("RMA"), and Farm Production and Conservation Business Center ("FPAC"); and the Rural Development Mission Area. *See* Exs. 1-2 to Walker Decl., Congressional Notifications. USDA provided an oral notification regarding Forest Service plans. USDA has made these notifications public on its reorganization webpage, along with other resources. *See* USDA *Reorganization*, https://www.usda.gov/about-usda/reorganization. These notifications reflect the most current

plans for each component agency. Rice Decl. ¶¶ 74-311 (detailing notifications).

Following Congressional notification, USDA has been fulfilling its bargaining obligations with the applicable unions. That process is ongoing, but agreements have been reached between the FNA and NTEU Ch. 226 as well as FNS and AFGE 2735 for NCR relocation issues; between ARS and AFGE 3147; and the Forest Service and NFFE-FSC. *See* Exs. 3-7 to Walker Decl.

To facilitate the reorganization and comply with its obligations under the Utilizing Space Efficiently and Improving Technologies Act (the "USE IT Act"), USDA has also taken steps to right-size its real property footprint. The General Services Administration ("GSA") and USDA have announced the disposal of the South Building, and USDA is actively working to maximize occupancy of the Whitten Building, Yates Building, and GWCC in the NCR. Rice Decl. ¶¶ 54-62. Not only had occupancy levels of those buildings plummeted in recent years, necessitating consolidation, but the South Building requires extensive deferred maintenance and modernization costs totaling $1.322 billion to address "deficiencies present[ing] material risks to life, safety, operational continuity, and compliance with federal standards." *Id.* ¶¶ 55-58.

The agency has terminated leases at many of its other facilities. *See id.* ¶ 313. In many cases, the agency made the decision to close particular offices because no employees currently work there, or only a handful of employees work there. And to transition to its hub-city model, the Department has also expanded its existing leases, executed new leases, completed renovations of existing leased space, submitted requests for new leases, and transferred funds to construct and purchase new office space in the hub cities. *See id.* ¶¶ 314-15.

USDA expects a maximum of 2,000 employees to be subject to relocation outside their current commuting areas. *Id.* ¶ 63. That reflects 2.1% of USDA's 93,674-person workforce.[1] *Id.* USDA has begun employee relocation notifications. As of September 14, 2026, USDA had sent approximately 750 Management Directed Reassignment ("MDR letters"), and 452 of those employees have accepted reassignment. *Id.* ¶¶ 66-71. USDA has also begun hiring under the new hub-based structure. To date, onboard levels at hub locations have increased by as much as 14 percent in those duty locations and hiring is actively underway. *Id.* ¶ 39.

[1] USDA's workforce as of August 8, 2026.

C. FY 2026 Appropriations Process

Plaintiffs claim that "Congress [p]rohibit[ed] [t]he USDA Reorganization," Pls.' Mot. for Prelim. Inj. and Stay Under § 705 at 4-6, ECF No. 5-1 ("Pls.' Mot."), but Congress did no such thing. After USDA announced its reorganization, the Senate Agriculture Committee—a single committee of one House of Congress—held a hearing on the matter. At no point during that hearing, or in the wake of it, did Congress prohibit the reorganization. *See* Review of the USDA Reorganization Proposal, Hearing Before the Committee on Agriculture, Nutrition, and Forestry United States Senate, S. Hrg. 119-132 at 11 (July 30, 2025) ("Dep. Sec. Test."). Some members of Congress (well short of a majority) also sent letters to USDA. Exs. A-D to Evers Decl., ECF No. 5-60.

The President then presented his recommended budget to Congress. That proposed budget recommended cuts not only to USDA funding, but to discretionary funding levels for most agencies, consistent with his efforts "to reach balance and restore confidence in America's fiscal management." *See* OMB Letter to Congress (May 2, 2025), https://perma.cc/XZ3A-RM9Z. And as to USDA's funding, the President primarily recommended cuts to types of USDA programming, *see id.* at 31-34; he did not recommend cuts simply "to drastically reduce agency staffing," as Plaintiffs contend. Pls.' Mot. at 5. Consistent with Executive Branch practice, USDA did not directly submit to Congress any proposals or recommendations regarding its budget. Plaintiffs cite a USDA Budget Summary in support of their allegations on this score, *id.* at 5 (citing Ex. Q to Levy Decl. at 1, ECF No. 5-61), but that document itself is a budget summary, not an actual budget request, and the figures it includes simply "show . . . the President's Budget request for 2026," *id.* at iii.

And while Congress reached an impasse on budget negotiations, resulting in a lapse in appropriations on September 30, 2025, Plaintiffs cite no evidence indicating that Congress allowed the lapse due to USDA's proposed reorganization. And there is none. *See, e.g.*, CBS News, *Why did the government shutdown? Here's what's behind the funding lapse* (Oct. 1, 2025), https://perma.cc/86Y8-4GY7 (identifying expiring "health insurance subsidies" as the center of the shutdown debate). Courts—not Congress—prohibited agencies from reducing staff during the lapse. *See* Pls.' Mot. at 5 (citing cases). The budget passed by Congress appropriated more funds

than the President had requested (as is often the case), but Congress had no occasion to "unambiguously reject[] USDA's proposed staffing cuts," *id.*, as no such cuts were proposed. *See* OMB Letter to Congress at 31-34; *see also* CRS, *The Role of the Office of Management and Budget (OMB) in Budget Development: In Brief* (updated Feb. 26, 2024) ("[T]he President's budget is a set of recommendations, which Congress is not required to adopt[.]").

USDA and Forest Service Fiscal Year 2026 ("FY 2016") Appropriations Acts contained the "notice and approval" provisions Plaintiffs invoke here, which have appeared in USDA's Appropriations Acts as a matter of course dating back to 2014.[2] As relevant, the FY 2026 USDA Appropriations Act provides that

> None of the funds provided by this Act . . . shall be available for obligation or expenditure through a reprogramming, transfer of funds, or reimbursements as authorized by the Economy Act, or in the case of the Department of Agriculture, through the use of the authority provided by section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or section 8 of Public Law 89-106 (7 U.S.C. 2263), that—
> (1) creates new programs;
> (2) eliminates a program, project, or activity;
> (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted;
> (4) relocates an office or employees;
> (5) reorganizes offices, programs, or activities; or
> (6) contracts out or privatizes any functions or activities presently performed by Federal employees;
> unless the Secretary of Agriculture or the Secretary of Health and Human Services (as the case may be) notifies in writing and receives approval from the Committees on Appropriations on both Houses of Congress at least 30 days in advance of the reprogramming of such funds or the use of such authority.

Pub. L. No. 119-37, Div. B, § 716, 139 Stat. 495, 544-45 (2025) ("§ 716"). That act also provides

[2] Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. No. 113-235, div. A, § 719(a), 128 Stat. 2130, 2165 (2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. A, § 717(a), 129 Stat. 2242, 2276 (2015) (similar); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. A, § 717(a), 131 Stat. 135, 169-70 (2017) (similar); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. A, § 717, 132 Stat. 348, 385 (2018) (similar); Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. B, § 716, 133 Stat. 13, 77-78 (2019) (similar); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. B, § 716, 133 Stat. 2534, 2645-46 (2019) (similar); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. D, § 716, 134 Stat. 1182, 1219-20 (2020) (similar); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. A, § 716, 136 Stat. 49, 89 (2022) (similar); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. A, § 716, 136 Stat. 4459, 4498 (2022) (similar); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. A, § 716, 138 Stat. 25, 104-05 (2024) (similar); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1105, 139 Stat. 9, 12 (2025) (continuing limitations from FY 2024 Appropriations Acts).

that none of its funds "may be used to close or consolidate the resources or locations of any existing [ARS] laboratories and facilities without prior notification and approval of the Committees on Appropriations of both Houses of Congress." *Id.* § 771. The Forest Service Appropriations Act contains similar language, stating that "[n]one of the funds made available in this Act . . . may be reprogrammed without the advance notification and approval of the House and Senate Committees on Appropriations." Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, Div. C, §421, 140 Stat. 5, 163 (2026) ("§ 421"). These provisions thus require USDA to notify Congress and seek the approval of its appropriations committees before taking steps to reorganize. But as explained below, because the approval requirement is unconstitutional under controlling Supreme Court precedent, and consistent with the remaining statutory language and Executive Branch practice going back decades, USDA provided Congress with notice only. *See infra* pp. 19-23. USDA has made appropriate notification to Congress, *see supra* p. 4, and Congress has taken no legislative action to halt the reorganization. If anything, Congress's decision to fund USDA through December 11, 2026, without prohibiting the reorganization, supports that Congress has acquiesced to it. *See* Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, 140 Stat. 987 (2026).

## II. Procedural History

On July 2, 2026, Plaintiffs sought to add these claims and moved for a preliminary injunction in another lawsuit, *AFGE v. Trump*, No. 3:25-cv-3698-SI (N.D. Cal.). Under a negotiated schedule, briefing was completed and oral argument was held on September 1, 2026. The Court rejected Plaintiffs' attempt to inject these new claims into that lawsuit, denied their motion to supplement, and denied their motion for preliminary injunction as moot. Plaintiffs refiled a new complaint on September 8, 2026, along with a new motion for preliminary injunction.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Thus, "[a] preliminary injunction should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Wunderwerks, Inc. v. Dual Beverage Co.*, 2021 WL 5771138, at *3 (N.D. Cal. Dec. 6, 2021) (citation omitted). To prevail,

Plaintiffs must make a clear showing that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). The final two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025). And because Plaintiffs ask the Court to unwind steps already taken, much of their requested injunction is mandatory and subject to a "doubly demanding" heightened standard. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

## ARGUMENT

### I. Plaintiffs' Claims Are Unlikely to Succeed on the Merits.

Likelihood of success "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). For the following reasons, Plaintiffs have not demonstrated a likelihood of success on their claims.

#### A. Plaintiffs' claims fail for threshold reasons.

##### *i. Plaintiffs have not challenged reviewable final agency action.*

Plaintiffs' claims fail out the gate because they do not seek judicial review of circumscribed and discrete agency action, and instead, seek review of the restructuring of the entire Department.[3] "Under the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). That action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Consistent with these principles, the APA does not permit Plaintiffs to "seek wholesale improvement" of agency management "by court decree." *Lujan*, 497 U.S. at 891. "Because an ongoing program or policy is not, in itself, a final agency action under the APA, [] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation modified). "[A] broad programmatic attack" is not a

[3] Plaintiffs also bring an *ultra vires* challenge, but there is no basis for that challenge, *infra* p. 15.

valid APA claim. *Greater Bos. Legal Servs. v. DHS*, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Cobell*, 455 F.3d at 307; *see also Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023) (explaining APA does not authorize "judicial review over everything done by an administrative agency").

Plaintiffs' motion presents *precisely* the type of wholesale challenge the APA forbids. For example, they seek to enjoin Defendants "from taking any action to implement, carry out, or effectuate the USDA Reorganization Plan by (1) closing or eliminating offices, programs, or facilities, or (2) relocating or reassigning employees or their positions or functions to different and/or new locations," effectively constraining the agency from managing its own component agencies, offices, programs, and buildings. Pls.' Proposed Order at 2, ECF No. 5-2. Thus, Plaintiffs are not seeking judicial review of a discrete agency action—they are asking the Court to manage USDA.

In *Lujan*, the Supreme Court dispelled any notion that the APA affords such relief, explaining that it is "entirely certain" that challenges to "flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA," even if "one of them that is ripe for review adversely affects [a plaintiff]." 497 U.S. at 892-93. Similarly, in *Norton*, the Supreme Court explained that the purpose of this requirement is "to *protect agencies* from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." 542 U.S. at 66 (emphasis added). "If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved," thus improperly "injecting the judge into day-to-day agency management." *Id.* at 66-67. The Court was unequivocal: "The prospect of pervasive oversight by federal courts . . . is not contemplated by the APA." *Id.* at 67. The Supreme Court has also stayed injunctions halting similar comprehensive reorganization efforts. *See Trump v. AFGE*, 145 S. Ct. 2635 (2025); *McMahon v. New York*, 145 S. Ct. 2643 (Mem.) (2025). Thus, there is no legal basis for Plaintiffs' claims or requested relief.

Considering Plaintiffs' motion through the prototypical final agency action analysis confirms they have brought an unreviewable programmatic challenge. Under the APA only "final agency action" is reviewable, which requires that plaintiffs challenge (1) "agency action," and (2) that action is "final." 5 U.S.C. § 704. The APA defines "agency action" as a "rule, order, license, sanction, relief, or the equivalent," *id.* § 551(13), that must be a "discrete" act, *Norton*, 542 U.S. at 64. Agency action must also be "final," meaning that it must (1) "mark the consummation of the agency's decisionmaking process," rather than "of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

Plaintiffs' claims fail under this analysis too. Though most of Plaintiffs' motion is ambiguous about which agency action they are challenging, towards the end, Plaintiffs identify USDA's Congressional notifications as final agency actions. *See* Pls.' Mot. at 21-22. Plaintiffs do not explain, however, how those notifications constitute rules, orders, licenses, sanctions, or relief, nor how they are injured by the submission of notices to Congress. *See id.* And the Ninth and D.C. Circuits have explained that agency reporting to Congress "is not agency action of the sort that is typically subject to judicial review" "[b]ecause it triggers no legal consequences and determines no rights or obligations." *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998); *NRDC v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988) (describing the "nature of the 'agency action'" for agency reporting as "quite distinct from the prototypical exercise of agency power" because instead of exercising "governmental power," the agency is "simply reporting back to the source of its delegated power"). Nor are the Congressional notifications final agency action with respect to the matter Plaintiffs primarily purport to challenge—the relocation of employees. While these notifications outline proposed changes to the structure of the mission areas and staff offices, they do not state which specific employees are subject to relocation, where specific employees are being asked to relocate, or a final number of total employees subject to relocation. Thus, they are not appropriate vehicles to challenge the matter with which Plaintiffs appear to be most concerned.

*ii. Plaintiffs' claims are precluded.*

Even if Plaintiffs had challenged final agency action, the Court still lacks jurisdiction over

Plaintiffs' claims because they are precluded. Congress has empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction," but nonetheless, "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 185 (2023). When a statute provides "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015). Where Congress has done so implicitly, courts determine whether it intended to preclude particular claims by assessing whether (1) such intent is "fairly discernible in the statutory scheme," and (2) the claims are "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994) (citation omitted).

At bottom, Plaintiffs' programmatic challenge rests on the agency's removal (or allegedly threatened removal) of employees for failure to relocate.[4] A challenge to employee removal (actual or threatened) is a prototypical personnel dispute, and the Civil Service Reform Act ("CSRA") "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988); *see also Nyunt v. Chairman Broad Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009) (CRSA "regulates virtually every aspect of federal employment"). It provides that "[a]n employee . . . may submit an appeal to the Merit Systems Protection Board [("MSPB")] from any action which is appealable to the Board under any law, rule, or regulation," 5 U.S.C. § 7701(a), and generally, an employee who is removed from their position may appeal that decision to the MSPB. *See id.* §§ 7512, 7514; *see also id.* § 7701(c)(2) (MSPB may not sustain agency action not in accordance with law). Employees who prevail may be entitled to reinstatement, back pay, and other remedies. *Id.* § 7701; *see also*, *e.g.*, 5 C.F.R. § 1201.115; 5 U.S.C. § 5596(b)(1)(B). Further, employees who prevail on their initial petition to an administrative law judge are generally entitled to interim relief whereby they are

[4] Though they also claim to be challenging the closure of offices, USDA has been unequivocal that any such closures, themselves, will not result in the separation of employees. *See* Rice Decl. ¶ 19.

immediately reinstated pending further review. 5 U.S.C. § 7701(b)(2). And any final order of decision of the MSPB is subject to Federal Circuit review. *Id.* § 7703. As the Supreme Court has explained, "[a] challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB." *Elgin v. DOT*, 567 U.S. 1, 22 (2012).

The CSRA also includes the Federal Service Labor-Management Relations Statute ("FSLMRS"), which governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The FSLMRS permits unions to file grievances over "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment" and to advance those grievances to binding arbitration. 5 U.S.C. §§ 7103(a)(9), 7121(b). The resulting arbitral awards are reviewable by the Federal Labor Relations Authority ("FLRA"), which is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Congress has authorized only courts of appeals review of FLRA decisions, and precluded judicial review of decisions concerning arbitral awards that do not involve an unfair labor practice ("ULP"). 5 U.S.C. § 7123(a).

The CSRA's statutory framework thus precludes district court jurisdiction. Plaintiffs' motion centers on the very type of personnel action for which Congress enacted the "elaborate framework" of the CSRA. *Elgin*, 567 U.S. at 11. Congress did not enact that framework only to permit labor unions and third parties to seek an end-run around those procedures through preemptive district court litigation. Rather, the "FSLMRS provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims." *AFGE v. Secretary of the Air Force*, 716 F. 3d 633, 638 (D.C. Cir. 2013) ("*Air Force*"). The union Plaintiffs can file a grievance challenging the relocations and advance that grievance to arbitration. The resulting award is appealable to the FLRA, and the FLRA to a circuit court if the union also asserts a ULP. And to the extent the CSRA provides no avenue for the public interest group and municipal government Plaintiffs to obtain relief on behalf of federal employees, the Supreme Court has indicated this reflects a "considered congressional judgment that [those Plaintiffs] should not have statutory entitlement to review for adverse action of the type governed by" the CSRA. *Fausto*, 484 U.S. at 448-49; *Air Force*, 716 F. 3d at 638-639 ("To the extent [FSLMRS]

procedures omit other parties . . . we presume that exclusion is intentional. Were we to hold otherwise, a union local could circumvent the CSRA's strictures by requesting that [a party without bargaining rights] file general APA claims outside the CSRA on its behalf. We decline to allow [a third party] to file a suit outside the CSRA simply because it cannot do so under the CSRA.").

The weight of authority has found that preclusion principles applied in similar challenges. *See, e.g.*, *AFGE*, 929 F.3d at 753, 761; *Maryland v. USDA*, 2025 WL 1073657 (4th Cir. Apr. 9, 2025); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 20-25 (D.D.C. 2025); *NTEU v. Trump*, 770 F. Supp. 3d 1, 8-11 (D.D.C. 2025); *AFGE v. Ezell*, 2025 WL 470459 (D. Mass. Feb. 12, 2025). Federal labor disputes must be heard through the FLRA review scheme, with judicial review in a court of appeals following FLRA proceedings. *See AFGE*, 929 F.3d at 754-61; *Air Force*, 716 F.3d. at 637-640; *but see AFGE v. OPM*, 771 F. Supp. 3d 1127 (N.D. Cal. 2025).

The *Thunder Basin* factors reinforce that Plaintiffs' claims must be channeled through the CSRA. Congress plainly intended to preclude district court review here for the reasons set forth above. The CSRA provides meaningful judicial review over Plaintiffs' claims; affected employees or organizations representing them can bring their claims within the administrative scheme where they are subject to judicial review if they also charge a ULP. The wholly collateral inquiry asks whether this "type" of action is "regularly adjudicated" in the administrative scheme and whether it seeks the "kinds of relief" that scheme provides. *Elgin*, 567 U.S. at 22. Here, Plaintiffs challenge the relocation or potential separation of employees and seek relief permitting those employees to remain at their current duty stations—the very type of dispute the CSRA addresses and the same relief it provides. *See AFGE*, 929 F.3d at 760 (finding claim not "wholly collateral" when plaintiffs sought "the same relief that they could ultimately obtain through the statutory scheme"). Finally, the application of employment regulations governing the reassignment and relocation of agency employees are matters on which administrative agencies have expertise.

For these reasons, the Court lacks jurisdiction over Plaintiffs' claims, and they must be channeled through the CSRA's review scheme.

*iii. USDA's organizational decisions are committed to agency discretion.*

Review of Plaintiffs' claims is independently unavailable because decisions about the Department's internal structure—where to locate offices and how to allocate personnel among duty stations—are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Judicial review under the APA requires a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). No statute prescribes the number of USDA regional offices, the location of the Forest Service's headquarters, or the duty station of any particular employee. An agency's allocation of lump-sum appropriations among permissible objects is the paradigm of unreviewable discretion, because such judgments "require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether its resources are best spent on one program or another." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). USDA's choice of organizational design represents exactly that type of judgment. The program-specific statutes Plaintiffs invoke—directives to administer nutrition programs, conduct research, and protect forests—speak to *what* the Department must do, not *where* or through what structure it must do it, and therefore supply no standard for reviewing the decisions challenged.

B. Plaintiffs cannot prevail on their *ultra vires* challenge.

Although Plaintiffs bring their claims under the APA and as *ultra vires* claims, they cannot mount an *ultra vires* challenge here. "An *ultra vires* challenge . . . is essentially a Hail Mary pass." *Fed Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (citation modified). "The agency overstep must be plain on the record and on the face of the statute." *Id.* (citation modified). "That demanding standard is necessary because *ultra vires* review seeks the intervention of an equity court where Congress has not authorized statutory judicial review, on the assumption that Congress has not barred judicial comparison of agency action with plain statutory commands." *Id.* As explained, *infra,* the agency invoked specific statutory reorganization authority, and its arguments about why any limitations on that authority are invalid are premised on bedrock constitutional law principles. Any dispute regarding whether USDA's reorganization is lawful is therefore not so plain on the face of the relevant statutes that *ultra vires* review is warranted, and the matter is properly considered as an APA contrary to law claim. *See DCH Reg'l Med. Ctr. v.*

*Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (*ultra vires* review "covers only extreme agency error, not merely garden-variety errors of law or fact").

C. USDA's reorganization efforts are lawful.

*i. USDA has properly invoked statutory and regulatory authority.*

USDA has invoked longstanding authority that authorizes the agency to reorganize and reassign or relocate its personnel.

To start, federal agencies have long had regulatory authority to "reassign [] career or career-conditional employees[s]," 5 C.F.R. § 335.102(a); *id.* § 302.102(a).[5] Plaintiffs do not suggest Defendants have not complied with these regulations.

Further, Reorganization Plan No. 2 of 1953 gives the Secretary broad authority to reorganize the Department. *See* 7 U.S.C. § 2201 note. The statute provides the Secretary with authority "*to simplify and make efficient the operation of the Department . . . to place administration of farm programs close to the State and local levels, and to adapt the administration of the programs of the Department to regional, State, and local conditions*," *id.* § 4(c)—precisely what USDA intends to do here. The statute "transfer[s] to the Secretary . . . all functions not now vested in him of all other officers, and of all agencies and employees, of the Department of Agriculture," *id.* § 1(a), and provides that the Secretary "may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the [Department] of any function of the Secretary[.]" *Id.* § 4(a). This language thus permits the Secretary to reorganize the functions of the agency as the Secretary "deem[s] appropriate." *Id.*

Additional context confirms that this statute authorizes USDA's current reorganization. President Eisenhower issued a Special Message to Congress when he transmitted the statute, in which he "directed" the Secretary to "utilize this delegation authority in such a way as to further certain objectives set forth in the reorganization plan," including "to simplify and make effective the operation of [USDA], to place the administration of farm programs close to the State and local levels, and to adapt the administration of the programs of the Department to regional, State, and

[5] USDA is not seeking to reduce its workforce through employee relocations, but if the Court were to accept Plaintiffs' framing, the agency has authority to issue RIFs. 5 U.S.C. § 3502; 5 C.F.R. part 351.

local conditions." H.R. Doc. No. 83-111 at 2305 (1953), https://perma.cc/2JCM-3G2N. Courts interpreting the statute have recognized the same. *See United States v. Marshall Durbin & Co. of Haleyville*, 363 F.2d 1, 6-7 (5th Cir. 1966) ("Reorganization Plan 2 of 1953 . . . placed the *entire administration* of the Department of Agriculture in the Secretary" (emphasis added)). USDA's past use of the statute confirms its broad scope. USDA invoked the statute to establish the Food and Nutrition Service in 1969 as a new agency of the Department. *See* CRS, *U.S. Department of Agriculture (USDA): Structure and Proposed Changes* at 1 n.7, n.8, 4 n.22, 12 n.77 (Apr. 14, 2026) https://perma.cc/LY3P-GGBY; *see also* Secretary's Memorandum No. 1446, Supplement 1 (Apr. 3, 1961). It has also invoked the statute to "abolish[]" the Office of Environmental Quality, *Revision of Delegations of Authority*, 46 Fed. Reg. 47747, 47753 (Sep. 30, 1981), and "disestablish[] . . . the Office of Audit and the Office of Investigation as independent agencies" and consolidate them into the Office of Inspector General, Sec. Mem. 1927 at 3 (Oct. 5, 1977). The Department also invoked the statute to relocate ERS and NIFA outside of the NCR area. *See, e.g.*, USDA OIG, Inspection Rep. 91801-0001-23; *USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture* (Aug. 1, 2019) ("OIG Report").

Accordingly, USDA's actions are supported by appropriate legal authority.

*ii. Plaintiffs lack a cause of action to challenge Appropriations Act restrictions.*

Plaintiffs do not contest that USDA has invoked valid legal authority to reorganize, but instead, contend that provisions in the agency's FY 2026 Appropriations Acts restrict that authority. *See* Pls.' Mot. at 16-18. Plaintiffs, however, have no cause of action to enforce those restrictions—which at most limit USDA's ability to expend funds for certain purposes, but do not limit its actual, substantive authority. Instead, appropriations disputes must be addressed under the Anti-Deficiency Act ("ADA"). The ADA's comprehensive and exclusive set of remedies for allegedly unlawful Executive Branch expenditures precludes any such claim, *see* 31 U.S.C. § 1341(a)(1)(A); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984), as it carefully regulates funding deficiencies and requires notification of violations to Congress, the President, and the Comptroller General, 31 U.S.C. §§ 1349, 1350, 1351. Congress has never suggested that actions taken in violation of

the Act are void, nor authorized judicial orders providing equitable relief. *See Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018) ("No private right of action for declaratory, mandatory, or injunctive relief exists under the [ADA].").

The Supreme Court has determined, on a stay application, that the Impoundment Control Act—the ADA's corollary governing when the Executive Branch may withhold funding authorized by Congress—"precludes respondents' suit, brought pursuant to the [APA], to enforce the appropriations at issue." *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 146 S. Ct. 19 (2025) (Mem.). Other courts have reached the same conclusion. *See Glob. Health Council v. Trump*, 153 F.4th 1, 19 (D.C. Cir. 2025) (holding plaintiffs had no cause of action to challenge an alleged violation of the Impoundment Control Act because the Act's "complex scheme" precluded APA review); *Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734 (S.D. Tex. 2024) (explaining "APA review for ICA violations is improper"). The same rationale for concluding that the Impoundment Control Act precludes APA review supports that the ADA does so too.

Similarly, the D.C. and Ninth Circuits have held that statutes requiring the Executive Branch to report information to Congress do not create judicially enforceable rights in third parties. *See Hodel*, 865 F.2d at 316-19 (holding reporting requirement not reviewable because "in the absence of a congressional directive for judicial review of claims by non-congressional parties, this issue seems to us quintessentially within the province of the political powers to resolve as part of their ongoing relationships"); *Guerrero*, 157 F.3d at 1195 ("Having requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants.").

Moreover, Plaintiffs challenge alleged unauthorized expenditures from the Treasury—a generalized grievance not suitable for APA review and incompatible with Article III jurisdiction. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573-76 (1992) (discussing line of cases dismissing taxpayer suits on basis that they implicated only generalized grievances that are incompatible with Article III); *Hansen v. Nat'l Comm'n on Observance of Int'l Women's Year*, 628 F.2d 533, 534 (9th Cir. 1980) (explaining even members of Congress have no "direct interest in having monies appropriated by the Congress used for no other purpose than those authorized by law").

Plaintiffs cite two related Ninth Circuit decisions to establish their cause of action, but

those cases were vacated for mootness and are not precedential. *See* Pls.' Mot. at 16 (citing *Sierra Club v. Trump*, 963 F.3d 874, 887 (9th Cir. 2020), *judgment vacated for mootness*, 142 S. Ct. 46 (2021); *California v. Trump*, 963 F.3d 926, 944 (9th Cir. 2020), *judgment vacated for mootness*, 142 S. Ct. 46 (2021)); *United States v. Munsingwear*, 340 U.S. 36, 40-41 (1950) (explaining procedure to vacate judgments as moot "prevent[s] a judgment, unreviewable because of mootness, from spawning any legal consequences"). If more were needed, before those cases became moot, the Supreme Court stayed the injunction in *Sierra Club* because "the Government ha[d] made a sufficient showing" that "the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005," *Trump v. Sierra Club*, 588 U.S. 930 (2019), as the Government contends here. Plaintiffs cite no other case invoking a similar cause of action.

*iii. Plaintiffs' cited Appropriations Act restrictions are invalid.*

Even if Plaintiffs had a cause of action, their Appropriations Act claim would fail. Plaintiffs seek to enforce Congressional approval requirements in USDA's FY 2026 Appropriations Acts, *see* Pls.' Mot. at 16-18, but all three branches of government have held or opined those requirements are unconstitutional and unenforceable. Accordingly, the requirements at issue here have no legal effect and do not prevent the Secretary from taking any of the actions at issue.

As explained, *supra* p. 7, the relevant FY 2026 USDA Appropriations Acts provide that USDA must give Congress notice and must seek Congressional committee approval before "relocat[ing] an office or employees" or "reorganize[ing] offices, programs, or activities." § 716[6]; *see also* § 771, § 421.[7] As a constitutional matter, however, Congress may not require this type of secondary committee approval because doing so gives one committee of Congress the ability to "veto" its own house, the other house of Congress, or even the President. In *INS v. Chadha*, 462 U.S. 919 (1983), the Supreme Court ruled that such provisions are unconstitutional and without

---

[6] Section 716's restriction also does not apply to the actions Plaintiffs challenge because none of these actions were taken pursuant to the authority provided by section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. § 2257) or section 8 of Public Law 89-106 (7 U.S.C. § 2263).

[7] No party disputes that USDA has fully complied with the Acts' Congressional notice requirements, *supra* p. 4, and no party disputes that those requirements are constitutionally valid oversight mechanisms. *See, e.g., INS v. Chadha*, 462 U.S. 919, 934-35 (1983); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 689-90 n.12 (1987); CRS, *Statutory Mechanisms for Agency Oversight After INS v. Chadha* at 15-18.

legal effect. There, the Court considered a challenge to a provision authorizing one house of Congress to invalidate a decision of the Executive Branch—a mechanism known as a legislative veto—and held the provision unconstitutional because it permitted one house of Congress to override Executive action without satisfying the Constitution's requirements for bicameral passage and presentment. *Id.* at 951-59. *Chadha* thus stands for the well-established principle that Congress may bind only through legislation—if Congress disagrees with an Executive Branch action, its only remedy is to pass a law. *Id. Chadha* also emphasized that the Constitution specifies when one house is authorized to perform a certain function. *Compare* U.S. Const. art. II, § 2, cl. 2 (Senate ratification of treaties); *id.* art. I, § 2, cl. 5 (House of Representatives impeachment). If anything, the provisions here are more problematic than those in *Chadha* because they contemplate that a single committee of either house of Congress may block USDA from taking otherwise authorized action. *See* § 716; § 771; § 421. The Executive Branch need not follow unconstitutional laws. *See Myers v. United States*, 272 U.S. 52 (1926).

The Government is aware of only one court that has considered a similar challenge to an appropriations act Congressional approval requirement. In *AFGE v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982), the D.C. Circuit considered a challenge to a Department of Housing and Urban Development ("HUD") reorganization that included a proposed RIF. *Id.* at 304. Plaintiffs challenged the RIF as "a reorganization of the Department of the type Congress meant to block through a provision in the HUD Appropriations Act," which "preclude[d] use of funds . . . to plan, design, implement, or administer any reorganization without the prior approval of the Committees on Appropriations." *Id.* (citation omitted). The court held that the clause was unconstitutional no matter if it was "regarded as creating a power in either Appropriations Committee to prevent otherwise-authorized expenditures of funds," or if it was regarded as "prohibiting HUD from using appropriated funds for certain purposes but empowering both Appropriations Committees, acting together, to lift the prohibition and authorize HUD to make such use of the funds." *Id.* at 306. In the first instance, the provision would be "a legislative veto in the usual sense," and therefore, it would "violate[] the Constitution in three respects": (1) "[l]egislative power may be exercised only as provided in article I, section 7 of the Constitution"; (2) a "one-house veto impermissibly makes

law without a vote by both Houses of Congress and circumvents the President's power to veto"; and (3) the veto "violate[s] the separation of powers" because it "provide[s] a means for Congress to control the executive without going through the full lawmaking process." *Id.* In the second instance, the court held that the clause would still be unconstitutional because it was an impermissible "grant of legislative power to two congressional committees," that disregarded article I, section 7 of the Constitution's requirement for "the approval of three constituencies, or a supermajority of two," and requirement for bicameralism and presentment to the President. *Id. Pierce* is squarely on point, and compels the conclusion that the committee approval requirements here are unconstitutional—even if the Court adopts Plaintiffs' framing that these provisions prohibit reorganization but permit two committees of Congress to lift that prohibition.

Opinions from the Legislative and Executive Branches have followed suit. For instance, both the Government Accountability Office ("GAO") and Congressional Research Service ("CRS") have tracked *Pierce*. *See* GAO, *About*, https://www.gao.gov/about ("GAO. . . is an independent, non-partisan agency that works for Congress."); CRS, *About Congressional Research Service (CRS) Products*, https://www.congress.gov/help/crs-products ("By law, CRS works exclusively for Congress, providing timely, objective, and authoritative research and analysis[.]"). GAO's Principles of Federal Appropriations Law publication states repeatedly that appropriations act "requirements for approval by one or more congressional committees" are "'legislative veto' provisions [that] are no longer valid" or "legally binding" following *Chadha*. GAO, *Principles of Federal Appropriations Law*, ch. 2, 2-43, 2-46, GAO-16-464SP (4th ed. Mar. 2016), https://www.gao.gov/assets/gao-16-464sp.pdf. Other GAO reports and decisions have recognized the same. *See* GAO, *Impact of Chadha on the Appropriation Process* at 8-9 (Mar. 1, 1984) https://www.gao.gov/assets/123542.pdf (explaining a statute "requir[ing] . . . committee approval of or a committee veto over reprogramming of lump sum appropriations, would not be permissible under *Chadha*"); GAO Decision B-332704 at 8, 10, 12 (June 30, 2022), https://www.gao.gov/assets/730/721417.pdf (finding similar approval requirement raised constitutional problems and was not "legally binding"). In analyzing USDA's relocation of NIFA and ERS in 2018, the GAO evaluated a Congressional approval clause in USDA's 2018 Appropriations Act, and explained that

the "provision reserves within the Appropriations Committees the power to approve executive action made pursuant to authority Congress has already delegated to the executive branch," and stated that *Chadha* held "that such provisions are inconsistent with the Constitution's procedures of bicameralism and presentment of legislation." *See* GAO, Decision, B-334306 at 10 (Aug. 15, 2023). CRS has concluded the same. *See* CRS, *U.S. Department of Agriculture (USDA): Structure and Proposed Changes* at 2 n.13, 22, 23 n.171 (Apr. 14, 2026), https://www.congress.gov/crs-product/R48905 ("[T]he requirement to obtain committee approval prior to completing reorganization raises legal issues concerning Congress's use of a 'legislative veto.'"); CRS, *Statutory Mechanisms for Agency Oversight after* INS v. Chadha, at 15 (June 2, 2026), https://perma.cc/6KL3-XH5N (committee "approval requirements likely violat[e] *Chadha*").

The Executive Branch has also long objected to Congressional approval provisions as unconstitutional. In 1996, the Department of Justice's Office of Legal Counsel ("OLC") confirmed its view that *Chadha* bars Congressional attempts to "bind the actions of executive or administrative officials that have not been approved by both houses and presented to the President," including provisions prohibiting "the expenditure of funds for some purpose, but allowing a future expression of approval by committee action to remove the prohibition." *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 1996 WL 876050, at *8-9 (May 7, 1996). And in a 2007 opinion, OLC noted that although "[m]ore than 20 years" had passed since the Supreme Court's "clearly controlling" decision in *Chadha*, "a surprising number of newly enacted states seek to require the approval of a congressional committee before execution of a law." *Presidential Signing Statements*, 31 Op. O.L.C., 23, 24, 2007 WL 5964723, at *2 (2007); *see id.* (noting "unconstitutional legislative veto provisions remain[ed] so common that President Bush [] had to raise the issue in approximately 55 of his 126 constitutional signing statements"); *Statutory Mechanisms for Agency Oversight after* INS v. Chadha at 15 (explaining that "[d]espite *Chadha*, Congress continues to enact legislative vetoes of varying kinds," with one survey estimating "Congress enacted nearly 1,000 additional legislative vetoes" between the *Chadha* decision and the end of 2013). In light of this intractable Congressional habit, the Executive Branch typically treats such provisions as unenforceable or "construe[s] certain provisions . . . that purport to

require congressional committee approval for the execution of a law as calling solely for notification, as any other construction would be inconsistent with the principles enunciated by [*Chadha*].” 2007 WL 5964723, at *2. USDA has done the same. *See* Ex. 4 to Rice Decl. (USDA notification letters to Congress where approval requirements applied in the governing Appropriations Act). And when USDA’s Office of General Counsel (“OGC”) issued a legal opinion addressing the ERS and NIFA relocation, it explained that “[i]n the nearly forty years since *Chadha*, the Executive Branch has consistently found that all such legislative veto provisions are null and void, including appropriations act provisions.” USDA OGC, *Memorandum re: USDA’s Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture* at 6-8 & 7 n.9 (July 19, 2019) (citing *Pierce*, 697 F.2d at 306); *id.* at 8 (noting it “reach[ed] the same conclusion as the Supreme Court, the Office of Legal Counsel, and Congress’s GAO[]: The [approval] provision is unconstitutional and of no effect”).

*iv. Plaintiffs propose severing too much.*

Plaintiffs concede that the Congressional approval requirements are unconstitutional, yet incredibly, still invoke them to try to create an absolute prohibition on reorganization that Congress itself did not impose. Pls.’ Mot. at 16-18. The Court should reject that baseless proposition.

Plaintiffs claim that the FY 2026 Appropriations Acts still bar USDA’s relocation of employees because, under severability principles, the Court should sever not just the clearly constitutionally impermissible Congressional approval requirements, but also the constitutionally permissible Congressional notice requirements paired with them—leaving in place only the absolute prohibition on the expenditure of funds. Congress knows how to enact such prohibitions, and the Court should not create one here where Congress declined to do so. The Court should sever only the legislative vetoes themselves, or should deem § 716, § 771, and § 421 invalid in their entirety.

“A court should refrain from invalidating more of the statute than necessary,” and “whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of [the] court to so declare, and maintain the act in so far as it is valid.” *Alaska Airlines*, 480 U.S. at 684. “Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part

may be dropped if what is left is fully operative as a law." *Id.* Further, courts consider "whether the statute will function in a manner consistent with the intent of Congress," and in the "context of a legislative veto," "it is not only appropriate to evaluate the importance of the veto in the original legislative bargain, but also to consider the nature of the delegated authority that Congress made subject to a veto." *Id.* at 685. This is because "[s]ome delegations of power to the Executive . . . may [be] so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism." *Id.*

Plaintiffs' severability arguments fail for a host of reasons. *First*, Plaintiffs propose invalidating more of the statute than necessary, contrary to *Alaska Airlines*. Plaintiffs' position is that, if the legislative vetoes are invalid, § 716, § 771, and § 421's limitations on the use of funds then function as absolute prohibitions. But that reading severs too much. Congress did not include just one oversight mechanism here, it included two—it required notice *and* approval. Simply because one mechanism is unconstitutional does not mean the other should be invalidated, particularly when the statutes remain completely "[]capable of functioning independently" and "fully operative as [] law." *Id.* at 684. *Chadha* itself recognized that "report and wait" provisions like the notice provisions here should ordinarily "survive[] as a workable administrative mechanism," that "preserve" "Congress' oversight." *Chadha*, 462 U.S. at 935. Such provisions "g[i]ve Congress the opportunity to review" agency actions before they are finalized "and to pass legislation barring their effectiveness if . . . found objectionable." *Id.* at 935 n.9. But if the Court disagrees, then it should follow *Pierce*, and hold the sections entirely without legal effect. *See* 697 F.2d 303.

*Second*, Plaintiffs read too much into the legislative history here. As explained, nothing in the appropriations process for FY 2026 demonstrates that Congress intended to prohibit USDA's current reorganization or relocation of employees, particularly since Congress has included the same notice and approval requirement in USDA's Appropriations Acts since 2014. *Supra* p. 7 n.2 That Congress did not enact the President's requested budget says little about its view of USDA's relocation of personnel. *See* Pls.' Mot. at 17. Congress's Explanatory Statement rejecting "research terminations and laboratory closures," says nothing about the relocation of USDA employees, or

closure of offices generally. *See* Ex. E to Levy Decl. at 94-95, ECF No. 5-61. And although Congress stated it "supports the continued operation of BARC," it did not mandate BARC's continued operations, nor did Congress appropriate sufficient funds to permit BARC's continued operation. *See* Rice Decl. ¶¶ 105-25; Exs. 17-18 to Walker Decl.

*Third*, further context also undermines Plaintiffs' account of Congressional intent here. As explained, forty-year-old Supreme Court precedent and opinions from Congress's own GAO and CRS, as well as the Executive Branch have made clear that Congressional approval provisions are unconstitutional. *See supra.* pp. 19-23. There can be no serious doubt that Congress is on notice that such approval provisions are not legally enforceable. Therefore, if Congress had intended to prohibit reorganization or employee relocation in the absence of those provisions, Congress simply would have enacted a prohibition to begin with.[8] Moreover, as explained above, USDA has diligently notified Congress about its reorganization. If Congress wished to halt the reorganization, it could have preempted the reorganization by statute. It has had ample time to do so since the Secretary announced the reorganization in summer 2025 and since USDA began making its notifications in spring 2026. Finally, if the FY 2026 Appropriations Acts were not being implemented in accordance with Congressional intent, Congress could have provided otherwise in the continuing resolution passed on September 2, 2026. *See* Pub. L. No. 119-103. It declined to do so, and instead, made continued funding available on the same terms as the FY 2026 acts themselves. *See id.* § 101. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," and where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law." *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) (citing cases). Simply put, the legislative history fails to demonstrate that the legislative veto over USDA's reorganization was so important to "the original legislative bargain" that without it, Congress would have prohibited USDA from using its preexisting statutory

[8] The Continuing Resolution Plaintiffs cite demonstrates this obvious point. *See* Pls.' Mot. at 5 (citing Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extension Act, 2026, Pub. L. No. 119-37, which states clearly that "no federal funds may be used to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government," full stop, through January 30, 2026).

authority to reorganize its structure and relocate employees. *Alaska Airlines*, 480 U.S. at 685.

*And fourth*, the delegation subject to the legislative veto only confirms that this is the case. The Appropriations Acts at issue delegate no additional authority to USDA (as relevant here)—they simply appropriate funds. There is no delegation of power "so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism." *Id.* Congress already granted USDA the statutory authority it is exercising, and if Congress wanted to limit that authority, it could repeal the Reorganization Plan No. 2 of 1953.

Accordingly, the Court should reject Plaintiffs' severability analysis.

***

For all of these reasons, the Department has exercised valid statutory authority, and the Congressional approval requirements in § 716, § 771, and § 421 are unconstitutional and lack legal effect. USDA's reorganization efforts thus have been, and continue to be, lawful.

D. USDA's reorganization comports with the APA.

Plaintiffs have made several arbitrary and capricious arguments under the APA. *See* Pls.' Mot. at 18-21. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.* "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* "An agency must examine the relevant data and its decision is arbitrary and capricious if it entirely failed to consider an important aspect of the problem." *Ctr. for Food Safety v. EPA*, 757 F. Supp. 3d 997, 1021 (N.D. Cal. 2024).

*i. USDA's reorganization is reasonable and reasonably explained.*

USDA's reorganization efforts are both reasonable and reasonably explained. As the Secretary's Memorandum explains, four commonsense principles animate the Department's reorganization: (1) ensuring the size of USDA's workforce aligns with financial resources and priorities; (2) bringing USDA closer to its customers by relocating resources outside of the national capital

region; (3) eliminating management layers and bureaucracy; and (4) consolidating support functions. *See* Sec. Mem. at 2-4. These goals serve as the foundation for reasonable agency action.

As to the first, in recent years, USDA's workforce expanded by 8%, but was funded largely through temporary funding. *Id.* at 2; *see also* Rice Decl. ¶ 21 ("Because many positions added in prior years were funded through temporary, nonrecurring sources—primarily the Inflation Reduction Act and the Infrastructure Investment and Jobs Act—USDA could not sustain those staffing levels once that supplemental funding diminished."). Still, USDA avoided RIFs by leveraging voluntary separation mechanisms, and has no plans to deploy RIFs. *Id.*

As to the second, "[t]o ensure that USDA is located closer to the people it serves while achieving savings to the American taxpayer," USDA intends to relocate some of its NCR staff to "five hub locations." *Id.* This "strengthen[s] USDA's presence in key agricultural regions across the country," and locates USDA employees closer to the public they serve. USDA, *FAQs USDA Reorganization* (Oct. 29, 2025) ("FAQs"); *see also* Dep. Sec. Test. at 11 ("It makes more sense for the Forest Service to be located actually close to the forests it is in charge of managing."). Further, the selection of hub locations considered "existing concentration of USDA employees and the cost of living for USDA employees." *Id.* And although USDA employs thousands of employees in the NCR, that region "has one of the highest costs of living in the country." Sec. Mem. at 2. Relocation not only helps USDA reduce costs, but facilitates its ability to develop and retain talent. As USDA's Deputy Secretary has explained, the reorganization will allow the Department "to build the next generation of USDA leadership," Dep. Sec. Test. at 6, as USDA "want[s] people to come to USDA for a career, to start a family, and to stay with us." *Id.* at 7.

The reorganization is also intended to reduce or eliminate bureaucratic management layers, reduce duplication, and consolidate support functions. To promote coordination across USDA, regional offices and similar management layers will be co-located in the hub locations to the extent possible, and agency resources will be realigned to consolidate functions. Sec. Mem. at 3-4; Rice Decl. ¶¶ 22-26. This is reasonable and consistent with statutory authority. *See supra* pp. 16-17.

Finally, where the Department's obligations under the USE IT Act require the closure of

existing facilities, they are also reasonable. Per the Act, all buildings leased or owned by a government agency should be at least 60 percent occupied, and agencies failing to meet that threshold should take steps to reduce space. Thomas R. Carper Water Resources Development Act of 2024, Pub. L. No. 118-272 § 2302(d)(1), (2), 138 Stat. 2992, 3218 (2025). That is exactly what USDA is doing because not "one of USDA's buildings in the [NCR] meets this congressionally mandated 60 percent occupancy." Dep. Sec. Test. at 5. And the buildings the Department has selected for disposal would cost the Department millions of dollars to retain due to deferred maintenance costs, and otherwise present significant operational challenges. *See supra* p. 5; *infra* pp. 33-34; Ex. 1, 17-18 to Walker Decl., Letter to Chairman Hoeven at 3.

USDA has also made significant efforts to explain its reorganization proposals. *See, e.g.*, USDA, *USDA Reorganization* https://perma.cc/87WQ-J7PV. For these reasons, Plaintiffs' arbitrary and capricious arguments fail. Defendants respond to Plaintiffs specific arguments as follows.

*ii. Plaintiffs' arguments do not establish otherwise.*

Plaintiffs contend that USDA's reorganization efforts are arbitrary because USDA failed to analyze the impact of employee attrition on agency functions. *See* Pls.' Mot. at 18-21. Not so.

To start, it has been (and remains) unclear which agency actions Plaintiffs are challenging as arbitrary—a difficult premise for an arbitrary and capricious claim. In their prior preliminary injunction motion, Plaintiffs advanced this argument related to the Secretary's initial July 2025 Memorandum and the even earlier draft February and March 2025 Agency RIF and Reorganization Plans. *See* ECF Nos. 440-1, 457, *AFGE v. Trump*, 3:25-cv-3698 (N.D. Cal.). In response, Defendants argued as a legal matter that USDA was not required to analyze hypothetical attrition in conjunction with those steps, before any actual implementation plans had been developed or any specific relocations proposed, because such speculative predictions would not be "relevant data," *Ctr. for Food Safety*, 757 F. Supp. 3d at 1021 (citation omitted), and hypothetical attrition is not an "important aspect" of the problem. *See, e.g. City of Angoon v. Hodel*, 803 F.2d 1016, 1020 (9th Cir. 1986) (agency "need not consider 'remote and speculative'" possibilities "whose effects cannot be readily ascertained" (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978))). It was thus reasonable to forego that large-scale analysis to accompany the Secretary's

basic framework for reorganization. *See Prometheus Radio Project*, 592 U.S. at 427 ("The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies."). To the extent Plaintiffs make those arguments now, Defendants raise them again.

To the extent that Plaintiffs are now challenging the mission area or staff office reorganization plans currently being implemented (as set forth in the Congressional notifications or otherwise), even if those plans constituted final agency action, USDA has shown they pass muster. The relevant agencies considered attrition in formulating those plans and are considering attrition in implementing them. USDA is not seeking to further reduce its workforce through relocation or otherwise. *See* Dep. Sec. Test. at 6 ("[W]e have made a commitment that if employees go with us to these new locations, they have got a job, and we are planning to have an office for them there."); Rice Decl. ¶ 19 ("All current USDA employees will have a position in the Department. USDA has no current plans to conduct any [RIFs] across the Department."). Still, the agency and its mission areas and staff offices have recognized the reality that not all employees may be willing to relocate. *See, e.g.,* Dep. Sec. Test. at 26 ("Do I think 100 percent will say yes and relocate? No, Senator, that would not be realistic for me to say that.").

Accordingly, in developing reorganization plans, mission areas and offices have taken pains to minimize relocation and associated attrition. For instance, USDA previously would have expected the maximum number of employees subject to relocation to be far greater, but USDA now expects a maximum of 2,000 employees to be subject to relocation outside their commuting area—2.1% of the agency's 93,674-person workforce—a much-reduced figure that is the product of the agency's concern about attrition. Rice Decl. ¶¶ 42, 63. Plaintiffs' submissions regarding attrition establish only hypothetical rates and are otherwise unpersuasive.[9]

Specific examples confirm that attrition has been factored into the relevant reorganization

[9] Plaintiffs rely on the declarations of employees and former employees who lack a basis to opine on USDA's reorganization plans and are otherwise riddled with hearsay and speculation. *See* Pls.' Mot. at 8-14. They also rely on surveys compiled by the union Plaintiffs that are likely to be biased or unrepresentative, and further, Plaintiffs have provided insufficient information about the form and content of these surveys. The Court should not give them persuasive value. Plaintiffs also cite the attrition experienced in the ERS and NIFA relocation in 2018. USDA did not believe that relocation would be predictive of how many employees would relocate for this reorganization because of changes to the job market in the NCR. Rice Decl. ¶ 73.

plans. For instance, although USDA originally contemplated disposing of the GWCC, USDA ultimately determined to retain that building "to better support long-term operational requirements in the NCR," as well as "to provide additional flexibility to maximize mission continuity . . . and mitigate the degree of attrition." Rice Decl. ¶ 47. In other words, USDA retained that space so that it could retain "1900 additional employees" in the NCR to mitigate attrition. *Id.* ¶ 48.

Similarly, in developing the Forest Service reorganization plan, the agency made substantial changes to its structure and facilities to deal with its serious financial difficulties, but it still took care to minimize attrition. *See id.* ¶¶ 49-51; Exs. 13-16 to Walker Decl. To that end, the Forest Service developed a plan whereby only a fraction of Forest Service employees will be subject to relocation. USDA currently estimates that "no more than 250 employees" will be required to relocate outside of the local commuting area—a mere 0.75% of the Service's workforce. Rice Decl. ¶ 165. The Forest Service also "initially announced that Regional Offices in Portland, Oregon; Atlanta, Georgia; and Milwaukee, Wisconsin would close"; however, "after several months of coordination to find more cost-effective space, the agency will not relocate the individuals" in those offices outside of their commuting area. *Id.* ¶ 49. Further, USDA has agreed to attrition provisions in its union agreements, *id.* ¶ 52, and although USDA ultimately decided against consolidating all of its support functions to mitigate attrition. *Id.* ¶ 53. These are just a handful of examples, but as USDA has been calibrating its reorganization plans, it has continued to consider attrition.

This is further confirmed by the agency's FY 2026 ASP and hiring—which have sustained hiring to offset and preempt potential attrition. The Department's FY 2026 ASP stated that USDA would continue hiring in FY 2026. Rice Decl. ¶ 28; ASP at 8. Nearly 1,500 of those employees were to be hired to ensure the agency could "fulfill [its] statutory obligations," and another 3,312 for "other mission-critical areas." ASP at 8. USDA "project[ed] a nominal *net gain* to the workforce." *Id.* at 7 (emphasis added). "Hiring in most agencies [was] expected to . . . focus[] on maintaining capacity by hiring at the rate of expected attrition and realigning the workforce to address the most critical priorities." *Id.* USDA has confirmed that in FY 2026 to date, its hiring has tracked those plans. *See* Rice Decl. ¶ 32. For a point of comparison, on January 24, 2026, USDA's workforce totaled 90,373, but as of August 8, 2026, USDA's workforce totals 93,674—an increase of

3,281 employees. *Id.* ¶ 42; *id.* ¶ 32 (onboarding 9,923 new employees in FY 2026).

Plaintiffs' argument that USDA failed to consider the reorganization's impact on the agency's ability to perform its statutory functions is also incorrect. In formulating their reorganization plans, each mission area or staff office considered the functions it is responsible for, and formulated its reorganization plans to *improve* its ability to perform those functions and deliver services to the public. For instance, FNA has proposed "changes . . . designed to simplify the chain of command, strengthen local partnerships, and enhance customer service, all while administering more effective evaluation of nutrition systems." Ex. 2 to Walker Decl., FNA Notice at 1; *see also id.* at 2 ("This model supports fair distribution of workload, increases collaboration among program specialists within their program areas, and expands nationwide program consistency—ultimately improving support provided to States. The structure will reinforce consistency in methods, and support knowledge transfer."). Likewise, RMA has "implemented a workforce realignment strategy to place personnel where they provide the greatest value – closer to agricultural producers, Approved Insurance Providers (AIPs), and regional partners," in order to "strengthen[] program delivery, improve[] responsiveness," and align[] staffing with field based operation needs." Ex. 2 to Walker Decl., RD Cong. Notice at 3. The FSA's changes "include integrating and expanding executive level oversight and leadership at the appropriate levels . . . to support rapid decision-making and implementation of statutorily mandated programs." *Id.* at 2. This list goes on. *See* Rice Decl. ¶¶ 74-311. The Department's mission areas and staff offices are not ignoring the reorganization's impact on agency functions; they are tailoring the reorganization—including where agency employees are located and deployed—to improve those functions.

Finally, Plaintiffs' arguments regarding USDA's hiring into different positions and hiring early career staff fail to persuade. *See* Pls.' Mot. at 21. Only a fraction of the agency's workforce is subject to relocation, so even assuming some attrition, Plaintiffs have not demonstrated that attrition will be significant enough to disrupt key functions. Given that context, the fact the agency is hiring into its new organizational structure, consistent with its perceived needs and priorities, is an entirely reasonable policy decision. Further, consistent with its goals of "build[ing] the next

generation of USDA leadership," Dep. Sec. Test. at 6, as well as OPM guidance, USDA is reasonably hiring a percentage of early career staff. And that employees have less experience does not necessarily make them "less qualified." *Shelly v. Green*, 666 F.3d 599, 618-19 (9th Cir. 2012) ("[E]very employer knows that mere years in service is not a perfect proxy for competence.").

For all these reasons, USDA has certainly not "entirely failed to consider an important aspect of the problem." *Ctr. for Food Safety*, 757 F. Supp. 3d at 1021 (citation omitted). USDA's efforts have been reasonable and comport with the APA.

## II. Plaintiffs Cannot Establish Irreparable Harm.

Plaintiffs' failure to demonstrate irreparable harm independently defeats their motion. Plaintiffs must establish a "likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). A "possibility" of irreparable harm is insufficient; "irreparable injury [must be] *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

To the extent that Plaintiffs' alleged harms are premised on the disruption of agency services, they are speculative. USDA is not conducting RIFs, and USDA estimates that a maximum of 2.1% of the agency's workforce may be subject to relocation. Rice Decl. ¶ 63. Early indications suggest that attrition resulting from relocation is not likely to be as substantial as Plaintiffs contend, *see id.* ¶¶ 66-73, but even assuming Plaintiffs' figures, Plaintiffs cannot show that potential attrition "will necessarily disrupt the services provided to Local Government and Non-Profit Plaintiffs," such as food benefit programs. Pls.' Mot. at 24. Plaintiffs also cite their recreation interests in national forest areas, *id.*, but that evidence is even weaker: only 250 of the Forest Service's 33,500 employees are subject to relocation. Plaintiffs cannot show that a .75% change in staffing could even potentially disrupt their enjoyment of public lands, much less satisfy the standard for irreparable harm. The Supreme Court also has recently granted requests to stay injunctions halting agency reorganizations premised on the theories of harm to downstream users of government services. *See OPM v. AFGE*, 145 S. Ct. 1914 (Mem.) (2025); *McMahon*, 145 S. Ct. at 2643. These

decisions indicate that, ordinarily, agencies may proceed with reorganizations pending litigation, and courts should not engage in the day-to-day agency oversight that Plaintiffs seek here.

To the extent that Plaintiffs argue that USDA employees represented by the union Plaintiffs will suffer irreparable harm from declining relocation, those harms are not irreparable. The MSPB may issue relief to covered employees found to have been wrongfully removed through reinstatement, backpay, and attorney's fees, 5 U.S.C. §§ 1204(a)(2), 7701(g), and the Supreme Court has expressly held that the loss of government employment does not ordinarily qualify as irreparable harm, *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Plaintiffs' substantial delay in seeking preliminary relief only confirms that the injuries they allege are speculative. The Secretary announced the reorganization in July 2025, and notified the presidents of AFGE and NFFE shortly thereafter. Rice Decl. ¶ 37. Still, Plaintiffs did not file the present preliminary injunction motion until September 2026. "Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see also Or. Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1266 (D. Or. 2022) (concluding two-month delay "counsels against a finding of likely irreparable harm"). The Court should conclude the same here.

**III. An Injunction Is Contrary to the Public Interest and the Balance of the Equities.**

The public interest at stake here, alone, is sufficient to deny Plaintiffs' motion. In considering requests for preliminary relief, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. And "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

The public interest requires the Court to deny Plaintiffs' motion. USDA's reorganization was announced over a year ago, and in that time, USDA has taken steps to implement it. USDA has already terminated the leases applicable to much of its NCR office space, and has returned to

GSA control of the South Building in Washington, D.C. and Braddock Place building in Alexandria, VA. *See* USDA, *Rollins, Vaden, and Forst Announce Disposal of Dilapidated USDA Facilities* (Feb. 25, 2026), https://perma.cc/2FW7-38D9. USDA has submitted lease terminations for offices across the country. *See* Rice Decl. ¶ 313. USDA has also incurred new lease actions and facilities work in anticipation of opening new locations in the hub cities. *See id.* ¶¶ 314-15. To require USDA to unwind those steps now would incur millions of dollars of expenses on behalf of American taxpayers. And were the Court to enjoin USDA's relocations, USDA's employees would be located in different places than its offices—disrupting agency functions, and creating the chaos Plaintiffs seek to prevent. The public interest cannot tolerate such an injunction.

Further, USDA is committed to meeting its bargaining obligations with the relevant unions, and to that end, USDA has reached agreements with several unions and negotiations are in progress for others. *See* Rice Decl. ¶¶ 35-37; Exs. 3-8 to Walker Decl. An injunction would jeopardize USDA's ability to comply with the agreements USDA has already completed. All told, those agreements have the potential to impact thousands of bargaining unit employees. Rice Decl. ¶ 36.

And because USDA's reorganization is already underway, some employees have already made decisions regarding the future of their employment. *See id.* ¶¶ 63-71. Some may have resigned and found alternate employment. And others have accepted their relocation offers, and in turn, may have sold their houses, or purchased homes or signed leases in the cities where they are being relocated. Were the Court to halt USDA's reorganization now, those employees' lives would be disrupted based on the uncertainty of a court-issued preliminary injunction—a temporary measure but one that will have real-world impacts on USDA's employees.

Were the Court to enjoin USDA's relocation of employees or closure of offices, USDA may be required to reduce the hiring of mission-critical employees in order to pay for the operation and maintenance of dual facilities, and USDA may be unable to support the salaries of researchers whose funding Congress canceled. *See id.* ¶ 107-08. Limiting hiring would create extended vacancies in key functions, concentrate workloads, and jeopardize execution of statutory obligations. Further, States in which new USDA offices are expected to open or expand have expressed support for the reorganization and stand to benefit from the influx of new jobs and operations. *See* Ex. 9

to Walker Decl., Letters from Governors in Support of USDA Reorganization.

Finally, an injunction would irreparably harm the Government by "improperly intrud[ing] on a coordinate branch," and "interfere[ing] with" and "meddl[ing] in" "the internal operations of the Executive Branch." *Trump v. California*, 609 U.S.----, 2026 WL 2473573, at *4-*5 (2026).

The bottom line is that Plaintiffs' attempt to enjoin the reorganization is too late, and jeopardizes millions in public funds to unwind efforts already under way that may, in the course of litigation, ultimately move forward. Such an injunction would be against the public interest.

## IV. Plaintiffs' Requested Relief Is Overbroad.

Even if the Court finds a preliminary injunction is warranted, Plaintiffs' requested injunction is overbroad, particularly insofar it seeks to enjoin USDA from relocating employees not represented by the Plaintiff unions, from reassigning employees without requiring relocation, and from "closing or eliminating offices, programs, or facilities." Pls.' Proposed Order at 2. Defendants request the opportunity to brief the scope of relief if the Court finds that relief is warranted.

## V. Defendants Request a Stay of Relief.

In light of the extraordinary breadth of Plaintiffs' requested injunction or § 705 stay, the United States respectfully requests that any relief granted be stayed pending the disposition of any authorized appeal, or at a minimum, stayed for a period of fourteen days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal and stay is authorized.

## VI. Plaintiffs Should Be Ordered to Post Security In Connection With Any Relief.

If the Court orders injunctive relief, it should also order security. The Court may issue an injunction "only if the movant gives security" for the "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined," Fed. R. Civ. P. 65(c). and the Rule's text presumes that security will be given. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Here, an appropriate bond would be commensurate with the costs USDA and its employees would have to expend to unwind its reorganization efforts. *See* Rice Decl. ¶¶ 312-15.

## CONCLUSION

For the reasons above, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: September 18, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

BRAD P. ROSENBERG
Chief Litigation Counsel

_/s/ Taylor Pitz_
TAYLOR PITZ
CA Bar No. 332080
Trial Attorney
Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 305-5200
Taylor.N.Pitz@usdoj.gov

*Counsel for Defendants*