# EXHIBIT 3

# MEMORANDUM OF UNDERSTANDING ON

# RELOCATION NEGOTIATIONS

# BETWEEN:

# THE AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES (AFGE) LOCAL 3403
# AND
# ECONOMIC RESEARCH SERVICE (ERS) &
# NATIONAL INSTITUTE OF FOOD AND AGRICULTURE (NIFA),
# UNITED STATES DEPARTMENT OF AGRICULTURE (USDA)

This Memorandum of Understanding (MOU) is entered into between the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA), United States Department of Agriculture (collectively, the "Agency" or “Management”), and the American Federation of Government Employees, Local 3403 (Union), collectively referred to as "the Parties."

This MOU constitutes the agreement between the Parties regarding the relocation of bargaining unit employees (BUEs) to Kansas City, Missouri. It supplements but does not supersede the Parties' Collective Bargaining Agreement (CBA) effective September 5, 2023.

## Section 1. Scope and Application

This MOU applies to all BUEs subject to a Management Directed Reassignment (MDR) to Kansas City, Missouri, as a result of the Agency's relocation decision. This MOU supplements the CBA and shall remain in effect from the date of Agency Head approval through the resolution of all matters arising from the relocation.

## Section 2. General Protections

**A.** The Agency does not anticipate a Reduction in Force (RIF) as a result of the relocation to Kansas City, Missouri. In the event that a RIF subsequently becomes necessary, the Agency will fulfill all bargaining obligations under Article 37 of the CBA prior to implementation.

**B.** Existing reasonable accommodation (RA) determinations will not be uniformly rescinded as a result of the relocation. Any reevaluation of existing accommodations will proceed

through the interactive process in accordance with applicable law and USDA Departmental Regulation 4300-008.

a. An employee who submits an RA request related to their ability to relocate shall not be required to report to Kansas City prior to the later of: (i) the report date; or (ii) 60 days after the employee receives a final written RA determination (approved or denied). During the period a reasonable accommodation request remains pending, the employee shall not be subject to AWOL designation or adverse action solely on the basis of not reporting to a new duty station in Kansas City.

b. An employee with an existing or pending RA request related to their ability to report to an office, which is not based on a particular geographic location, must relocate. Existing RAs will remain in place at the new duty station until reevaluated in accordance with the DR to consider need for and effectiveness of the accommodation at the new location. During the review process, employees will be given sufficient time as determined by the Management RA officer to find medical care and provide the required documentation for the re-review process.

**C.** Existing Flexible Work Schedules (FWS), including Maxiflex, as outlined in CBA Article 14, Section 5, will not be uniformly rescinded as a result of the relocation. Individual agreements remain in effect unless modified through the procedures set forth in the CBA.

**Section 3. Reorganization**

---

**A.** The Agency confirms that the duties, essential functions, and reporting relationships for BUEs have not changed and will not change upon issuance of an MDR to relocate to Kansas City. A change in duty station location alone does not constitute a change in duties, essential functions, or reporting relationships for the purposes of this MOU.

**B.** The Agency will provide written notification to the Union prior to any changes in BUE duties, essential functions, and reporting relationships.

**C.** Changes to position descriptions and work reassignments will be conducted in accordance with Articles 13, 16, and 21 of the Parties' existing CBA.

(a) Under the ERS Research Position Classification System (RPCS), employees whose position descriptions, work assignments, or subject matter expertise change may elect to request a delayed review of their promotion package in accordance with the process outlined in the ERS RPCS Handbook.

(b) As outlined in Article 21 Performance Management of the Parties' existing CBA, any changes to performance management standards must be communicated to bargaining unit employees formally by the rating officials before they are applied to the employee. For ERS employees subject to RPCS, this provision encompasses RPCS promotion package reviews.

(c) The Agency recognizes that relocation may affect an employee's ability to meet established performance expectations. Accordingly, rating officials will document

and account for adjustments to newly assigned duties when evaluating performance during the transition period.

**Section 4. MDR Letter and Decision Period**

**A.** Upon issuance of the MDR letter, employees will be provided with a minimum of 30 days to respond with a decision to accept or decline the reassignment.

**B.** Each MDR letter will include, at minimum:

(a) Information regarding the Voluntary Early Retirement Authority (VERA) and the Voluntary Separation Incentive Program (VSIP) (eligibility will be determined on a case-by-case basis);

(b) Contact information in order to be assigned a relocation coordinator;

(c) Contact information in order to be assigned a retirement and benefits counselor;

(d) A description of the personal hardship request process; and

(e) Contact information for the Union will be included in the email accompanying the MDR letter.

**C.** Employees retain the right to change their decision to accept or decline the MDR at any time prior to the Friday before the report date.

**D.** Employees may utilize the hardship request process to request an extension of the decision period in writing. These requests will be considered on a case-by-case basis under the Department hardship process.

**E.** If an employee has a Reasonable Accommodation or Hardship Request, they may request an application by sending an email to the REE Reorganization email address and they will be provided with a link to the application.

**Section 5. Employees Who Decline the Relocation**

**A.** Employees may select a separation or retirement effective date before the report date for the purposes of severance or retirement.

**B.** An employee who declines the relocation will remain in duty status and receive pay from MDR issuance through: (i) the Saturday preceding the report date, or (ii) the employee's selected termination or retirement date, whichever is earlier.

**C.** Nothing in this MOU prevents the Agency from initiating adverse action proceedings prior to the report date; however, an employee shall not be removed from service before the report date unless the employee authorizes it.

**D.** If removal proceedings have not been concluded by the report date, the employee will be placed in an Absent Without Leave (AWOL) status until the adverse action removal has concluded. The employee’s FEHB enrollment may continue during this period; the employee will be responsible for paying both the employee and employer premium shares.

**E.** The Agency retains the authority and discretion to assess mission-critical workload requirements and may extend the termination date of declining employees when

necessary to ensure continuity of operations. The Agency will determine which positions qualify, as well as the duration and end date of any such extensions.

## Section 6. Workspace

***805 Pennsylvania Avenue, Kansas City***

**A.** The Agency will provide adequate individual workspace for BUEs subject to MDR that is at least equivalent to the existing workspaces for bargaining unit positions housed in the 805 Pennsylvania Avenue facility, Kansas City, MO.

**B.** The Agency will ensure that all newly assigned workspaces are appropriately furnished, to include, but not limited to; standing desk, two (2) functioning monitors, office chair, mouse and keyboard, laptop docking station, locking cabinet with keys, and office supplies.

**C.** BUEs are responsible for ensuring that any government-issued equipment, including laptops, monitors, keyboards, and docking stations, is either transported to the new duty station as part of their relocation package or returned to USDA through the existing surplus process at their local USDA building management prior to the report date.

**D.** The Agency will ensure that new workspaces are appropriately sanitized and cleaned prior to assignment.

**E.** New workspaces will be assigned in accordance with Article 11 of the Parties existing CBA.

**F.** Requests for workspace accommodations for employees working in the 805 Pennsylvania Avenue facility will be administered consistently with current Departmental practices.

**G.** Employees for whom a Kansas City workstation is not available by the report date will be authorized to telework until their workstation is ready.

**H.** The Agency will ensure that all employees assigned to the 805 Pennsylvania Avenue, Kansas City facility have access to the paid public parking garage adjacent to the building. Employees will be notified of the cost and process of obtaining a monthly parking agreement at the rate provided to all USDA employees. Parking information will be communicated to the employee no later than 30 days before the report date.

## Section 7. Personal Hardship

### A. Personal Hardship Scope and Definition

(a) In accordance with the Parties' current CBA and the statute, Management will establish a process under which Management will consider employee requests for relief from personal hardship arising from the directed relocation to Kansas City.

(b) Management reserves the right to determine whether a personal hardship exists and what action, if any, should be taken.

(c) Management will consider hardship requests in good faith, consistent with Article 12, Section 2(E) of the Collective Bargaining Agreement, but Management may not be able to satisfy every request.

(d) The provisions of this MOU are separate from and do not apply to requests for Reasonable Accommodation under the Rehabilitation Act or the Pregnant Workers Fairness Act, which are processed through the Reasonable Accommodation program.

(e) A personal hardship is a situation outside of the employee's reasonable ability to control that affects the health and/or welfare of the employee and/or a family member as defined in 5 C.F.R. § 630.201.

**B. Requests for a Personal Hardship Consideration**

(a) Any bargaining unit employee who receives an MDR letter may submit a written personal hardship request via the process outlined by Management.

(b) When Management receives a personal hardship request, Management will determine whether a hardship exists. If needed before making a final determination, Management may request additional information from the employee, and the employee may submit additional information voluntarily.

(c) Management will notify the employee in writing normally within 30 calendar days of receipt of a complete submission. The written decision will include a determination of whether a hardship exists and, if so, what accommodation Management will provide.

(d) Where a hardship is approved or denied, the employee will be provided with a revised report date: the later of: (i) the report date provided in the MDR letter; or (ii) 60 days after the employee receives a final written hardship determination. During the period a hardship request remains pending, the employee shall not be subject to AWOL designation or adverse action solely on the basis of not reporting to a new duty station in Kansas City.

(e) Confidentiality regarding an employee's hardship situation will be maintained to the extent possible. Information shared in connection with a hardship request will not be disclosed beyond those Management officials with a need to know for purposes of processing the request.

(f) Upon the employee's request, a Union representative will be included in any meeting that may be held in connection with the hardship determination.

(g) A Union representative may accompany the employee at any meeting held in connection with any appeal that may be filed. Nothing in any appeal limits the right of the Union or any employee to file a grievance under Section 11 of this MOU.

(h) An employee must submit a hardship request within 30 calendar days of receipt of the MDR letter to be considered under this MOU during the initial decision period. Requests submitted after that deadline may be considered at Management's discretion where circumstances have changed or could not reasonably have been identified earlier.

## Section 8. Relocation Financial Support

**A. Election of Relocation Package**

(a) Within 30 days of MDR issuance, each accepting employee will elect either: (i) the traditional Federal Travel Regulation (FTR) relocation package, or (ii) the USDA Lump Sum Relocation Program.

(b) There will be case by case counseling services and tools available prior to the election deadline to assist employees with the decision-making process.

(c) The election is binding once the employee's relocation authorization payment is received.

(d) Employees who accept the relocation and receive relocation payment under the FTR or lump sum program shall serve a 12-month service agreement. Employees may serve the agreement with any USDA agency in any duty station or with any other Federal Government Agency. If an employee leaves the Agency before the end of their service agreement, the authorizing official will determine whether repayment is required, considering whether circumstances were outside the employee's control. During the service agreement period, employees who accept the lump sum will be responsible for attesting that they have moved to the new duty station.

**B. Traditional FTR Package**

(a) Employees who select the traditional FTR package are entitled to the following:

1. En route travel expenses, including per diem for the employee and accompanying family members as defined in 5 C.F.R. § 300.103, during travel to the new duty station;
2. Miscellaneous moving expenses;
   i. $905 (no dependents) or the equivalent of one week's basic gross pay, whichever is the lesser amount, or;
   ii. $1,810 (with dependents) or the equivalent of two weeks' basic gross pay, whichever is the lesser amount.
3. Household goods shipment of up to 18,000 lbs.;
4. Storage in transit (SIT) of household goods, for up to 90 days
5. One (1) house hunting trip not to exceed 10 days, including rental car;
6. Sell and buy residence transaction expenses or lease termination expenses;
   i. Up to 10 percent of the actual sales price for the sale of a residence at the old official duty station;
   ii. Up to 5 percent of the actual purchase price for the purchase of a residence at the new official duty station;
   iii. Reimbursement for lease-termination expenses at actual cost, with proper documentation;
7. Property management services for up to 12 months;
8. Shipment of one (1) privately owned vehicle (POV);
9. Withholding Tax Allowance (WTA) and Relocation Income Tax Allowance (RITA) payments to offset actual tax liability;
10. 60 days of approved Temporary Quarters Subsistence Expenses (TQSE), with extensions authorized by the Agency up to a maximum of 120 days; extensions beyond 60 days are authorized at the Agency level and will be determined on a case-by-case basis.

**C. Relocation Incentive**

(a) The Agency will offer a $20,000 relocation incentive to employees who select the lump sum relocation program because the vacancy rate in Kansas City, MO is above the 5% threshold for the lump sum authorization for temporary quarters.

(b) The service agreement for the relocation incentive shall be 24 months, served concurrently with any other applicable service agreement**.** The service agreement is transferable to any USDA agency regardless of duty station location. Employees who voluntarily separate or transfer from USDA service prior to completion of the service agreement shall be required to repay the relocation incentive on a pro-rated basis.

**D. Situational Telework and Leave for Relocation Purposes**

(a) Employees may request situational telework to address operational circumstances arising from the relocation transition when telework is more practicable than reporting in person. Situational telework may be appropriate during periods such as temporary housing arrangements or reduced access to the employee's permanent duty workspace. However, situational telework hours are not automatically approved. All situational telework must be specifically requested by the employee and approved.

(b) Employees must submit situational telework requests through their agency's established process. For NIFA, requests are submitted via a Decision Memo routed through the supervisory chain. For ERS, employees may submit situational telework requests to their first-line supervisor for consideration.

(c) Accepting employees will be credited with 80 hours of administrative leave, available for use from MDR issuance through 60 days after the report date. The 80-hour time allotment may be used to perform any relocation purposes to include but not limited to house hunting purposes, packing, supervising movers, and similar activities. Administrative leave under Section 8D(c) is separate from, and in addition to, any Leave Without Pay authorized under Section 8D(d).

(d) Employees may request leave with or without pay in excess of the 80-hour administrative leave allotment defined in this Section for relocation purposes at any point after MDR issuance. An accepting employee may also request annual leave or Leave Without Pay (LWOP) for a period of up to 30 days after the report date to allow additional time for the physical relocation These requests should be approved unless there is a mission critical need to decline them.

**E. Report Date and Personnel Action Protections**

(a) The report date shall not be earlier than October 5th or 90 days from the date of MDR issuance, whichever is later.

(b) Personnel actions reflecting the Kansas City duty station shall not be processed before the report date or the employee begins reporting to Kansas City, whichever is sooner.

(c) Employees will remain in their current locality pay area through the day before the report date, or the day before beginning to report to Kansas City, whichever is sooner.

**F. Equivalent Relocation Support**

(a) BUEs subject to an MDR who accept a different position within the bargaining unit that is also located in Kansas City will receive equivalent relocation support, subject to applicable personnel regulations.

(b) The Agency confirms that funding for FTR and Lump Sum relocation entitlements will be available for employees whose relocation occurs after October 5th, 2026, including those whose relocation is delayed due to an approved hardship accommodation or pending reasonable accommodation determination. The availability of funding shall not limit any employees' entitlement to relocation benefits under this MOU.

## Section 9. Separation and Retirement Support

### A. VERA/VSIP

(a) In accordance with the OPM and OMB approval, the Agency will open an election window for 30 calendar days starting from the date of MDR issuance.

(b) The maximum VSIP amount is $25,000, pursuant to 5 U.S.C. § 3523(b)(2)(B).

### B. Career Transition Assistance Plan (CTAP)

(a) Employees who decline the relocation and receive a notice of proposed removal for declining a directed reassignment to another local commuting area, are entitled to Career Transition Assistance Plan (CTAP) selection priority if they satisfy CTAP candidate requirements and are deemed "well qualified" for the job. Management agrees that open positions advertised by ERS and NIFA will be open to CTAP candidates resulting from this reorganization beyond the local commuting area for their respective employees.

(b) The Agency will provide each declining employee with written documentation supporting involuntary separation status at or before the effective date of separation.

(c) Employees who decline the relocation and are separated as a result will be eligible for Interagency Career Transition Assistance Plan (ICTAP) selection priority in accordance with applicable law and regulation.

### C. Career Transition Services

(a) The Agency will provide group information sessions covering CTAP, ICTAP, VSIP, resume writing, and retirement planning. These sessions will occur on duty time. Employees will reasonably be excused from regular duties to attend training sessions.

(b) Consistent with the parties' existing agreement in CBA Article 37, Section 12, and as an appropriate arrangement under 5 U.S.C. § 7106(b)(3) for employees adversely affected by an MDR, employees may use up to twenty (20) hours of duty time for career transition activities — including preparing and updating resumes and job applications, attending employment interviews, contacting potential employers, and reviewing vacancy announcements — beginning at MDR issuance. Duty time for career transition activities is not subject to prior supervisory approval; employees shall provide reasonable advance notice of their intent to use such time.

### D. Retirement Processing

(a) Retirement counseling contacts will be made available to employees at the time of MDR issuance.

(b) The Agency agrees to provide a retirement processing timeline on the REE AXON page for the portions of the process that are within USDA control.

(c) Employees with outstanding Thrift Savings Plan (TSP) loans will receive written notice of the implications of separation prior to their separation effective date.

(d) Employees may submit a hardship request to delay the report or separation date to meet the minimum service and age requirements for an immediate annuity under Federal Employees Retirement System (FERS) or Civil Service Retirement Service (CSRS), including Discontinued Service Retirement under 5 U.S.C. § 8414(b) or § 8336(d). Upon request, employees will receive an individualized written retirement readiness assessment from the Agency's benefits counselor within 15 days of the request.

**E. Severance Pay.**

(a) Employees serving under qualifying appointments, meeting all eligibility requirements who decline the relocation and are separated as a result shall be entitled to severance pay in accordance with 5 U.S.C. § 5595 and 5 CFR Part 550, Subpart G. For purposes of this MOU, the Agency confirms that an employee's declination of a directed reassignment to a different commuting area does not constitute a declination of a reasonable offer under 5 CFR § 550.707(a), and no employee shall be disqualified from severance pay on that basis.

(b) An employee who elects an earlier separation date pursuant to Section 5(a) of this MOU retains full eligibility for severance pay. Any such separation date must fall after the employee declines the MDR and receives their final decision letter. The election of a separation date shall not be construed as a voluntary separation for purposes of severance pay eligibility.

## Section 10. Union Communications

**A.** To the extent practicable, the Agency agrees to provide the Union with advance notice of any all-hands sessions, town halls, or agency-wide communications to bargaining unit employees regarding the reorganization, relocation, or individual duty station changes, with an opportunity for the Union to submit questions or responses before those communications are issued.

**B.** The Agency will provide the Union with written notice of any new bargaining unit positions created as a result of the relocation before the external recruitment period closes.

## Section 11. Grievance and Enforcement

**A.** All provisions of this MOU constitute enforceable terms and conditions of employment. Any alleged violation of this MOU by the Agency shall be subject to the grievance and arbitration procedure set forth in Article 7 of the Collective Bargaining Agreement. Time limits for filing a grievance under Article 7 shall begin from the date the Union or the affected employee knew or reasonably should have known of the alleged violation.

**B.** Nothing in this MOU waives or limits any right of the Union or any BUE under applicable law, including rights under 5 U.S.C. Chapter 71, the Rehabilitation Act, or any other law governing federal employment.

**C.** This MOU may not be modified, waived, or superseded except by a written agreement signed by the authorized representatives of both Parties. No verbal agreement, informal understanding, or past practice shall constitute a modification of this MOU.

**D.** If any provision of this MOU is determined to be invalid or unenforceable under applicable law or regulation, that provision shall be severed, and the remaining provisions shall remain in full force and effect. Upon severance, the Parties agree to bargain in good faith over a lawful replacement provision.

**Effective Date and Duration**

**A.** This MOU becomes effective upon Agency Head approval and shall remain in effect through the resolution of all matters arising from the relocation of bargaining unit employees covered by this agreement, unless terminated earlier or extended by mutual written agreement of the Parties.

**B.** Upon approval of this MOU, the Parties will provide a joint training session on the provisions of this agreement which will be recorded for staff who are unavailable. The training will be conducted at a mutually agreed date and time.

**The Parties Agreed to this MOU on June 18, 2026**

For the Agency:

CHRISTOPHER GRONDALSKI Digitally signed by CHRISTOPHER GRONDALSKI Date: 2026.06.18 15:26:22 -04'00'

Chris Grondalski
Agency Chief Negotiator
Labor Relations Officer, REE

For the Union:

LAURA DODSON Digitally signed by LAURA DODSON Date: 2026.06.18 15:17:20 -04'00'

Laura Dodson
Union Co-Chief Negotiator
Vice President, ERS, AFGE Local 3403

THOMAS BEWICK Digitally signed by THOMAS BEWICK Date: 2026.06.18 15:19:51 -04'00'

Thomas Bewick
Union Co-Chief Negotiator
Vice President, NIFA, AFGE Local 3403