# EXHIBIT 17

U.S. OFFICE OF SPECIAL COUNSEL
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

The Special Counsel

June 29, 2023

The Honorable Thomas J. Vilsack
Secretary
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, D.C. 20250

Re: OSC File Nos. DI-23-000706; DI-23-000708; and DI-23-000719
Request for Investigation–5 U.S.C. § 1213(c)

Dear Secretary Vilsack:

I am referring to you for investigation a whistleblower disclosure concerning employees of the Department of Agriculture, Agricultural Research Service, Beltsville Agricultural Research Center (BARC) in Beltsville, Maryland. The whistleblowers alleged that BARC leadership has engaged in activity that may constitute a violation of law, rule, or regulation; gross mismanagement; a gross waste of funds; and a substantial and specific danger to public health and safety. A report of your investigation on these allegations and any related matters is due to the Office of Special Counsel (OSC) by August 28, 2023.

[redacted] BARC employees who consented to the release of their names, disclosed that BARC leadership has failed to provide employees a workplace that is free from recognized hazards, as required by 29 U.S.C. § 654. The allegations to be investigated include:

- BARC leadership has failed to adequately maintain many of the facility buildings and structures, resulting in an unsafe and deteriorating workplace environment for employees;
- BARC facilities employees do not have the required tools and equipment for adequate maintenance and repair of the buildings and structures;
- The unsafe and deteriorating conditions have resulted in the loss and improper handling of scientific equipment, research, and data; and

- Any additional, related allegations of wrongdoing discovered during the investigation of the foregoing allegations.

The whistleblowers alleged that BARC leadership has failed to adequately address complaints concerning workplace conditions since 2017. As a result, the facility has unsafe conditions throughout its approximately 300 buildings and structures situated on over 6,000 acres. In Building 001, the elevator was out of service 144 days in 2022 and has again been out of service since June 6, 2023. Moreover, when the elevator is operational, employees frequently get trapped. The whistleblowers alleged the lack of a working elevator has resulted in the unsafe transport of compressed gases between floors. For example, the whistleblowers alleged liquid nitrogen is used in many of the BARC laboratories and must be transported between floors. They reported it is unsafe to be trapped in an elevator with tanks of compressed liquid nitrogen because it could cause asphyxiation and requires venting. And it is impractical to transport the tanks on the stairs due to their weight and volatility.

The whistleblowers also alleged that the entire campus is frequently without running water, the temperature in most buildings is poorly regulated, many buildings have water damage or flooding from unstable plumbing, and dozens of buildings have not had working fire suppression systems since 2021. In Building 007, all five floors flooded from burst pipes in December 2022. The whistleblowers alleged that approximately 70 percent of this building is laboratories and the flooding resulted in damaged equipment and compromised experiments. The lack of temperature regulation allegedly creates possible exposure of research to mold and runoff water. Employees were required to continue working in Building 007 from December 2022 to June 2023 even though it was not remediated for mold or water damage. When the building was finally closed to employees over six months after the flood, sufficient notice was not provided to allow employees to safely move research and equipment to other locations, resulting in additional damage and loss. The whistleblowers alleged these conditions create a substantial and specific danger to the health and safety of BARC employees as well as the public who relies on the accuracy of USDA research.[1]

Pursuant to my authority under 5 U.S.C. § 1213(c), I have concluded that there is a substantial likelihood that the information provided to OSC discloses a violation of law, rule, or regulation; gross mismanagement; a gross waste of funds; and a substantial and specific danger to public health and safety. Please note that specific allegations and references to specific violations of law, rule or regulation are not intended to be exclusive. If, in the course of your investigation, you discover additional violations, please include your findings on these additional matters in the report to OSC. As previously noted, your agency must conduct an investigation of these matters and produce a report, which must be reviewed and signed by you. Per statutory requirements, I will review the report for sufficiency and reasonableness before sending copies of the agency report along with the whistleblower's comments and any

---

[1] We have described some of the unsafe conditions disclosed to OSC for illustrative purposes in this letter, but the whistleblowers will provide a more comprehensive list of the identified hazards to investigators.

comments or recommendations I may have, to the President and congressional oversight committees and making these documents publicly available.

Additional important requirements and guidance on the agency report are included in the attached Appendix, which can also be accessed at https://osc.gov/Documents/Public%20Files/1213%20Appendix.pdf. If your investigators have questions regarding the statutory process or the report required under section 1213, please contact Catherine A. McMullen, Chief, Disclosure Unit, at (202) 804-7088 or cmcmullen@osc.gov for assistance. I am also available for any questions you may have.

Sincerely,

Henry J. Kerner
Special Counsel

Enclosure

cc: The Honorable Phyllis K. Fong, Inspector General

USDA United States Department of Agriculture

Office of the Secretary
Washington, DC 20250

March 29, 2024

THE HONORABLE HAMPTON Y. DELLINGER
*Special Counsel*
*U.S. Office of Special Counsel*
*1730 M Street NW, Suite 300*
*Washington, DC 20036*

Dear Special Counsel Dellinger:

This responds to former Special Counsel Kerner's letter of June 29, 2023. Thank you for your patience as we have worked to investigate these allegations thoroughly.

I take all matters involving employee safety and healthy very seriously. The issues noted in the letter concern me greatly, and I sincerely appreciate the dedication of the employees who raised them. Given the severity of the allegations, it was important that I received a full and unbiased report. Accordingly, I directed that a team of safety and health experts, engineers, and facility managers from a different United States Department of Agriculture (USDA) Mission Area thoroughly investigate the situation at the Agricultural Research Service's (ARS) Beltsville Agricultural Research Center (BARC). The team also included experts from USDA's Office of Human Resources Management to ascertain any potential personnel actions that might be appropriate. Their report is attached.

The team's report found two allegations by the employees in their disclosure to the Office of Special Counsel (OSC) to be substantiated, at least in part:

- BARC leadership has failed to adequately maintain many of the facility buildings and structures, resulting in an unsafe and deteriorating workplace environment for employees; and
- BARC facilities employees do not have the required tools and equipment for adequate maintenance and repair of the buildings and structures.

The report found a lack of substantiation for the third allegation, that "the unsafe and deteriorating conditions have resulted in the loss and improper handling of scientific equipment, research, and data."

As the report explains, many of the problems at BARC have accumulated over decades as a systematic result of inadequate funding from Congress to repair, maintain, and modernize BARC and indeed all ARS laboratories and research centers nationwide. These problems are particularly acute at BARC. Its sheer physical magnitude, sitting on 6,500 acres, and its age (more than 100 years) mean that many of its hundreds of structures need major repairs, modernization, replacement, or removal. Founded when the area was rural, BARC now sits among suburban sprawl that has changed and threatened the land and watershed. Despite all that, the people who have worked at BARC over the decades and to this day have continued to make enormous contributions to American farmers and ranchers.

However, although the lack of funding is a central issue, it cannot be an excuse. The situation at BARC is unacceptable. Although our review of personnel is ongoing, USDA has already made changes to the leadership structure, and additional changes may be forthcoming if further investigation determines that is warranted.

Now my main focus is addressing the most concerning immediate threats to safety and health. USDA employees should not be at risk on the job. As the attachment makes clear, USDA has already begun to respond to the serious allegations by taking immediate actions to address the most concerning issues. Other responses will take more time along with the assistance of Congress to resolve. But make no mistake, I will do whatever I can in my authority to protect and support our employees. For example, I have already directed the transfer of $50 million previously allocated for a new building at another ARS location to BARC for crucial repairs and modernization to ensure employee safety and health.

ARS leadership has identified 60 distinct recommendations in the investigation team's report and is in the process of addressing every one of them. To date, 14 are already complete. A list of all recommendations and a time frame for action is attached and underway.

I am committed to resolving these specific issues as well as addressing the larger problem of deferred maintenance at research facilities throughout USDA. This will require a clear, funded plan in cooperation with the Congress, State cooperators, and industry. I look forward to working with all partners to achieve that goal. The points of contact for this matter are Kevin Shea, Senior Advisor and Inga Bumbary-Langston, Deputy General Counsel. Both may be reached by calling (202) 720-3351.

Sincerely,

THOMAS J. VILSACK
*Secretary*

cc: Phyllis K. Fong, USDA Inspector General

Enclosures:
Enclosure A BARC Report
Enclosure B BARC CUI Key Word
Enclosure C Exhibits with Investigative Report
Enclosure D ARS Response Report
Enclosure E Action Tracker
Enclosure F BARC Master Plan

USDA

United States Department of Agriculture

March 25, 2024

**United States Department of Agriculture**

Departmental Administration

Office of Human Resources Management

1400 Independence Avenue, SW

Washington, DC 20250-9600

**TO:** Xochitl Torres Small
Deputy Secretary, USDA

Kevin Shea
Senior Advisor to the Deputy Secretary, USDA

**FROM:** [redacted]
Team Lead, Forest Service Research & Development [redacted]
Date: 2024.03.25 17:27:45 -04'00'

**SUBJECT:** Administrative Investigation of the Beltsville Agricultural Research Center (BARC) Report of Investigation INV202300001

This report details an investigation into whistleblower allegations concerning the Agricultural Research Service (ARS), Beltsville Agricultural Research Center (BARC) facility located in Beltsville, Maryland. The whistleblowers claim BARC leadership has failed to properly maintain facilities, resulting in an unsafe work environment and improper handling of research. In June 2023, the U.S. Office of Special Counsel referred the investigation to the Office of the Secretary of the U.S. Department of Agriculture. The investigation aimed to determine if these allegations violated safety regulations and to identify potential mismanagement.

A multi-disciplinary team led by the USDA Forest Service (FS) and Departmental Administration's Office of Human Resource Management (OHRM) conducted the investigation. The team reviewed almost 1,500 documents, interviewed three whistleblowers and 29 members of BARC staff and leadership, and toured the facility to assess the physical condition of BARC's infrastructure.

BARC is a large research center with hundreds of buildings on thousands of acres located within the metropolitan Washington, DC area suburbs. The facility suffers from decades of deferred maintenance needs, declining budgets, and aging infrastructure. BARC leadership acknowledged maintenance needs, resource constraints, and bureaucratic processes as challenges. Although improvements in processes and a renewed focus on leadership engagement over the last year were noted, records and reports provided by BARC document failures in the safe, effective, and efficient management of the Center's built environment since the early 2000s. Facility conditions appear to have started declining in the mid-1990s, likely due in part to federal funding cuts to research, increased expectations (standards development) on facilities management, and inadequate leadership attention and decision making for decades. However, although the conditions at BARC are the result of 30 years of cascading problems, the environment at the facility over the last decade is one of a demonstrated lack of internal controls, little accountability for performance, a multitude of poor or missing management decisions, and a culture that normalizes risky behavior and practices resulting in weak or unenforced safety standards.

## Background

By letter dated June 29, 2023, the U.S. Office of Special Counsel (OSC) referred a whistleblower disclosure for investigation to the Office of the Secretary of the U.S. Department of Agriculture (USDA or Department) concerning employees of the Agricultural Research Service (ARS), Beltsville Agricultural Research Center (BARC) located in Beltsville, Maryland. (Ex. 42-1) The whistleblowers, who consented to the release of their names, claimed that BARC leadership and employees engaged in conduct that may constitute a violation of law, rule, or regulation; gross mismanagement; gross waste of funds; and a substantial and specific danger to public health and safety. The whistleblowers specifically alleged that:

1) BARC leadership has failed to adequately maintain many of the facility buildings and structures, resulting in an unsafe and deteriorating workplace environment for employees;
2) BARC facility employees do not have the required tools and equipment for adequate maintenance and repair of the buildings and structures; and
3) unsafe and deteriorating conditions have resulted in the loss and improper handling of scientific equipment, research, and data.

Having determined that a substantial likelihood existed that the whistleblowers' information disclosed various violations at BARC, OSC tasked USDA with investigating the alleged violations of requirements outlined in Title 29 United States Code (U.S.C.), Chapter 15 – Occupational Safety and Health, Section (§) 654:

- Employers shall provide a place of employment free from recognized hazards that are likely to cause serious injury or death, and
- Employers shall comply with the standards promulgated in this chapter, and
- Employees shall comply with the standards and all rules, regulations, and orders issued pursuant to this chapter which are applicable to their own actions and conduct.

USDA was further tasked with submitting a report of investigation of these allegations as well as any additional, related allegations of wrongdoing discovered during the BARC inquiry. A multi-disciplinary inquiry team was assembled to investigate the allegations; this team conducted interviews of staff and leadership, physically toured BARC site buildings and infrastructure, and requested and reviewed numerous documents related to the operation of the BARC complex.

### a. Facility Profile

The Beltsville Agricultural Research Center (BARC) is part of the Northeast Area (NEA) Region within the Agricultural Research Service (ARS) which is one (1) of four (4) agencies comprising USDA's Research, Education and Economics (REE) mission area. With over 90 research facilities across five (5) geographic areas in the U.S., it is the mission of ARS to deliver scientific solutions to national and global agricultural challenges. Established in 1910 and currently the largest ARS facility in the nation, BARC houses many research laboratories for 17 research units on site that focus on a range of areas, including animal biosciences, biotechnology, animal parasitic diseases, environmental microbial and food safety, hydrology and remote sensing, invasive insect biocontrol, systemic entomology, and sustainable agricultural systems. The campus is approximately 6,000 acres of land and hosts over 400 buildings that serve 172 scientists and 530 employees in technical research support, administrative, and facilities roles. With an

average building age of 67 years, approximately half of the buildings on campus are currently in operation.

BARC is under the leadership of a Center Director (Senior Executive Service member) who is the Designated Official for the facility and an Assistant Director. The current BARC Center Director has encumbered that position since being placed in January 2017. In July 2023, the BARC Center Director began serving a detail as the Acting Associate Area Director for NEA and the BARC Assistant Director was named the Acting BARC Center Director. The Organizational Structure of BARC's facilities services area substantially changed at the time of a BARC reorganization in 2018 lead by the BARC Center Director, and subsequent organizational charts obtained by the Inquiry Team vary often (Ex. 35). At the time of this investigation, Facilities Services at BARC were organized into four (4) main units: Real Property Unit (PMU) managed by the PMU Unit Leader; Repairs and Renovations Unit (RRU) managed by the RRU Unit Leader; Operations Management Unit (OMU) managed by the OMU Unit Leader; and Utilities Management Unit (UMU) managed by the Acting UMU Unit Leader. Each Unit Leader reported to the Acting BARC Facilities Director.

The BARC facility has annual base funds of $98 million with $190 million in identified deferred maintenance needs. For the last ten fiscal years (FY), i.e., FY2014 – FY2023, total spending per year on facilities at BARC has ranged from $6 million [FY14 and FY19] to $52 million [FY16]. Total spending on facilities in the last three fiscal years—FY23, FY22, FY21—were $21 million, $43 million, and $34 million, respectively. Facility spending includes appropriated repairs and maintenance funds, unfunded priorities from salary lapse, and a high priority requirements list from salary lapse. ARS uses a Capital Investment Strategy (CIS) to organize funding approaches for new facilities and modernization efforts across the Agency which incorporates research priorities and facility condition indices as variables. Recent projects include: Renovations of Buildings 306 and 307 in FY22 using an FY16 award of $37.1 million; a $27.3 million award provided in FY20/21 to renovate Building 002 (estimated completion in FY25); a $37.3 million award in FY20 made to renovate Building 005 (estimated completion in FY26); and another FY20 award for $5.2 million for the renovation design for Building 308. ARS' current CIS lists eleven (11) projects at the BARC campus, with only three (3) fully funded. (Ex. 43-2, 43-4, 44-2)

### b. Inquiry Methodology

On or about July 17, 2023, the Forest Service (FS) was contacted by the Department to lead an investigation into the facilities and safety allegations lodged against BARC in the whistleblower complaints, i.e., OSC File Nos. DI-23-000706, -000708, and -000719. The request for assistance was based on the FS's institutional experience with constructing and managing numerous research facilities around the country. The FS assembled an inquiry team comprised of subject matter experts in the areas of safety and occupational health, engineering and facilities management, and industrial hygiene under the leadership of an Associate Deputy Chief in Research and Development and Senior Executive Member with years of experience in managing scientific research facilities. The full Inquiry Team convened its initial meeting on August 17, 2023, with the addition of two credentialed personnel misconduct investigators from Departmental Administration's Office of Human Resources Management (OHRM) with extensive employee and labor relations experience that were added to the team to assist with inquiry process and navigate any organized labor requirements as the individual whistleblowers and some BARC staff are bargaining unit employees (Ex. 42-2). The Team submitted an initial information request to

BARC's servicing Human Resources Office on August 31, 2001, seeking campus maps and schematics, organizational charts, health and safety policies, ARS directives on property management, etc. (Ex.40-1)

On September 8, 2023, the Inquiry Team commenced a joint interview of the three BARC Whistleblowers, per their request, who were accompanied by their attorney from the American Federation of Government Employees (AFGE) as all three individuals are bargaining unit employees (BUEs) and elected officials representing AFGE Local 3417 at BARC. (Ex. 37-1) The interview was conducted at USDA's George Washington Carver Center (GWCC) in Beltsville, MD with the Team lead and a Team member from OHRM participating in-person and the remaining Team members duty stationed outside of the National Capitol Region (NCR) joining virtually using a Microsoft Teams connection. The Whistleblowers spent several hours sharing their collective experiences at BARC; presenting electronic, video and hard copy artifacts; and responding to clarifying questions from the Team attempting to distill an effective narrative and timeline of the multiple allegations against BARC leadership and practices. (Ex. 38-1 through 42; 41-1 through 4)

The full Inquiry Team physically met at BARC the week of September 25, 2023, using the adjacent GWCC as a basecamp and neutral environment for conducting interviews and logistical staging. After meeting with the Acting BARC Center Director, Acting BARC Assistant Director, and Safety and Occupational Health Unit Leader for a facilities safety briefing the morning of Tuesday September 26, 2023, the team toured both the East and West operational areas of the BARC campus for several hours with the assistance of an agency-provided bus and non-supervisory, non-bargaining unit (NBU) employee. To further avoid the appearance of potential bias or interference by either management or the Whistleblowers, the Team arranged for physical access (HSPD-12 PIV card enabled), unescorted access to controlled buildings and sites of interest across BARC. Between September 26 and September 28, the team conducted 15 interviews with the supervisors of BARC's Safety and Occupational Health Unit, Environmental Health Unit, UMU, OMU, PPU, and RRU; subordinate facilities and industrial hygiene staff; and other witnesses identified by the Whistleblowers as possessing pertinent knowledge of alleged events (Ex. 37-2 through 6,10,13 through 16,19,21,24,26,28). The Team conducted BUE witness interviews within the presence of the AFGE attorney to honor the union's institutional right to representation and limit any unnecessary involvement in the inquiry process.

During that week, Team members explored buildings of interest specifically identified by the Whistleblowers, including Buildings 001, 003, 007, 010A, 012, 302 and 307B. Nearly 20 additional buildings, greenhouses, laboratories, and water storage/wastewater treatment sites across BARC identified by individual Team members based on the campus tour, observation, and interviews were also visited. Almost 800 digital photos were taken by the Team during the site visit to capture and document the present physical state of the BARC facilities (Ex. 39-1 through 88). Based on interviews and observations gathered, the Team submitted a second and more substantial information request to ARS/BARC on October 4, 2023. The thematic categories of documentation requested included: (1) Directives, policy, and guidance regarding ARS and BARC facilities management and business rules; (2) organizational charts and staffing trends of the applicable sub organizations; (3) portfolio management reports, spreadsheets, maps, master plans, funding, and project requests; (4) facilities operations and maintenance reports; (5) campus operations and maintenance plans, (6) plans and drawings, (7) safety and health policies and history of related complaints; and (8) records related to industrial hygiene (Ex. 40-2).

Several members of the Inquiry Team returned to BARC and the adjacent GWCC the week of November 6-9, 2023, to conduct additional interviews with several subordinate supervisors and staffers within the BARC facilities units—i.e., Utility Management and Operations Management (Ex. 37-8,12, 22) — and extensive interviews with Acting BARC Center Director (Ex. 37-7), Acting BARC Assistant Director (Ex. 37-9) and BARC Research Leader (Ex. 37-20) who also performed a rotational detail as Acting BARC Assistant Director during 2023. Inquiry Team members who were unable to travel to the NCR participated in meetings and engaged witnesses via Microsoft Teams, and BUEs were again engaged with the AFGE union attorney physically present (Ex. 37-25). In follow-up to several leads provided by the Whistleblowers and BARC staff, the Inquiry Team successfully contacted and gained the cooperation of a former UMU Unit Leader (Ex. 37-27). Despite having left Federal service earlier in the year, the Former UMU Unit Leader met with members of the Team at USDA headquarters on November 13, 2023, for a lengthy interview. Unfortunately, the BARC Center Director was on travel for annual leave for the first two weeks of November when the Inquiry Team was available.

A final round of interviews occurred in January and February 2024. These included the BARC Center Director of record (Ex. 37-29) and leadership within the Northeast Area Region of ARS (which BARC reports to) and the Office of the ARS Administrator with targeted focus on budgetary process, resource availability, discretion over funding expenditures, and physical plant operating plan determinations (Ex. 37-11,17,18,23,30). In all, a total of 32 people were interviewed including the three Whistleblowers. The Inquiry Team believes it has met all ARS personnel with pertinent information on the allegations as well as compiled and reviewed hundreds of responsive documents, artifacts and reports totaling thousands of pages of potential evidence in this administrative investigation. In instances where ARS and/or BARC personnel provided partially responsive information or were unable to provide any documentation requested, the Inquiry Team accessed official records contained within electronic Official Personnel Files (eOPF) and the National Finance Center's Insight comprehensive, enterprise-wide HR data warehouse to supplement information on BARC staff and organizational structure.

## FINDINGS AND ANALYSIS

### Allegation 1: BARC leadership has failed to adequately maintain many of the facility buildings and structures, resulting in an unsafe and deteriorating workplace environment for employees.

#### a. Facilities Management Organization

According to interviews with the official BARC Center Director, Acting BARC Director, and the current Facilities Units Leaders, coupled with eOPF records, a unified facilities management unit identified as the "Facilities Division" under the Office of the BARC Center Director with a single manager — i.e., the current Real Property Management Unit Leader — was split into four (4) separate units during a 2017-2018 reorganization implemented by the BARC Center Director. (Ex. 46-32) This reorganization was purportedly effectuated because of known failures of the Facilities Division unit at the time as well as significant communication issues between that unit and BARC leadership (Ex. 37-7). Four separate units, each with their own function-related jurisdiction and now known as the Operations Management Unit (OMU), Utilities Management Unit (UMU), Repair & Renovation Unit (RRU), and Real Property Management Unit (PMU) were created, with each respective Unit Leader reporting directly to the BARC

Center Director (Ex. 35; 46-7). This has resulted in an unclear understanding of “who does what?”; has rendered communications worse between the work units compared to the pre-reorganization state; has units separately developing project proposals for all funding types to be prioritized by the BARC Center Director; and has created cascading failures of the Center’s infrastructure to include buildings and certain structures.

Staff and research scientists are unclear as to where the work of one facilities unit ends and another begins. For example, if there is a problem with a building’s electrical service entrance, the OMU (Operations) and UMU (Utilities) units will often dispute who is responsible for issues that arise between the electrical distribution transformer – managed by UMU as a utility – and the building’s main switchgear – managed by OMU as a building matter (Ex. 37-27,22,8,2,16,11,23,17). There are similar issues with the backup generator interfaces. In addition, facilities work performed inside BARC buildings is often not coordinated between the OMU and RRU (Repair and Renovation) units, leading to improper installation and inadequate handover of finished work. Effective definition of roles and responsibilities includes the safety, environmental, and physical security staffs and the collective Facilities units. Groups that should be focusing on oversight and compliance are actively managing facilities systems, adding to the confusion of roles and responsibilities.

As part of the facilities reorganization, the BARC Center Director abolished around 25 vacant positions from the facilities group allegedly without detailed analysis of the impacts to the Center. Some interviewees indicated they believed that abolished positions were in response to the reorganization’s goals to reduce budgets, although the BARC Center Director indicated the abolished positions were in response to long-term vacancies due to a prior hiring freeze (Ex. 37-29). Despite contradictory assertions by multiple staff as to whether the reorganization required a PADI [program adjustment decision item] to be created, the Inquiry Team was unable to locate such a document. Regardless, it is apparent from multiple sources that the NEA Director and Administrative and Financial Management (AFM) were aware of the reorganization at the time (Ex. 37-11, 29). The resulting inadequate staffing is leading to a significant and regular use of overtime hours and pay just to keep the Center functional, i.e., responding to emergent and emergency needs. The understaffing is also causing specialized technicians, like HVAC [heating, ventilation, and air conditioning] techs to do the work not related to maintaining HVAC systems, like escorting contractors to non-HVAC-related issues simply because there is not enough manpower. Moreover, there is evidence supporting the assertion that there has been a failure in implementing preventative maintenance on BARC buildings and facilities due to the lack of staff (Ex. 37-27,22,20,9,8,2,16,11,23,17).

Interviews with Center leadership, facilities Unit Leaders, and workers on the facilities teams all stated that staff training needs are not being assessed. The Federal Buildings Personnel Training Act (FBPTA) of 2010 requires all federal personnel providing building operations and maintenance services to demonstrate competencies necessary to effectively operate government facilities (Ex. 46-1 through 36). These standards are developed and maintained by the General Services Agency (GSA) and the Department of Energy and apply to both federal employees and contractors working in federal facilities operations and maintenance. The Act applies to “Federal personnel performing building operations and maintenance, energy management, safety, and design functions.” Required competencies include “building operations and maintenance, energy management, sustainability, water efficiency, safety (including electrical safety), and building performance measures” (Ex. 46-36).

The competency model, assessments, and links to industry training are available through GSA's Sustainable Facilities Tool (available at: https://sftool.gov/train). Employees stated that they did not receive the training necessary to perform their duties. The Acting BARC Center Director stated that funds were available and just needed to be requested, however unit supervisors and employees all stated that they have been told that there was no money available for training. The limited training provided was for only some of the occupational safety and health needs of the units (Ex. 37-3,8,12,13,22,27,28)

It is the conclusion of the Inquiry Team that the above affirmative findings are based on a demonstrated lack of effective communication and professional relationships between middle management and leadership. Additionally, there is a confirmed deficiency in communication between middle management and the development of working relationships aimed at resolving programmatic issues. BARC leadership has demonstrated insufficient communication in promptly and accurately sharing information with employees about workplace hazards. To improve communication, it's crucial for executive leadership to directly engage with the safety director on safety-related matters, ensuring a streamlined and efficient flow of information within the organization. The Inquiry Team similarly makes the following recommendations:

(1) Expand the occupational series within the facility management units to include the GS-1640 *Facilities Operations* or the GS-1176 *Building Management* series to provide the customer connection, operations and maintenance planning and management, space planning, service and repair acquisition management, and staff redundancy within the programs to allow the current and future BARC maintenance workers to focus on the duties they were hired to perform.

(2) Provide a surge in staffing by contract vehicles to stabilize BARC's facilities management program while the Center develops a new Facility Master Plan and Concept of Operations. This staffing surge should include experienced facility managers and maintenance managers to assist in the development of operation and maintenance plans.

(3) Assess the current workforce's facilities competencies using the FBPTA model and implement a training plan to develop the competencies necessary to successfully manage the Center's infrastructure.

### b. Facility and Maintenance Management

ARS' relevant policies on facility management extensively cover real property reporting and appropriate use of funds for operations and maintenance, but direction to maintain facilities can only be found by inference and reliance on other directions. Concerning the appropriate minimum standard for facility management, Section 4.n. of USDA Departmental Regulation (DR) 1620-003 – *Facilities and Space Management* applies the Federal Management Regulation (FMR) at Title 41 Code of Federal Regulations (CFR) 102-74 to "all buildings and real property that are under the control of the Department of Agriculture but are not operating under or subject to the authorities of the GSA Administrator."[1] Further, Section 102-74.10 of the FMR states:

> The management, operation and maintenance of buildings and building systems must—
>
> (a) Be cost effective and energy efficient;

[1] USDA DR 1620-003 – *Facilities and Space Management* (effective March 31, 2026); available at: https://www.usda.gov/directives/dr-1620-003

(b) be adequate to meet the agency's missions;
(c) meet nationally recognized standards; and
(d) be at an appropriate level to maintain and preserve the physical plant assets, consistent with available funding.

Concerning what constitutes appropriate nationally recognized standards for facilities management, ARS Facilities Design Standards, ARS-242.1, states that the Agency will follow the International Building Code (IBC) developed by the International Code Council (ICC) and the Life Safety Code (LSC) developed by the National Fire Protection Association. The LSC has provisions for existing buildings in all occupancy classifications. The ICC also publishes the International Existing Building Code and the International Property Maintenance Code (IPMC). Section 101.2 of the 2021 IPMC establishes:

> "…minimum requirements and standards for premises, structures, equipment and facilities for light, ventilation, space, heating, sanitation, protection from the elements, a reasonable level of safety from fire and other hazards, and for a reasonable level of sanitary maintenance; [and] the responsibility of owners..."[2]

The IBC, LSC, and IPMC are codes that are generally more stringent than the Occupational Safety Health Administration (OSHA) General Industry standards, and the more stringent standard normally applies. The IPMC generally allows for existing installations if safe, in good condition, and compliant with the code in place at the time of construction. The LSC's existing building provisions by use allow qualified professionals and code officials to evaluate the safety of existing building features that would not be allowed in new construction and to provide appropriate mitigations.

ARS Policy and Procedures Document 242.8, *ARS Facility Operations and Maintenance,* dated October 8, 2015, requires the development of Operation and Maintenance (O&M) plans for all ARS facilities within three (3) years of the date of issuance (Ex. 46-2). Prior to receiving this agency directive, the Inquiry Team requested BARC's O&M Plans, but none were provided. The Center did provide some brief standard operating procedures that were created under the supervision of the Former UMU Leader. The Acting BARC Center Director and all facility Unit Leaders stated during interviews that the Center does not have an O&M plan (Ex. 37-5,7,8,20,27).

O&M plans for both BARC wastewater treatment plants were provided and appear to adequately cover the material required by ARS directive and the Maryland Department of the Environment as the appropriate regulator of the system. Photographs of the binders purportedly containing the water system O&M plan were provided, but this precluded even a cursory examination by the Inquiry Team (Ex. 12-1 through 28).

The Inquiry Team requested O&M plans for Buildings 307, 309, and 310. No plans were received for either 307 or 309 and the "plan" furnished for Building 310 consisted of only photos of binders purportedly containing the O&M plans (Ex. 12-1 through 28). Because Building 307 was recently gutted and reconstructed, it should have had an O&M plan as part of the "closeout" documentation provided by the contractor at the time of Substantial Completion. Building 309's plan was requested because it is one of the Center's central steam heating plants which requires specialist operators and specialized certifications

---

[2] Section 101.2 2021 IPMC; available at: https://codes.iccsafe.org/content/IPMC2021P2/chapter-1-scope-and-administration

for maintenance; dirty, cluttered, and damaged office and shop portions of the building were observed by the Team during our physical inspection (Ex. 39-1 through 12). Similar to O&M plans pertaining to facilities, all staff interviewed stated that BARC does not have O&M plans for the Center's infrastructure (Ex. 37-5,7,8,20,27). The Center is operating its infrastructure by reacting to problems after they occur. BARC uses IBM's Maximo enterprise asset management software for the agency's Computerized Maintenance Management System (CMMS). All facility Unit Leaders, facility employees, and the Acting BARC Facilities Director consistently maintained that the Center is only using Maximo as a work intake and ticketing system (Ex. 37-2,3,5,8,9,16,25).

The Center has not loaded into Maximo any overall inspection cycles, equipment listings, preventative maintenance schedules and is not tracking work by asset or component. The PMU Unit Leader stated that the Center had put some basic preventative maintenance tasks, like HVAC filter and belt changes, into Maximo. After the volume of tickets began overwhelming the maintenance staff the PMU Unit Leader requested and was granted permission from the BARC Center Director to turn off the preventative maintenance scheduling (Ex. 37-16). The complainants alleged that all tickets were deleted in Maximo. Generally, a CMMS is designed to prevent deletion of records at all, much less accidentally, to preserve the integrity of the system and ensure effective tracking of issues (Ex. 37-4,5,8,13,16,25). Based on the few emails provided and this understanding, it is more likely that the tickets were closed using a batch process as opposed to deletion (Ex. 38-2). However, even this action would have required significant and deliberate effort to achieve. The Center is in the process of replacing and upgrading the Direct Digital Control (DDC) systems for major building systems. These controls are not being integrated into Maximo.

It is the conclusion of the Inquiry Team that BARC facilities teams are collectively understaffed and undertrained in the effective use of the maintenance management system. Because Maximo is only being used as a ticketing system, long-term issue tracking is unavailable, and preventative and predictive maintenance is not being scheduled or tracked. This will cause a reduction in system life expectancy and increase the life cycle costs to operate and maintain the Center. The Inquiry Team similarly makes the following recommendations:

(1) Conduct a comprehensive maintenance condition survey for the Center. As part of the survey, collect all records and organize them into a common electronic file structure and integrate within Maximo.

(2) Develop a "Concept of Operations and Maintenance" plan as the first step in creating a center-wide O&M plan in an iterative process. Use this Concept O&M plan to guide the development of the center-wide plan and begin building out Maximo for the Center's use. The Concept plan should also assign roles and responsibilities to Center work units to provide accountability for results and provide the necessary separation of duties between operational work and oversight.

(3) Add on-Center staff to manage Maximo, deliver and coordinate training, and oversee the buildout.

(4) For new construction and major renovation projects, develop standard language for the design and Construction Building Information Models to use industry standard protocols to automatically populate Maximo with the new O&M plan prior to Substantial Completion.

(5) Fully digitize building records, link to Maximo, and move files to a detailed design and documentation software for civil infrastructure such as Revit/Civil 3d.

(6) Develop a training assessment for center facilities and supporting staff and deliver the needed training to comply with the Federal Buildings Personnel Training Act.

(7) Provide staff formal education and training in facilities management and maintenance management.

(8) Provide a web-based front-end interface for Center staff outside of facilities units to report and track maintenance issues.

### c. Facility Master Plan

Notes from BARC all-employee meetings convened during the summer of 2023 about facilities issues and published on the internal Center SharePoint website stated that there were previous Facility Master Plan updates prior to the 1996 master plan, and that the ARS NEA Director was leading the effort to update the Facility Master Plan, with completion expected in 2024 (Ex. 38-4). This revision is currently in the "framework level" with the Acting BARC Center Director and Acting BARC Facilities Manager, as well as discussions with ARS leadership and AFGE Local 3417. The Inquiry Team requested the 1996 master plan and all subsequent updates but was only provided the original 1996 master plan (Ex. 1). During her interview with the team, Acting BARC Center Director stated that in 2018 she and the BARC Center Director revised the master plan and sent it for review to the NEA which should have been shared with the ARS administrator (Ex. 37-7). The 2018 revision was not shared with the Inquiry Team and appears to not have been shared with BARC staff. However, in interviews with the current NEA Director and ARS Administrator, both individuals confirmed that the BARC Center Director did in fact submit a 2018 master plan, but that it could not be fully implemented as called for the demolition of nearly 170 obsolete structures as well as campus improvements that would have cost approximately $270 million and thus exceeded available funding (Ex. 37-23, 37-18).

According to the interviewees, each of the facilities units separately plans and submits projects for funding to the BARC Center Director, who then selects and prioritizes the projects (Ex. 37-2,5,16,11,20,22). Projects submitted are not well coordinated and integrated between units before submission. The lack of a current Facility Master Plan and operations and maintenance plans mean that units are not necessarily working on the highest priority projects to keep and restore the Center's infrastructure to a good condition. This also results in reduced staff capacity that is solely devoted to responding to sudden failures that could have been predicted and prevented. These plans should be projecting future infrastructure needs, identifying existing infrastructure no longer needed, and projects to acquire, repurpose, or remove infrastructure based on BARC's needs. The Center has identified around 100 buildings that are no longer needed for the Center's mission and has been working with the Maryland Historic Trust on their removal because many are eligible for listing on the National Register of Historic Places (Ex. 37-6,16). In January 2020, ARS released an Environmental Analysis to demolish 22 buildings on campus (Ex. 44-2).

It is the conclusion of the Inquiry Team that Facility Master Plan (FMP) should be the organizing document for all facilities operations, effectively tying the operational mission of the Center to the infrastructure needed to support that operational mission. The FMP should also include prioritization of existing assets and identification of assets no longer needed for the operational mission. Professional services support will have to come from either the NEA or ARS Headquarters facilities staff as the Center

does not have the capacity nor capability in house to develop a new master plan on its own. The Inquiry Team similarly makes the following recommendations:

(1) Conduct a condition survey of the campus by a qualified architecture and engineering team managed by a non-BARC group to document the existing conditions. Immediate tasks include:
   a. New Environmental Compliance and Protection Audit with immediate corrective action and plan for action.
   b. Inspection and repair of all three water towers.
   c. Retro commissioning of existing building systems to return them to appropriate operating conditions until more extensive work can be programmed.

(2) Create a new Facilities Master Plan for the Center, looking at a minimum 100-year vision for the 7,000-acre campus to guide investment and to provide focus to future cyclical facility and major project plans. The new FMP should consider all USDA agencies within the BARC campus, including the National Agricultural Library and the GWCC. With the FMP, a land management plan for the agricultural and forested areas should be included to plan for the effective management of all natural resources entrusted to the Center.

### d. Safety and Health

According to the interviews with an Operations and Management Unit (OMU) employee, employees enter permit required confined spaces on a periodic basis to perform cleanout operations, valve manipulation, and other miscellaneous repairs (Ex. 37-3). Permit required confined spaces are documented in the employer's "List of Confined Spaces", and the list includes steam pits adjacent to the steam plant and valve pits located in the wastewater treatment plants (Ex. 37-2,3,8,13). Based on observations noted during Inquiry Team walkthroughs of BARC Buildings 001, 003, 007, 010, 010A, 010B, 306, 307, 309, 310, and 316 between September 26-28, 2023, all these pits were large enough to bodily enter and perform work, and they had a limited means off access and egress due to ladders used to access them. They were not designed for continuous human occupancy, and they presented the potential for atmospheric hazards. The steam pits were located next to underground tanks used to store fuel oil, and these pits were "permit-required" due to the potential for a hazardous atmosphere developing in the steam pit from leaking fuel oil (Ex. 7; 32-10,20; 33; 39-13,14). The wastewater treatment plant valve pits adjacent to Building 010 were in an area used to treat raw sewage posing the potential for a hazardous atmosphere.

During the walkthrough of Building 010A, fall hazards and electrical hazards were observed in Room 008 consisting of unguarded sump pit openings (Ex. 39-15,16). The sump pits were equipped with hatchway covers, and the cover for one of the pits was observed as being left open and exposing employees to potential fall hazards greater than four feet. In addition, electrical hazards were observed in and around the sump pits as follows: 1) The control panels for the sump pits were left open exposing employees to energized 480 volt electrical components; and 2) The flexible cord used to power one of the sump pumps was routed through the hatchway opening and was being pinched by the hatch cover creating the potential for energizing the metal cover should the cord insulation break down due to the physical damage from being pinched (Ex. 39-17 through 28).

During the walkthrough of Building 007, a blocked exit was noted in the east mechanical room on the 4th floor. Exit signs in this area directed employees to an exterior door that was blocked by HVAC ducts and electrical conduit. The general safety and facility deficiencies found throughout the buildings we visited are too numerous to list in their entirety. Pictures indicative of overall conditions are included in Ex. 39-47 through 66. In contrast, Building 307 was renovated last year and shows few of these issues. However, it was noted by our engineering team members that some inspections and routine maintenance already were not being performed, as evidenced in our walk-through, and the Inquiry Team recently learned that significant flooding occurred in this brand-new building at some point in the last two months. The observed pervasive issues in many buildings include: a general lack of housekeeping; excessive dirt and grime; flaking and peeling paint; damaged flooring; active and post flooding and other water intrusions; mold; and a lack of potable water (Ex. 39).

The Inquiry Team concludes that many of the facilities and structures at BARC have failed to be maintained, resulting in safety issues for employees and a deteriorating workplace environment. The following recommendations are suggested for adoption and implementation:

(1) Provide retraining on permit required confined space entry requirements for all affected employees. [29 CFR 1910.146 (g)]

(2) Ensure that all employees are informed of the presence of permit spaces by posting danger signs or other equally effective means that notify the employees of the existence, location, and dangers posed by the permit spaces [29 CFR 1910.146 (c)(2)]

(3) Implement the use of entry permits for all entries made into permit required confined spaces. [29 CFR 1910.146 (e), (f), (h), (i), (j), (k)]
   a. Implement the use of entry supervisors for all permit space entries.
   b. Implement the use of entry attendants for all permit space entries.
   c. Provide and use air monitoring equipment to assess confined spaces prior for hazardous atmospheres prior to and continuously during permit space entries.
   d. Provide and use confined space entry rescue equipment appropriate for the permit spaces entered that will enable the entry attendant to rescue an incapacitated or injured confined space entrant.

(4) In Building 010A, Room 008
   a. Secure sump pump electrical panel covers to prevent access by unqualified employees.
   b. Secure the hatchway covers for the sump pump pits to eliminate fall hazards and prevent unauthorized access. [29 CFR 1910.28 (b)]
   c. Secure the sump pump electrical panel covers to prevent access by unqualified employees. [29 CFR 1910.303 (g)(2)]
   d. Install permanent wiring for the sump pumps that is approved for location. [29 CFR 1910.305 (g)]

(5) Establish and follow preventative maintenance plans; fund appropriately; clarify roles and responsibilities among staff.

### e. Accessibility

The Inquiry Teams requested the Center's Accessibility Transition Plans, however the Center failed to provide the plans nor any statement or explanations as to why they could not be provided. Team

members performed multiple walkthroughs between September 26-28, 2023, of select buildings on the Center including Buildings 001, 003, 007, 010, 010A, 010B, 306, 307, 309, 310, and 316. It's readily apparent that many of the older buildings at BARC are not compliant with either the Architectural Barriers Act of 1968 or the Rehabilitation Act of 1973. Newly constructed buildings and buildings that have been completely renovated appear to be compliant with the accessibility standards in effect at the time of design.

For buildings constructed prior to 1968 or that are non-compliant with the standards, USDA requires its agencies to develop accessibility transition plans documenting both readily achievable improvements and structural modifications needed for conformance.[3] This is due, in part, to comply with 7 CFR § 15e – *Enforcement of Non-discrimination on the basis of handicap in programs or activities conducted by the United States Department of Agriculture,* the stated purpose of which is "to effectuate section 119 of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, which amended section 504 of the Rehabilitation Act of 1973 to prohibit discrimination on the basis of handicap in programs or activities conducted by Executive agencies." The Inquiry Team requested the Center's Accessibility Transition Plans, but neither plans nor a statement that the required plans could not be found were provided.

Many of the National Register of Historic Places eligible laboratory and administrative buildings at BARC appear to have received at least one significant renovation since construction, but the dates of these renovations cannot be determined from a walkthrough. The Center has failed to make even easy changes, like replacement of knob locksets with lever locksets on doors; renovating at least one set of restrooms for full compliance in each building; or creating a single user accessible restroom in many buildings to improve accessibility until complete renovations can be accomplished. Many buildings with elevators only have one elevator, so the Center's persistent and ongoing failure to keep elevators in operable condition violates the ABA and the Rehabilitation Act as well as the International Property Maintenance Code, and overall facilities management policy.

The Inquiry Team concludes that the lack of progress in meeting accessibility requirements is indicative of the Center's overall deficiencies in safely, effectively, and efficiently managing its infrastructure. Failure to maintain existing compliant accessibility features, such as elevators, in safe working condition violates the Architectural Barriers Act due to the failure to maintain its obligation to provide a reasonable accommodation under the Rehabilitation Act. The Accessibility Transition Plans required by USDA regulation to implement the Rehabilitation Act's programmatic accessibility requirements over time as the opportunity arises are needed to identify, plan, and implement readily achievable improvements in accessibility in the regular course of maintenance and minor renovation work until full building rehabilitation projects can be selected and funded. The following recommendations are suggested for adoption and implementation:

(1) Conduct an accessibility survey for all buildings and sites as part of a wider effort to document existing conditions at BARC.

---

[3] 7CFR 15e: Enforcement of Non-discrimination on the basis of handicap in programs or activities conducted by the United States Department of Agriculture

(2) Develop Accessibility Transition Plans for each building and site and incorporate the results int the Center's O&M plans.

(3) Incorporate the results into the new Facility Master Plan.

## f. Physical Security

The Inquiry Team requested all physical security assessments for BARC for the last five (5) years because Federal facilities are required to be assessed on a three- or five-year recurring cycle depending on the Federal Security Level determination made in the previous assessment. Two (2) assessment reports were provided, one from 2017 and one from 2023 (Ex. 10-3,4). The 2017 report is a "limited scope update" of a 2013 report, and the 2023 report appears to cover the entire Center. Neither report meets the Interagency Security Council's standards for determining and documenting physical security risks and determining the appropriate Facility Security Level (FSL).[3] The 2017 report does include a FSL determination table, but it appears to only look at a single building and not the total size of all buildings within a campus (Facility Size Factor) or all employees on a campus (Facility Population Factor). That table likely understates the risk associated with the Symbolism and Threat to Tenant Agencies Factors. Because of this understatement, both assessments suffer from the same fundamental flaw in that they wholly fail to consider risks and risk countermeasures as required by the Standard for higher FSL facilities.

Both reports were prepared solely by the physical security specialists instead of an interdisciplinary team, and neither report provides a comprehensive list of buildings, structures, and sites included within the analysis. Moreover, the security specialists work within the Safety and Occupational Health Unit (SOHO) and Security section which organizationally report to the BARC Center Director akin to the current four (4) Facilities Units. While neither report meets the ISC standard, both do document significant physical security issues in the overall design and construction, operations, and maintenance of the Center. The 2017 report does address the Standard's Design Basis Threat and discusses the standard countermeasures needed for the assessed FSL. Both reports were sent to the BARC Center Director for his review and action as the Designated Official for the Center to accept or mitigate the risks identified in the reports (Ex. 37-7).

Based on the complainant's allegations that doors could not be secured during a shelter-in-place incident in March 2022, allegations that the Center does not have adequate key control, and the team's own observations across the Center, the team requested copies of all physical security assessments for the last five years (Ex. 10-1 through 4). The assessments provided confirm the allegations presented by the complainants and the team's observations about the integrity of the security perimeters and overall physical security of the campus. Further, day-to-day operation and monitoring as well as maintenance responsibility for the Center's access control, intrusion detection, and video surveillance systems are performed by the physical security team. Significant challenges arise because these systems also interface with facility systems maintained by other units. This presents a challenge in maintaining

[3] The Risk Management Process: An Interagency Security Committee Standard, 2021 Edition. U.S. Department of Homeland Security, Cybersecurity and Infrastructure Security Agency, Interagency Security Committee; available at: https://www.cisa.gov/sites/default/files/2022-11/The%20Risk%20Management%20Process%20-%202021%20Edition_2.pdf

adequate separation of duties between assessors and day-to-day operators because the assessors are assessing themselves.

The Inquiry Team concludes that the person and/or staff responsible for conducting assessments at the Center is the same person with day-to-day responsibility for managing the Center's physical access control system and day-to-day security operations. The assessments provided are very narrowly scoped and do not provide the comprehensive campus level assessment of risk required by the ISC standard. Without the comprehensive assessment of risk and assignment of the FSL, appropriate countermeasures cannot be implemented, and significant risk may be unknowingly accepted by the BARC Center Director as the Designated Official. The following recommendations are suggested for adoption and implementation:

(1) Conduct a complete Physical Security Assessment of the entire Center by an outside team of assessors to the current ISC standards and develop an implementation plan integrated with the Center's O&M and major project plans.

(2) Develop and provide training for Center staff, contractors, and cooperators about their roles and responsibilities in maintaining physical security across the Center.

(3) Provide a clear separation of duties for physical infrastructure and systems. Separate the staff responsible for leading physical security assessments from the daily operational staff. Assign responsibility for the maintenance of access control, intrusion detection, and camera systems to the facilities maintenance team.

### g. Water Treatment and Distribution

The Inquiry Team requested all photographs of the binders containing the Operations and Maintenance Plans for the water treatment plant that were provided instead of the O&M plans. From the photos, the O&M plans for the wells and treatment system appear to be prepared by the contracted engineers-of-record and likely meet the appropriate industry and state standards at the time they were prepared (Ex. 4-1 through 6; 12-1 through 28). The Team similarly requested daily logs, testing results, and monthly operating reports for 2019 through 2023 for review. The team received the following:

- Monthly operator logs from the treatment plant from January 2021 through August 2023 (Ex. 14).
- Bacteriological testing reports for January 2021 through October 2021 and January 2023 through September 2023. Samples for these tests were collected only from point of use fixtures in Building 309 (Steam plant) and Building 310 (Water Treatment Plant). This testing was performed by a contracted testing agency and reported to the state of Maryland (Ex. 14-3.13 through 14-3.23).
- Disinfection byproduct testing was provided only for August 2022, and August 2023. This testing was performed by a contracted testing agency and reported to the state of Maryland (Ex. 25).

Water quality sampling reports conducted by Federal Occupational Health (FOH) in 2018 and 2019 across multiple buildings at BARC and the GWCC were provided and document an extensive sampling across the campus (Ex. 17-1 through 9; 20-1 through 4). This sampling identified many buildings not compliant with acceptable standards. FOH addressed the reports to the Center's Industrial Hygienist on the SOHU staff. No sampling reports were provided to the Team for 2020 through 2023. The Inquiry Team requested inspection and cleaning reports for all three (3) elevated water storage tanks located on the

BARC campus, but none were provided. Water well condition and status were reported in a briefing paper prepared by the UMU in October 2023 (Ex. 13-1.8, 1.9).

Based on the documents provided, the water source and treatment plant appear to conform to the requirements for a non-transient, non-community system under the Safe Drinking Water Act based on the documentation provided. A new sampling contract is being prepared for the state mandated point of use sampling plan (Ex. 11; 15). The water treatment plant is also showing significant signs of failure and a lack of routine repairs that could lead to catastrophic failure of water treatment and distribution for the Center. The treatment plant is relatively unsecured considering the importance it serves to the operations and lives on the BARC campus and safety protection as the system provides water for fire suppression, and the treatment plant has large fire pumps to supplement the pressure from the elevated storage tanks. However, like most of the Center's infrastructure, the water transmission and distribution system is at or beyond its expected life and has witnessed multiple failures. One failure in June 2023 resulted in completely draining all the Center's water towers and depriving the entire Center of water for both domestic and fire suppression use until the leak was found (Ex. 37-1,13). The Inquiry Team was unable to discover any documentation of this incident being reported to the state, and none has been provided.

The three elevated treated water storage tanks, however, likely do not meet needed requirements at present. The investigation team observed Tower 3 (Building 316) leaking water from the central pipe (Ex. 39-86,87,88). According to Center staff, this tower has been leaking for over a year. This is a catastrophic failure that will lead at least to the tower not being able to store and deliver water to the campus. The Inquiry Team was able to access this tower without escort or keys for the immediate perimeter fence gate. Team members returned to Tower 3 to confirm the consistency of the observed leak and lack of controlled access. Another tower on site was reported to be not in use because of its poor condition. The team requested the tower inspection records for the last five years, but none were provided. The American Water Works Association (AWWA) Management Standard G200-21, Distribution Systems Operation and Management, Section 4.3 Facility Operations and Maintenance requires establishment of an inspection program and comprehensive inspection at least every five years.

The Inquiry Team concludes that although BARC may be acquiring and treating water to the relevant standards, the quality at the point of use has previously been reported as non-compliant in multiple locations on the Center. This nonconformance is likely caused by failing distribution networks and old plumbing within buildings. The Center has experienced complete loss of water due to distribution system failures. Loss of the water system would require temporary closure until repairs could be made and would likely cause harm or loss of research because of the lack of water. The following recommendations are suggested for adoption and implementation:

(1) Conduct a new Environmental Compliance and Protection Audit and develop a plan of corrective action.

(2) Conduct a comprehensive condition survey of the water collection, treatment, storage, and distribution systems, and provide a recommended prioritization for corrective work and costing for corrective work and likely future major projects to restore the system to good operation.

(3) Immediately inspect all three water towers and repair to prevent further deterioration and loss of service to the campus.

(4) Update system O&M plan and input activities and information into CMMS for documentation, tracking, analysis, and scheduling.

(5) Conduct comprehensive point of use water sampling and create and implement a plan of corrective action to provide safe water.

(6) Conduct a feasibility study to examine alternatives to meet the water supply needs of the Center with a focus on connecting campuses within the Center to Washington Suburban Sanitations Commission (WSSC) distribution. As part of the effort, include an estimate of both upfront and lifecycle costs.

### h. Wastewater Treatment

Concerning the Center's wastewater treatment operations, BARC and ARS provided the Inquiry Team with the documents requested. Responsive documentation included: State of Maryland Wastewater Operator Licenses (Ex. 15-1 through 7); National Pollutant Discharge Elimination System (NPDES) Permits for both treatment plants (Ex. 16-1,2); Wastewater Monthly Operating Reports, Test Records, and Non-compliance Reports for East treatment plant 2018 through 2023 (Ex. 17-1 through 6); Wastewater Monthly Operating Reports, Test Records, and Non-compliance Reports for West treatment plant 2021 through 2023 (Ex. 17-7 through 9); System schematics for East and West Wastewater Treatment Plants (Ex. 11-1 through 4); Operations and Maintenance Manuals for Modernized East, old East, and West Wastewater Treatment Plants (Ex. 19-1 through 15); BARC – Biosafety, Safety and Health Assessment Report, April 2015 (Ex. 9-1); and an Environmental Compliance Program Review, October 2022 (Ex. 9-2). It should be noted that the NPDES permit for the East wastewater treatment plant expired on August 31, 2021 and no succeeding permit has been provided.

During their interview, the Whistleblowers spoke about a sewage spill backup occurring at the West campus wastewater treatment plant allegedly due to the failure of both pumps (Ex. 37-27,28,21). According to BARC employees interviewed by the Inquiry Team, there were two spills – one in late July or early August 2023 and another approximately two weeks later. Sewage water backed up into the greenhouse [Building 052] adjacent to the treatment plant, and into the service trenches for the latter structure's growth chambers (Ex. 37-27,21). Unaware of the presence of wastewater, research technicians affiliated with that building and research unit voluntarily cleaned out the trenches by themselves without proper precautions or personal protective equipment – and with the knowledge of the treatment plant operator (Ex. 37-27,21). Medical evaluation for potential bloodborne pathogens was not provided to impacted employees. From the records provided the Inquiry Team, the state, i.e., Maryland Department of the Environment, was notified of the second spill, but not the first (Ex. 37-27).

ARS conducted a program review of the Center's Environmental Protection and Compliance Program in October 2022 (Ex. 9-2). Their report noted that significant and persistent issues have not been addressed since the last comprehensive audit in 2015 (Ex. 9-1) and noted that there were no audits conducted in either 2018 or 2021. The 2022 program review especially noted significant violations associated with the wastewater treatment plants. However, the 2022 program review was not tantamount to a formal Environmental Compliance Assessment Program (ECAP) audit required by USDA's Environmental Pollution Prevention, Control, and Abatement Manual (DM5600-001, Chapter IX) (Ex. 46-37), which is integral for an accountable and effective environmental compliance program. The Inquiry Team also noted

numerous underlying maintenance concerns, poor housekeeping, lack of appropriate operational environmental health and safety practices, and issues with the water and wastewater systems observed during numerous walkthroughs of BARC buildings and the sites, particularly Building 309 (Steam Plant) (Ex. 39-1 through 12) and the wastewater treatment plant, Building 310 (Ex. 39-83 through 85).

Based on interviews, site observations, and review of pertinent documentation provided by the Agency, the Inquiry Team concludes that similar to most systems at the Center, the wastewater collection and treatment infrastructure is aging, and issues had been reported in 2015 to a Former BARC Center Director in the ECAP audit (Ex. 9-1) and in 2022 to the current BARC Center Director in the ECAP program review (Ex. 9-2,3,4). The lack of a recent ECAP audit or formal review by qualified professionals makes it difficult to assess if the current operations meet or can continue to meet standards without substantial changes for the legal requirements for safe, healthy, and effective operation of wastewater systems. The following recommendations are suggested for adoption and implementation:

(1) Conduct a new Environmental Compliance and Protection Audit and develop a plan of corrective action.

(2) Conduct a comprehensive condition survey of the wastewater collection, treatment, and discharge systems and provide a recommended prioritization for corrective work and costing for corrective work and likely future major projects to restore the system to good operation.

(3) Update system O&M plan and input activities and information into CMMS for documentation, tracking, analysis, and scheduling.

(4) Conduct a feasibility study to examine alternatives to meet the wastewater needs of the Center with a focus on connecting campuses within the Center to WSSC collection and treatment. The cost estimate should provide both upfront and lifecycle costs.

### i. Road Network

In response to information requests, the Inquiry Team was provided a 1996 Facility Master Plan (Ex. 1), an FY2022 Federal Real Property Profile (FRPP) (Ex. 44-1), and a BARC Boundaries and Roads Map dated September 12, 2023 (Ex. 45-1). Section 4.9 of the 1996 Facility Master Plan discusses the summary of a referenced Transportation Assessment that was not provided in the documents (Ex. 1). The NEA Administrative and Financial Management Director stated that “it [BARC] is a small city and requires a special skillset to manage” (Ex. 37-11). This is especially true with the Center owned roads used by the general public. The relevant guidance and standards are those published by the US Department of Transportation, Federal Highway Administration (FHA) for the planning, operation, maintenance, and management of a transportation system.

The Center reports owning two publicly accessed and used roads: Powder Mill Road between Edmonston Road and Scarlet Tanger Loop (approximately 10 lane miles), and Soil Conservation Road from Powder Mill Road to Hubble Road (Approximately 4 lane miles). From discussions with the Facilities Unit leaders, the cost to manage and maintain these roads rests with the Center, even though the majority of vehicles traversing the roads are non-center traffic. Powder Mill Road serves as a key arterial road linking the Baltimore-Washington Parkway/Maryland Route 295 to US Route 1/Baltimore Avenue.
In addition to the two roads listed by the Center as “BARC Public Roads,” Research Road is likely to be used by the residents of the City of Greenbelt as an additional access route to US Route 1 and the

Baltimore-Washington Parkway. This linkage was likely planned by the Resettlement Administration during the New Deal when Greenbelt was planned and developed, and currently provides one of only four access points to the original community.

The Center also owns several other administrative-use-only roads not open to the public that are in poor shape. The FHA does inspect the four bridges listed in the FRPP report as part of the National Bridge Inspection Program. The BARC Boundaries and Roads map shows an extensive network of roads owned by the Center. The FY22 FRPP report, however, only lists four (4) bridges and two (2) roads reported. Comparison of the tabular report with the map provided by the Center indicates that BARC is not accounting for all transportation assets in its inventory of record (Ex. 2-1 through 5, 12). Even for those reported, roads and bridges may be significantly underreported. From the information provided, it is not known if there are other transportation structures on the Center; given the size of the transportation network, it is likely there are additional transportation structures not being recorded in the real property inventory.

Roads owned by the Center are maintained by BARC, but the Center does not receive specific funding appropriations for road operations and maintenance. Center staff have stated that they perform mowing and snow clearing by both inhouse labor and contract (Ex. 37-25,13,6). Funding to cover these costs is likely coming from facility maintenance appropriations and assessed research funds. Estimated repair needs costs on assets included in the FRPP are likely extremely low even with the underestimated replacement values. For example, the FRPP report is reporting replacement values for the roads of $400K per lane mile for the 11 lane miles reported for a total of $4.4 million. A rough, order-of-magnitude estimate for replacement value of a two-lane asphalt paved road is closer to $2.5 million per lane mile for the 11 lane miles reported would be a replacement value of $27.5 million. Further, no Historic Capital Expenditure or Future Capital Expenditure is reported as required by the Federal Real Property Council's guidance for the FRPP (Ex. 44-1).

The Inquiry Team concludes that the Center's management of its transportation network is inadequate to meet its present and likely future needs to support BARC's mission and does not meet relevant norms and standards for the management and maintenance of public roads. The current funding model for operations and maintenance is taking funds that could be used for other facility maintenance work at the Center and would likely be insufficient in the event of even a moderate damage event. These challenges are indicative of the broader challenges facing the Center. The following recommendations are suggested for adoption and implementation:

(1) Conduct a new inventory of all transportation assets and conduct new condition surveys and update the asset records in the system of record.

(2) As part of the broader Facility Master Planning effort, conduct a comprehensive transportation assessment and travel analysis to develop a transportation plan for the Center. Develop a plan to decommission or close roads not needed and develop a maintenance plan for roads to remain.

(3) Study changing the ownership and maintenance responsibility of the publicly used roads owned by USDA on the campus to better align the operations and maintenance responsibility with the actual use.

## <u>Allegation 2</u>: BARC facilities employees do not have the required tools and equipment for adequate maintenance and repair of the buildings and structures.

### a. Safety Program

Interviews with employees revealed several shortcomings in the management of the safety program at BARC. First, the organizational culture at BARC, characterized by a lack of support for safety initiatives from leadership and a reactive, rather than proactive, approach to safety and health issues, significantly hinders the development and enforcement of effective safety program management. For instance, both the Industrial Hygienist (Ex. 37-15) with BARC's Environmental Management team and the Safety and Occupational Health (SOH) Specialist (Ex. 37-4) commented in their respective interviews with the Inquiry Team that the BARC safety program is always in react mode dealing with constant emergencies instead of being proactive when solving safety and health issues. In fact, the SOH Specialist specifically commented that it is hard to focus on safety and health priorities because of this lack of prioritization on compliance issues (Ex. 37-4). The SOH Specialist's experience with frequently responding to fire alarms —despite her lack of experience managing fire alarm systems—underscores the broader issue of the BARC safety staff being overwhelmed by constant emergencies, thereby emphasizing the detrimental impact on the organization's ability to focus on priority safety initiatives. Additionally, both the SOH Specialist and Safety and Occupational Health Unit Leader (SOHU Leader) (Ex. 37-10) shared that the organization left the Safety Unit Leader position vacant for over a year leading to disorganization in the safety office.

The BARC safety staff have struggled to develop a program which emphasizes identifying and mitigating workplace hazards, which has led to the deterioration of BARC's safety program and facilities. For example, the safety staff reported frequent incidents of exposure to hazardous chemicals due to inadequate personal protective equipment. The examples of the OMU Maintenance Mechanic Supervisor (Ex. 37-2) and his crew working without arc flash gear, and the OMU team lacking essential tools, set the stage for a narrative of underfunded safety measures and inadequate provision of necessary safety equipment. The team also struggles with implementing effective fire safety measures, highlighted by the staff's delayed responses to fire alarm incidents. Additionally, the team's efforts to mitigate electrical hazards have been hindered by the lack of regular equipment inspections and maintenance. The Whistleblowers highlighted mold and environmental issues as key complaints, revealing the safety team's absence of a clear policy for addressing and communicating such hazards to employees and leadership. The SOH Specialist offered that the mitigation strategies shared with employees by the Safety and Occupational Health Manager (SOH Manager) (Ex. 37-19), did not align with safety and health standards and that both her [SOH Specialist] and the SOHU Leader tried to counsel her on the appropriate mitigation strategies (Ex. 37-4). As a result, the SOH Manager admits that she advised the inhabitants of Building 001 to adopt the same mitigation strategies of the contractors working in the building instead of consulting the safety and health standards. The SOH Specialist (Ex. 37-4) specifically commented that it was hard to focus on safety and health priorities because of this lack of prioritization on compliance issues. SOHU's demonstrated difficulty in identifying and mitigating workplace hazards reveals a deeper issue of inadequate workplace inspections, signaling a critical gap in proactive safety management and oversight within the organization.

In addressing the challenges faced by the safety staff at BARC, three key points emerge that underscore the depth of their struggles in ensuring an effective safety program. First, the SOH Specialist highlighted the significant gap in proper recordkeeping and inspections, particularly noting the program's inability to adhere to established safety protocols and documentation standards (Ex. 37-4). The SOH Specialist also confirmed that there were no historical reports or workplace inspections before she arrived at BARC and that current workplace inspections were lacking. The Industrial Hygienist acknowledged issues related to safety inspections and shed light on the systemic problems with the safety management framework, indicating a lack of thoroughness in inspections and a failure to maintain essential safety records (Ex.37-15). Finally, the SOHU Leader, mentioned that he promoted the use of inspection checklists but indicated that a formal inspection process had been neglected (Ex. 37-10). His observations suggest a disconnect between the safety protocols that should have been followed and the actual practices, highlighting deficiencies in both inspections and recordkeeping. Transitioning from the shortcomings in inspections and recordkeeping, it's crucial to examine the underlying issues within the SOHU safety team itself, such as the lack of clarity in job tasks and responsibilities, coupled with communication breakdowns. These internal dynamics not only fuel conflict but also contribute significantly to the failures observed in the safety program's execution and effectiveness.

Within the safety team at BARC, the effectiveness of their program is severely compromised by a fundamental misunderstanding of roles as well as poor communication not only within the safety team, but also with the organization's leadership. For instance, the colleagues of the Industrial Hygienist expressed a lack of confidence in his qualifications and understanding of the work required for an industrial hygienist of this organization's complexity. Furthermore, the SOH Specialist and SOHU Leader expressed a lack of confidence in the SOH Manager's professional understanding of her job as a biosafety specialist despite continued attempts to provide educational opportunities through training and mentorship. Additionally, when mold was discovered in one of the BARC buildings, the SOH Specialist felt that the SOH Manager overreacted by telling employees to wear respirators when occupying the building despite a lack of workplace assessment to substantiate this mitigation (Ex. 37-4). Additionally, the SOH Specialist and SOHU Leader shared that the SOH Manager would frequently bring safety and health concerns directly to the Acting BARC Center Director, effectively cutting the Center's Safety Unit Leader out of the mitigation process. With the mold issue in Building 001, the SOH Specialist and SOHU Leader attempted to revise the SOH Manager's guidance, especially since employee use of respirators would require fit testing and medical exams, which created much conflict within the team, so much so that the SOH Specialist and SOH Manager will no longer speak to each other without the SOHU Leader being present (Ex. 37-4). The SOH Specialist also shared that she's filed workplace harassment claims against the SOH Manager as a result of this deleterious relationship with her co-worker.

Overall, this lack of an ability to communicate as a team also degrades the unit's ability to communicate the requirements of the organization's safety program to BARC employees, which leads to noncompliance in the workplace. Instead of embracing a proactive approach to safety and health program management with the development of program goals, as suggested as a management best practice by the SOH Specialist, the organization's safety program remains reactive as evidenced by the lack of buy-in from leadership and employees at BARC. The safety staff also feels that there is a culture of blame when safety incidents occur, which reflects upon a poor safety reporting culture. Additionally, the SOHU Leader and SOH Specialist shared that when upper-level management were asked to help prioritize safety and health issues they felt they did not get management's support under both the Acting BARC Center

Director and the Center Director (Ex. 37-4,10). According to BARC's safety team, this lack of leadership and employee buy-in also contributes to other key program deficiencies, including the lack of medical surveillance for employees.

The investigation into BARC's safety practices unveiled a glaring deficiency in critical health and safety programs, notably the absence of medical surveillance programs. For instance, the safety staff, and particularly the SOH Specialist, raised concerns about the lack of medical surveillance for employees at BARC, a key safety and health program which helps to identify and mitigate potentially serious safety and health issues. She shared that the program was never re-established after the COVID-19 pandemic ended an agreement with Federal Occupational Health (FOH) to provide those services (Ex. 37-4). A Physical Science Technician who was interviewed indicated that she was not enrolled in a medical surveillance program though she does need to use personal protective equipment for her job (Ex. 37-24).

The Inquiry Team requested documents suggesting the presence of a complete safety program, such as workplace inspections, reports, and medical surveillance recordkeeping. Paper copies of inspection checklists, workplace assessments, and industrial hygiene reports were provided (Ex. 31-1 through 306); however, they do not demonstrate the presence of a complete safety program within the organization. Furthermore, the industrial hygiene reports written by the Industrial Hygienist are basic and lacking the parameters expected from a standardized industrial hygiene program. For instance, as discussed in the interviews with the SOH Specialist, the Industrial Hygienist's reports lacked evidence of instrument calibration information typically expected by industrial hygienists when conducting hazard surveys (Ex. 37-4). Additionally, the Industrial Hygienist's reports were missing coherent sampling strategies for his surveys, the establishment of similar exposure groups, statistical analysis and error adjustment for the sampling campaigns, and the narratives of findings which are expected in professional industrial hygiene reports. The Industrial Hygienist, however, provided an excellent estimation of the lead and copper hazards found in his water samples given his limitations with this type of sampling.

Additionally, the Inquiry Team requested access to the online and cloud resources referenced throughout the interviews, such as the Y: drive, BARC SharePoint, and ARS SharePoint resources. Analysis of those resources did not confirm the presence of a complete safety program for this organization.
The Inquiry Team examined witness interviews, program documents, and database records to validate the main findings and conclusions of the Whistleblowers' second allegation. This analysis revealed significant shortcomings in safety program management, notably in conducting workplace inspections and identifying and mitigating hazards. Furthermore, the investigation found that the BARC safety program had ineffective communication strategies, failing to convey program needs and responsibilities clearly to both upper management and employees. Expert analyses confirm noncompliance with 29 CFR 1910 OSHA standards (Ex. 46-40), notably the General Duty Clause, which requires employers to proactively identify and mitigate hazards. The core issue identified is the lack of a comprehensive safety program, highlighted by insufficient facility and workplace inspections, ineffective hazard management, inadequate training for safety and industrial hygiene (IH) personnel, and poor communication on safety roles and reporting procedures. Additionally, while there is clear evidence of systemic safety management failures, data linking these deficiencies directly to specific employee injuries or illnesses remains inconclusive. Considering these findings, the following corrective measures and compliance actions are warranted to rectify the identified deficiencies and ensure the ARS BARC's adherence to legal, regulatory, and safety standards:

(1) Strengthen Leadership Commitment to Safety: Establish a strong safety culture that starts from the top. Leadership must actively support and participate in safety initiatives, demonstrating a commitment to safety as a core organizational value. This includes reinstating the Safety Manager position promptly if it becomes vacant and ensuring that the appointed individual has the authority and resources to effect change.

(2) Enhance Communication and Training: Develop and implement a comprehensive communication strategy to ensure that safety information, responsibilities, and updates are effectively disseminated throughout the organization. This should include regular safety meetings, training sessions tailored to different roles within the organization, and clear protocols for reporting safety concerns. Additionally, investing in training and mentorship programs for safety staff to improve their understanding and implementation of safety protocols, is crucial.

(3) Implement Proactive Safety Measures: Shift the focus from a reactive to a proactive approach in managing safety and health issues. This involves conducting regular and thorough workplace inspections, hazard assessments, and implementing preventive measures to mitigate identified risks. Utilizing inspection checklists and ensuring they are completed diligently can help in identifying potential hazards before they result in incidents.

(4) Improve Recordkeeping and Documentation: Address the significant gaps in recordkeeping and documentation practices. Establish a reliable system for maintaining accurate and up-to-date safety records, including workplace inspections, hazard assessments, and training records. This system should be easily accessible and regularly reviewed to ensure compliance with established safety protocols and documentation standards.

(5) Re-establish Medical Surveillance Programs: Prioritize the health of employees by reinstating comprehensive medical surveillance programs, which are critical for identifying and mitigating potential health issues. This should be done in partnership with reputable health organizations to ensure the program meets the needs of employees and complies with regulatory requirements.

By implementing these recommendations, the organization can address the critical deficiencies identified in the safety program, improve the overall safety culture, and ensure compliance with relevant safety standards and regulations.

### b. Personal Protective Equipment

In addition to conducting multiple interviews with BARC facilities unit Leaders and staff, the Inquiry Team requested documents evidencing the presence of a complete safety program, such as workplace inspections, reports, and medical surveillance recordkeeping. Paper copies of inspection checklists, workplace assessments, and industrial hygiene reports were provided by BARC ARS (Ex. 31; 32); however, they do not demonstrate the presence of a complete safety program, including effective management of personal protective equipment (PPE), within the organization. Additionally, the Inquiry Team requested access to the online and cloud resources referenced throughout the interviews, such as the Y: drive, BARC SharePoint, and ARS SharePoint resources. Analyses of those resources did not confirm the presence of a complete safety program for this organization.

The investigation discovered several examples that collectively highlight issues with PPE provision, usage, and management, alongside broader safety management challenges at BARC. First, the lack of

basic tools and equipment, including PPE, points to a broader issue of resource constraints that may prevent employees from performing their duties safely. Instances shared of the OMU Maintenance Mechanic Supervisor and his crew working without arc flash gear, and other members of the Operations Management Unit (OMU) team lacking essential tools, set the stage for a narrative of underfunded safety measures and inadequate provision of necessary safety equipment (Ex. 37-2). Employees who work on electrical equipment without arc flash gear and essential tools face a significant risk of serious injury or even death. Similar instances such as the lack of confined space training since 2017 (Ex. 37-13,3,2,8), showcase a significant gap in safety preparedness and employee training. This lack of training extends to PPE management, where employees are not adequately trained on the use of N95 masks in hazardous conditions, further exemplifying the organization's failure to prioritize and invest in safety education (Ex. 37-24,20,13,12,1,2).

The reliance upon – and apparent cultural acceptance of – reactive maintenance and safety protocols, as opposed to proactive measures, underlies many of the issues raised in the interviews. The limited use of Maximo for work orders only, without a broader application for preventive maintenance, exemplifies this reactive culture. This approach affects not just equipment maintenance but also the timely and appropriate provision and use of PPE, leading to situations where employees are exposed to unnecessary risks (Ex. 37-24,20,13,12,1,2). The safety office’s struggles with understaffing and the challenges faced in advocating for a reestablished medical surveillance program indicate a systemic failure to prioritize safety at both the management and operational levels. This includes failures in effectively communicating the importance of PPE use compliance with safety standards. The narrative underscores safety as a collective organizational responsibility that has been neglected. The mention of the safety office's inability to support over 600 employees and visitors due to understaffing and the lack of leadership support for prioritizing safety and health issues serve as critical reminders of the consequences of deprioritizing safety and PPE management.

Affirmative findings indicate a violation of regulations due to a failure in instituting 29 CFR 1910 OSHA standards. This encompasses, but is not limited to, 29 CFR 1910.132 General Requirements, which provides the general guidance on the selection, provision, and use of PPE. This standard also outlines the employer’s responsibility to assess the workplace for hazards and to provide suitable PPE to employees at no cost. Specific standards citing non-compliance of PPE requirements at BARC also includes, but is not limited to, 1910.134 Respiratory Protection and 1910.137 Electrical Protective Equipment. Further, there is affirmative evidence demonstrating that the absence of coherent safety program management poses a danger to public and worker safety and health. For example, there is an absence of documented employee training on hazard identification and PPE selection (Ex. 33; 34). Additionally, several employees expressed concerns with procuring appropriate PPE because of purchase card violations (Ex. 37-8,27,25,22,17,7). BARC safety office’s failure to collaborate actively with work groups for advising and auditing PPE programs reflect a broader organizational oversight in prioritizing and integrating effective safety practices across the board.

The Inquiry Team examined witness interviews, program documents, and database records to reach the above findings. This analysis revealed significant shortcomings in the safety program’s management of employee’s PPE. Overall, the evidence reviewed reflects a general shortfall in managing PPE requirements and training for employees, as well as a lack of adherence to proper safety standards and protocols. The investigation substantiates the allegations of violations of regulations, as outlined in 29

CFR 1910 OSHA standards, including 1910.134 (Respiratory Protection), 1910.132(d) (Hazard Identification and Equipment Selection), 1910.146 Confined Space, 1910.30 (Training Requirements), 1910.1200 (Hazardous Communication - HAZCOM). Despite these substantiated instances, the totality of the pertinent evidence gathered is inconclusive regarding injuries or illnesses suffered by BARC employees directly attributable to conditions within the facility. The following corrective measures and compliance actions are warranted to rectify the identified deficiencies:

(1) Establish Dedicated PPE Management Teams: Form specialized teams within work groups tasked with the management of PPE programs, including the selection, distribution, and auditing of PPE use within their respective areas. These teams should work in close collaboration with the safety office or their team's collateral duty safety coordinator to ensure that PPE practices are aligned with both organizational safety standards and regulatory requirements.

(2) Implement Comprehensive PPE Training Programs: Develop and implement a comprehensive PPE training program for all employees, focusing on the proper use, maintenance, and limitations of PPE. This program should also include training for supervisors and managers on how to effectively enforce PPE compliance and create a culture of safety within their teams.

(3) Conduct Regular PPE Audits and Reviews: Establish a schedule for regular audits and reviews of PPE programs across the organization, conducted by the safety office in partnership with the dedicated PPE management teams. These audits should assess compliance with both internal policies and external regulations, identify areas for improvement, and ensure that any deficiencies are promptly addressed.

(4) Improve Communication and Reporting Mechanisms: Enhance communication channels between the safety office, PPE management teams, and employees to facilitate the reporting of PPE-related issues and concerns. Implement a transparent mechanism for employees to provide feedback on PPE effectiveness and suggest improvements without fear of retaliation.

(5) Update and Revise PPE Policies Regularly: Regularly review and update PPE policies and procedures to reflect changes in regulatory requirements, workplace hazards, and best practices. This should involve consultation with work groups, PPE manufacturers, and safety experts to ensure that PPE policies remain relevant and effective in protecting employees.

By implementing these recommendations, BARC can strengthen its approach to PPE management, improve safety outcomes, and ensure compliance with relevant safety standards.

### c. Contracting

Complainants alleged that the Center's elevators are often out of service and commonly break while transporting people, equipment, or supplies (Ex. 37-1; 38-23). Complainants were especially concerned with the transportation of large dewars [insulated containers used for storing biological samples or chemicals at required temperatures] of liquid nitrogen, which can result in severe injury or death if the dewar leaks in a space with inadequate ventilation, like an immobile malfunctioning elevator. BARC's Operations Management Unit (OMU) leader stated that while the Center does have maintenance contracts, if high-cost parts are needed, BARC and NEA contracting staffs requiring a competitive bidding process (Ex. 37-5).

BARC and ARS provided numerous items of information in response to the Inquiry Team's request including: elevator inspection and maintenance records (Ex. 21-1 through 9); fire detection and suppression system maintenance records (Ex. 22-1 through 5; 23-1 through 11); autoclave maintenance records (Ex. 24-1 through 10); water and wastewater operation and treatment records (Ex. 25-1 through 119); electrical and HVAC systems records (Ex. 26-1 through 62); and information on mold and interior environmental remediation efforts (Ex. 28-1 through 13). ARS provided several hundred contract award documents, but few, if any, associated scopes of work, internal government estimates, or designation of Contracting Officer's Representatives. For the inspection and maintenance service contracts reviewed, none included a line item for the acquisition at cost of major parts and components that had failed. This is a normal method for this type of contract to appropriately balance risk between the Government and Contractor while allowing swift acquisition to return systems to service. Instead, according to the OMU Leader (Ex. 37-5,28,16), the contracting team requires the Center to prepare a full contract package for the contracting team to put out to bid.

Center facilities staff do not appear to have the appropriate training in procurement to develop appropriate scopes of work or knowledge of existing government-wide acquisition tools that could streamline contract actions and reduce the level of effort needed to maintain facilities (Ex. 37-11,17,23). It's unclear to the Inquiry Team as to why these contracts are structured in the manner they are, but the pattern of these contracts indicates the contracting expertise of BARC's technical staff is significantly underdeveloped to meet the Center's need to maintain BARC effectively and efficiently. The following recommendations are suggested for adoption and implementation:

(1) Provide maintenance management planning training for Center staff.

(2) Provide procurement training for appropriate BARC Facilities staff relevant to the performance of the operations, maintenance, and repair work within the Center's span of control.

(3) Establish an acquisition planning team to work with NEA and ARS headquarters contracting staff to align procurement planning and contracts to reduce administrative burden and be ready for end of year available funds that can be put towards necessary maintenance and repair.

### d. Internal Controls & Purchase Cards

Inquiry interviews with multiple facilities unit leaders and employees indicated that all credit cards for the facilities units were effectively cancelled or suspended in May 2023 due to misuse (Ex. 37-27,22,20,16,12,7,8). Since May 2022, eight (8) Center cards have been cancelled due to unauthorized commitments, 14 cancelled due to failure to complete required refresher training, and ten (10) cancelled for being in "suspension" for 120 days (Ex. 30-1,2). Examining purchase card audits provided by BARC ARS, just two (2) facilities employees have charge cards while between FY20 through FY23, 47 incidents of using the wrong procurement method were flagged (Ex. 29-1). According to the Acting BARC Center Director and several facilities unit Leaders, the facilities groups are currently relying on other Center card holders for micro-purchases of supplies and services. Facilities employees also stated that they have been told that they could use a supply or service vendor only once per year and did not understand the reasoning (Ex. 37-22,16,7). This is likely due to a misunderstanding of procurement policy related to avoiding split purchasing and can be easily addressed with good training tailored to the nature of the work. It is reasonable for a facilities management organization or even a single cardholder to make multiple purchases from a single vendor in a short time window to accomplish the organization's work.

The Former Utilities Management Unit (UMU) Leader alleged that during his tenure at BARC, split purchasing after services were performed or supplies delivered was often used to keep the purchase under the micro purchase threshold (Ex. 37-27). He has also alleged that funds from one fiscal year were regularly used to pay for work performed in a prior fiscal year. Multiple witnesses alleged that several vendors have refused to perform future work for the Center because they have not been paid for work performed (Ex. 37-20,17). The Acting BARC Center Director (Ex. 37-7) and Acting BARC Facilities Director (Ex. 37-8) – stated that the Center is working through around 100 ratifications of unauthorized commitments. The Center has hired administrative staff outside of the Facilities units to process the ratifications, but the Acting BARC Center Director stated that they were having difficulties because they could not get a good example of a ratification from the reviewers (Ex. 37-7,17). The Acting BARC Facilities Director stated, "you can't manage facilities without credit cards" and that there should have been a stand-down and retraining for the staff when the second ratification arose (Ex. 37-8).

The NEA Administrative and Financial Management (AFM) Director (Ex. 37-17) claimed he personally addressed misuse of credit cards with the BARC Center Director, but little progress was made on needed ratifications. ARS audits conducted between 2020 and 2023 identified issues of policy infractions by cardholders (Ex. 29-1). In 2023 alone, 435 transactions were identified as possible purchase card misuse or fraud. Records provided by BARC (Ex. 30-1,2) detailing cancelled or closed credit card accounts indicate that oversight has resulted in the termination of some cards. Between 2019 and 2023, 138 card holder accounts have been cancelled or closed for all issues including lack of card holder training, misuse, fraud, or employee separation (2019 – 10 cards; 2020 – 34 cards; 2021 – 24 cards; 2022 – 26 cards; 2023 – 44 cards). AFM's Acquisition Property Division (APD) was brought in by NEA to assist with training and organizational changes including forming a committee to 'pick through ratifications.' The NEA AFM Director shared that credit card misuse has been a challenge and recently told the Acting BARC Center Director that purchasing and ratifications must be corrected, saying, "You need to address this. This is serious." Furthermore, NEA's AFM and APD have provided training to BARC staff at all hands meetings concerning purchasing and charge card requirements for the past three years and have recently helped BARC create a "master purchaser" position to assist in ratification and internal controls efforts (Ex. 37-17).

Barring recent attempts, BARC leadership has failed to implement and maintain adequate internal management controls required by USDA Department Regulation (DR) 1110-002 *Management's Responsibility for Internal Control* (March 2021) for the facilities management program (Ex. 46-39). This has contributed to the failure to adequately maintain facilities and provide tools, equipment, and supplies for maintenance. The Center has been abusing purchase cards because Center leadership has failed to implement adequate internal controls and failed to train facilities staff in the appropriate methods for acquiring services and support to accomplish their work. The following recommendations are suggested for adoption and implementation:

(1) Provide maintenance management planning training for Center staff.

(2) Implement stringent internal controls for purchase cards at the Center.

(3) Refer BARC's credit card program to a third-party professional accounting group for an independent audit, forensic accounting, and trends analysis.

### e. Health & Safety

According to an interview with the OMU Leader, employees in the OMU department are routinely performing electrical testing and troubleshooting on energized electrical equipment operating at voltages up to and including 480 volts (Ex. 37-5,2). This work is done without electrical protective equipment that would minimize injury in the event of an electrical arc flash, and this hazard exists because BARC had not equipped OMU and other affected employees with electrical protective equipment and tools.

These recommendations apply to any BARC employee who performs electrical testing/troubleshooting or other electrical work on energized conductors greater than 50 volts A.C.:

(1) Supply affected employees with adequate supplies of electrical protective equipment and tools that is rated for the voltage levels and available fault current at any point where electrical testing/troubleshooting and/or other energized electrical work is being performed. The electrical protective equipment must be sized for the affected employee who is to wear it. [29 CFR 1910.335 (a) and (b), NFPA 70E-Standard for Electrical Safety in the Workplace]
   Examples of electrical protective equipment and tools include, but are not limited to:
   - Voltage-rated rubber insulating gloves with leather protectors
   - Arc-rated face shields and head protection
   - Arc-rated body protection-shirt, pants, coveralls, insulated suit, etc.
   - Insulated hand tools-screwdrivers, wrenches, etc.

(2) Implement in-service care and use procedures for electrical protective equipment to ensure that the equipment is safe to use. [29 CFR 1910.137 (c)]

(3) Train affected employees on safety-related work practices that pertain to their job assignments. [29 CFR 1910.332]

(4) Ensure that adequate supervision is provided to ensure that electrical safe work practices and the use of electrical protective equipment and tools are used.

Conclusion: BARC facilities employees do not have the required tools and equipment for adequate maintenance and repair of the electrical testing and troubleshooting needs of buildings and structures.

## Allegation 3: The unsafe and deteriorating conditions have resulted in the loss and improper handling of scientific equipment, research, and data.

### a. Space Condition and Management

Interviews with BARC leadership acknowledged that scientific research progress has been negatively impacted by the condition of facilities (Ex. 37-9,23,20,8). Although the Inquiry Team found no evidence of irretrievable research loss, it was clear that the condition of the facilities has damaged scientific equipment, derailed and delayed research studies, and resulted in increased costs to research operations at BARC (Ex. 39-1 through 88). The Acting BARC Center Director confirmed the disruption to research caused by power losses to facilities, and the damage to and evacuation of Building 007 (power failure, equipment failure, water damage) (Ex. 37-7). She acknowledged that lack of power has caused animals to be too cold and therefore unusable for data collection; the nuance of this position is that there is not irretrievable loss of data, but loss of the ability to collect data.

The Acting BARC Assistant Director has not personally experienced research loss but has lost equipment due to excessive heat, though has always been able to salvage the contents. She spoke of walk-in cold boxes in Building 10A that have not worked properly for years; alleged scientists do not know what is alive or dead inside a walk-in, and don't know where to put the contents so just "don't look" (Ex. 37-9). She had no answer (she did not know) when asked why the walk-in cold boxes couldn't be repaired or replaced.

The Research Leader spoke of research being lost or damaged because contracting takes so long (month to get a final contract in place). When asked if he has lost research or had research compromised, he responded that he has been impacted: greenhouses that get too cold (problems with the steam system); lost freezer (due to power outages); and general disruption (having to come in and move materials to safe, functioning locations, or bring in space heaters when rooms get too cold; having other rooms be 85 degrees Fahrenheit all summer and need to continue work) (Ex. 37-20). However, he maintains that his research is more negatively impacted by poor contracting than facility deficiencies.

The NEA Director stated that leadership paid for a forensic accounting of data compromised in the flooding that took place in Building 007, but that all data was shown to be recovered. He added that there is an awareness that due to continued disruption of research operations, BARC scientists may have lower quantifiable performance outcomes and that there would be leniency provided at time of evaluation (Ex. 37-23).

Space management and assignment is managed by the Property Management Unit's (PMU) realty specialists. The PMU documents continuing and future needs solely by polling the research unit leaders and does not provide any space or functional programming support to the research units (Ex. 37-16; 31). While the team does not know if there is any benchmarking of space and functional needs by the PMU, our observation of space assignment and use would indicate that no such benchmarking has occurred. One example where a comprehensive approach to space management is placing research at risk is the mycology sample storage room in the basement of Building 10A which presently houses years' worth of research samples in an underground room not designed for secure, archival, and transactional storage and use of critical research samples in the correct environmental conditions for long term storage. According to the Acting BARC Assistant Director, the collection is housed in that space because it was the only space available (Ex. 37-9). Lack of clear space management plans is creating a situation where at every facility or operational business failure, scientists are left scrambling to move their research to new, also inadequate, spaces.

Another example observed of deteriorating facility conditions putting research at risk, and is still occurring, is Building 007. Building 007 flooded in 2018 and again in December 2022; the latter flooding event lasted over two days and is reflective of the general lack of maintenance and the lack of processes and procedures in place to respond to emergencies. Research was impacted in the flooding event(s) and scientists had to move operations following the 2022 flood with little notice and planning (Ex. 37-1; 38-21,4). From December to May 2023, employees were still going into the building as evidenced by equipment inspection logs observed throughout the building by the Team's physical walk-through of the facility in late September 2023. The Inquiry Team was told that the building was closed to all people as of May 2023 which coincides with negative, albeit limited distribution media attention of the situation at BARC (Ex. 41-1 through 4). However, it was clear to the Inquiry Team during building walkthroughs that people were still accessing and using some parts of the building when we conducted our tour. The NEA

Director informed the team that two functions are currently allowed in the building with one being active computer servers in the basement running daily research computations (Ex. 37-23). Entry into the building results in increased employee exposure to unsafe conditions. The poor building condition is also exposing remaining research functions to damage or loss through exposures to things such as temperature extremes and continued chance of flooding.

The lack of operating elevators in some buildings, lack of fully functional fire detection and suppression systems in some buildings, limited observable maintenance contracts for autoclaves and other large scientific equipment, multiple on-going instances of flooding, and repeated documented temperature extremes in many buildings, all are negatively impacting the ability to conduct research operations. Spaces used to conduct research need to meet minimum standards as outlined elsewhere in this report to meet research goals and provide an environment safe for employees. It is recommended that BARC conduct campus wide functional and space programming as a prelude to creating a long-term sustainable vision for the Center that can be updated every five years to reflect changing conditions and emerging needs.

**CONCLUSION**

This administrative inquiry has amassed a significant amount of documentary evidence in the form of memorandums of conversation, records and files maintained by BARC and NEA including emails, electronic documents, maps, schematics, reports, SOPs, compliance reviews, test results, contracts, licenses, etc. in a concerted effort to develop a complete and thorough record. The multi-disciplinary investigative team led by the USDA's Forest Service and Office of Human Resources Management reviewed almost 1,500 documents, interviewed three (3) Whistleblowers and 29 other members of BARC, NEA and ARS staff and leadership – including the ARS Administrator and Associate Administrator for Research Operations and Management – as well as extensively toured the facility to assess the physical condition of BARC buildings and facilities.

Concerning the claim that BARC leadership has failed to adequately maintain many of the facility buildings and structures, resulting in an unsafe and deteriorating workplace environment for employees, a critical assessment of the evidentiary record substantiates this allegation. As set forth in greater detail above, the Inquiry Team concludes that BARC facilities units, i.e., OMU, UMU, RRU, and RPU, demonstratively lack effective communication and professional relationships between Unit Leaders, their respective staff and subordinate supervisors, and Center leadership that undermines program delivery. Moreover, these units are collectively lacking in appropriate expertise to perform functional disciplines, are understaffed, and lack training in the effective use of the Maximo maintenance management system and not scheduling preventative and predictive maintenance. Analysis of information and review of the evidentiary record in this matter establishes that the general safety and facility deficiencies found throughout many of the buildings visited coupled with noted failures to meet or maintain existing compliant accessibility features demonstrates that BARC is facially in violation of 29 CFR 1910.146 *et. seq.* and the Architectural Barriers Act, respectively. Based on available evidence which was devoid of a recent Environmental Compliance and Protection Audit, the Inquiry Team concludes that while BARC may be treating water in accord with relevant standards, instances of non-compliant water distribution have occurred at the Center, and it could not be substantially determined whether current wastewater treatment operations meet or can continue to meet system standards without substantial changes.

The second allegation that BARC facilities employees do not have the required tools and equipment for adequate maintenance and repair of the buildings and structures is substantiated, in part. Based predominantly on witness interviews and program documents, the evidentiary record establishes that the BARC safety staff in both the Safety and Occupational Health Unit (SOHU) and Environmental Management have struggled to develop a program that emphasizes identifying and mitigating workplace hazards, which has led to the deterioration of BARC's safety program and facilities. The efficacy of the safety team and its program is severely compromised by a fundamental misunderstanding of roles and poor communication within the safety team and with the organization's leadership. The Inquiry Team unveiled a glaring deficiency in critical health and safety programs with the absence of a medical surveillance program. Multiple witnesses across the facilities units responded that they or their work units possess the appropriate tools and equipment to perform adequate maintenance and repair work at BARC. However, the Inquiry Team found evidence that the safety office is deficient in furnishing or maintaining personal protective equipment (PPE) as well as conducting appropriate PPE fit-testing and providing adequate training on use. Similar deficiencies were identified concerning required confined space training and signage. It's likely that BARC has violated multiple sections of 29 CFR 1910 OSHA standards in relation to these deficiencies. However, despite these substantiated instances, the totality of the pertinent evidence gathered is inconclusive regarding any injuries or illnesses suffered by BARC employees directly attributable to conditions within the facility. While BARC leadership failed to implement and maintain adequate internal controls on purchase cards issued to facilities unit staff, the alleged nexus between this lack of controls and the failure to maintain facilities is not sufficiently corroborated by the evidentiary record.

Based upon review of the evidence, the final allegation that unsafe and deteriorating conditions have resulted in the loss and improper handling of scientific equipment, research, and data is not substantiated. A consensus emerged from interviews with BARC leadership and scientific staff that acknowledged that scientific research has been negatively impacted by the physical state and condition of certain facilities and building. Despite several assertions, many anecdotal, that facilities conditions have damaged scientific equipment due to temperature extremes, derailed or delayed research studies, or resulted in increased research costs, the Inquiry Team found no evidence of permanent, irretrievable loss of research data.

Missing from the above analyses and conclusions is a contextualization that adequately conveys the physical magnitude of BARC and how the Center encapsulates not just current agricultural scientific research, but the physical artifacts and intangible pride of past achievements. BARC is a large research center with hundreds of buildings in various states of repair situated on thousands of acres of once bucolic open space on a watershed that has become enmeshed in a sprawling suburban community. The facility suffers from decades of deferred maintenance needs and aging infrastructure. Leadership across BARC, NEA and ARS acknowledge maintenance needs, resource constraints, and bureaucratic processes as challenges. Records and reports provided by BARC document failures in the safe, effective, and efficient management of the Center's built environment since the early 2000's. Facility conditions look to have started declining in the mid-1990s, likely due in part to federal funding cuts to research, increased expectations (standards development) on facilities management, and inadequate leadership attention and decision making over succeeding decades. The evidence as a whole demonstrates that BARC and NEA have been active participants for several years in the ARS CIS process which utilizes facility condition

index and research program priority frameworks to drive the buildings and facilities (B&F) modernization analysis to identify improvements. Yet a continued lag in appropriated funding for BARC [$98M annual base fund], coupled with $190M in identified existing deferred maintenance on campus, effectively stifle any nimble, large-scale facilities improvements at BARC, often irrespective of whether a project or building has been identified as an ARS priority. Considering the scope of this financial reality, it is doubtful that BARC leadership could effectively martial necessary facilities improvements from a mandated 4 percent set-aside for maintenance and repairs.

Considering the large amount of information constituting the evidence file and the potential violations of rules and regulations identified by the Inquiry Team, especially those related to health and safety, ARS and/or USDA may wish to consider or refer portions of this matter for administrative actions for certain individuals based on respective role, position, responsibility, actions, or failures to act. This may necessitate formal Personnel Misconduct Investigations to generate or refine evidence to support potential corrective actions with precise charges and elements. As for proving a charge of “gross mismanagement” an agency would arguably need to show an action or inaction created a substantial risk of a significant adverse impact on the agency’s ability to accomplish its mission; it is more than *de minimis* wrongdoing or negligence. *Jensen v. Department of Agriculture,* 104 M.S.P.R. 379 (2007). To prove “gross waste of funds” an agency would need to show an expenditure is significantly out of proportion to the benefit reasonably expected to accrue to the government. *Herman v. Department of Justice,* 115 M.S.P.R. 386 (2011) (quoting *Van Ee v. Environmental Protection Agency,* 64 M.S.P.R. 693 (1994)). Adding the word “gross” to a charge creates a higher proof burden for an Agency.

Although the conditions at BARC are the result of 30 years of cascading problems, the environment at the facility at the time of this investigation is one of a demonstrated lack of internal controls, little accountability for performance, a multitude of poor or missing management decisions, and a culture that normalizes risky behavior and practices resulting in weak or unenforced safety standards. Moreover, a cultural disconnect or outright aversion by BARC’s scientific research units to recognizing the need for and contributing funds towards maintenance and facilities investment is evident and may prove deleterious to BARC’s ultimate viability. The collective actions of multiple iterations of BARC facilities and safety unit Leaders in concert with several Center Directors and Assistant Directors have facially violated regulations, policies and procedures articulated by multiple federal regulations, CFRs and USDA Directive intended to ensure a robust, healthy, safe and secure working environment. However, the totality of the evidentiary record demonstrates that these failures pre-date 2017 and are likely institutional in nature with the organizational reporting construct of BARC, NEA and ARS. Perhaps a research center as comprehensive both in terms of physical size and breadth of housed research programs should be administratively operated by a non-scientist member of the Senior Executive Service or the NEA office with direct support from AFM.

| Item Number | Description |
|---|---|
| | **Documentation Provided by Beltsville Agricultural Research Center** |
| **1** | **1996 Facility Master Plan** |
| **2** | **Real Property Inventory & Federal Real Property Reports** |
| 2-1 | FY 18 Federal Real Property Report Profile |
| 2-2 | FY 19 Federal Real Property Report Profile |
| 2-3 | FY 20 Federal Real Property Report Profile |
| 2-4 | FY 21 Federal Real Property Report Profile |
| 2-5 | FY 22 Federal Real Property Report Profile |
| 2-6 | ARS-259 Certification Form (BARC - September 2020) (003) |
| 2-7 | ARS-259 Certification Form (BARC - September 2021) SIGNED |
| 2-8 | ARS-259 Certification Form (NEA - September 2023) |
| 2-9 | Beltsville MD 2019 BARC Inventory |
| 2-10 | Beltsville MD 2023 Beltsville Inventory |
| 2-11 | Beltsville MD FY2022 Inventory |
| 2-12 | FY22 FRPP--Roads Analysis |
| 2-13 | FY22 NEA FRPP Cert ARS259 |
| **3** | **Capital Project Submission** |
| 3-1 | Capital Project Submission 2024 |
| 3-2 | Capital Project Submission 2019-2023 |
| **4** | **O&M Plans, BARC West & Buildings 307, 309, and 310** |
| 4-1 | SOP Chlorine Cylinders |
| 4-2 | SOP Chlorine Test Easy and West WWTP Plants |
| 4-3 | SOP Proper Lifting Technique |
| 4-4 | SOP Soda Ash |
| 4-5 | SOP USDA BARC Personnel |
| 4-6 | SOP USDA BARC WTP Building 310 |
| **5** | **Historical Eval Reports - National Register Historic Places** |
| 5-1 | Historic Site Survey Volume I |
| 5-2 | Historic Site Survey Volume II |
| 5-3 | Historic Site Survey Volume III |
| 5-4 | Historic Site Survey Volume IV |
| 5-5 | Historic Site Survey Volume V |
| 5-6 | Historic Site Survey Volume VI |
| **6** | **Asbestos and Lead Surveys** |
| 6-1 | Asbestos Containing Materials and Lead Report 2023 Rev. 1 |
| 6-2 | Asbestos Containing Materials and Lead Report 2023 |
| 6-3 | Building 007 Asbestos Air Monitoring Report, July 2023 |
| 6-4 | Building 007 Asbestos Containing Materials Report 2022 |
| 6-5 | Building 007 Asbestos Sampling Report, March 2023 |
| 6-6 | Building 007 Lead Testing Report, March 2023 |
| 6-7 | Building 007 Asbestos Positive Sampling Photos |
| 6-8 | Building 012 Asbestos Sampling Results, August 2023 |
| 6-9 | Buildings 308 & 309 Asbestos Air Monitoring Report, August 2023 |
| 6-10 | Building 309 Corridor Asbestos Sampling Report, August 2023 |
| 6-11 | Building 1043 Attic Asbestos Sampling Report, August 2023 |
| 6-12 | Building 002 Hazardous Material Building Report, August 2021 |
| 6-13 | Builing 005, Hazardous Material Building Report, August 2021 |
| 6-14 | Building 308 Hazardous Material Building Report, August 2021 |
| 6-15 | Building 307 Hazardous Material Building Report, March 202 |
| **7** | **BARC Confined Space Entry Program, Appendix F Facilities Service, Physical Plant Management** |
| **8** | **2016 BARC Condition Assessment** |
| 8-1 | BARC Building Facility Assessment Report, September 2019 Assessment |
| 8-2 | BARC Location Summary Report: Beltsville 2, October 2022 |
| 8-3 | BARC Location Summary Report: Beltsville 3, October 2022 |
| 8-4 | BARC Location Summary Report: 4 Beltsville 2, October 2022 |
| 8-5 | BARC Building Facility Assessment Report (100 and 300 areas), September 2017 Assessment |
| 8-6 | BARC Building Facility Assessment Report (Buildings 001 002, 003, 006, & 007), September 2017 Assessment |
| **9** | **Environmental Compliance & Protection Audits** |
| 9-1 | Biosafety, Safety, and Health Assessment Report, April 2015 |
| 9-2 | Environmental Compliance Program Review, October 2022 |
| 9-3 | ARS Environmental Management System Declaration of Management Review Form, December 2022 |
| 9-4 | ARS Environmental Management System Non-Confromance Listing for BARC |
| 9-5 | BARCEM~1 |
| **10** | **Physical Security Assessment** |
| 10-1 | BARC Limited Risk Assessment Report |
| 10-2 | BARC Risk Assessment Report (Final) |
| 10-3 | USDA Physical Security Assessment Report, April 2017 |
| 10-4 | USDA Physical Security Assessment Report, February 2023 |
| **11** | **Water System Schematics** |
| 11-1 | Water System Improvements: BARC East, 1995 |
| 11-2 | Site Plan, 1995 Improvements |
| 11-3 | Water Distribution System Map: BARC East |
| 11-4 | Water Distribution System Map: BARC West |
| **12** | **Water System O&M Manual [Photos of manuals provided]** |
| 12-1 | 20231010_101928.jpeg |
| 12-2 | 20231010_101946.jpeg |
| 12-3 | 20231010_102019.jpeg |
| 12-4 | 20231010_102026.jpeg |
| 12-5 | 20231010_102033.jpeg |
| 12-6 | 20231010_102223.jpeg |
| 12-7 | 20231010_102236.jpeg |
| 12-8 | 20231010_102324.jpeg |
| 12-9 | 20231010_102328.jpeg |
| 12-10 | 20231010_102337.jpeg |
| 12-11 | 20231010_102515.jpeg |
| 12-12 | 20231010_102533.jpeg |
| 12-13 | 20231010_102623.jpeg |
| 12-14 | 20231010_102658.jpeg |
| 12-15 | 20231010_102729.jpeg |
| 12-16 | 20231010_102840.jpeg |
| 12-17 | 20231010_102902.jpeg |
| 12-18 | 20231010_103006.jpeg |
| 12-19 | 20231010_103011.jpeg |
| 12-20 | 20231010_103019.jpeg |
| 12-21 | IMG_0780.jpeg |
| 12-22 | IMG_0781.jpeg |

| | |
|---|---|
| 12-23 | IMG_0782.jpeg |
| 12-24 | IMG_0783.jpeg |
| 12-25 | IMG_0784.jpeg |
| 12-26 | IMG_0785.jpeg |
| 12-27 | IMG_0786.jpeg |
| 12-28 | IMG_0787.jpeg |
| **13** | **Water Source Data, Logs, Records** |
| 13-1 | Well Asbuilts |
| 13-1.1 | *Asbuilts: Well #1* |
| 13-1.2 | *Asbuilts: Well #2* |
| 13-1.3 | *Asbuilts: Well #4* |
| 13-1.4 | *Asbuilts: Well #5* |
| 13-1.5 | *Asbuilts: Well #6* |
| 13-1.6 | *Asbuilts: Well #7* |
| 13-1.7 | *Asbuilts: Well #8* |
| 13-1.8 | October 2023 Water & Wastewater System Information Request and Response |
| 13-1.9 | BARC Water Study Report: Source Water Wells Data |
| **14** | **Monthly Water Operating Reports to Maryland DEQ & Test Records** |
| 14-1 | BARC 2021 Maryland DEQ Water Monitoring Report Forms |
| 14-1.1 | *BARC January 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.2 | *BARC February 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.3 | *BARC March 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.4 | *BARC April 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.5 | *BARC May 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.6 | *BARC June 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.7 | *BARC July 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.8 | *BARC August 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.9 | *BARC September 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.10 | *BARC October 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.11 | *BARC November 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-1.12 | *BARC December 2021 Maryland DEQ Water Monitoring Report Form* |
| 14-2 | BARC 2022 Maryland DEQ Water Monitoring Report Forms |
| 14-2.1 | *BARC January 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.2 | *BARC February 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.3 | *BARC March 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.4 | *BARC April 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.5 | *BARC May 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.6 | *BARC June 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.7 | *BARC July 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.8 | *BARC August 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.9 | *BARC September 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.10 | *BARC October 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.11 | *BARC November 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-2.12 | *BARC December 2022 Maryland DEQ Water Monitoring Report Form* |
| 14-3 | BARC 2023 Maryland DEQ Water Monitoring Report Forms |
| 14-3.1 | *BARC January 2023 Maryland DEQ Water Monitoring Report Form* |
| 14-3.2 | *BARC February 2023 Maryland DEQ Water Monitoring Report Form* |
| 14-3.3 | *BARC March 2023 Maryland DEQ Water Monitoring Report Form* |
| 14-3.4 | *BARC April 2023 Maryland DEQ Water Monitoring Report Form* |
| 14-3.5 | *BARC May 2023 Maryland DEQ Water Monitoring Report Form* |
| 14-3.13 | *220801 USDA ARC - MDE - Stage 2 DBP's* |
| 14-3.14 | *230109 BARC- Bacteriological Results* |
| 14-3.15 | *230206 BARC-Bacteriological Results* |
| 14-3.16 | *230301 BARC-Bacteriological Results* |
| 14-3.17 | *230405 BARC-Bacteriological Results* |
| 14-3.18 | *230501 BARC-Bacteriological Results* |
| 14-3.19 | *230613 BARC-Bacteriological Results* |
| 14-3.20 | *230706 BARC-Bacteriological Results* |
| 14-3.21 | *230801 BARC W-THM, HAA5-Stage 2 DBP's* |
| 14-3.22 | *230801 BARC-Bacteriological Results* |
| 14-3.23 | *230905 BARC Bacteriological Results* |
| 14-4 | BARC Wastewater Discharge Monitoring Reports 2021 |
| 14-4.1 | *BARC East Wastewater Discharge Monitoring Reports February 2021* |
| 14-4.2 | *BARC East Wastewater Discharge Monitoring Reports March 2021* |
| 14-4.3 | *BARC East Wastewater Discharge Monitoring Reports May 2021* |
| 14-4.4 | *BARC East Wastewater Discharge Monitoring Reports July 2021* |
| 14-4.5 | *BARC East Wastewater Discharge Monitoring Reports August 2021* |
| 14-4.6 | *BARC East Wastewater Discharge Monitoring Reports September 2021* |
| 14-4.7 | *BARC East Wastewater Discharge Monitoring Reports October 2021* |
| 14-4.8 | *BARC East Wastewater Discharge Monitoring Reports November 2021* |
| 14-4.9 | *BARC East Wastewater Discharge Monitoring Reports December 2021* |
| 14-4.10 | *BARC West Wastewater Discharge Monitoring Reports February 2021* |
| 14-4.11 | *BARC West Wastewater Discharge Monitoring Reports March 2021* |
| 14-4.12 | *BARC West Wastewater Discharge Monitoring Reports May 2021* |
| 14-4.13 | *BARC West Wastewater Discharge Monitoring Reports July 2021* |
| 14-4.14 | *BARC West Wastewater Discharge Monitoring Reports August 2021* |
| 14-4.15 | *BARC West Wastewater Discharge Monitoring Reports September 2021* |
| 14-4.16 | *BARC West Wastewater Discharge Monitoring Reports October 2021* |
| 14-4.17 | *BARC West Wastewater Discharge Monitoring Reports November 2021* |
| 14-4.18 | *BARC West Wastewater Discharge Monitoring Reports December 2021* |
| 14-5 | BARC Wastewater Discharge Monitoring Reports 2022 |
| 14-5.1 | *BARC East Wastewater Discharge Monitoring Reports January 2022* |
| 14-5.2 | *BARC East Wastewater Discharge Monitoring Reports February 2022* |
| 14-5.3 | *BARC East Wastewater Discharge Monitoring Reports March 2022* |
| 14-5.4 | *BARC East Wastewater Discharge Monitoring Reports April 2022* |
| 14-5.5 | *BARC East Wastewater Discharge Monitoring Reports May 2022* |
| 14-5.6 | *BARC East Wastewater Discharge Monitoring Reports June 2022* |
| 14-5.7 | *BARC East Wastewater Discharge Monitoring Reports July 2022* |
| 14-5.8 | *BARC East Wastewater Discharge Monitoring Reports August 2022* |
| 14-5.9 | *BARC East Wastewater Discharge Monitoring Reports September 2022* |
| 14-5.10 | *BARC East Wastewater Discharge Monitoring Reports October 2022* |
| 14-5.11 | *BARC East Wastewater Discharge Monitoring Reports November 2022* |
| 14-5.12 | *BARC East Wastewater Discharge Monitoring Reports December 2022* |
| 14-5.13 | *BARC West Wastewater Discharge Monitoring Reports January 2022* |
| 14-5.14 | *BARC West Wastewater Discharge Monitoring Reports February 2022* |
| 14-5.15 | *BARC West Wastewater Discharge Monitoring Reports March 2022* |
| 14-5.16 | *BARC West Wastewater Discharge Monitoring Reports April 2022* |
| 14-5.17 | *BARC West Wastewater Discharge Monitoring Reports May 2022* |

| | |
|---|---|
| 14-5.18 | *BARC West Wastewater Discharge Monitoring Reports June 2022* |
| 14-5.19 | *BARC West Wastewater Discharge Monitoring Reports July 2022* |
| 14-5.20 | *BARC West Wastewater Discharge Monitoring Reports August 2022* |
| 14-5.21 | *BARC West Wastewater Discharge Monitoring Reports September 2022* |
| 14-5.22 | *BARC West Wastewater Discharge Monitoring Reports October 2022* |
| 14-5.23 | *BARC West Wastewater Discharge Monitoring Reports November 2022* |
| 14-5.24 | *BARC West Wastewater Discharge Monitoring Reports December 2022* |
| 14-6 | BARC Wastewater Discharge Monitoring Reports 2023 |
| 14-6.1 | *BARC East Wastewater Discharge Monitoring Reports January 2023* |
| 14-6.2 | *BARC East Wastewater Discharge Monitoring Reports February 2023* |
| 14-6.3 | *BARC East Wastewater Discharge Monitoring Reports March 2023* |
| 14-6.4 | *BARC East Wastewater Discharge Monitoring Reports April 2023* |
| 14-6.5 | *BARC East Wastewater Discharge Monitoring Reports May 2023* |
| 14-6.6 | *BARC East Wastewater Discharge Monitoring Reports June 2023* |
| 14-6.7 | *BARC East Wastewater Discharge Monitoring Reports July 2023* |
| 14-6.8 | *BARC East Wastewater Discharge Monitoring Reports August 2023* |
| 14-6.9 | *BARC West Wastewater Discharge Monitoring Reports January 2023* |
| 14-6.10 | *BARC West Wastewater Discharge Monitoring Reports February 2023* |
| 14-6.11 | *BARC West Wastewater Discharge Monitoring Reports March 2023* |
| 14-6.12 | *BARC West Wastewater Discharge Monitoring Reports April 2023* |
| 14-6.13 | *BARC West Wastewater Discharge Monitoring Reports May 2023* |
| 14-6.14 | *BARC West Wastewater Discharge Monitoring Reports June 2023* |
| 14-6.15 | *BARC West Wastewater Discharge Monitoring Reports July 2023* |
| 14-6.16 | *BARC West Wastewater Discharge Monitoring Reports August 2023* |
| 14-7 | *Index file of Wastewater Dischage Monitoring Reports requested by and provided to Whistleblower team* |
| **15** | **Maryland Water System Operator Licenses** |
| 15-1 | A. Gizzi Water Treatment Operator License |
| 15-2 | C. Myers Water Treatment, Wasyewater Treatment, Superintendent Wasterwater Treatment Operator Licenses |
| 15-3 | R. Whitson Water Treatment and Wastewater Treatment Operator License (2022) |
| 15-4 | K. Ramsey Water Treatment and Wastewater Treatment Operator License |
| 15-5 | D. Shields Superintendent: Water Treatment and Wastewater Treatment & Temporary Wastewater Treatment Operator License |
| 15-6 | R. Shields Superintendent: Water Treatment and Wastewater Treatment & Wastewater Treatment Operator License |
| 15-7 | R. Whitson Water Treatment and Wastewater Treatment Operator License (2024) |
| **16** | **National Pollutant Discharge Elimination System (NPDES) Permits** |
| 16-1 | BARC East Wastewater Treatment Plant |
| 16-1.1 | *BARC East Wastewater Treatment Plant Maryland Sludge Utilization Permit (03/20/2015)* |
| 16-1.2 | *BARC East Wastewater Treatment Plant Discharge Permit (Expired 08/31/2021)* |
| 16-1.3 | *BARC East Wastewater Treatment Plant Maryland EPA Summary Report & Fact sheet (01/21/2016)* |
| 16-2 | BARC West Wastewater Treatment Plant |
| 16-2.1 | *BARC West Wastewater Treatment Plant Maryland Sludge Utilization Permit (03/08/2013)* |
| 16-2.2 | *BARC West Wastewater Treatment Plant Maryland Sludge Utilization Permit (04/05/2021)* |
| 16-2.3 | *BARC West Wastewater Treatment Plant Discharge Permit (Expired 10/31/2023)* |
| 16-2.4 | *BARC West Wastewater Treatment Plant Discharge Permit Modification (Issued 11/27/2018)* |
| **17** | **Wastewater Monthly Operations Report test records (2018-2023)** |
| 17-1 | BARC East Wastewater Treatment Plant Discharge Monitoring Report 2018 |
| 17-1.1 | *BARC East Wasterwater Treatment Plant Discharge Flume Lab Results, January 2018* |
| 17-1.2 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, January 2018* |
| 17-1.3 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, February 2018* |
| 17-1.4 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, March 2018* |
| 17-1.5 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, April 2018* |
| 17-1.6 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, May 2018* |
| 17-1.7 | *BAR East Wastewater Treatment Plant Discharge Monitoring Report, June 2018* |
| 17-1.8 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, July 2018* |
| 17-1.9 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Revised, July 2018* |
| 17-1.10 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, August 2018* |
| 17-1.11 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, September 2018* |
| 17-1.12 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, October 2018* |
| 17-1.13 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, November 2018* |
| 17-1.14 | *BARC East Wastewater Treatment Plant Discharge Monitoring Reportm Part 1, December 2018* |
| 17-1.15 | *BARC East Wastewater Treatment Plant Discharge Monitoring Reportm Part 2, December 2018* |
| 17-2 | BARC East Wastewater Treatment Plant Discharge Monitoring Report 2019 |
| 17-2.1 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, January 2019* |
| 17-2.2 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, February 2019* |
| 17-2.3 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, March 2019* |
| 17-2.4 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, April 2019* |
| 17-2.5 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, May 2019* |
| 17-2.6 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, June 2019* |
| 17-2.7 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, July 2019* |
| 17-2.8 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, August 2019* |
| 17-2.9 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, September 2019* |
| 17-2.10 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, October 2019* |
| 17-2.11 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, November 2019* |
| 17-2.12 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, December 2019* |
| 17-2.13 | *BARC East Wastewater Treatment Plant Final PCBs Report, Quarter 1 2019* |
| 17-3 | BARC East Wastewater Treatment Plant Discharge Monitoring Report 2020 |
| 17-3.1 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, January 2020* |
| 17-3.2 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, February 2020* |
| 17-3.3 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, March 2020* |
| 17-3.4 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, April 2020* |
| 17-3.5 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Revised, May 2020* |
| 17-3.6 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, June 2020* |
| 17-3.7 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, July 2020* |
| 17-3.8 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, August 2020* |
| 17-3.9 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, September 2020* |
| 17-3.10 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, October 2020* |
| 17-3.11 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, November 2020* |
| 17-3.12 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, December 2020* |
| 17-3.13 | *BARC East Wastewater Treatment Plant Final PCBs Annual Report, 2020* |
| 17-4 | BARC East Wastewater Treatment Plant Discharge Monitoring Report 2021 |
| 17-4.1 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, January 2021* |
| 17-4.2 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, February 2021* |
| 17-4.3 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, March 2021* |
| 17-4.4 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, April 2021* |
| 17-4.5 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, May 2021* |
| 17-4.6 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, June 2021* |
| 17-4.7 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, July 2021* |
| 17-4.8 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, August 2021* |
| 17-4.9 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, September 2021* |

| | |
|---|---|
| 17-4.10 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report, October 2021* |
| 17-4.11 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, November 2021* |
| 17-4.12 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, December 2021* |
| 17-4.13 | *BARC East Wastewater Treatment Plant Discharge Monitoring Annual Report, 2021* |
| 17-4.14 | *BARC East Wastewater Treatment Plant Discharge Monitoring Annual Calculations Worksheet, 2021* |
| 17-4.15 | *BARC East 002 External Outfall Discharge Monitoring Report, December 2021* |
| 17-4.16 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, November 2021* |
| 17-4.17 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, December 2021* |
| 17-4.18 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, November 2021* |
| 17-4.19 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, November 2021* |
| 17-4.20 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, December 2021* |
| 17-4.21 | *BARC East Wastewater Treatment Plant 002A Effluent Chain of Custody Record, December 2021* |
| 17-4.22 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, November 2021* |
| 17-4.23 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, December 2021* |
| 17-5 | BARC East Wastewater Treatment Plant Discharge Monitoring Report 2022 |
| 17-5.1 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, January 2022* |
| 17-5.2 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, January 2022* |
| 17-5.3 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, January 2022* |
| 17-5.4 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, January 2022* |
| 17-5.5 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, January 2022* |
| 17-5.6 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, January 2022* |
| 17-5.7 | *BARC East Wastewater Treatment Plant MOR Worksheet, January 2022* |
| 17-5.8 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, February 2022* |
| 17-5.9 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, February 2022* |
| 17-5.10 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, February 2022* |
| 17-5.11 | *BARC East Wastewater Treatment Plant Violations Summary, February 2022* |
| 17-5.12 | *BARC East Wastewater Treatment Plant MOR Worksheet, February 2022* |
| 17-5.13 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, March 2022* |
| 17-5.14 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, March 2022* |
| 17-5.15 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, March 2022* |
| 17-5.16 | *BARC East Wastewater Treatment Plant Violations Summary, March 2022* |
| 17-5.17 | *BARC East Wastewater Treatment Plant MOR Worksheet, March 2022* |
| 17-5.18 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, March 2022* |
| 17-5.19 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, March 2022* |
| 17-5.20 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, April 2022* |
| 17-5.21 | *BARC East Wastewater Treatment Plant Violations Summary, April 2022* |
| 17-5.22 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, April 2022* |
| 17-5.23 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, April 2022* |
| 17-5.24 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, April 2022* |
| 17-5.25 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, April 2022* |
| 17-5.26 | *BARC East Wastewater Treatment Plant MOR Worksheet, April 2022* |
| 17-5.27 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, May 2022* |
| 17-5.28 | *BARC East Wastewater Treatment Plant Violations Summary, May 2022* |
| 17-5.29 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, May 2022* |
| 17-5.30 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, May 2022* |
| 17-5.31 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, May 2022* |
| 17-5.32 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, May 2022* |
| 17-5.33 | *BARC East Wastewater Treatment Plant MOR Worksheet, May 2022* |
| 17-5.34 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, May 2022* |
| 17-5.35 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, June 2022* |
| 17-5.36 | *BARC East Wastewater Treatment Plant Violations Summary, June 2022* |
| 17-5.37 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, June 2022* |
| 17-5.38 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, June 2022* |
| 17-5.39 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, June 2022* |
| 17-5.40 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, June 2022* |
| 17-5.41 | *BARC East Wastewater Treatment Plant MOR Worksheet, June 2022* |
| 17-5.42 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, June 2022* |
| 17-5.43 | *BARC East Wastewater Treatment Plant PCB Calculations, January through June 2022* |
| 17-5.44 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, July 2022* |
| 17-5.45 | *BARC East Wastewater Treatment Plant Violations Summary, July 2022* |
| 17-5.46 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, July 2022* |
| 17-5.47 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, July 2022* |
| 17-5.48 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, July 2022* |
| 17-5.49 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, July 2022* |
| 17-5.50 | *BARC East Wastewater Treatment Plant MOR Worksheet, July 2022* |
| 17-5.51 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, July 2022* |
| 17-5.52 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, August 2022* |
| 17-5.53 | *BARC East Wastewater Treatment Plant Violations Summary, August 2022* |
| 17-5.54 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, August 2022* |
| 17-5.55 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, August 2022* |
| 17-5.56 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, August 2022* |
| 17-5.57 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, August 2022* |
| 17-5.58 | *BARC East Wastewater Treatment Plant MOR Worksheet, August 2022* |
| 17-5.59 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, August 2022* |
| 17-5.60 | *BARC East Wastewater Treatment Plant Analytical Report, August 2022* |
| 17-5.61 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice,September 2022* |
| 17-5.62 | *BARC East Wastewater Treatment Plant Violations Summary, September 2022* |
| 17-5.63 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, September 2022* |
| 17-5.64 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, September 2022* |
| 17-5.65 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, September 2022* |
| 17-5.66 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, September 2022* |
| 17-5.67 | *BARC East Wastewater Treatment Plant MOR Worksheet, September 2022* |
| 17-5.68 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, September 2022* |
| 17-5.69 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, October 2022* |
| 17-5.70 | *BARC East Wastewater Treatment Plant Violations Summary, October 2022* |
| 17-5.71 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, October 2022* |
| 17-5.72 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, October 2022* |
| 17-5.73 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, October 2022* |
| 17-5.74 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, October 2022* |
| 17-5.75 | *BARC East Wastewater Treatment Plant MOR Worksheet, October 2022* |
| 17-5.76 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, October 2022* |
| 17-5.77 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, November 2022* |
| 17-5.78 | *BARC East Wastewater Treatment Plant Violations Summary, November 2022* |
| 17-5.79 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, November 2022* |
| 17-5.80 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, November 2022* |
| 17-5.81 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, November 2022* |
| 17-5.82 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, November 2022* |
| 17-5.83 | *BARC East Wastewater Treatment Plant MOR Worksheet, November 2022* |

| | |
|---|---|
| 17-5.84 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, November 2022* |
| 17-5.85 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, December 2022* |
| 17-5.86 | *BARC East Wastewater Treatment Plant Violations Summary, December 2022* |
| 17-5.87 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, December 2022* |
| 17-5.88 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, December 2022* |
| 17-5.89 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, December 2022* |
| 17-5.90 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, December 2022* |
| 17-5.91 | *BARC East Wastewater Treatment Plant PCB Calculations, January through December 2022* |
| 17-5.92 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, December 2022* |
| 17-6 | BARC East Wastewater Treatment Plant Discharge Monitoring Report 2023 |
| 17-6.1 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, January 2023* |
| 17-6.2 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, January 2023* |
| 17-6.3 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, January 2023* |
| 17-6.4 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, January 2023* |
| 17-6.5 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, January 2023* |
| 17-6.6 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, January 2023* |
| 17-6.7 | *BARC East Wastewater Treatment Plant MOR Worksheet, January 2023* |
| 17-6.8 | *BARC East Wastewater Treatment Plant Violations Summary, January 2023* |
| 17-6.9 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, February 2023* |
| 17-6.10 | *BARC East Wastewater Treatment Plant Violations Summary, February 2023* |
| 17-6.11 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, February 2023* |
| 17-6.12 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, February 2023* |
| 17-6.13 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, February 2023* |
| 17-6.14 | *BARC East Wastewater Treatment Plant MOR Worksheet, February 2023* |
| 17-6.15 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, February 2023* |
| 17-6.16 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, March 2023* |
| 17-6.17 | *BARC East Wastewater Treatment Plant Violations Summary, March 2023* |
| 17-6.18 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, March 2023* |
| 17-6.19 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, March 2023* |
| 17-6.20 | *BARC East Wastewater Treatment Plant MOR Worksheet, March 2023* |
| 17-6.21 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, March 2023* |
| 17-6.22 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, March 2023* |
| 17-6.23 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, March 2023* |
| 17-6.24 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, April 2023* |
| 17-6.25 | *BARC East Wastewater Treatment Plant Violations Summary, April 2023* |
| 17-6.26 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, April 2023* |
| 17-6.27 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, April 2023* |
| 17-6.28 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, April 2023* |
| 17-6.29 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, April 2023* |
| 17-6.30 | *BARC East Wastewater Treatment Plant MOR Worksheet, April 2023* |
| 17-6.31 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, April 2023* |
| 17-6.32 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, May 2023* |
| 17-6.33 | *BARC East Wastewater Treatment Plant Violations Summary, May 2023* |
| 17-6.34 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, May 2023* |
| 17-6.35 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, May 2023* |
| 17-6.36 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, May 2023* |
| 17-6.37 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, May 2023* |
| 17-6.38 | *BARC East Wastewater Treatment Plant MOR Worksheet, May 2023* |
| 17-6.39 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, May 2023* |
| 17-6.40 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, June 2023* |
| 17-6.41 | *BARC East Wastewater Treatment Plant Violations Summary, June 2023* |
| 17-6.42 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, June 2023* |
| 17-6.43 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, June 2023* |
| 17-6.44 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, June 2023* |
| 17-6.45 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, June 2023* |
| 17-6.46 | *BARC East Wastewater Treatment Plant MOR Worksheet, June 2023* |
| 17-6.47 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, June 2023* |
| 17-6.48 | *BARC East Wastewater Treatment Plant PCBS Analytical Report, January through June 2023* |
| 17-6.49 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, July 2023* |
| 17-6.50 | *BARC East Wastewater Treatment Plant Violations Summary, July 2023* |
| 17-6.51 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, July 2023* |
| 17-6.52 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, July 2023* |
| 17-6.53 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, July 2023* |
| 17-6.54 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, July 2023* |
| 17-6.55 | *BARC East Wastewater Treatment Plant MOR Worksheet, July 2023* |
| 17-6.56 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, July 2023* |
| 17-6.57 | *BARC East Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, August 2023* |
| 17-6.58 | *BARC East Wastewater Treatment Plant Violations Summary, August 2023* |
| 17-6.59 | *BARC East 002 External Outfall Discharge Monitoring Report Submission, August 2023* |
| 17-6.60 | *BARC East 101 External Outfall Discharge Monitoring Report Submission, August 2023* |
| 17-6.61 | *BARC East 002 External Outfall Discharge Monitoring Lab Results, August 2023* |
| 17-6.62 | *BARC East Wasterwater Treatment Plan Activated Sludge MOR, August 2023* |
| 17-6.63 | *BARC East Wastewater Treatment Plant MOR Worksheet, August 2023* |
| 17-6.64 | *BARC East Wastewater Treatment Plant Effluent Chain of Custody Record, August 2023* |
| 17-7 | BARC West Wastewater Treatment Plant Discharge Monitoring Report 2021 |
| 17-7.1 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, January 2021* |
| 17-7.2 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, February 2021* |
| 17-7.3 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, March 2021* |
| 17-7.4 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, April 2021* |
| 17-7.5 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, May 2021* |
| 17-7.6 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, June 2021* |
| 17-7.7 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, July 2021* |
| 17-7.8 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, August 2021* |
| 17-7.9 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, September 2021* |
| 17-7.10 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report, October 2021* |
| 17-7.11 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, December 2021* |
| 17-7.12 | *BARC West Wastewater Treatment Plant Discharge Monitoring Calculations December, 2021* |
| 17-7.13 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, November 2021* |
| 17-7.14 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, December 2021* |
| 17-7.15 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, November 2021* |
| 17-7.16 | *BARC West 101 External Outfall Discharge Monitoring Report Submission, December 2021* |
| 17-7.17 | *BARC West Wastewater Treatment Plant 002A Effluent Chain of Custody Record, December 2021* |
| 17-7.18 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, November 2021* |
| 17-7.19 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, December 2021* |
| 17-8 | BARC West Wastewater Treatment Plant Discharge Monitoring Report 2022 |
| 17-8.1 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, January 2022* |
| 17-8.2 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, January 2022* |
| 17-8.3 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, January 2022* |

| | |
|---|---|
| 17-8.4 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, January 2022* |
| 17-8.5 | *BARC West Wastewater Treatment Plant MOR Worksheet, January 2022* |
| 17-8.6 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, February 2022* |
| 17-8.7 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, February 2022* |
| 17-8.8 | *BARC West Wastewater Treatment Plant Violations Summary, February 2022* |
| 17-8.9 | *BARC West Wastewater Treatment Plant MOR Worksheet, February 2022* |
| 17-8.10 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, March 2022* |
| 17-8.11 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, March 2022* |
| 17-8.12 | *BARC West Wastewater Treatment Plant Violations Summary, March 2022* |
| 17-8.13 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, March 2022* |
| 17-8.14 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, March 2022* |
| 17-8.15 | *BARC West Wastewater Treatment Plant Discharge Monitoring Report Noncompliance Notice, April 2022* |
| 17-8.16 | *BARC West Wastewater Treatment Plant Violations Summary, April 2022* |
| 17-8.17 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, April 2022* |
| 17-8.18 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, April 2022* |
| 17-8.19 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, April 2022* |
| 17-8.20 | *BARC West Wastewater Treatment Plant MOR Worksheet, April 2022* |
| 17-8.21 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, May 2022* |
| 17-8.22 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, May 2022* |
| 17-8.23 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, May 2022* |
| 17-8.24 | *BARC West Wastewater Treatment Plant MOR Worksheet, May 2022* |
| 17-8.25 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, May 2022* |
| 17-8.26 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, June 2022* |
| 17-8.27 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, June 2022* |
| 17-8.28 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, June 2022* |
| 17-8.29 | *BARC West Wastewater Treatment Plant MOR Worksheet, June 2022* |
| 17-8.30 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, June 2022* |
| 17-8.31 | *BARC West Wastewater Treatment Plant PCB Calculations, June 2022* |
| 17-8.32 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, July 2022* |
| 17-8.33 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, July 2022* |
| 17-8.34 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, July 2022* |
| 17-8.35 | *BARC West Wastewater Treatment Plant MOR Worksheet, July 2022* |
| 17-8.36 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, July 2022* |
| 17-8.37 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, August 2022* |
| 17-8.38 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, August 2022* |
| 17-8.39 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, August 2022* |
| 17-8.40 | *BARC West Wastewater Treatment Plant MOR Worksheet, August 2022* |
| 17-8.41 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, August 2022* |
| 17-8.42 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, September 2022* |
| 17-8.43 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, September 2022* |
| 17-8.44 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, September 2022* |
| 17-8.45 | *BARC West Wastewater Treatment Plant MOR Worksheet, September 2022* |
| 17-8.46 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, September 2022* |
| 17-8.47 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, October 2022* |
| 17-8.48 | *BARC West Wastewater Treatment Plant Phase Separation Science Water Testing Report , October 2022* |
| 17-8.49 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, October 2022* |
| 17-8.50 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, October 2022* |
| 17-8.51 | *BARC West Wastewater Treatment Plant MOR Worksheet, October 2022* |
| 17-8.52 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, October 2022* |
| 17-8.53 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, November 2022* |
| 17-8.54 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, November 2022* |
| 17-8.55 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, November 2022* |
| 17-8.56 | *BARC West Wastewater Treatment Plant MOR Worksheet, November 2022* |
| 17-8.57 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, November 2022* |
| 17-8.58 | *BARC West Wastewater Treatment Plant MOR Worksheet, December 2022* |
| 17-8.59 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, December 2022* |
| 17-8.60 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, December 2022* |
| 17-8.61 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, December 2022* |
| 17-8.62 | *BARC West Wastewater Treatment Plant PCB Calculations, January through December 2022* |
| 17-8.63 | *BARC West Wastewater Treatment Plant PCB Analysis Report, January through December 2022* |
| 17-8.64 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, December 2022* |
| 17-8.65 | *BARC West Wastewater Treatment Plant MOR Worksheet, March 2022* |
| 17-9 | BARC West Wastewater Treatment Plant Discharge Monitoring Report 2023 |
| 17-9.1 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, January 2023* |
| 17-9.2 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, January 2023* |
| 17-9.3 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, January 2023* |
| 17-9.4 | *BARC West Wasterwater Treatment Plan Activated Sludge Raw Data, January 2023* |
| 17-9.5 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, January 2023* |
| 17-9.6 | *BARC West Wastewater Treatment Plant MOR Worksheet, January 2023* |
| 17-9.7 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, February 2023* |
| 17-9.8 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, February 2023* |
| 17-9.9 | *BARC West Wastewater Treatment Plant MOR Worksheet, February 2023* |
| 17-9.10 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, February 2023* |
| 17-9.11 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, March 2023* |
| 17-9.12 | *BARC West Wastewater Treatment Plant MOR Worksheet, March 2023* |
| 17-9.13 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, March 2023* |
| 17-9.14 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, March 2023* |
| 17-9.15 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, March 2023* |
| 17-9.16 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, April 2023* |
| 17-9.17 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, April 2023* |
| 17-9.18 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, April 2023* |
| 17-9.19 | *BARC West Wastewater Treatment Plant MOR Worksheet, April 2023* |
| 17-9.20 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, April 2023* |
| 17-9.21 | *BARC West Wastewater Treatment Plant Phase Separation Science Water Testing Report , April 2023* |
| 17-9.22 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, May 2023* |
| 17-9.23 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, May 2023* |
| 17-9.24 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, May 2023* |
| 17-9.25 | *BARC West Wastewater Treatment Plant MOR Worksheet, May 2023* |
| 17-9.26 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, May 2023* |
| 17-9.27 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, June 2023* |
| 17-9.28 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, June 2023* |
| 17-9.29 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, June 2023* |
| 17-9.30 | *BARC West Wastewater Treatment Plant MOR Worksheet, June 2023* |
| 17-9.31 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, June 2023* |
| 17-9.32 | *BARC West Wastewater Treatment Plant PCBS Analytical Report, January through June 2023* |
| 17-9.33 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, July 2023* |
| 17-9.34 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, July 2023* |
| 17-9.35 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, July 2023* |

| | |
|---|---|
| 17-9.36 | *BARC West Wastewater Treatment Plant MOR Worksheet, January - July 2023* |
| 17-9.37 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, July 2023* |
| 17-9.38 | *BARC West Wastewater Treatment Plant Phase Separation Science Water Testing Report , July 2023* |
| 17-9.39 | *BARC West 002 External Outfall Discharge Monitoring Report Submission, August 2023* |
| 17-9.40 | *BARC West 002 External Outfall Discharge Monitoring Lab Results, August 2023* |
| 17-9.41 | *BARC West Wasterwater Treatment Plan Activated Sludge MOR, August 2023* |
| 17-9.42 | *BARC West Wastewater Treatment Plant MOR Worksheet, August 2023* |
| 17-9.43 | *BARC West Wastewater Treatment Plant Effluent Chain of Custody Record, August 2023* |
| 17-9.44 | *BARC West Notice of Sanitary Sewer Overflow Occurance, August 15 2023* |
| **18** | **Wastewater System Schematics** |
| 18-1 | BARC-East_WWTP Process Flow Diagram.pdf |
| 18-2 | BARC-East_WWTP Site Plans.pdf |
| 18-3 | BARC-West_WWTP Process Flow Diagram.pdf |
| 18-4 | BARC-West_WWTP Site Plan.pdf |
| **19** | **Wastewater O&M Manual** |
| 19-1 | Eastside WWTP O&M Manual_Old Plant_1994.pdf |
| 19-2 | 22 13 29_Influent Pumps Final O&M_092922_ARRO_Full.pdf |
| 19-3 | 22 13 29_Overland Pumps Final O&M_092122_ARRO_Full.pdf |
| 19-4 | 281005_Electr Security System Final O&M_100322_ARRO_Full.pdf |
| 19-5 | 33 61 13_Sump Pump Final O&M_100422_ARRO_Full.pdf |
| 19-6 | 43 15 00_ButterflyVlv O&M_092322_ARRO_Full.pdf |
| 19-7 | 43 32 69_Chem Feed O&M_092322_ARRO_Full.pdf |
| 19-8 | 46 07 53_Evoqua Clarifier Rehab O&M_092622_ARRO_Full.pdf |
| 19-9 | 46 23 00_Grit System Final O&M_092722_ARRO_Full.pdf |
| 19-10 | 46 51 00_Blowers Final O&M_092922_ARRO_Full.pdf |
| 19-11 | 46 51 00_Controls Final O&M_093022_ARRO_Full.pdf |
| 19-12 | 46 51 00_IMLR Pumps Final O&M_092922_ARRO_Full.pdf |
| 19-13 | 46 51 00_Invent Final O&M_092922_ARRO_Full.pdf |
| 19-14 | 46 51 00_RAS Pumps Final O&M_092922_ARRO_Full.pdf |
| 19-15 | Westside WWTP O&M Manual_1995.pdf |
| **20** | **Carver Center Water Sampling** |
| 20-1 | USDA ARS_Water Sampling Report_Final_11272018.pdf |
| 20-2 | USDA ARS_Water Sampling Summary Report.pdf |
| 20-3 | USDA-ARS GWCC Water Re-Sampling Report_05012019.pdf |
| 20-4 | USDAGW~1.PDF |
| **21** | **Procurement Elevator Inspection** |
| 21-1 | 12305B19F0032 Elev Maint Srvc BARC USNA NAL.pdf |
| 21-2 | 12305B19F0032 Mod 01 - Del Apr Srvc & 3 NAL Elev base yr.pdf |
| 21-3 | 12305B19F0032 Mod 2 - Del 2 Mo NAL Elev #4.pdf |
| 21-4 | 12305B19F0032 Mod 3 Opt Yr 1 Apr20-21 Elev Maint BARC USNA.pdf |
| 21-5 | 12305B19F0032 Mod 4-fully executed (1).pdf |
| 21-6 | 12305B19F0032 Mod 5 - Del Elev 307B1n2 Waiter 201.pdf |
| 21-7 | 12305B19F0032 Mod 6 - Opt Yr 3 FY22.pdf |
| 21-8 | 12305B19F0032 Mod 7 - Rpr Elev Bldg 1 BARC.pdf |
| 21-9 | 12305B19F0032 Mod 8 - Opt Yr 4 APR23-24.pdf |
| **22** | **Procurement Fire Detection Maintenance** |
| 22-1 | 12305B19C0039-executemv.pdf |
| 22-2 | 12305B19F0175 Fire Alarm Upgrade Bldgs 4 10A BARC.pdf |
| 22-3 | 12305B19F0175 Mod 1 - Del Final Design.pdf |
| 22-4 | a12305B22C0020_ARK signedMV.pdf |
| 22-5 | a12305B22P0157.pdf |
| **23** | **Procurement Fire Suppression Maintenance** |
| 23-1 | 1232SC18F0089 Mod 3.pdf |
| 23-2 | Contract_12305B19C0057.pdf |
| 23-3 | DOTO_12305B21D0016_12305B23F0218.pdf |
| 23-4 | DOTO_12305B21D0016_12305B23F0240.pdf |
| 23-5 | DOTO_47QSHA23D0002_12305B23F0244 (1).pdf |
| 23-6 | DOTO_GS-06F-0004P_12305B23F0094.pdf |
| 23-7 | DOTO_GS-21F-0097W_1232SC18F0089.pdf |
| 23-8 | DOTO_GS-21F-0097W_1232SC18F0089_Mod_P00001.pdf |
| 23-9 | DOTO_GS-21F-0097W_1232SC18F0089_Mod_P00002.pdf |
| 23-10 | DOTO_GS-21F-0097W_1232SC18F0089_Mod_P00004.pdf |
| 23-11 | DOTO_GS-21F-0097W_1232SC18F0089_Mod_P00005 (1).pdf |
| **24** | **Procurement Autoclave Maintenance** |
| 24-1 | Contract_12305B19C0016.pdf |
| 24-2 | Contract_12305B19C0016_Mod_P00001.pdf |
| 24-3 | Contract_12305B19C0016_Mod_P00002.pdf |
| 24-4 | Contract_12305B19C0016_Mod_P00003.pdf |
| 24-5 | Contract_12305B19C0016_Mod_P00004.pdf |
| 24-6 | Contract_12305B19C0016_Mod_P00005.pdf |
| 24-7 | Contract_12305B19C0016_Mod_P00006.pdf |
| 24-8 | Contract_12305B19C0016_Mod_P00007.pdf |
| 24-9 | Contract_12305B19C0016_Mod_P00008.pdf |
| 24-10 | Contract_12305B19C0016_Mod_P00009 (1).pdf |
| **25** | **Procurement Water, Wastewater Operation & Maintenance** |
| 25-1 | BARC Wastewater Treatment Plant Sludge Removal Contract 1232SC18C0049, Lagoon #3, Modification 1, Extend Performance Date, March 18, 2020 |
| 25-2 | BARC Wastewater Treatment Plant Sludge Removal Contract 1232SC18C0049, Lagoon #3, Modification 2, Add funding and increase period of performance, |
| 25-3 | BARC Wastewater Treatment Plant Sludge Removal Contract 1232SC18C0049, Lagoon #3 and #2, Modification 4, Extend Performance Date and add Lagoon #2 |
| 25-4 | BARC Wastewater Treatment Plant Sludge Removal Contract 1232SC18C0049, Lagoon #3 and #2, Modification 5, Extend Performance Date and add service |
| 25-5 | BARC Wastewater and Water Treatment Plant Monitoring and Operation Services Contract 1232SC18P0227, Modification 1, Add funds for daily water |
| 25-6 | BARC Wastewater and Water Treatment Plant Monitoring and Operation Services Contract 1232SC18P0227, Modification 3, Extend Period of Performance, to |
| 25-7 | BARC Sewage Grinder and Controls Replacement Contract 12305B19C0023, Modification 1, Weather-related extension, Mary 28, 2019 to March 1, 2020 |
| 25-8 | BARC Building 005 Water Infiltration and Leaking Evaluation Study Project Contract 12305B19F0157, September 26, 2019 |
| 25-9 | BARC CERCLA Program Support Contract 12305B19A0001, Order #12305B19F0160, September 24, 2019 to September 23, 2024 |
| 25-10 | BARC Emergency Service Water Main Break Repair Contract 12305B20C0005, East Dairy, December 1, 2019 to February 29, 2020 |
| 25-11 | BARC Emergency Service Repair Stormwater Line Contract 12305B20C0010, Buidling 200, February 24, 2020 to May 24, 2020 |
| 25-12 | BARC Emergency Water Main Repair Contact 12305B20P0122, Pump Station #005, July 29, 2020 to August 31, 2020 |
| 25-13 | BARC Storm Water Line Repair Contract 12305B20P0181, Powder Mill and Edmonson Road, September 2, 2020 to October 31, 2020 |
| 25-14 | BARC East Wastewater Treatment Plan Redesign Project Contract AG32SCD150335, Modification 4, Add unfunded option, October 15, 2015 to June 30, 2018 |
| 25-15 | BARC East Wastewater Treatment Plan Redesign Project Contract AG32SCD150335, Modification 5, Add Cell 1 Sampling, October 15, 2015 to November 27, |
| 25-16 | BARC East Wastewater Treatment Plan Redesign Project Contract AG32SCD150335, Modification 6, Exercise option for Bid Services, October 15, 2015 to |
| 25-17 | BARC East Wastewater Treatment Plan Redesign Project Contract AG32SCD150335, Modification 7, Add construction administration services, October 15, 2015 |
| 25-18 | BARC East Wastewater Treatment Plan Redesign Project Contract AG32SCD150335, Modification 8, Add design services, October 15, 2015 to Augusts 31, 2020 |
| 25-19 | BARC Small Business Administration Contract 1232SD18A0005, Order #12305B19F0049, Support Services for Water Treatment Distribution System, September |
| 25-20 | BARC CERCLA Program Support Contract 12305B19A0001, Order #12305B19F0160, Modification 1, Supplemental Agreement, September 24, 2019 to |
| 25-21 | BARC Small Business Administration Contract 12305B19A0001, Order #12305B21F0247, Annual Groundwater and Surface Water Sampling, October 1, 2021 to |
| 25-22 | BARC Small Businss Administration Contract 12305B19A0002, Order #12305B22F0184, Former Glenn Dale Plant Support Waste Characterization, September 8, |
| 25-23 | BARC Small Business Administration Contract 1232SD18A0005, Order #12305B21F0093, Engineering support services, July 6, 2021 to July 5, 2022 |

25-24 BARC Small Businses Administration Contract 1232SD18A0005, Order #12305B22F0073, Engineering and technical management support, July 6, 2022 to July 5,
25-25 BARC Small Business Administration Contract AG-32SC-B-16-0009, Order #1232SC18F0354, Hazardous Waste Pickup and Management, September 30, 2018 to
25-26 BARC Small Business Administration Contract AG-32SC-B-16-0009, Order #1232SC18F0354, Modification 1, Change issuing office, contracting officer, and
25-27 BARC Small Business Administration Contract AG-32SC-B-16-0009, Order #1232SC18F0354, Modification 2, Add funding, September 30, 2019
25-28 BARC Urgent Lift Station #304 Control Panel and Float Replacement Contract_12305B19C0003, March 18, 2019 to May 31, 2019
25-29 BARC Wastewater Treatment Plant Services Contract 12305B19C0005, Superintendence, Labs, DMR, and MOR, February 2019 to January 2020
25-30 BARC Emergency Broken Sewer Line Repair Contract 12305B19C0014, Building 208, March 13, 2019 to April 15, 2019
25-31 BARC Wastewater Treatment Plant Sewage Grinder and Controls Replacement Project Contract 12305B19C0023, May 28, 2019 to August 30, 2019
25-32 BARC Wastewater Treatment Plant Sewage Grinder and Controls Replacement Project Contract 12305B19C0023, Modification 1, No Cost Time Extension, May
25-33 BARC Domestic Waterline Replacement Contract 12305B19C0026, Building 001, October 1, 2019 to March 31, 2020
25-34 BARC RO Water Service & Maintenance Contract 12305B19C0031, August 1, 2019 to August 31, 2024
25-35 BARC West Wastewater Treatment Plant Operational Superintendent and Supervisor Contract 12305B20C0011, May 1, 2020 to April 30, 2021
25-36 BARC West Wastewater Treatment Plant Operational Superintendent and Supervisor Contract 12305B20C0011, Modification 1, Supplemental Agreement,
25-37 BARC West Wastewater Treatment Plant Operational Superintendent and Supervisor Contract 12305B20C0011, Modification 2, Supplemental Agreement, May
25-38 BARC West Wastewater Treatment Plant Operational Superintendent and Supervisor Contract 12305B20C0011, Modification 3, Sadd funding, August 1, 2021
25-39 BARC Waste Water Treatment Plant Emergency Operator Contract 12305B21C0003, February 4, 2021 to August 31, 2021
25-40 BARC Wastewater Treatment Plant Emergency Operator Contract 12305B21C0010, June 10, 2021 to October 29, 2021
25-41 BARC Wastewater Treatment Plant Emergency Operator Contract 12305B21C0010, Modification 1, Exercise Option Period 1, August 5, 2021 to September 30,
25-42 BARC Wastewater Treatment Plant Emergency Operator Contract 12305B21C0010, Modification 2, Exercise Option Period, October 1, 2021 to October 29,
25-43 BARC Wastewater Treatment Plant Emergency Operator Contract 12305B21C0010, Modification 3, Add funding, October 1, 2021 to October 29, 2021
25-44 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, October 30, 2021 to October 29, 2026
25-45 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, Modification 1, Fund Base Period, December 4, 2021 to February 18, 2022
25-46 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, Modification 2, Funding Only Action, February 18, 2021 to March 11, 2022
25-47 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, Modification 3, Funding Only Action, March 12, 2022 to October 29, 2022
25-48 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, Modification 4, Supplemental agreement, July 31, 2022 to October 29,
25-49 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, Modification 5, Exercise Option Period 1, October 30, 2022 to October 29,
25-50 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, Modification 6, Fund Option Period 1, October 30, 2022 to December 16,
25-51 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, Modification 7, Fund Option Period 1, December 18, 2022 to October 29,
25-52 BARC Water & Wastewater Treatment Plant Lab Services Contract 12305B22C0003, Modification 8, Exercise Option Period 2, October 29, 2023 to October 29,
25-53 BARC Superintendent Operator Service Contract 12305B22C0004, October 28, 2021 to January 26, 2022
25-54 BARC Superintendent Operator Service Contract 12305B22C0004, Modification 1, Add funding, October 28, 2021 to January 26, 2022
25-55 BARC Superintendent Operator Service Contract 12305B22C0004, Modification 2, Exercise Option Period 1, January 26, 2022 to April 26, 2022
25-56 BARC Superintendent Operator Service Contract 12305B22C0004, Modification 3, Fund Option Period 2, October 28, 2021 to April 26, 2022
25-57 BARC Superintendent Operator Service Contract 12305B22C0011, April 27, 2022 to October 26, 2022
25-58 BARC Superintendent Operator Service Contract 12305B22C0011, Modification 1, Exercise Option Period 1, April 27, 2022 to October 26, 2022
25-59 BARC Superintendent Operator Service Contract 12305B23C0001, October 27, 2022 to April 26, 2023
25-60 BARC Superintendent Operator Service Contract 12305B23C0001, Modification 1, Exercise Option Year 1, October 27, 2022 to April 26, 2023
25-61 BARC Superintendent Operator Service Contract 12305B23C0005, April 27, 2023 to October 25, 2023
25-62 BARC Superintendent Operator Service Contract 12305B23C0005, Modification 1, Exercise Option Period 1, July 27, 2023 to April 27, 2023 to October 25, 2023
25-63 BARC Emergency Water Main Repair Contract 12305B23C0016, Buidling 178-1 (Milking Parlor), August 22, 2023 to October 31, 2023
25-64 BARC Water and Wastewater Treatment Plant Chemicals and Supplies Contract 12305B23D0014, September 20, 2023 to September 19, 2024
25-65 BARC Wastewater Treamant Plant Improvements Contract 1232SC18C0049, East and West, September 28, 2018 to September 27, 2019
25-66 BARC Wastewater Treamant Plant Improvements Contract 1232SC18C0049, East and West, Modification 3, Add Sludge Cell Removal, September 28, 2018 to
25-67 BARC Wastewater Treamant Plant Improvements Contract 1232SC18C0049, East and West, Modification 6, Closeout Modifications, September 28, 2018 to
25-68 BARC Wastewater Treamant Plant Improvements Contract 1232SC18C0049, East and West, Modification 7, Closeout Modifications, September 28, 2018 to
25-69 BARC Wastewater Treamant Plant Improvements Contract 1232SC18C0049, East and West, Modification 8, Add tertiary filter system, September 30, 2021 to
25-70 BARC Wastewater Treamant Plant Improvements Contract 1232SC18C0049, East and West, Modification 9, Add rehabilitation of final clarifier and grit system
25-71 BARC Wastewater Treamant Plant Improvements Contract 1232SC18C0049, East and West, Modification 10, No cost time extension, August 31, 2023 to
25-72 BARC Water Purification Systems Inspection, Preventative Repair, and Emergency Maintenance Services Contract AG-32SC-C-17-0023, May 1, 2017 to April 30,
25-73 BARC Water Purification Systems Inspection, Preventative Repair, and Emergency Maintenance Services Contract AG-32SC-C-17-0023, Modification 1, Fund
25-74 BARC Water Purification Systems Inspection, Preventative Repair, and Emergency Maintenance Services Contract AG-32SC-C-17-0023, Modification 2, Add line
25-75 BARC Water Purification Systems Inspection, Preventative Repair, and Emergency Maintenance Services Contract AG-32SC-C-17-0023, Modification 3, Exercise
25-76 BARC Water Purification Systems Inspection, Preventative Repair, and Emergency Maintenance Services Contract AG-32SC-C-17-0023, Modification 4, Add line
25-77 BARC Water Purification Systems Inspection, Preventative Repair, and Emergency Maintenance Services Contract AG-32SC-C-17-0023, Modification 5, Add line
25-78 BARC Water Purification Systems Inspection, Preventative Repair, and Emergency Maintenance Services Contract AG-32SC-C-17-0023, Modification 6, Add line
25-79 BARC Water Purification Systems Inspection, Preventative Repair, and Emergency Maintenance Services Contract AG-32SC-C-17-0023, Modification 7, Add line
25-80 BARC East Wastewater Treatment Plant Overland Flow Pond Conditions Assessment Contract 12305B21D0014, Order #12305B22F0236, September 16, 2022 to
25-81 BARC East Wastewater Treatment Plant Overland Flow Pond Conditions Assessment Contract 12305B21D0014, Order #12305B22F0236, Modification 1,
25-82 BARC Sanitary Waste and Water Connection Feasibility Study Contract 12305B21D0016, Order #12305B23F0226 September 20, 2023
25-83 BARC Water and Wastewater Treatment Plant Chemicals and Supplies Contract 12305B23D0014, Order #12305B23F0242, September 25, 2023 to November
25-84 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, October 15, 2015 to August 25, 2016
25-85 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, Modification 1, Add to scope of work and
25-86 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, Modification 2, Change contracting officer,
25-87 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, Modification 3, Change contracting officer,
25-88 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, Modification 9, Add line item and funding,
25-89 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, Modification 10, No cost time extension, October
25-90 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, Modification 11, Exercise Option 1, October 15,
25-91 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, Modification 12, Add services to match
25-92 BARC Wastewater Treatment Plant Improvements Contract AG-32SD-C-15-0010, Order #AG-32SC-D-15-0335, Modification 13, Add redesign services, October
25-93 BARC Water Quality and Resource Support Services Contract Statement of Work, May 15, 2019 to May 14, 2020
25-94 Performance Work Statement Testing for the National Primary Drinking Water Standards at BARC.docx
25-95 PO_12305B19P0038.pdf
25-96 PO_12305B21P0006.pdf
25-97 PO_12305B21P0006_Mod_P00001.pdf
25-98 PO_12305B21P0006_Mod_P00002.pdf
25-99 PO_12305B21P0006_Mod_P00003.pdf
25-100 PO_12305B21P0015.pdf
25-101 PO_12305B21P0094.pdf
25-102 PO_12305B21P0186.pdf
25-103 PO_12305B21P0186_Mod_P00001.pdf
25-104 PO_12305B22P0016.pdf
25-105 PO_12305B22P0030.pdf
25-106 PO_12305B22P0059.pdf
25-107 PO_12305B22P0081.pdf
25-108 PO_12305B22P0081_Mod_P00001.pdf
25-109 PO_12305B23P0209.pdf
25-110 PO_12305B23P0213.pdf
25-111 PO_12305B23P0269.pdf
25-112 PO_1232SA23P0090.pdf
25-113 PO_1232SC18P0227.pdf
25-114 PO_1232SC18P0227_Mod_P00002.pdf
25-115 PO_AG-32SC-P-15-0214.pdf
25-116 PO_AG-32SC-P-15-0214_Mod_0001.pdf
25-117 PO_AG-32SC-P-15-0214_Mod_0002.pdf
25-118 PO_AG-32SC-P-15-0214_Mod_0003.pdf
25-119 PO_AG-32SC-P-15-0214_Mod_0004.pdf
**26 Procurement Electrical Systems**
26-1 12305B20P0152.pdf
26-2 12305B20P0185.pdf

| | |
|---|---|
| 26-3 | 1232SC18C0012-01.pdf |
| 26-4 | 1232SC18C0025-04.pdf |
| 26-5 | 1232SC18P0289-01.pdf |
| 26-6 | AG32SCC160086-15.pdf |
| 26-7 | AG32SCD160271-01.pdf |
| 26-8 | AG32SCD160271-04.pdf |
| 26-9 | AG32SCD160271-06.pdf |
| 26-10 | AG32SCD160271.pdf |
| 26-11 | Contract_12305B21C0018.pdf |
| 26-12 | Contract_12305B21C0018_Mod_P00001.pdf |
| 26-13 | Contract_12305B21C0040.pdf |
| 26-14 | Contract_12305B21C0040_Mod_P00001.pdf |
| 26-15 | Contract_12305B22C0039 (1).pdf |
| 26-16 | Contract_12305B22D0003 (2).pdf |
| 26-17 | Contract_12305B23C0034.pdf |
| 26-18 | Contract_1232SC18C0012.pdf |
| 26-19 | Contract_1232SC18C0012_Mod_P00002.pdf |
| 26-20 | Contract_1232SC18C0012_Mod_P00003.pdf |
| 26-21 | Contract_1232SC18C0025.pdf |
| 26-22 | Contract_1232SC18C0025_Mod_P00001.pdf |
| 26-23 | Contract_1232SC18C0025_Mod_P00002.pdf |
| 26-24 | Contract_1232SC18C0025_Mod_P00003.pdf |
| 26-25 | Contract_AG-32SC-C-16-0086 (1).pdf |
| 26-26 | Contract_AG-32SC-C-16-0086_Mod_0001.pdf |
| 26-27 | Contract_AG-32SC-C-16-0086_Mod_0002.pdf |
| 26-28 | Contract_AG-32SC-C-16-0086_Mod_0003.pdf |
| 26-29 | Contract_AG-32SC-C-16-0086_Mod_0004.pdf |
| 26-30 | Contract_AG-32SC-C-16-0086_Mod_0005.pdf |
| 26-31 | Contract_AG-32SC-C-16-0086_Mod_0006.pdf |
| 26-32 | Contract_AG-32SC-C-16-0086_Mod_0007.pdf |
| 26-33 | Contract_AG-32SC-C-16-0086_Mod_0008.pdf |
| 26-34 | Contract_AG-32SC-C-16-0086_Mod_0009.pdf |
| 26-35 | Contract_AG-32SC-C-16-0086_Mod_0010.pdf |
| 26-36 | Contract_AG-32SC-C-16-0086_Mod_0011.pdf |
| 26-37 | Contract_AG-32SC-C-16-0086_Mod_0012.pdf |
| 26-38 | Contract_AG-32SC-C-16-0086_Mod_0013.pdf |
| 26-39 | Contract_AG-32SC-C-16-0086_Mod_0014.pdf |
| 26-40 | Contract_AG-32SC-C-16-0086_Mod_0016.pdf |
| 26-41 | Contract_AG-32SC-C-16-0086_Mod_0017.pdf |
| 26-42 | Contract_AG-32SC-C-17-0086 (1).pdf |
| 26-43 | Contract_AG-32SC-C-17-0086_Mod_0001.pdf |
| 26-44 | Contract_AG-32SC-C-17-0086_Mod_0002.pdf |
| 26-45 | Contract_AG-32SC-C-17-0086_Mod_0003.pdf |
| 26-46 | Contract_AG-32SC-C-17-0086_Mod_0004.pdf |
| 26-47 | Contract_AG-32SC-C-17-0086_Mod_0005.pdf |
| 26-48 | Contract_AG-32SC-C-17-0086_Mod_0006.pdf |
| 26-49 | Contract_AG-32SC-C-17-0086_Mod_0007.pdf |
| 26-50 | DOTO_12305B21D0015_12305B22F0245.pdf |
| 26-51 | DOTO_12305B22D0003_12305B22F0261.pdf |
| 26-52 | DOTO_12305B22D0003_12305B23F0005.pdf |
| 26-53 | DOTO_12305B22D0003_12305B23F0005_Mod_P00001.pdf |
| 26-54 | DOTO_12305B22D0003_12305B23F0059.pdf |
| 26-55 | DOTO_12305B22D0003_12305B23F0102.pdf |
| 26-56 | DOTO_12305B22D0003_12305B23F0198.pdf |
| 26-57 | DOTO_AG-32SD-C-15-0012_AG-32SC-D-16-0271_Mod_0002.pdf |
| 26-58 | DOTO_AG-32SD-C-15-0012_AG-32SC-D-16-0271_Mod_0003.pdf |
| 26-59 | DOTO_AG-32SD-C-15-0012_AG-32SC-D-16-0271_Mod_0005.pdf |
| 26-60 | PO_1232SC18P0289.pdf |
| 26-61 | PO_1232SC18P0289_Mod_P00002.pdf |
| 26-62 | PO_12305B22P0010.pdf |
| **27** | **Procurement HVAC Systems** |
| 27-1 | 12305B19C0038.pdf |
| 27-2 | 12305B19C0055 Rplc 2 Heat Exchg & 2 HW Heaters Greenhouse Bldg 10 BARC (1).pdf |
| 27-3 | 12305B19C0055 Rplc 2 Heat Exchg & 2 HW Heaters Greenhouse Bldg 10 BARC.pdf |
| 27-4 | 12305B19F0077.pdf |
| 27-5 | 12305B20C0024.pdf |
| 27-6 | 12305B20C0031 001jwmv.pdf |
| 27-7 | 12305B20C0031 002.pdf |
| 27-8 | 12305B20C0031 Usdamv.pdf |
| 27-9 | 12305B20C0044 Bldg 12 AHU Steam Line BARC (1).pdf |
| 27-10 | 12305B20F0055.pdf |
| 27-11 | 12305B20P0058.pdf |
| 27-12 | 12305B20P0150.pdf |
| 27-13 | 12305B20P0268.pdf |
| 27-14 | 12305B21C0032 Fully Executed.pdf |
| 27-15 | 1232SC18C0011 mod 1.pdf |
| 27-16 | a12305B21P013682 vmv.pdf |
| 27-17 | Contract_12305B19C0024.pdf |
| 27-18 | Contract_12305B19C0055_Mod_P00001 (1).pdf |
| 27-19 | Contract_12305B19C0055_Mod_P00001.pdf |
| 27-20 | Contract_12305B19C0056.pdf |
| 27-21 | Contract_12305B19C0060.pdf |
| 27-22 | Contract_12305B20C0009.pdf |
| 27-23 | Contract_12305B20C0014.pdf |
| 27-24 | Contract_12305B20C0044_Mod_P00001.pdf |
| 27-25 | Contract_12305B21C0023.pdf |
| 27-26 | Contract_12305B21C0032_Mod_P00001.pdf |
| 27-27 | Contract_12305B21C0032_Mod_P00002.pdf |
| 27-28 | Contract_12305B21C0032_Mod_P00003.pdf |
| 27-29 | Contract_12305B21C0036.pdf |
| 27-30 | Contract_12305B22C0039.pdf |
| 27-31 | Contract_12305B23C0018.pdf |
| 27-32 | Contract_12305B23C0022.pdf |
| 27-33 | Contract_1232SC18C0011.pdf |
| 27-34 | Contract_1232SC18C0011_Mod_P00002.pdf |
| 27-35 | Contract_1232SC18C0011_Mod_P00003.pdf |
| 27-36 | Contract_1232SC18C0011_Mod_P00004.pdf |
| 27-37 | DOTO_12305B21D0014_12305B23F0239.pdf |

| | |
|---|---|
| 27-38 | DOTO_12305B21D0015_12305B23F0246.pdf |
| 27-39 | DOTO_GS-07F-217CA_12305B20F0040.pdf |
| 27-40 | DOTO_GS-07F-217CA_12305B21F0051.pdf |
| 27-41 | DOTO_GS-07F-217CA_12305B21F0080.pdf |
| 27-42 | DOTO_GS-07F-217CA_12305B21F0111.pdf |
| 27-43 | DOTO_GS07F217CA_12305B23F0112.pdf |
| 27-44 | PO_12305B19P0071.pdf |
| 27-45 | PO_12305B19P0132.pdf |
| 27-46 | PO_12305B21P0136_Mod_P00001.pdf |
| 27-47 | PO_12305B22P0023.pdf |
| 27-48 | PO_12305B22P0023_Mod_P00001.pdf |
| **28** | **Procurement Mold & Interior Environmental Remediation** |
| 28-1 | BPA-C_12305B20A0001_12305B22F0095.pdf |
| 28-2 | BPA-C_12305B20A0001_12305B22F0161.pdf |
| 28-3 | BPA-C_12305B20A0001_12305B22F0193.pdf |
| 28-4 | BPA-C_12305B20A0001_12305B23F0123.pdf |
| 28-5 | BPA_12305B20A0001 (4).pdf |
| 28-6 | Contract_12305B23C0004 (2).pdf |
| 28-7 | Contract_12305B23C0004_Mod_P00001 (1).pdf |
| 28-8 | Contract_12305B23C0004_Mod_P00002 (1).pdf |
| 28-9 | Contract_12305B23C0004_Mod_P00003 (2).pdf |
| 28-10 | DOTO_47QSHA20D0037_12305B22F0117.pdf |
| 28-11 | DOTO_47QSHA20D0037_12305B22F0117_Mod_P00001.pdf |
| 28-12 | DOTO_GS-21F-096AA_12305B23F0132.pdf |
| 28-13 | PO_12305B23P0073.pdf |
| **29** | **Purchase Card Audits** |
| 29-1 | BARC Closed Audit.xlsx |
| **30** | **Purchase Card Cancellations** |
| 30-1 | BARC Card Closed-Analysis.xlsx |
| 30-2 | BARC Card Closed.xlsx |
| **31** | **Health and Safety Inspections** |
| 31-1 | 10 March 2023 RAS B229 and B308C Noise Survey Signed.pdf |
| 31-2 | 10 March 2023 RAS B229 and B308C Noise Survey.pdf |
| 31-3 | 10 March 2023 RAS B229 and B308C Noise Survey1.pdf |
| 31-4 | 2019 BARC SPCL Real Property List.pdf |
| 31-5 | 2019 BHNRC MAFCL Real Property List.pdf |
| 31-6 | 2019 USNA Facilities Unit Real Property List.pdf |
| 31-7 | 2019 USNA OAD Real Property List.pdf |
| 31-8 | 2019-02 BARC FQL Bldg 002 Fumehoods.pdf |
| 31-9 | 2019-02 BARC FQL Bldg 002 Page 1.pdf |
| 31-10 | 2019-02 BARC FQL Bldg 002 Page 2.pdf |
| 31-11 | 2019-03 USNA Facilities Unit NA-12.pdf |
| 31-12 | 2019-03 USNA Facilities Unit NA-13.pdf |
| 31-13 | 2019-03 USNA Facilities Unit NA-14.pdf |
| 31-14 | 2019-03 USNA Facilities Unit NA-19.pdf |
| 31-15 | 2019-03 USNA FNPRU 004.pdf |
| 31-16 | 2019-03 USNA FNPRU 010.pdf |
| 31-17 | 2019-03 USNA FNPRU 010A.pdf |
| 31-18 | 2019-03 USNA FNPRU 011.pdf |
| 31-19 | 2019-03 USNA FNPRU ALL.pdf |
| 31-20 | 2019-03 USNA FNPRU NA-16.pdf |
| 31-21 | 2019-03 USNA FNPRU NA-19.pdf |
| 31-22 | 2019-03 USNA FNPRU NA-23B.pdf |
| 31-23 | 2019-03 USNA FNPRU NA-23E.pdf |
| 31-24 | 2019-03 USNA FNPRU NA-23F-seb+ms.pdf |
| 31-25 | 2019-03 USNA FNPRU NA-23F.pdf |
| 31-26 | 2019-03 USNA GU Chinese Pavilion (003).pdf |
| 31-27 | 2019-03 USNA GU Grow Out Area (003).pdf |
| 31-28 | 2019-03 USNA GU NA-17 (003).pdf |
| 31-29 | 2019-03 USNA OAD NA-19.pdf |
| 31-30 | 2019-03 USNA OAD NA-20.pdf |
| 31-31 | 2019-04 BARC ACSL 001confirmed & one outstanding.pdf |
| 31-32 | 2019-04 BARC ACSL 007confirmed.pdf |
| 31-33 | 2019-04 BARC ACSL 010 confirmed.pdf |
| 31-34 | 2019-04 BARC ACSL 010B Page 1 confirmed.pdf |
| 31-35 | 2019-04 BARC ACSL 010B Page 2 confirmed.pdf |
| 31-36 | 2019-04 BARC ACSL 052 confirmed.pdf |
| 31-37 | 2019-04 BARC ACSL All confirmed.pdf |
| 31-38 | 2019-04 BARC HRSL 001 REP.pdf |
| 31-39 | 2019-04 BARC HRSL 007 Page 1.pdf |
| 31-40 | 2019-04 BARC HRSL 007 Page 2.pdf |
| 31-41 | 2019-04 BARC HRSL 012.pdf |
| 31-42 | 2019-08 BARC APDL 1003-COMPLETE BLDG NOT IN USE.pdf |
| 31-43 | 2019-08 BARC APDL 1004 COMPLETE NEED SOHES CONFIRMATION.pdf |
| 31-44 | 2019-08 BARC APDL 1004 NOT COMPLETE.pdf |
| 31-45 | 2019-08 BARC APDL 1048-COMPLETE.pdf |
| 31-46 | 2019-08 BARC APDL 1062- NOT COMPLETE.pdf |
| 31-47 | 2019-08 BARC APDL 1074 COMPLETE.pdf |
| 31-48 | 2019-08 BARC APDL 1075 COMPLETE 3-3-20.PDF |
| 31-49 | 2019-08 BARC APDL 1075 NOT COMPLETE.pdf |
| 31-50 | 2019-08 BARC APDL 1076 COMPLETE.pdf |
| 31-51 | 2019-08 BARC APDL 1077 COMPLETE.pdf |
| 31-52 | 2019-08 BARC APDL 1140-BLDG NOT IN USE UNDER CONSTRUCTION.pdf |
| 31-53 | 2019-08 BARC APDL 1180 Page 2-NOT COMPLETE.pdf |
| 31-54 | 2019-08 BARC APDL 1180A- NOT COMPLETE.pdf |
| 31-55 | 2019-08 BARC APDL 1320 Page 1-NOT COMPLETE.pdf |
| 31-56 | 2019-08 BARC APDL 1320 Page 2-NOT COMPLETE.pdf |
| 31-57 | 2019-08 BARC APDL 200 Page 1 NOT COMPLETE.pdf |
| 31-58 | 2019-08 BARC APDL 200 Page 2 NOT COMPLETE.pdf |
| 31-59 | 2019-08 BARC APDL 200 Page 2_2020 COMPLETE.pdf |
| 31-60 | 2019-08 BARC APDL 200 Page 3 COMPLETE.pdf |
| 31-61 | 2019-08 BARC APDL 200 Page 4 COMPLETE.pdf |
| 31-62 | 2019-08 BARC APDL 307C-NOT COMPLETE.pdf |
| 31-63 | 2019-08 BARC APDL 308C-NOT COMPLETE.pdf |
| 31-64 | 2019-08 BARC APDL 308D-COMPLETE.pdf |
| 31-65 | 2019-08 BARC BRL 306 Page 1.pdf |
| 31-66 | 2019-08 BARC BRL 306 Page 2.pdf |
| 31-67 | 2019-08 BARC BRL 306 Page 3.pdf |

| | |
|---|---|
| 31-68 | 2019-08 BARC BRL 306 Page 4.pdf |
| 31-69 | 2019-08 BARC BRL 306 Page 5.pdf |
| 31-70 | 2019-08 BARC BRL 481-1.pdf |
| 31-71 | 2019-08 BARC BRL 484A.pdf |
| 31-72 | 2019-08 BARC MNGDBL 010A Page 1 filled.pdf |
| 31-73 | 2019-08 BARC MNGDBL 010A Page 2 filled.pdf |
| 31-74 | 2019-08 BARC MNGDBL 010B filled.pdf |
| 31-75 | 2019-08 BARC NGRL 003.pdf |
| 31-76 | 2019-08 BARC NGRL 004.pdf |
| 31-77 | 2019-08 BARC NGRL 011.pdf |
| 31-78 | 2019-08 BARC SEL 005 Page 1 (002).pdf Safety Hazard.pdf |
| 31-79 | 2019-08 BARC SEL 005 Page 2 (002).pdf Safety Hazard.pdf |
| 31-80 | 2019-08 BARC SEL 010A.pdf Safety Hazard.pdf |
| 31-81 | 2019-08 BARC SGIL 006 Page 1 (1).pdf |
| 31-82 | 2019-08 BARC SGIL 006 Page 1.pdf |
| 31-83 | 2019-08 BARC SGIL 006 Page 2 (1).pdf |
| 31-84 | 2019-08 BARC SGIL 006 Page 2.pdf |
| 31-85 | 2019-08 BARC SGIL 006 Page 3 (1).pdf |
| 31-86 | 2019-08 BARC SGIL 006 Page 3.pdf |
| 31-87 | 2019-08 BARC SGIL 012 (1).pdf |
| 31-88 | 2019-08 BARC SGIL 012.pdf |
| 31-89 | 2019-08 BARC SGIL Greenhouses (1).pdf |
| 31-90 | 2019-08 BARC SGIL Greenhouses.pdf |
| 31-91 | 2019-08 NEA ADO Bldg 003.pdf |
| 31-92 | 2019-09 BARC SASL 001 Page 1.pdf |
| 31-93 | 2019-09 BARC SASL 001 Page 2.pdf |
| 31-94 | 2019-09 BARC SASL 001 Page 3.pdf |
| 31-95 | 2019-09 BARC SASL 001 Page 4.pdf |
| 31-96 | 2019-09 BARC SASL 010.pdf |
| 31-97 | 2019-09 BARC SASL 012.pdf |
| 31-98 | 2019-09 BARC SASL 029.pdf |
| 31-99 | 2019-09 BARC SASL 029A.pdf |
| 31-100 | 2019-10 BARC AGIL 005 abatement.pdf |
| 31-101 | 2019-10 BARC AGIL 163F- abatement.pdf |
| 31-102 | 2019-10 BARC AGIL 306 Page 1 abatement.pdf |
| 31-103 | 2019-10 BARC AGIL 306 Page 2- abatement.pdf |
| 31-104 | 2019-10 BARC EMFSL 001 Addressed.pdf |
| 31-105 | 2019-10 BARC EMFSL 173 (003) updated.pdf |
| 31-106 | 2019-10 BARC EMFSL 175.pdf |
| 31-107 | 2019-10 BARC EMFSL 176-.pdf |
| 31-108 | 2019-10 BARC EMFSL 176.pdf |
| 31-109 | 2019-10 BARC EMFSL 177C.pdf |
| 31-110 | 2019-10 BARC EMFSL 201 Page 1 completed version.pdf |
| 31-111 | 2019-10 BARC EMFSL 201 Page 2 completed version.pdf |
| 31-112 | 2019-10 BARC EMFSL 201 Page 3 completed version.pdf |
| 31-113 | 2019-10 BARC EMFSL 201 Page 4 completed version.pdf |
| 31-114 | 2019-10 BARC EMFSL 303 Page 1 Completed.pdf |
| 31-115 | 2019-10 BARC EMFSL 303 Page 2 Complete.pdf |
| 31-116 | 2019-10 BARC EMFSL 303A Completed.pdf |
| 31-117 | 2019-10 BARC GIFVL 010 Page 1.pdf |
| 31-118 | 2019-10 BARC GIFVL 010A Page 1.pdf |
| 31-119 | 2019-10 BARC GIFVL 010A Page 2.pdf |
| 31-120 | 2019-10 BARC GIFVL 010A Page 3.pdf |
| 31-121 | 2019-10 BARC GIFVL 010A Page 4.pdf |
| 31-122 | 2019-10 BARC GIFVL 029A.pdf |
| 31-123 | 2019-10 BARC GIFVL 031.pdf |
| 31-124 | 2019-10 BARC MPPL 004 Abatement Report.pdf |
| 31-125 | 2019-10 BARC MPPL 010 Abatement Report.pdf |
| 31-126 | 2019-10 BARC MPPL 011 Abatement Report.pdf |
| 31-127 | 2019-10 BHNRC FCHL 307B Page 1.pdf |
| 31-128 | 2019-10 BHNRC FSRG 005 Page 1.pdf |
| 31-129 | 2019-10 BHNRC FSRG 005 Page 2.pdf |
| 31-130 | 2019-11 BARC SPCL 001 Page 1.pdf |
| 31-131 | 2019-11 BARC SPCL 001 Page 2.pdf |
| 31-132 | 2019-11 BARC SPCL 001 Page 3.pdf |
| 31-133 | 2019-11 BARC SPCL 001 Page 4.pdf |
| 31-134 | 2019-11 BARC SPCL 010B.pdf |
| 31-135 | 2019-11 BARC SPCL 011.pdf |
| 31-136 | 2019-11 BHNRC DGIL 1140_jfu_02052020.pdf |
| 31-137 | 2019-11 BHNRC HSU 308B.pdf |
| 31-138 | 2019-BARC ABBL 1043 Page 1 abatement letter 121719.pdf |
| 31-139 | 2019-BARC ABBL 1043 Page 2  abatement letter 121719.pdf |
| 31-140 | 2019-safety checking BARC IIBBL 007 M.Cornelius.pdf |
| 31-141 | 2020-01 BARC ACSL 001 Page 1.pdf |
| 31-142 | 2020-01 BARC ACSL 001 Page 2.pdf |
| 31-143 | 2020-01 BARC ACSL 007 Page 1.pdf |
| 31-144 | 2020-01 BARC ACSL 007 Page 2.pdf |
| 31-145 | 2020-01 BARC ACSL 010.pdf |
| 31-146 | 2020-01 BARC ACSL 010B (002).pdf |
| 31-147 | 2020-01 BARC ACSL 012.pdf |
| 31-148 | 2020-01 BARC ACSL 052.pdf |
| 31-149 | 2020-02 BARC APDL 1001 OK.pdf |
| 31-150 | 2020-02 BARC APDL 1041 charles li.pdf |
| 31-151 | 2020-02 BARC APDL 1041.pdf |
| 31-152 | 2020-02 BARC APDL 200Complete.pdf |
| 31-153 | 2020-02 BARC FQL Bldg 002 Fumehoods P1.pdf |
| 31-154 | 2020-02 BARC FQL Bldg 002 Page 1.pdf |
| 31-155 | 2020-02 BARC FQL Bldg 002 Page 2.pdf |
| 31-156 | 2020-02 BARC FQL Bldg 002 Page 3.pdf |
| 31-157 | 2020-02 BARC FQL Bldg 010.pdf |
| 31-158 | 2020-02 BARC FQL Bldg 303 complete.pdf |
| 31-159 | 2021 EMFSL Laboratory Safety Inspection Checklist _KIM_BLDGS 303 & 303A.docx |
| 31-160 | 2021 EMFSL Laboratory Safety Inspection Checklist_BLDG 173.docx |
| 31-161 | 2021 EMFSL Laboratory Safety Inspection Checklist_MILLNER LAB BLDG 001.docx |
| 31-162 | 2021 EMFSL Laboratory Safety Inspection Checklist_NOU_BLDG 201.docx |
| 31-163 | 2021 EMFSL Laboratory Safety Inspection Checklist_PACHEPSKY_BLDG 177C.docx |
| 31-164 | 2021 EMFSL Laboratory Safety Inspection Checklist_PATEL_BLDG 201.docx |
| 31-165 | 2021 EMFSL Safety Assessment Summary_ BLDG 173.xlsx |

| | |
|---|---|
| 31-166 | 2022-11 BARC EMFSL 303.pdf |
| 31-167 | 2023-04 BARC ABBL 1043.pdf |
| 31-168 | 2091-11 BHNRC MAFCL-FCMDL 161 Page 1.pdf |
| 31-169 | 2091-11 BHNRC MAFCL-FCMDL 161 Page 2.pdf |
| 31-170 | 2091-11 BHNRC MAFCL-FCMDL 161 Page 3.pdf |
| 31-171 | 2091-11 BHNRC MAFCL-FCMDL 161 Page 4.pdf |
| 31-172 | 2091-11 BHNRC MAFCL-FCMDL 161 Page 5.pdf |
| 31-173 | 2091-11 BHNRC MAFCL-NDL 005 Page 1.pdf |
| 31-174 | 2091-11 BHNRC MAFCL-NDL 005 Page 2.pdf |
| 31-175 | 28AUGU~1.PDF |
| 31-176 | 6 November 2019.docx |
| 31-177 | 8001 00_01 NEA Office of the Director and Area Adminstrative Office (FEBRUARY 2020).xlsx |
| 31-178 | Annual Inspection 2019-11 BHNRC DGIL 307C Wang Lab.pdf |
| 31-179 | ARS BARC Radiation Safety Inspection April 2021.pdf |
| 31-180 | ARS BARC Radiation Safety Inspection Report April 2023.pdf |
| 31-181 | B 229 Turkey Rooms Sound Pressure Levels October 2019.pdf |
| 31-182 | B-001 Safety Hazard & Abatement Notice.pdf |
| 31-183 | B-007 Safety Hazard & Abatement Notice.pdf |
| 31-184 | B-007-2 Safety Hazard & Abatement Notice.pdf |
| 31-185 | B-012 Safety Hazard & Abatement Notice.pdf |
| 31-186 | BARC After Action Report - Final.docx |
| 31-187 | BARC BRL Beltsville MD NEA 3-Year Health Safety Inspection Cover Memo 2023.pdf |
| 31-188 | BARC, ABBL, Beltsville, MD NEA 3-Year H&S Finding Assessment Summ Spreadsheet 2023.xlsx |
| 31-189 | BARC, ABBL, Beltsville, MD NEA 3-Year H&S Inspection Cover Memo 2023.pdf |
| 31-190 | BARC, ABBL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-191 | BARC, ABBL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-192 | BARC, ACSL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-193 | BARC, ACSL, Beltsville, MD NEA 3-Year H&S Inspection Report Cover Memo 2023.pdf |
| 31-194 | BARC, AGIL Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-195 | BARC, AGIL Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-196 | BARC, AGIL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-197 | BARC, APDL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-198 | BARC, APDL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-199 | BARC, BRL Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-200 | BARC, BRL Beltsville, MD NEA 3-Year Health & Safety Inspection Report Checklist 2023.pdf |
| 31-201 | BARC, EMFSL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-202 | BARC, EMFSL, Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-203 | BARC, EMFSL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-204 | BARC, FQL Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-205 | BARC, FQL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-206 | BARC, FQL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-207 | BARC, FQL, Beltsville, MD NEA 3-Year Health & Safety Inspection Report Checklist 2023.pdf |
| 31-208 | BARC, GIFVL, Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-209 | BARC, GIFVL, Beltsville, MD NEA 3-Year Health & Safety Inspection Checklist 2023.pdf |
| 31-210 | BARC, GIFVL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-211 | BARC, HRSL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-212 | BARC, HRSL, Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-213 | BARC, HRSL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-214 | BARC, IIBBL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-215 | BARC, IIBBL, Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-216 | BARC, IIBBL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-217 | BARC, MNGDBL, Beltsville, MD NEA 3-Year H&S Inspection Cover Memo 2023.pdf |
| 31-218 | BARC, MNGDBL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-219 | BARC, MNGDBL, Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-220 | BARC, MNGDBL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-221 | BARC, MPPL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-222 | BARC, MPPL, Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-223 | BARC, MPPL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-224 | Bee Research Lab Safety (BRL) Inspection Summary 2022.docx |
| 31-225 | Bee Research Lab Safety (BRL) Inspection Summary.docx |
| 31-226 | BHNRC MAFCL Beltsville MD NEA 3-Year Health Safety Inspection Cover Memo 2023.pdf |
| 31-227 | BHNRC, DGIL Beltsville, MD NEA 3-Year Health & Safety Assessment Summary 2023.xlsx |
| 31-228 | BHNRC, DGIL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-229 | BHNRC, DGIL, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-230 | BHNRC, MAFCL, Beltsville, MD NEA 3-Year H&S Assessment Summary Spreadsheet 2023.xlsx |
| 31-231 | BHNRC, MAFCL, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-232 | BL Safety Assessment Summary of FQL Building 002 and 303.xlsx |
| 31-233 | BL Safety Assessment Summary (1).xlsx |
| 31-234 | BL Safety Assessment Summary 08.2021.xlsx |
| 31-235 | BL Safety Assessment Summary IIBBL summary-N.Novak.xlsx |
| 31-236 | BL Safety Assessment Summary MNGDBL Areas-FY21-Final.xlsx |
| 31-237 | BL Safety Assessment Summary- 08.2022.xlsx |
| 31-238 | BL Safety Assessment Summary-2021.xlsx |
| 31-239 | BL Safety Assessment Summary-FNPRU.xlsx |
| 31-240 | BL Safety Assessment Summary.xlsx |
| 31-241 | BL Safety Assessment Summary_HRSL_2021_AW.xlsx |
| 31-242 | BL Safety Assessment Summary_MPPL_9-9-2021.xlsx |
| 31-243 | Bldg 173 pic 1.jpg |
| 31-244 | Bldg 173 pic 2.jpg |
| 31-245 | Bldg 173 pic 3.jpg |
| 31-246 | Bldg 303 Annual Safety Inspection Checklist 2022.docx |
| 31-247 | Copy of BL Safety Assessment Summary.xlsx |
| 31-248 | Copy of USNA DO FY-21 Space Allocation.xlsx |
| 31-249 | Copy of USNA Facilities Unit FY-21 Space Allocation.xlsx |
| 31-250 | Copy of USNA FNPRU FY-21 Space Allocation.xlsx |
| 31-251 | Copy of USNA GU FY-21 Space Allocation.xlsx |
| 31-252 | Description of Chemical Fume Hood Face Velocity Building 007.docx |
| 31-253 | Dosimetry Noise Survey A. Alignay.pdf |
| 31-254 | Dosimetry Summary Report Abraham Alignay 2023 March.pdf |
| 31-255 | Dosimetry Summary Report William Gagnon 2023 March.pdf |
| 31-256 | Dosimetry Summary Report William Gognon 2023 March.pdf |
| 31-257 | Dosimetry Summary Report Yannick Bakiele 2023 March.pdf |
| 31-258 | EMFSL Safety Assessment Summary - Bldgs 001, 167, and 303 8-26-22.xlsx |
| 31-259 | FCHL Safety Assesmment Summary 2021.xlsx |
| 31-260 | Fume Hood Inspection-Facilities 03-2020 and 06-2021.xlsx |
| 31-261 | Fume Hood Meeting Minutes 07-23-2021.docx |
| 31-262 | IIBBL Chemical Fume Hood locations-NEA standards.pptx |
| 31-263 | IIBBL Safety Assessment Summary 2022.xlsx |

| | |
|---|---|
| 31-264 | Inspection 2019-08 BARC APDL 1001 COMPLETE.pdf |
| 31-265 | Inspection 2019-08 BARC APDL 1040 Page 1-COMPLETE.pdf |
| 31-266 | Inspection 2019-08 BARC APDL 1040 Page 2-COMPLETE.pdf |
| 31-267 | Inspection 2019-08 BARC APDL 1040 Page 3 COMPLETE.pdf |
| 31-268 | Inspection 2019-08 BARC APDL 1041 NOT COMPLETE.pdf |
| 31-269 | Inspection 2019-08 BARC APDL 1042 NOT COMPLETE.pdf |
| 31-270 | Inspection 2019-08 BARC APDL 1045 NOT COMPLETE.pdf |
| 31-271 | Inspection 2019-08 BARC APDL 1180 Page 1 COMPLETE.pdf |
| 31-272 | Inspection 2019-08 BARC APDL 306 COMPLETE.pdf |
| 31-273 | Laboratory Safety Inspection Checklist.docx |
| 31-274 | Laboratory Safety Inspection Checklist_SGIL-2021.docx |
| 31-275 | Lab_Inspection_Full_Details_08.23.2022.pdf |
| 31-276 | Loading dock B161.jpg |
| 31-277 | Mold remediation 007 Phase 2-August 16.docx |
| 31-278 | Mold remediation 007 start date July 14th(3).docx |
| 31-279 | Range 1 NGRL.jpg |
| 31-280 | Rm 102 major leaks -B161.jpg |
| 31-281 | Rm 102 over the door CT - B161.jpg |
| 31-282 | Safety 12-18-2019 BHNRC DGIL 307C room 208 Abatement action taken.pdf |
| 31-283 | Safety Inspection Checklist, SGIL Bldg 12, FY21.docx |
| 31-284 | Safety Inspection--Abatement Report--IIBBL 11-08-2019.pdf |
| 31-285 | SASL lab check list.docx |
| 31-286 | SO9D58~1.PDF |
| 31-287 | SOHU Beltsville Annual Biosafety Inspection Report ABBL 2023-P.pdf |
| 31-288 | SOHU Beltsville Annual Biosafety Inspection Report APDL 2023-P.pdf |
| 31-289 | SOHU Beltsville Annual Biosafety Inspection Report EMFSL 2023-P.pdf |
| 31-290 | SOHU Beltsville Annual Biosafety Inspection Report IIBBL 2023-P.pdf |
| 31-291 | SOHU Beltsville Annual Biosafety Inspection Report MNGDBL 2023-P.pdf |
| 31-292 | SOW Building 1140 Additional Renovations 7-15-19.docx |
| 31-293 | Supplemental Inspection Notes 07.23.2021.pdf |
| 31-294 | TL - Notes for NGRL.pdf |
| 31-295 | TL Notes for USNA FU 3-2019.pdf |
| 31-296 | TL Notes for USNA OAD 3-2019.pdf |
| 31-297 | USNA, FNPRU, Beltsville, MD NEA 3-Year H&S Inspection Cover Memo 2023.pdf |
| 31-298 | USNA, FNPRU, Beltsville, MD NEA 3-Year Health & Safety Inspection Cover Memo 2023.pdf |
| 31-299 | USNA, FNRPU, Beltsville, MD NEA 3-Year H&S Inspection Report Checklist 2023.pdf |
| 31-300 | Virtual Assessment Checklist 2020 VM.xlsx |
| 31-301 | VM - Notes for NGRL.pdf |
| 31-302 | VM Notes for BARC SPCL 2019.pdf |
| 31-303 | VM Notes for GIFVL 2019.pdf |
| 31-304 | VM Notes for MAFCL-FCMDL 2019.pdf |
| 31-305 | VM Notes for MAFCL-NDL 2019.pdf |
| 31-306 | Yakov Pachepsky_Annual_Biosafet_Inspection_Checklist-2022.pdf |
| **32** | **Safety and Health Policies** |
| 32-1 | 130.4.v4.pdf |
| 32-2 | 160.0.v1.pdf |
| 32-3 | 242.1M-ARS (1).pdf |
| 32-4 | 602.0.v2-Institutional Biosafety Committee.pdf |
| 32-5 | 604.0.v1-Reporting Incidents, Accidents, and Issues Involving Haz Bio Agents and Toxins.pdf |
| 32-6 | 621.0.v3-Dual Use Research of Concern.pdf |
| 32-7 | ARS 414.0 - ARS Occupational Medical Surveillance Program.pdf |
| 32-8 | Beltsville Bloodborne Pathogens Exposure Control Plan_062020_v1.6_FINAL1.pdf |
| 32-9 | BiosafetyLaboratoryManual.pdf |
| 32-10 | CONFINED_SPACE_PROGRAM.pdf |
| 32-11 | DR 4400-007 - USDA Biorisk Mngt Policy.pdf |
| 32-12 | DR 4410-004 - Safety Mgmt Program 2015.pdf |
| 32-13 | DR 9630-001 - BiohazWasteDecontamination.pdf |
| 32-14 | eaesp.pdf |
| 32-15 | Fire Safety Guideline for Appliances Version 1.1 2019.pdf |
| 32-16 | Hand wash and Eyewash Station Requirements_Beltsville Location Guidance.pdf |
| 32-17 | HAZARD COMMUNICATION PROGRAM Ver 2.1 2019.pdf |
| 32-18 | JHA Policy Ver 1.0 2019 Version 1.0 Signed.pdf |
| 32-19 | Location Closeout Policy 05-2022.pdf |
| 32-20 | lock_tag.pdf |
| 32-21 | Open_Flame_Policy.pdf |
| 32-22 | PesticidePolicy.pdf |
| 32-23 | PPE_Policy.pdf |
| 32-24 | Special_(Regulated)_Medical_Waste_Disposal_SOP.pdf |
| **33** | **Training Confined Spaces Record** |
| 33-1 | CB0000~1.PDF |
| 33-2 | CB0000~2.PDF |
| 33-3 | Confined Space Training Attendee List.docx |
| **34** | **Training HAZCOM Records** |
| 34-1 | Beltsville Radiation Training record.xlsx |
| **35** | **Facilities Operations Org Chart** |
| **36** | **Whistleblower Information - 2nd Request Tracking.xlsx** |
| **37** | **Memos of Conversation** |
| 37-1 | Claimants Memorandum of Conversation, September 8, 2023 |
| 37-2 | Altman Memorandum of Conversation |
| 37-3 | Ashiwaya Memorandum of Conversation |
| 37-4 | Augustin Memorandum of Conversation |
| 37-5 | Baltimore Memorandum of Conversation |
| 37-6 | Bhatt Memorandum of Conversation |
| 37-7 | Blomberg Memorandum of Conversation |
| 37-8 | Brakke Memorandum of Conversation |
| 37-9 | Castlebury Memorandum of Conversation |
| 37-10 | Corral Memorandum of Conversation |
| 37-11 | Fleri Memorandum of Conversation |
| 37-12 | Harley Memorandum of Conversation |
| 37-13 | Houchens Memorandum of Conversation |
| 37-14 | Houston Memorandum of Conversation |
| 37-15 | Howl Memorandum of Conversation |
| 37-16 | Irechukwu Memorandum of Conversation |
| 37-17 | Levin Memorandum of Conversation |
| 37-18 | Liu Memorandum of Conversation |
| 37-19 | Martins Memorandum of Conversation |
| 37-20 | Meinhardt Memorandum of Conversation |
| 37-21 | Morris Memorandum of Conversation |

| | |
|---|---|
| 37-22 | Ponte Memorandum of Conversation |
| 37-23 | Shanower Memorandum of Conversation |
| 37-24 | Soucoup Memorandum of Conversation |
| 37-25 | Taylor Memorandum of Conversation Final |
| 37-26 | Tushek Memorandum of Conversation |
| 37-27 | Warr Memorandum of Conversation |
| 37-28 | Winstead Memorandum of Conversation |
| 37-29 | Zhang Memorandum of Conversation |
| 37-30 | Park Memorandum of Conversation |
| **38** | **Documentation Provided by Whistleblowers** |
| 38-1 | BARC Safety and Maintenance.xlsx |
| 38-2 | RE_ Leaks in Bldg 001.pdf |
| 38-3 | IMPORTANT NEWS_ BARC Building 001 Visible Mold Observation.pdf |
| 38-4 | Linda's OSC Documentation.pdf |
| 38-5 | Agency Response to Union information request dated January 9 2023 LAB.docx |
| 38-6 | Building 303B image000001 - 060623_2023.09.21.jpg |
| 38-7 | OMU_program_overview_T.Baltimore.pdf |
| 38-8 | OMU_roster_est.FY24_budget_T.Baltimore.pdf |
| 38-9 | R.Corrall_FW Bill Howl Purchase Card Ratifications.msg |
| 38-10 | R.Corrall_RE Deleted data from Safety server - Y drive.msg |
| 38-11 | Shanower Meeting - 02_22_23_2023.09.21.pptx |
| 38-12 | Email - OMU Tickets accidently completed - 061423.pdf |
| 38-13 | Fire Alarm Watch Notices - 2021-22.pdf |
| 38-14 | Freon escaping from AC Units.3gpp |
| 38-15 | BARC Compiled Water Outages.pdf |
| 38-16 | BLDG 001 no HOT water for 2 years.pdf |
| 38-17 | Email - Mold in Bldg 001 - 091223.pdf |
| 38-18 | Fine Particulate Black Material from HVAC System B001.pdf |
| 38-19 | RE_ NO DRINKING WATER.pdf |
| 38-20 | RE_ Status of Bottled Water Bldg 001.pdf |
| 38-21 | Building 007 - ServPro 050223.pdf |
| 38-22 | B010A -basement-2-20220830_082815.jpg |
| 38-23 | Email - 010A elevator 20230113_101822 redacted.jpg |
| 38-24 | Work Order Tickets for MNGDBL and B010A - 092123.xlsx |
| 38-25 | 20230912_125553.jpg |
| 38-26 | 20230912_130316.jpg |
| 38-27 | 20230912_130340.jpg |
| 38-28 | 20230912_130355.jpg |
| 38-29 | 20230913_111915.jpg |
| 38-30 | 20230913_112825.jpg |
| 38-31 | 20230913_113006.jpg |
| 38-32 | 20230913_113025.jpg |
| 38-33 | 20230913_113051.jpg |
| 38-34 | 708263336.jpg |
| 38-35 | 708263345.jpg |
| 38-36 | 713368363.jpg |
| 38-37 | Greenhouse report.docx |
| 38-38 | imagejpeg_0(26).jpg |
| 38-39 | IMG_0853.jpg |
| 38-40 | IMG_20230105_094947310_HDR.jpg |
| 38-41 | IMG_20230105_102828158_HDR.jpg |
| 38-42 | IMG_20230105_111615579.jpg |
| 38-43 | BARC BLDG3 IEQ Report DRAFT - 12 DEC 23 |
| **39** | **Photo Documentation** |
| 39-1 | Photo - Building 309 East Steam Plant - 1 |
| 39-2 | Photo - Building 309 East Steam Plant - 2 |
| 39-3 | Photo - Building 309 East Steam Plant - 3 |
| 39-4 | Photo - Building 309 East Steam Plant - 4 |
| 39-5 | Photo - Building 309 East Steam Plant - 5 |
| 39-6 | Photo - Building 309 East Steam Plant - 6 |
| 39-7 | Photo - Building 309 East Steam Plant - 7 |
| 39-8 | Photo - Building 309 East Steam Plant - 8 |
| 39-9 | Photo - Building 309 East Steam Plant - 9 |
| 39-10 | Photo - Building 309 East Steam Plant - 10 |
| 39-11 | Photo - Building 309 East Steam Plant - 11 |
| 39-12 | Photo - Building 309 East Steam Plant - 12 |
| 39-13 | Photo - Permit Spaces Steam Plant - 1 |
| 39-14 | Photo - Permit Spaces Steam Plant - 2 |
| 39-15 | Photo - Buildings 10-10A-10B - 1 |
| 39-16 | Photo - Buildings 10-10A-10B - 2 |
| 39-17 | Photo - Buildings 10-10A-10B - 3 |
| 39-18 | Photo - Buildings 10-10A-10B - 4 |
| 39-19 | Photo - Buildings 10-10A-10B - 5 |
| 39-20 | Photo - Buildings 10-10A-10B - 6 |
| 39-21 | Photo - Buildings 10-10A-10B - 7 |
| 39-22 | Photo - Buildings 10-10A-10B - 8 |
| 39-23 | Photo - Buildings 10-10A-10B - 9 |
| 39-24 | Photo - Buildings 10-10A-10B - 10 |
| 39-25 | Photo - Buildings 10-10A-10B - 11 |
| 39-26 | Photo - Buildings 10-10A-10B - 12 |
| 39-27 | Photo - Buildings 10-10A-10B - 13 |
| 39-28 | Photo - Buildings 10-10A-10B - 14 |
| 39-29 | Photo - Building 001 - 1 |
| 39-30 | Photo - Building 001 - 2 |
| 39-31 | Photo - Building 001 - 3 |
| 39-32 | Photo - Building 001 - 4 |
| 39-33 | Photo - Building 001 - 5 |
| 39-34 | Photo - Building 001 - 6 |
| 39-35 | Photo - Building 001 - 7 |
| 39-36 | Photo - Building 001 - 8 |
| 39-37 | Photo - Building 001 - 9 |
| 39-38 | Photo - Building 001 - 10 |
| 39-39 | Photo - Building 001 - 11 |
| 39-40 | Photo - Building 001 - 12 |
| 39-41 | Photo - Building 001 - 13 |
| 39-42 | Photo - Building 001 - 14 |
| 39-43 | Photo - Building 001 - 15 |
| 39-44 | Photo - Building 001 - 16 |

| | |
|---|---|
| 39-45 | Photo - Building 001 - 17 |
| 39-46 | Photo - Building 001 - 18 |
| 39-47 | Photo - Building 007 - 1 |
| 39-48 | Photo - Building 007 - 2 |
| 39-49 | Photo - Building 007 - 3 |
| 39-50 | Photo - Building 007 - 4 |
| 39-51 | Photo - Building 007 - 5 |
| 39-52 | Photo - Building 007 - 6 |
| 39-53 | Photo - Building 007 - 7 |
| 39-54 | Photo - Building 007 - 8 |
| 39-55 | Photo - Building 007 - 9 |
| 39-56 | Photo - Building 007 - 10 |
| 39-57 | Photo - Building 007 - 11 |
| 39-58 | Photo - Building 007 - 12 |
| 39-59 | Photo - Building 007 - 13 |
| 39-60 | Photo - Building 007 - 14 |
| 39-61 | Photo - Building 007 - 15 |
| 39-62 | Photo - Building 007 - 16 |
| 39-63 | Photo - Building 007 - 17 |
| 39-64 | Photo - Building 007 - 18 |
| 39-65 | Photo - Building 007 - 19 |
| 39-66 | Photo - Building 007 - 20 |
| 39-67 | Photo - Building 015 - 1 |
| 39-68 | Photo - Building 015 - 2 |
| 39-69 | Photo - Building 015 - 3 |
| 39-70 | Photo - Building 015 - 4 |
| 39-71 | Photo - Building 301 - 1 |
| 39-72 | Photo - Building 301 - 2 |
| 39-73 | Photo - Building 301 - 3 |
| 39-74 | Photo - Building 301 - 4 |
| 39-75 | Photo - Building 301 - 5 |

| | |
|---|---|
| 39-76 | Photo - Building 301 - 6 |
| 39-77 | Photo - Building 301 - 7 |
| 39-78 | Photo - Building 301 - 8 |
| 39-79 | Photo - Building 307 - 1 |
| 39-80 | Photo - Building 307 - 2 |
| 39-81 | Photo - Building 307 - 3 |
| 39-82 | Photo - Building 307 - 4 |
| 39-83 | Photo - Building 310 Water Treatment Plant - 1 |
| 39-84 | Photo - Building 310 Water Treatment Plant - 2 |
| 39-85 | Photo - Building 310 Water Treatment Plant - 3 |
| 39-86 | Photo - Water Tower - 1 |
| 39-87 | Photo - Water Tower - 2 |
| 39-88 | Photo - Water Tower - 3 |
| **40** | **Investigation Team Documentation** |
| 40-1 | Investigatory Information Request - 1.pdf |
| 40-2 | Investigatory Information Request - 2.pdf |
| **41** | **News Articles** |
| 41-1 | US News-20230630 |
| 41-2 | Government Executive-20230712 |
| 41-3 | reuters-20230519.docx |
| 41-4 | AFGE_USDA, We Have a Problem-20230206 |
| **42** | **Complaint and Authorization** |
| 42-1 | DI-23-000706; 708; 719 Referral[90].pdf |
| 42-2 | BARC Authorization Letter |
| **43** | **Background Overviews** |
| 43-1 | BARC Brief.pptx |
| 43-2 | ARS and BARC Overview 14 AUG 2023.pptx |
| 43-3 | General ARS and BARC Overview July 2023.pptx |
| 43-4 | ARS Real Property AMRB Charter-10.12.22.pdf |
| 43-5 | USDA-ARS_BARC_22_Building_Demo_EA_2020JAN22 |
| **44** | **Items Researched by Investigation Team** |
| 44-1 | frpp_public_dataset_fy21_final_02242023-1.xlsx |
| 44-2 | USDA-ARS_BARC_22_Building_Demo_EA_2020JAN22 |
| **45** | **Maps** |
| 45-1 | Item 2- Boundary_Road_2023 |
| **46** | **Agency Reference Documents** |
| 46-1 | 242.1M-ARS |
| 46-2 | 242.8 ARS Facility Operations and Maintenance, October 8, 2015 |
| 46-3 | Admin Issuances |
| 46-4 | BARC Map With Notes-2023-09-26 |
| 46-5 | DR 4050-531-002 Superior Qualification_0 |
| 46-6 | Item 1- BARC facility with buildings |
| 46-7 | Item 3- BARC Organizational Chart |
| 46-8 | Job Hazard Analysis (20-160.0M) Highlighted |
| 46-9 | BARC BHNRC USNA PPE_Policy Ver.1.0 |
| 46-10 | ba_safety_policy |
| 46-11 | DR 4410-004 Safety Management Program |
| 46-12 | JHA_policy |
| 46-13 | Location Closeout Policy 05-2022 |
| 46-14 | Open_Flame_Policy |
| 46-15 | 160-0M SHEM Manual |
| 46-16 | 160.0.v1 |
| 46-17 | 156.1M-ARS (Accountability & Control) |
| 46-18 | 156.1M-ARS (Acquisitions) |
| 46-19 | 156.1M-ARS (Disposals) |
| 46-20 | 156.1M-ARS (Easements) |
| 46-21 | 156.1M-ARS (Facility Protection & Conduct on Federal Property) |
| 46-22 | 156.1M-ARS (Quarters Management) |
| 46-23 | 156.1M-ARS-Chapter4 (Mineral Leasing) |
| 46-24 | 156.1M-ARS-Chapter5 (Accountability and Control) |
| 46-25 | 156.1M-ARS-Chapter9 (Facility Protection) |
| 46-26 | 156.1P-ARS (Revocable Permits) |
| 46-27 | 32 - 151.0 ARS Capital Project and Repair Plan |
| 46-28 | 32 - 157.0M Major Facilities Construction |
| 46-29 | 32 - 157.2-ARS Facilities Construction Authorities |
| 46-30 | 32 - 157.3 Management of Base Fund Set Asides |
| 46-31 | 32 - 157.4 - ARS (Leasing Federally-owned Land for construction by a non-Federal Entity) |
| 46-32 | Irechukwu AD332 |
| 46-33 | DR 1620-003.4.n Applicability of FMR to USDA Real Property (https://www.usda.gov/directives/dr-1620-003) |
| 46-34 | FMR § 102-74.10 (https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-74) |
| 46-35 | 2021 IPMC §101.2 Scope (https://codes.iccsafe.org/content/IPMC2021P2/chapter-1-scope-and-administration) |
| 46-36 | Federal Buildings Personnel Training Act (FBPTA) of 2010 |
| 46-37 | USDA Environmental Pollution Prevention, Control, and Abatement Manual (DM5600-001) |
| 46-38 | UPL and Repair and Maintenance Projects 2019-2023 |
| 46-39 | USDA Department Regulation (DR) 1110-002 *Management's Responsibility for Internal Control* (March 2021) (https://www.usda.gov/directives/dr-1110-002) |
| 46-40 | 29 CFR 1910 OSHA Standards (https://www.osha.gov/laws-regs/regulations/standardnumber/1910) |
| **47** | **Documentation Provided During Interviews** |
| 47-1 | Asset Management Review Board Charter |
| 47-2 | Spore Trap Air Cell Analysis, September 14, 2023 |
| 47-3 | BARC, ACSL, Beltsville, MD NEA THREE (3) YEAR ON-SITE HEALTH & SAFETY ASSESSMENT SUMMARY |

**ARS RESPONSE PLAN**
**ADMINISTRATIVE INVESTIGATION REPORT FOR OF THE BARC INVESTIGATION INV202300001**

## 1. INTRODUCTION

The Beltsville Agricultural Research Center (BARC) Investigation Report (Report) is a result of an investigation into whistleblower allegations concerning facility operations and management at BARC which is a research facility of the Agricultural Research Service (ARS) in Beltsville, Maryland. Whistleblowers claimed BARC leadership failed to properly maintain facilities, resulting in an unsafe work environment and improper handling of research. In July 2023, the U.S. Office of Special Counsel referred the investigation to the Office of the Secretary of the U.S. Department of Agriculture (USDA). The investigators were charged with determining if the allegations led to violations of safety regulations, loss of research, and if mismanagement occurred. A multi-disciplinary team led by the USDA Forest Service and Office of Human Resources Management conducted the investigation.

This plan outlines the ARS response to the Report's findings.

### 1.1. Priority & Timeline

The ERT and RTT team leaders have developed a response timeline that prioritizes actions needed to rectify immediate and urgent issues such as those related to employee health, safety, and well-being and assess the relative urgency of all other action items for prioritization. The Action Tracker (Appendix I) tracks all recommendations by percentage complete and specific due dates. Support and assistance required for successful completion of recommendations will be immediately made available from ARS-wide resources through the ERT and ARS senior leadership.

Among the Report recommendation categories, Safety and Health and Leadership and Staffing will be the top priorities. Engineering, BARC Master Plan, and Training activities will be ongoing and have a cumulative impact throughout the BARC campus. Execution of the BARC Master Plan will depend on the availability of funding.

Progress on each action item will be tracked on the Action Tracker as follows:

- Completed
- 50+ % completed
- 25-50 % completed
- To be started

Among 60 distinct Report recommendations, 14 have been completed by March 2024. A total of 38 will be completed by December 2024. The implementation of remaining 22

recommendations will be either ongoing or depending on the availability of fundings as depicted in the graph below.




## 2. APPROACH

To respond to the Report swiftly and decisively, ARS formed multiple response teams to respond to Report recommendations and develop strategies to inform and engage stakeholders to solicit their inputs.

### 2.1. Form Response Teams

ARS has established multiple action response teams to ensure a successful and timely response to all Report recommendations.

An Oversight and Support Team (OST) has been established to provide USDA and ARS oversight and accountability to the response efforts. Members of this team have extensive experience and technical expertise with agency operations, USDA environmental management, facility management, and Federal procurement. Members' leadership and guidance will ensure the successful completion of the responses. The OST will be co-chaired by the Director, USDA Office of Property and Environmental Management (OPEM) and the Director, ARS Southeast Area (SEA). The OST will meet once a week and provide oversight, accountability, and support to the ARS Executive Response Team. The OST will be comprised of:

- Director, USDA OPEM (Co-Chair)
- Director, ARS SEA (Co-Chair)
- Director, USDA Office of Contracting and Procurement (OCP)

- Senior Advisor, Research, Education, and Economics (REE) Mission Area
- Associate Administrator, Economic Research Service (ERS)
- Associate Administrator, National Institute of Food and Agriculture (NIFA) Operations
- Associate Administrator, ARS Research Operations and Management
- Chief of Staff, ARS

An Executive Response Team (ERT) has been established and will meet daily to:

- Ensure timely and successful completion of Report recommendations.
- Ensure ARS Northeast Area (NEA) and BARC have priority and coordinated support from resources and staff across ARS.
- Provide regular updates to the ARS Administrator, OST, REE, and USDA.
- Designate and manage Response Tiger Teams to address and implement Report recommendations.
- Manage the BARC Report Action Tracker (identify deliverables, measures of success, implementation timelines, and post-completion measures of success).

The ERT will be comprised of:

- Associate Administrator, ARS Research Operations and Management (Chair)
- Chief of Staff, ARS (Vice-Chair)
- Director, ARS NEA
- Director, ARS Facilities Division
- Director, ARS Acquisition and Procurement Division
- Director, ARS Office of Communications
- Director, ARS NEA BARC
- Director, ARS SEA Southern Regional Research Center
- Administrative Office Director, ARS NEA
- Labor Relations Specialist, ARS Human Resources Division (HRD)
- Area Administrative Office Director, ARS Plains Area (PA)
- Section Head, ARS PA Facilities, Safety and Real Property
- Assistant Director, ARS NEA BARC

Response Tiger Teams (RTTs) have been established to thoroughly and urgently address and implement Report recommendations. They report to the ERT. Each RTT is comprised of subject matter experts and managers from BARC, ARS NEA, and across ARS. Each RTT is led by a Team Leader and all recommendations in the BARC Response Action Tracker have an assigned RTT team leader.

### 2.2. Review Report

The Report provided ARS with a comprehensive and independent assessment of BARC challenges needing remediation and includes 60 distinct recommendations. The ARS response

teams organized recommendations into six categories to facilitate assignment, execution, and closure of action items by relevant experts as shown in the graph below.




Administrative: These items address Report recommendations for various administrative topics to include purchase card management, contracting, physical security, and record keeping

BARC Master Plan: These items address Report recommendations for ensuring a viable BARC capital investment strategy for a future BARC campus with modernized labs, offices and infrastructure to support agricultural research.

Engineering: These items address Report recommendations for overall BARC facilities assessments, design, repair, and maintenance in support of effective facilities and infrastructure operations.

Leadership & Staffing: These items address Report recommendations for creating an ARS culture of care and response to staff concerns, positive labor relations and addressing hiring to align with staffing priorities for facility and infrastructure management.

Safety and Health: These items address Report recommendations about actions, equipment, and for BARC employees to ensure their safety when conducting workplace activities such as HVAC inspections and working with electrical components and ensuring the physical security of facilities.

Training: These items address Report recommendations for the development of training needed to ensure workplace safety throughout the BARC campus, provide training in facilities management and maintenance, and reinforce training on personal protective equipment, credit card use, and procurement processes.

### 2.3. Engage Stakeholders

ARS will seek input and feedback on the Report Response Plan from various stakeholders including ARS research leaders, Beltsville facility staff, other Beltsville employees, and union members, as needed, to ensure transparency in approach, implementation, and resolution of action items. ARS' approach, implementation, and closure of action items will be reviewed and approved by both the Executive Response Team and the USDA Oversight and Support Team as discussed in Section 2.1 above. The full accounting will be transparent to any interested parties.

- OST and ERT will update the ARS Administrator, REE, and OSEC key staff with progress toward implementing report response and will provide as much notice as possible if RTTs encounter obstacles or delays while conducting their responses.

- Monthly meetings with Beltsville employees will continue until all renovations and repairs are complete. During these meetings we are currently or will:
  - Relay progress overall of renovation and modernization efforts in Beltsville.
  - Provide updates on specific building repairs.
  - Provide status update on mold monitoring and remediation.
  - Discuss future action to include the movement of some employees to new buildings.
  - Hold a Q&A portion that should last at least 30 minutes.
  - Commit to providing responses to questions that cannot be answered during the meeting.

- Regular meetings with labor representatives are being held to leverage this partnership by confirming the Union is kept current, by ensuring that collaboration is the norm, and by assuring any issues or concerns of the Union are promptly addressed.

## 3. CORRECTIVE ACTION PLAN

OST and ERT have developed a corrective action plan that provides a clear process for the successful completion of each Action Item to address each distinct recommendation. The RTTs

and ERT will monitor and track progress on each recommendation through successful completion. The OST will monitor and track on a weekly basis and provide oversight and accountability. The Action Tracker will be the primary tool to convey the progress of each action through completion.

### 3.1. Corrective Actions Monitoring & Tracking

The Action Tracker (Appendix I) has been developed and as noted previously, includes action items for all 60 Report recommendations. These action items define specific steps to rectify the deficiencies, improve processes, and implement the recommended changes. The Action Tracker will be used daily by the RTT and ERT and weekly by the OST to ensure quality and timeliness of all closeout actions. About 25% of the 60 recommendations have already been completed as of the end of March 2024.

### 3.2. Corrective Actions and Tiger Teams

ARS has developed a corrective action plan (Plan) for each of the 60 items identified in the Action Tracker (Appendix 1). Each Plan builds on Report findings and recommendations to develop a comprehensive blueprint that outlines how ARS will rectify each item. Some of these actions have already been taken; others are ongoing, and the remaining items still need to be started.

3.2.1. Administrative: There are eight recommendations in this category. Mr. Brandon Levin, ARS NEA Area Administrative Office Director, is the leader of the Administrative RTT. Administrative RTT members and sub-team members have been assigned and developed an aggressive and thorough action plan and timeline for each of the eight recommendations. Accomplishments to date include:

3.2.1.1. A BARC campus-wide Mechanical, Electrical, and Plumbing (MEP) multi-year contract was awarded on 14 March 2024 to provide efficient access to a wide variety of repairs.

3.2.2. BARC Master Plan: There are four recommendations in this category. Mr. Nino Fleri, ARS Facilities Division Director, is the leader of the BARC Master Plan RTT. BARC Master Plan RTT members and sub-team members have been assigned and have developed an aggressive and thorough action plan and timeline for each of the four recommendations. Accomplishments to date include:

3.2.2.1. Obtained Congressional and USDA approval to move $50M from Fort Detrick to BARC to address challenges.

3.2.2.2. Developed a new BARC Master Plan (Appendix II) to plan, prioritize, and modernize future workspace and aligned the new Master Plan with ARS 2024 Capital Investment Strategy (CIS).

3.2.2.3. Developed a high-level plan to gradually move BARC employees from 23 buildings to 11 modernized buildings.

3.2.2.4. Currently mobilizing ARS resources (personnel, contractual vehicles, or funds) from other areas to address BARC challenges and implement the Master Plan.

3.2.3. Engineering: There are twenty-two recommendations in this category. Mr. Frank King, ARS Facilities Division Senior Engineer, is the leader of the Engineering RTT. Four recommendations in this category are now complete. Engineering RTT members and sub-team members have been assigned and have developed an aggressive and thorough action plan and timeline for each of the remaining eighteen recommendations. Accomplishments to date include:

3.2.3.1. Engaged with US Army Corps of Engineers (USACE) and others to conduct BARC campus-wide assessments of hazardous materials, mold, asbestos, HVAC, fume hood, fire alarm, elevator, and roof.

3.2.3.2. Engaged with USACE to select building modernization firms; a selection was made in March 2024 for three buildings (1, 4 & 10A).

3.2.4. Leadership and Staffing: There are five recommendations in this category. Dr. Charles Onwulata, ARS NEA Associate Director, is the leader of the Leadership & Staffing RTT. Leadership & Staffing RTT members and sub-team members have been assigned and have developed an aggressive and thorough action plan and timeline for each of the five recommendations. Accomplishments to date include:

3.2.4.1. Selection of new permanent BARC Director with a targeted started date in May 2024 (the hiring action is currently pending USDA approval.)

3.2.4.2. Organized oversight and support team, including leaders from USDA, REE, and ARS, to oversee response plan development and implementation.

3.2.4.3. Assembled an executive response team to review and analyze the investigation report and develop, manage, and track corrective actions to address 60 recommendations from the Report.

3.2.4.4. Assembling RTTs to execute corrective actions to implement recommendations.

3.2.4.5. Distributed a conceptual new Beltsville facilities modernization plan to labor union and employees on March 12 and 13, 2024.

3.2.4.6. REE Under Secretary and ARS Administrators hosted a Town Hall employee engagement on March 14, 2024, to discuss plans for improving facilities and infrastructure to provide a safe and modernized space for agricultural research.

3.2.4.7. Established monthly all-hands meetings that began in July 2023 to provide updates on facilities and other high priority items and posted a summary and responses to questions/comments on the agency intranet.

3.2.4.8. Communicated upcoming campus wide assessments or remediation efforts during monthly town halls.

3.2.4.9. Posted final reports of hazardous materials and other campus-wide assessments on the agency intranet.

3.2.4.10. Held facility staff and farming crew sessions to discuss employee and BARC concerns.

3.2.5. Safety and Health: There are twelve recommendations in this category. Mr. Cal Mather, ARS Facilities Division, Safety, Health, and Environmental Management Branch Chief is the leader of the Safety RTT. Eight recommendations have been completed. Safety RTT members and sub-team members have been assigned and have developed an aggressive and thorough action plan and timeline for each of the remaining four recommendations. Accomplishments to date include:

3.2.5.1. Identified facility and research safety training deficits and ensured employees received required training.

3.2.5.2. Re-instituted occupational health program to enhance employee participation.

3.2.5.3. Assisted employee enrollment in occupational health program.

3.2.5.4. Established monthly meetings with the Union to provide updates on facilities and other high priority items. REE PALS attended these union discussions.

3.2.5.5. Leveraged the Federal Mediation Conciliation Service to assist both Parties in mediating disputes on contract negotiation matters.

3.2.5.6. Planning a 2-day offsite meeting to work on building bridges, closing the gap, and improving the labor management relationship.

3.2.6. Training: There are nine recommendations in this category. Due to the broad nature of the training category, Training RTTs will be led by Mr. Brandon Levin, Mr. Cal Mather, or Mr. David Johnson, ARS NEA BARC Physical Security Specialist. Three recommendations have been completed. Training RTT members and sub-team members have been assigned and have developed an aggressive and thorough action plan and timeline for each of the remaining six recommendations. Accomplishments to date include:

3.2.6.1. Physical security training provided to BARC staff, contractors and cooperators.

3.2.6.2. Acquisition customer roles and responsibilities and General contracting overview training provided to BARC facilities and acquisition related staff.

**4. A FUTURE ARS BELTSVILLE CAMPUS**

ARS takes all Report findings and recommendations very seriously. Addressing the challenges at BARC and ensuring a swift and thorough completion of Report recommendations is an agency priority. ARS will accomplish this task in partnership with external REE and USDA organizations for oversight, accountability, and support. RTTs will be assigned to tackle each Report recommendation supported by the ERT and the OST. The Action Tracker will track progress in completing responses to recommendations and provide quantitative milestones that measure long-term management and success. The future of the ARS Beltsville Campus will include sound engineering management where cost-effective and streamlined maintenance programs will ensure upkeep of buildings, infrastructure, and facilities that are compliant with the Americans with Disabilities Act. The new BARC leadership team will provide renewed focus and emphasis on employee safety and health along with proper staffing and employee training.

This long-term success of the Beltsville campus as a research facility will rely on successful implementation of the BARC Master Plan (Appendix II), which includes the consolidation of our employees and research to labs and offices in a cluster of modernized buildings that will be concentrated on both the East and West campuses of BARC. This will be implemented to achieve economies of scale in consolidation, concentration, and modernization. It will enable ARS to maximize facility investments and ensure that ARS staff has safe and energy-efficient work environments with modern amenities and research infrastructure.

ARS response teams strategically developed the Master Plan to ensure it is both feasible and sustainable for the future, which will enable ARS to continue its current global leadership in agricultural science.

Appendix I – Action Tracker
Appendix II – BARC Master Plan

| Action Item # | Category | Status | Action | Team Leader | Deliverable | Measure of Success | Due Date | Completion Date | Post-Completion Measure of Success | Status / Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1C1 | Engineering | Completed | Conduct a condition survey of the campus by a qualified architecture and engineering team managed by a non-BARC group to document the existing conditions. Immediate tasks include: | [redacted] | BUILDER facilities assessment by the contractor - Completed | ARS acceptance of the report that documents facility conditions | 9/17/2017 | 9/17/2017 | Will conduct an update to the BARC Facilities Assessment Report as we complete projects. Therefore establishing current conditions of the buildings annually. | Completed. |
| 1D4A | Engineering | Completed | BLDG 010A RM 008 Secure sump pump electrical panel covers to prevent access by unqualified employees. | [redacted] | Covering and securing of panel cover. | Meet electrical code requirements. | 3/14/2024 | 3/14/2024 | Visual inspection via walk through. | Completed. |
| 1D4B | Engineering | Completed | BLDG 010A RM 008 Secure the hatchway covers for the sump pump pits to eliminate fall hazards and prevent unauthorized access. [29 CFR 1910.28 (b)] | [redacted] | Secure hatchway cover. | Cover in place and fall hazard eliminated. | 3/14/2024 | 3/14/2024 | Visual inspection via walk through. | Completed. |
| 1D4D | Engineering | 25-50% Completed | BLDG 010A RM 008 Install permanent wiring for the sump pumps that is approved for location. [29 CFR 1910.305 (g)] | [redacted] | Installation of perm wiring for sump pump. | Validation of successful installation and operation | 5/10/2024 | | Periodic check. | First task order on MEP to vendor on 25 MAR. Contractor has been onsite. Lead time for delivery of materials is approximately 6 weeks. |
| 2A5 | Safety | Completed | Re-establish Medical Surveillance Programs: Prioritize the health of employees by reinstating comprehensive medical surveillance programs, which are critical for identifying and mitigating potential health issues. This should be done in partnership with reputable health organizations to ensure the program meets the needs of employees and complies with regulatory requirements. | [redacted] | Federal Occupational Health OMSP established | Ongoing employee participation | 11/1/2023 | 11/1/2023 | Ongoing employee participation and review of FOH Annual Report | Completed. |
| 1D2 | Safety | Completed | Ensure that all employees are informed of the presence of permit spaces by posting danger signs or other equally effective means that notify the employees of the existence, location, and dangers posed by the permit spaces [29 CFR 1910.146 (c)(2)] | [redacted] | Identify all permitted space, obtain placards or other effective means. | Permitted space properly labelled or identified and employees informed of spaces and dangers | 3/30/2024 | 3/28/2024 | Permited space visited to confirm placement of danger signs. List of locations kept up to date and made available to applicable employees. | Completed. |
| 1D3A | Safety | Completed | Implement the use of entry supervisors for all permit space entries. | [redacted] | Identify and train entry supervisor | Entry supervisor identified and trained | 3/30/2024 | 3/29/2024 | Refresher/additional in-depth training as needed | Baseline training provided week of 25 MAR 2024. |
| 1D3B | Safety | Completed | Implement the use of entry attendants for all permit space entries. | [redacted] | Identify and train attendents | Entry attendents identified and trained | 3/30/2024 | 3/29/2024 | Refresher/additional in-depth training as needed | Baseline training provided week of 25 MAR 2024. |
| 1D3C | Safety | Completed | Provide and use air monitoring equipment to assess confined spaces prior for hazardous atmospheres prior to and continuously during permit space entries. | [redacted] | Procure air monitoring equipment | Air monitoring equipment on-site and successfully utilized | 3/30/2024 | 3/25/2024 | Verify air monitoring equip on-site and successfully utilized | Completed. |
| 1D3D | Safety | Completed | Provide and use confined space entry rescue equipment appropriate for the permit spaces entered that will enable the entry attendant to rescue an incapacitated or injured confined space entrant. | [redacted] | Procure rescue equipment | Rescue equipment onsite and available for use | 3/30/2024 | 3/15/2024 | Verify rescue equipment onsite and successfully utilized | Equipment on-site. Training on 29 March. |
| 1G5 | Safety | Completed | Conduct comprehensive point of use water sampling and create and implement a plan of corrective action to provide safe water. | [redacted] | Water testing completed and develop corrective action plan | Plan for corrective action developed, if needed | 3/30/2024 | 3/28/2024 | Verify testing complete, review plan for corrective action, if developed and implement correction. Implement periodic tests per regulations. | Completed. |
| 2B5 | Safety | Completed | Update and Revise PPE Policies Regularly: Regularly review and update PPE policies and procedures to reflect changes in regulatory requirements, workplace hazards, and best practices. This should involve consultation with work groups, PPE manufacturers, and safety experts to ensure that PPE policies remain relevant and effective in protecting employees. | [redacted] | Adopt the existing ARS PPE Policy Bulletin. Establish a safety steering committee to oversee. | Implementation of agency PPE policy and functional safety oversight (steering committee) | 3/30/2024 | 3/27/2024 | All PPE issues to be addressed through development of PPE program. | Safety Steering Committee established and meeting scheduled. |
| 1F2 | Training | Completed | Develop and provide training for Center staff, contractors, and cooperators about their roles and responsibilities in maintaining physical security across the Center. | [redacted] | Physical security training provided to staff, contractors and cooperators | Physical security training provided to staff, contractors and cooperators | 3/31/2024 | 3/28/2024 | Verify security training has been provided to staff, contractors, and cooperators | Completed for existing staff, contractors, and cooperators. Need completion date and info on training for new employees during onboarding. |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2C2 | Training | Completed | Provide procurement training for appropriate BARC Facilities staff relevant to the performance of the operations, maintenance, and repair work within the Center's span of control. | [redacted] | Internal Training:<br>January 17, 2024:<br>Contracting Process and Customer Roles and Responsibilities Training– Opened to all BARC employees involved in contracting<br><br>February 13, 2024:<br>General Contracting Overview – Opened to all BARC employees involved in contracting<br><br>March 19, 2024<br>Joint Contracting Townhall Hosted by APD and NEA – Opened to all NEA employees involved in contracting<br><br>March 28, 2024<br>Contracting Open Floor Discussion<br><br>External Training<br>March 25-27, 2024 | Facilities Staff have the knowledge anda capabilities to properly initiatie and oversee contracts | 3/31/2024 | 3/28/2024 | Ensure new employees that need the training are provided the training. | Completed. |
| 1D4C | Engineering | Duplicate | BLDG 010A RM 008 Secure the sump pump electrical panel covers to prevent access by unqualified employees. [29 CFR 1910.303 (g)(2)] | [redacted] | | | N/A | | | Duplicate of 1D4A |
| 1G1 | Safety | Duplicate | Conduct a new Environmental Compliance and Protection Audit and develop a plan of corrective action. | [redacted] | Establish a contract for audit, conduct audit, receive final report, and develop action plan | Complete corrective actions and compliant with regulations. | N/A | | | Duplicate of 1C1A |
| 1H1 | Safety | Duplicate | Conduct a new Environmental Compliance and Protection Audit and develop a plan of corrective action. | [redacted] | Establish a contract for audit, conduct audit, receive final report, and develop action plan | Complete corrective actions and compliant with regulations. | N/A | | | Duplicate of 1C1A |
| 2D1 | Training | Duplicate | Provide maintenance management planning training for Center staff. | [redacted] | | | N/A | | | Duplicate of 2C1 |
| [illegible] | Administrative | | Implement strong internal controls for purchase cards at the Center. | [redacted] | | | 6/30/2024 | | | |
| [illegible] | Administrative | | Provide a clear separation of duties for physical infrastructure and systems. Separate the staff responsible for leading physical security assessments from the daily operational staff. Assign responsibility for the maintenance of access control, intrusion detection, and camera systems to the facilities maintenance team. | [redacted] | | | 9/30/2024 | | | |
| [illegible] | Administrative | | Study changing the ownership and maintenance responsibility of the publicly used roads owned by USDA on the campus to better align the operations and maintenance responsibility with the actual use. | [redacted] | | | 9/30/2024 | | | |
| [illegible] | Administrative | | Improve Recordkeeping and Documentation: Address the significant gaps in recordkeeping and documentation practices. Establish a reliable system for maintaining accurate and up-to-date safety records, including workplace inspections, hazard assessments, and training records. This system should be easily accessible and regularly reviewed to ensure compliance with established safety protocols and documentation standards. | [redacted] | | | 9/30/2024 | | | |
| [illegible] | Administrative | | Refer BARC's credit card program to the USDA Office of the Inspector General for an independent audit because of the likely abuse | [redacted] | | | 9/30/2024 | | | |
| [illegible] | Administrative | | Conclusion: BARC facilities employees do not have the required tools and equipment for adequate maintenance and repair of the electrical testing and troubleshooting needs of buildings and structures. | [redacted] | | | 9/30/2024 | | | |
| [illegible] | Administrative | | Provide a surge in staffing by contract vehicles to stabilize BARC's facilities management program while the Center develops a new Facility Master Plan and Concept of Operations. This staffing surge should include experienced facility managers and maintenance managers to assist in the development of operation and maintenance plans | [redacted] | | | 9/30/2024 | | | |
| [illegible] | Administrative | | Provide a web-based front-end interface for Center staff outside of facilities units to report and track maintenance issues. | [redacted] | | | 12/31/2024 | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1C1 | BARC Master Plan | Completed | Create a new Facilities Master Plan for the Center, looking at a minimum 100-year vision for the 7,000 acre campus to guide investment and to provide focus to future cyclical facility and major project plans. The new FMP should consider all USDA agencies within the BARC campus, including the National Agricultural Library and the George Washington Carver Center. With the FMP, a land management plan for the agricultural and forested areas should be included to plan for the effective management of all natural resources entrusted to the Center. | [redacted] | BARC Master Plan revised to 12 Laboratory/Office buildings in February 2024. GWCC modernized by USDA Office of Operations in FY 20 through FY 22. Space Utilization in NAL by Office of Operations during USDA One Neighborhood Initiative. | Produce a holistic plan to insure employee safety while conducting research. | 9/30/2024 | 3/31/2024 | Employees are in a safer working environment with the ability to conduct research mission. | Completed. |
| 1EC | BARC Master Plan | | Incorporate the results into the new Facility Master Plan. | | | | 9/30/2027 | | | Incorporate accessibility survey results only. |
| 1I2 | BARC Master Plan | | As part of the broader Facility Master Planning effort, conduct a comprehensive transportation assessment and travel analysis to develop a transportation plan for the Center. Develop a plan to decommission or close roads not needed and develop a maintenance plan for roads to remain. | | | | 9/30/2027 | | | BEP is conducting a traffic study and BARC will assess and take action accordingly. More than likely, as facilities are demolished, roads will be permanently barricaded but not removed in order to save funding. |
| 3A1 | BARC Master Plan | | It is recommended that BARC conduct campus wide functional and space programming as a prelude to creating a long-term sustainable vision for the Center that can be updated every five years to reflect changing conditions and emerging needs. | | | | 9/30/2029 | | | Master plan to house all staff in 12 buildings already established. Within five years, once we receive B&F funding through CIS, we will address animal and greenhouse facilities in conjunction with programs validated by ONP and BARC leadership. |
| 1G6 | Engineering | | Conduct a feasibility study to examine alternatives to meet the water supply needs of the Center with a focus on connecting campuses within the Center to Washington Suburban Sanitations Commission (WSSC) distribution. As part of the effort, include an estimate of both upfront and lifecycle costs. | | Three Deliverables - 1) Determination of WSSC nnection Points in FY 24; 2) Pipe condition survey to determine what needs replaced in FY 25; 3) Design of new piping, connections and estimated costs to WSSC in FY 26 | Connection to WSSC in FY 28 | 9/30/2028 | FY 28 | Sucessful conectiuon to WSSC water | Determination for connection points to WSSC by 9/30/24. |
| 1H4 | Engineering | | Conduct a feasibility study to examine alternatives to meet the wastewater needs of the Center with a focus on connecting campuses within the Center to WSSC collection and treatment. The cost estimate should provide both upfront and lifecycle costs. | | Three Deliverables - 1) Determination of WSSC Connection Points in FY 24; 2) Pipe condition survey to determine what needs replaced in FY 25; 3) Design of new piping, connections and estimated costs to WSSC in FY 26 | Connection to WSSC in FY 28 | 9/30/2028 | FY 28 | Sucessful conectiuon to WSSC wastewater | Determination for connection points to WSSC by 9/30/24. |
| 1B4 | Engineering | | For new construction and major renovation projects, develop standard language for the design and Construction Building Information Models to use industry standard protocols to automatically populate Maximo with the new O&M plan prior to Substantial Completion. | | | | 9/30/2024 | | | |
| 1C1B | Engineering | | Inspection and repair of all three water towers. | | Inspection of the 3 towers. Necessary repairs made and validated. | 100% inspection. 100% repairs | 6/30/2025 | | Monthly visual inspection of water tower and annual inspection by contractor. | All 3 inspected and operational. However, one tower is leaking that must be addressed. The water towers are included in the Army Corps of Engineers (ACE) BARC infrastructure analysis and design. The water tower needs the AE design completed to properly identify the repairs required. 50% complete. |
| 1G3 | Engineering | | Immediately inspect all three water towers and repair to prevent further deterioration and loss of service to the campus. | | | 100% inspection. 100% repairs | 6/30/2025 | | Monthly visual inspection of water tower and annual inspection by contractor. | All 3 inspected and operational. However, one tower is leaking that must be addressed. The water towers are included in the Army Corps of Engineers (ACE) BARC infrastructure analysis and design. The water tower needs the AE design completed to properly identify the repairs required. 50% complete. |
| 1F1 | Engineering | | Conduct a complete Physical Security Assessment of the entire Center by an outside team of assessors to the current ISC standards and develop an implementation plan integrated with the Center's O&M and major project plans. | | | | 9/30/2025 | | | This will be conducted in-house by ARS professionals trained in performing physical security assessments based on their Facility Security Level rating, as defined by GAO. |
| 1B2 | Engineering | | Develop a "Concept of Operations and Maintenance" plan as the first step in creating a center-wide O&M plan in an iterative process. Use this Concept O&M plan to guide the development of the center-wide plan and begin building out Maximo for the Center's use. The Concept plan should also assign roles and responsibilities to Center work units to provide accountability for results and provide the necessary separation of duties between operational work and oversight. | | | | 9/30/2026 | | | Contract to be awarded by 9/30/25 with completion by 9/30/26. |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1EA | Engineering | | Conduct an accessibility survey for all buildings and sites as part of a wider effort to document existing conditions at BARC. | [redacted] | | | 9/30/2026 | | | |
| 1EB | Engineering | | Develop Accessibility Transition Plans for each building and site and incorporate the results int the Center's O&M plans. | [redacted] | | | 9/30/2026 | | | Contract to be awarded by 9/30/25 with completion by 9/30/26. |
| 1G2 | Engineering | | Conduct a comprehensive condition survey of the water collection, treatment, storage, and distribution systems, and provide a recommended prioritization for corrective work and costing for corrective work and likely future major projects to restore the system to good operation. | [redacted] | | | 9/30/2026 | | | Determination for connection points to WSSC by 9/30/24. |
| 1H2 | Engineering | | Conduct a comprehensive condition survey of the wastewater collection, treatment, and discharge systems and provide a recommended prioritization for corrective work and costing for corrective work and likely future major projects to restore the system to good operation. | [redacted] | | | 9/30/2026 | | | Determination for connection points to WSSC by 9/30/24. |
| 1B1 | Engineering | | Conduct a comprehensive maintenance condition survey for the Center. As part of the survey, collect all records and organize them into a common electronic file structure and integrate within Maximo. | [redacted] | | | 9/30/2027 | | | Maintenance condition surveys completed under BUILDER program, integration into Maximo will require contract support. |
| 1B5 | Engineering | | Fully digitize building records, link to Maximo, and move files to a detailed design and documentation software for civil infrastructure such as Revit/Civil 3d. | [redacted] | | | 9/30/2027 | | | All buildings surveyed under BUILDER have been scanned and stored in a SharePoint site. Eventually, drawings will have to be converted to CADD or Revit. Recommendation is to leave them as is and whenever major work is needed, it will be done by A&E firm who can do the conversion. |
| 1C1C | Engineering | | Retro commissioning of existing building systems to return them to appropriate operating conditions until more extensive work can be programmed. | [redacted] | | | 9/30/2027 | | | |
| 1G4 | Engineering | | Update system O&M plan and input activities and information into CMMS for documentation, tracking, analysis, and scheduling. (Water) | [redacted] | | | 9/30/2027 | | | Maintenance condition surveys completed under BUILDER program, integration into Maximo will require contract support. |
| 1H3 | Engineering | | Update system O&M plan and input activities and information into CMMS for documentation, tracking, analysis, and scheduling. (Waste Water) | [redacted] | | | 9/30/2027 | | | Maintenance condition surveys completed under BUILDER program, integration into Maximo will require contract support. |
| 1I1 | Engineering | | Conduct a new inventory of all transportation assets and conduct new condition surveys and update the asset records in the system of record. | [redacted] | | | 9/30/2027 | | | BEP is conducting a traffic study and BARC will assess and take action accordingly. More than likely, as facilities are demolished, roads will be permanently barricaded but not removed in order to save funding. |
| 1D5 | Engineering | | Establish and follow preventative maintenance plans; fund appropriately; clarify roles and responsibilities among staff. | [redacted] | | | 9/30/2028 | | | Based on Maximo input completion. Once Maximo is integrated with facilities components, it will generate a maintenance plan for each component. |
| 2A1 | Leadership & Staffing | | Strengthen Leadership Commitment to Safety: Establish a strong safety culture that starts from the top. Leadership must actively support and participate in safety initiatives, demonstrating a commitment to safety as a core organizational value. This includes reinstating the Safety Manager position promptly if it becomes vacant and ensuring that the appointed individual has the authority and resources to effect change. | [redacted] | | | 6/30/2024 | | | |
| 2A3 | Leadership & Staffing | | Implement Proactive Safety Measures: Shift the focus from a reactive to a proactive approach in managing safety and health issues. This involves conducting regular and thorough workplace inspections, hazard assessments, and implementing preventive measures to mitigate identified risks. Utilizing inspection checklists and ensuring they are completed diligently can help in identifying potential hazards before they result in incidents. | [redacted] | | | 6/30/2024 | | | |
| 1A1 | Leadership & Staffing | | Expand the occupational series within the facility management units to include the GS-1640 Facilities Operations or the GS-1176 Building Management series to provide the customer connection, operations and maintenance planning and management, space planning, service and repair acquisition management, and staff redundancy within the programs to allow the current and future BARC maintenance workers to focus on the duties they were hired to perform | [redacted] | | | 6/30/2024 | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1B3 | Leadership & Staffing | | Add on-Center staff to manage Maximo, deliver and coordinate training, and oversee the buildout. | [redacted] | | | 9/30/2024 | | | |
| 2C3 | Leadership & Staffing | | Establish an acquisition planning team to work with NEA and ARS headquarters contracting staff to align procurement planning and contracts to reduce administrative burden and be ready for end of year available funds that can be put towards necessary maintenance and repair. | [redacted] | | | 9/30/2024 | | | |
| 2B4 | Safety | | Improve Communication and Reporting Mechanisms: Enhance communication channels between the safety office, PPE management teams, and employees to facilitate the reporting of PPE-related issues and concerns. Implement a transparent mechanism for employees to provide feedback on PPE effectiveness and suggest improvements without fear of retaliation. | [redacted] | Develop centralized and transparent safety-led PPE program and tracking. Develop and implement customer service survey. | All employees that require PPE have access and provide feedback. All relevent stakeholder teams have access to status. | 5/31/2024 | | All PPE issues to be addressed through development of PPE program. | |
| 2B1 | Safety | | Establish Dedicated PPE Management Teams: Form specialized teams within work groups tasked with the management of PPE programs, including the selection, distribution, and auditing of PPE use within their respective areas. These teams should work in close collaboration with the safety office or their team's collateral duty safety coordinator to ensure that PPE practices are aligned with both organizational safety standards and regulatory requirements. | [redacted] | Develop centralized safety-led PPE program and track. Develop and implement customer service survey. | All employees that require PPE have access and provide feedback. | 5/31/2024 | | All PPE issues to be addressed through development of PPE program. | |
| 2B3 | Safety | | Conduct Regular PPE Audits and Reviews: Establish a schedule for regular audits and reviews of PPE programs across the organization, conducted by the safety office in partnership with the dedicated PPE management teams. These audits should assess compliance with both internal policies and external regulations, identify areas for improvement, and ensure that any deficiencies are promptly addressed. | [redacted] | Develop centralized safety-led PPE program and track. Develop and implement customer service survey. | All employees that require PPE have access and provide feedback. | 5/31/2024 | | All PPE issues to be addressed through development of PPE program. | |
| 1C1A | Safety | | New Environmental Compliance and Protection Audit with immediate corrective action and plan for action. | [redacted] | Audit and associated corrective action plan. | Completed audit and completed corrective action plan. | 9/30/2025 | | | |
| 2C1 | Training | | Provide maintenance management planning training for Center staff. | [redacted] | | | 12/31/2024 | | | |
| 2B2 | Training | | Implement Comprehensive PPE Training Programs: Develop and implement a comprehensive PPE training program for all employees, focusing on the proper use, maintenance, and limitations of PPE. This program should also include training for supervisors and managers on how to effectively enforce PPE compliance and create a culture of safety within their teams. | [redacted] | Assess PPE needs across Beltsville, train safety personnel where gaps exist, establish and implement Beltsville training program. | Employees know and use required PPE. | 6/30/2024 | | | |
| 1B6 | Training | | Develop a training assessment for center facilities and supporting staff and deliver the needed training to comply with the Federal Buildings Personnel Training Act. | [redacted] | Develop training plan by job series and assess current worker training | Training plan developed and training assessment complete | 9/30/2024 | | | |
| 1D1 | Training | | Provide retraining on permit required confined space entry requirements for all affected employees. [29 CFR 1910.146 (g)] | [redacted] | Develop and execute a confined space training plan | Employees trained and equipped for confines spaces | 9/30/2024 | | | Provide a training program. |
| 2A2 | Training | | Enhance Communication and Training: Develop and implement a comprehensive communication strategy to ensure that safety information, responsibilities, and updates are effectively disseminated throughout the organization. This should include regular safety meetings, training sessions tailored to different roles within the organization, and clear protocols for reporting safety concerns. Additionally, investing in training and mentorship programs for safety staff to improve their understanding and implementation of safety protocols, is crucial. | [redacted] | Establish GS-14 safety manager who manages the BARC site safety plan that includes training and communication | Hire or detail an individual to develop and implement the BARC site safety plan | 9/30/2024 | | | |
| 1B7 | Training | | Provide staff formal education and training in facilities management and maintenance management. | [redacted] | Assess current worker skills/abilities and develop training plan by job assignment | Better trained, skilled facility staff | 12/30/2024 | | | |
| 1A3 | Training | | Assess the current workforce's facilities competencies using the FBPTA model and implement a training plan to develop the competencies necessary to successfully manage the Center's infrastructure | [redacted] | Facility staff competencies assess and training plan developed | Facility staff competencies asessed and training plan developed | 3/31/2025 | | | |

USDA Agricultural Research Service

# Beltsville Agricultural Research Center (BARC) Master Plan

3/20/2024

USDA Agricultural Research Service

# BARC Overview

- 6,400 acres
- 207 active buildings
  - 23 Offices / Labs
  - 184 Greenhouses, animal facilities, other structures in CPAIS
- Average age of buildings is 67 years
- Complex & aging Infrastructure
  - Wastewater
    - 2 treatment plants, 60 miles of line, lift stations, force mains
  - Potable water
    - 8 wells, 3 towers, treatment plant, 56 miles of main and lateral lines, WSSC backup
  - Electrical
    - Aging generators, high and low voltage transformers, lines, junction boxes
  - Steam generation and distribution system – east and west campus
  - 19+miles of paved public roads

USDA Agricultural Research Service

# BARC Facilities Investments (FY 2011 – FY 2024)

| BARC Spending per FY | | | | | | |
|---|---|---|---|---|---|---|
| FY | R&M | UPL | B&F | Location 4% R&M | HPRL | Total per FY |
| 24 | $6,000,000 | $10,000,000 | $50,000,000 | $5,515,518 | $163,000 | **$71,678,542** |
| 23 | $1,332,000 | $880,000 | $17,600,000 | $5,146,000 | $1,116,419 | **$26,074,419** |
| 22 | $287,072 | $2,868,067 | $34,800,000 | $4,694,251 | | **$42,649,390** |
| 21 | $681,851 | $3,194,165 | $24,500,000 | $4,957,432 | $375,000 | **$33,708,448** |
| 20 | $662,916 | $562,970 | $12,305,000 | $4,822,000 | $50,000 | **$18,402,886** |
| 19 | $1,360,136 | $408,000 | | $4,734,000 | | **$6,502,136** |
| 18 | $3,941,859 | $1,717,142 | | $4,622,000 | | **$10,281,001** |
| 17 | $1,104,610 | $2,603,256 | | $4,443,000 | $349,888 | **$8,500,754** |
| 16 | $8,367,709 | $440,842 | $37,100,000 | $4,620,000 | $1,253,188 | **$51,781,739** |
| 15 | $3,412,325 | $1,228,310 | | $4,561,000 | $1,204,103 | **$10,405,738** |
| 14 | $245,000 | $683,000 | | $4,561,000 | $695,000 | **$6,184,000** |
| 13 | | | | | $515,162 | **$515,162** |
| 11 | | | $13,000,000 | | | **$13,000,000** |
| **Totals** | **$27,395,478** | **$24,585,752** | **$189,305,000** | **$52,676,201** | **$5,721,760** | |
| **Total** | | | | | | **$299,684,191** |

USDA Agricultural Research Service

# BARC Master Plan – Modernizations

- 217 SYs (Incumbered & vacant)
- Consolidate 23 to 11 offices/labs buildings
  - Ongoing renovation and completed renovation (227,485 SF)
    - B002
    - B005
    - B307
    - B306
  - Phase 1 (199,531 SF)
    - B001
    - B010A
    - B004
    - B003
    - Infrastructure
  - Phase 2 (135,160 SF)
    - B307B
    - B307C
    - B006
    - Infrastructure

| Phase 1 | | |
|---|---|---|
| **Building/Infrastructure** | **Size (SF)** | **Cost ($M)** |
| B001 | 52,580 | $22.6 |
| B010A | 68,000 | $14.7 |
| B004 | 31,480 | $18.3 |
| B003 | 47,471 | $8.4 |
| Infrastructure Repairs | | $10.0 |
| ***Phase 1 Total $*** | | ***$74.0*** |

| Phase 2 | | |
|---|---|---|
| **Building/Infrastructure** | **Size (SF)** | **Cost ($M)** |
| B307B | 52,900 | $13.7 |
| B307C | 50,780 | $13.4 |
| B006 | 31,480 | $10.6 |
| Infrastructure Repairs | | $45.0 |
| ***Phase 2 Total $*** | | ***$82.7*** |
| ***Phase 1 & 2 Total*** | | ***$156.7*** |

USDA Agricultural Research Service

# BARC Transition Strategy

- Ongoing renovation and completed renovation
- Phase 1
- Phase 2
- Total of 562,176 SF renovated
- 2,590 SF per SY

| 23 OFFICES/LABS TO 11 OFFICES/LABS | | |
|---|---|---|
| BLDG | Current Units | Future Units |
| B001 | ACSL | ACSL |
| | SASL | SASL |
| | SPCL | SPCL |
| B002 | FQL | FQL |
| | SEL | EMFSL (FROM 303) |
| B003 | NGRL | NGRL |
| | SEL | HRSL (COMPUTER) |
| B004 | MPPL | MPPL |
| | FNPRU (USNA) | FNPRU (USNA) |
| | NGRL | NGRL |
| | APHIS | ABBL (DISEASE) |
| B005 | IBBL | IBBL |
| | FQL | SGIL |
| B006 | SGIL | HRSL (WET LABs)<br>APDL |
| B007 | IBBL | |
| | HRSL | |
| B010A | GIFVL | GIFVL |
| | MNGDBL | MNGDBL |
| | FNPRU (USNA) | FNPRU (USNA) |
| | APHIS | |
| B012 | SEL | FACILITIES SUPPORT |
| B052 | ACSL | GROWTH CHAMBERS |
| B303 | EMFSL | FACILITES SUPPORT |
| B306 | AGIL | AGIL |
| | BRL | BRL |
| B307 | ABBL | ABBL (PRODUCTION) |
| | EMFSL | EMFSL |
| B307B | FCHL (BHNRC) | FCHL (BHNRC) |
| | FSRG (BHNRC) | FSRG (BHNRC) |
| | FHPEL (BHNRC - swing space) | FHPEL (BNHRC) |
| B307C | DGIL (BHNRC) | DGIL (BHNRC) |
| | MAFCL (BHNRC - swing space) | MAFCL (BHNRC) |
| B308 | Currently vacant | |
| B1001 | APDL | |
| B1040 | APDL | |
| | ABBL | |
| B1041 | APDL | |
| B1042 | APDL | |
| B1043 | ABBL | |
| B1045 | APDL | |
| B1180 | APDL | |

American Federation
of Government Employees

June 25, 2024

The Office of the Special Counsel
Reference: Evidence, Findings, and Conclusions of the USDA Report on the Beltsville Agricultural Research Center (BARC) by the American Federation of Government Employees (AFGE) Local 3147

Thank you so much for providing the investigative report of the Beltsville Agricultural Research Center (BARC), a location of the Agricultural Research Service in the U.S. Department of Agriculture, to the Whistleblowers. We have been working very hard for over two years to bring awareness and resolutions to the multitude of issues facing BARC. We value the efforts and consideration given by the USDA Investigators, and we believe this is a good start to addressing the ever-deteriorating conditions at BARC. We want to be clear up front, employees of BARC have no desire to see our valued facility closed. For years, dedicated BARCers have kept the facility operating and research progressing to the best of their ability despite the severe and systemic failures in leadership and infrastructure.

The "R" in ARS gets lost in the administrative abyss (credit card ratifications, critical positions remaining vacant for years, decisions being made for the bottom line and not for the good of the research, etc.). We completely disagree with the assessment of the investigators that, "*...the unsafe and deteriorating conditions have [not] resulted in the loss and improper handling of scientific equipment, research, and data.*" It is not possible for essential functions (utilities, high turnover of human capital, lack of repairs and routine maintenance, etc.) to fail continuously and over several years with no impact to our mission, RESEARCH!

The whistleblowing that launched this investigation was not an impulsive decision. For over four years, the Whistleblowers, along with members of the AFGE Local 3147 Executive Board, met with the BARC Leadership team and brought issues relating to our allegations to the Labor-Management Relations Committee (LMRC). Critical issues were ignored month after month, year after year. When we began conducting targeted focus groups with Bargaining Unit Employees all over campus, we realized how pervasive and systemic the negligence, apathy, and incompetence really was.

More than anything, we are concerned about the things that are *not* in this report. Here are a few impactful subject matters that were not mentioned. This is VERY disconcerting.

We would impress upon the Department the need to examine these further.

- Position Descriptions (PD) are poorly aligned with the duties and responsibilities required by employees in order to carry out the mission of ARS. We are very concerned that these disparities and subsequent impacts were not investigated.
    - COR duties have been required of employees who were not hired to perform these functions and whose PD does not include them
    - Unqualified employees are continuously being required to perform higher level duties without the appropriate skills, support, and compensation.

- Merit Promotions and Career Ladders are severely underutilized, leading to costly turnovers, the loss of institutional knowledge, and decreased employee loyalty to the Agency and its mission.

- Hiring panels are time and labor intensive. A lot of time and resources are diverted from research in order to hire employees that do not stay in the positions because there is no promotional potential
- BARC's needs are high, but positions are filled at lower grades.

- BARC-wide Fire Watches
  - For months, employees have been walking around large buildings (100+ employees) for hours each work day because the parts of the fire suppression system are inoperable. At one point, there were over a dozen buildings on fire watch. This is a VERY serious safety concern! Unlike office buildings, research labs have loud equipment and flammable compounds. We are surrounded by the higher-than-average potential for a fire and explosion, yet many of our employees must rely on someone yelling "Fire!" in the hallways while employees work in areas with equipment that produce high decibels. In this telework/remote work environment, a fire watcher might not even know who is on site that day. In an emergency situation, they might endanger themselves to find an employee is not onsite, or not notify an onsite employee because they believe them to be teleworking.

- The lack of interviewing and obtaining documentation from the Wage Grade population. They work in the belly of the beast (so to speak). The boots on the ground NEED to be interviewed if the real issues are to be gleaned and addressed.

  The WGs and how many were spoken to, on a 6,000 acre working farm with over 600 employees.
  - Farm Crew (0)
  - Animal Caretakers (0)
  - Facilities (1)

- The investigators seem to primarily focus on interviewing managers, not the employees who deal with the systemic issues day after day, and find "creative" ways to continue our important mission with little to no upper leadership support. We call these "creative" ways "the work-arounds", and it is the ONLY reason BARC is still standing.

We feel a deeper investigation by the Inspector General is more than warranted. From our understanding, none of the investigators had this needed expertise (forensic financial investigation). The following are a few examples to support this.

- Financial records/data missing and unaccounted for (as evidenced by the BARC Facilities Investments [FY 2011-2024]) and contained in this report, coupled with our conversations and documentation from numerous employees.

- Space charges were paid by laboratories for services that were never/poorly provided (potable/running water, sufficient electrical supply, dumpster contracts lapsing, broken elevators for months/years, etc.)

- Road Salt was not purchased for three years, though the money was apparently in the ARMPS package for those years. This was a major public safety issue. This road salt is used to treat and make the public roads maintained by BARC safe for commuters, employees, and tenants (thousands of people each day). These roads are traversed by commuters in order to access the Baltimore-Washington Parkway, Route 1, and Edmonston Road.

- Contractors were hired when Federal employees were already performing the duties and were denied requests to continue to perform those duties. Questions about the association between the manager(s) and the contractors that were hired were repeatedly brought up by subordinates, but never investigated

by the BARC leadership.

- Contracts were poorly written or not maintained:
    - Landscaping contract did not include mulch, so the Agency supplied the mulch to contractors doing the same work on the West side of the campus that was being done on the East side by Federal employees
    - Building renovation contracts were written for the warranty to begin at installation and not turnover

The following pages outline our evidence, findings, and conclusions as it concerns this report. In some instances we cite specific examples, but in others we only have general conclusions we can draw based on extensive conversations with employees.

Please feel free to flow up with us with any additional questions and/or concerns. We are committed to restoring BARC to its previous status as a world leader for agricultural innovation and problem solving. We believe healthy and ongoing collaborations between Agency leadership, Union representatives, and employees are essential for making this happen.

Sincerely,

[redacted]

[redacted]
President, AFGE Local 3147

[redacted]
Vice President, AFGE Local 3147

[redacted]
Secretary, AFGE Local 3147

USDA, Agricultural Research Service
Henry A. Wallace Beltsville Agricultural Research Center
10300 Baltimore Ave, Building 426A, Cubicle #8, BARC-East
Beltsville, MD 20705

AFGE
PROUD TO MAKE AMERICA WORK
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES · AFL-CIO

# ***Comments by Category:***

**RESEARCH IMPACTS**

We could not disagree more with the investigators' assessment that, "*Based upon review of the evidence, the final allegation that unsafe and deteriorating conditions have resulted in the loss and improper handling of scientific equipment, research, and data is not substantiated.*"

We understand, but wholeheartedly disagree, why the Department would state that research was not impacted by the lack of leadership and adequate infrastructure. They do not want to call into the question the validity and repeatability of past data, discoveries, and publications. Though a valid concern, this is no reason to continue the farce at the expense of taxpayer money and trust. REAL issues require REAL experimentation that lead to REAL solutions. Food is the basis for our life on this planet, and there is no room for Kabuki Theater when it comes to research on such a serious need.

It is unconscionable that ANY impacts on research are trivialized. ARS is the research arm for the entire Department, and as such we must have the most up-to-date resources because, by definition, research is on the cutting edge. Our mission is NOT diagnostic or distributive in nature. WE conduct the research that writes the textbooks.

- Some examples cited by the investigators that support our allegations of research impacts and the wasting of taxpayer money:
    - *One example where a comprehensive approach to space management is* ***placing research at risk*** *is the mycology sample storage room in the basement of Building 10A which presently houses years' worth of research samples in an underground room* ***not designed for*** *secure, archival, and transactional storage and use of critical research samples in the correct environmental conditions for long term storage.*
    - *According to the Acting BARC Assistant Director, the collection is housed in that space because it was the only space available (Ex. 37-9). Lack of clear space management plans is creating a situation where at every facility or operational business failure, scientists are* ***left scrambling to move their research to new, also inadequate, spaces****.*
    - *The Acting BARC Center Director confirmed the disruption to research caused by power losses to facilities, and the damage to and evacuation of Building 007 (power failure, equipment failure, water damage) (Ex. 37-7). She acknowledged that lack of power has caused animals to be too cold and therefore* ***unusable for data collection****; the nuance of this position is that there is not irretrievable loss of data, but* ***loss of the ability to collect data****.*
    - *Interviews with BARC leadership acknowledged that* ***scientific research progress has been negatively impacted by the condition of facilities*** *(Ex. 37-9,23,20,8). Although the Inquiry Team found no evidence of irretrievable research loss, it was clear that the condition of the facilities has* ***damaged scientific equipment, derailed and delayed research studies, and resulted in increased costs to research operations*** *at BARC (Ex. 39-1 through 88).*
    - *The Research Leader* ***spoke of research being lost or damaged*** *because contracting takes so long (month to get a final contract in place). When asked if he has lost research or had research*

*compromised, he responded that he has been impacted: greenhouses that get too cold (problems with the steam system); lost freezer (due to power outages); and general disruption (having to come in and move materials to safe, functioning locations, or bring in space heaters when rooms get too cold; having other rooms be 85 degrees Fahrenheit all summer and need to continue work) (Ex. 37-20). However, he maintains that his research is more negatively impacted by poor contracting than facility deficiencies.*

- This report DID substantiate severe impacts on research and its cost for taxpayers, as evidenced by their own observations. Issues at BARC could/can take months/years to address (if ever). The constant redirection of resources (money, personnel, etc.) and delays in implementation costs taxpayer's money.

- Only two Research Leaders were interviewed among the sixteen at BARC. The research at BARC encompasses a wide variety of disciplines, expertise, and resources. Two brief perspectives out of sixteen does not give an accurate picture of how detrimental the conditions have been/are on our research goals and mission. Taxpayers send us their hard earned money so that we can find solutions for the multitude of agricultural challenges. ANY delays and/or diversions to our mission, incur additional costs to taxpayers.

- The report states, "*The Acting BARC Assistant Director has not personally experienced research loss*"
    - As Research Leader, the Acting BARC Assistant Director had/has a team of extremely dedicated employees who ensured that her research was minimally impacted by the substandard working conditions at BARC. Research Leaders have had to be creative over the years by paying top-dollar for outside services because of the lack of in-house expertise and sufficient infrastructure (i.e. DNA sequencing, etc.)

- Lack of temperature maintenance in many of the buildings (42° F - 97° F) has severe impacts on the effectiveness of the workforce and has caused malfunctions and shortened life-spans for sensitive equipment. Many research projects must be done on an open benchtop and can be impacted by the temperatures in the buildings (i.e molecular studies, chemical reactions). Validity and repeatability cannot be obtained when the temperatures are different from day to day, or consistently at temperatures not previously published.

- Water/moisture damaged equipment (caused by continuous leaks and high humidity) are costly to repair and/or replace. Taxpayer money is being wasted while waiting for repairs and replacements. Without operable equipment, many experiments and projects are stopped.

- Greenhouses provide surrogates to replicate field conditions, but with the advantage of being able to control specific factors and measure the impact of these changes. Greenhouse Studies have been negatively impacted for years as a result of the poor maintenance, lack of experience, and inability to order, repair, and replace parts for years. A few examples include:
    - Louvers to adjust temperature and ventilation have been broken for months and years.
    - Legacy equipment and outdated infrastructure are fast becoming irreparable. Equipment is so old, parts can no longer be procured and the knowledge about how to maintain them is disappearing.
    - The Operations and Maintenance Unit (OMU) Manager terminated contracts that maintained vital aspects of the greenhouse while simultaneously leaving positions vacant that were essential for maintaining many of these greenhouses

- Field Studies negatively impacted:

  - Heavy/large farm equipment is going without maintenance and repairs due to lack of in-house expertise and appropriate funding.
  - Weather stations vital for monitoring research conditions over the course of experiments are old (early 1940s). These create ongoing data for numerous vital research projects.
  - Time, money, and resources are invested in large research plots, only for data to be compromised and potentially usable due to poor irrigation, broken tractors, understaffing, etc.

- Unstable and/or unreliable electricity in buildings and generators have led to the destruction of sensitive equipment that can cost thousands of dollars in repairs and/or replacement (HPLC, Microscopes, computers, greenhouse environmental controllers etc.). Without properly calibrated and operational equipment, research stops.

- Scientists and collaborators have changed how they conduct their research because of the substandard conditions at BARC. This is "short-changing" the taxpayers who are investing in real long-term solutions, not short-term band-aids.
  - BARC Postdocs are conducting experiments in other locations because there is no adequate space available for them on campus. Supplies and resources must be shipped to their offsite location for their use.

- Water down on the East side - employees hauled 5,000 gallons of water over from the West side to keep the animals hydrated.

- Quality of the research **is** impacted when the facility experiences constant interruptions and neglect. Scientists tend to focus on the low-hanging fruit of research projects, focusing on whatever can be performed under the existing conditions. So if ANY data (good, bad, other) is obtained, it can appear that research is not impacted. It's hard to prove the decay in quality, the increased cost for the taxpayer, and the delay in innovation that can cause a cascading effect.

- Chemical fumes that move around buildings with little to no control, which are supposed to be vented directly to the outside via an air handling/fume hood system, continue to create research environments where accuracy, validity, and repeatability are in serious question. Scientists are publishing data on research conducted in substandard conditions and in laboratories where researchers are not able to consistently protect experiments from unknown, and potentially impactful, factors.

- From conversations Union Reps have had with credit card holders, potentially millions of research dollars (money slated specifically to fund research projects) has been used to maintain the facility. Over many years this cannot ***NOT*** have an impact on research, innovation, and our ability to compete on the world stage.

- Employees hired to conduct research spend days each week reconciling credit charges, figuring out which vendors we can order from (NDAA requirements), tracking down packages, figuring out how to order infrastructure needs by credit card without getting into trouble, etc, when they should be conducting research. YES! This has a HUGE impact on research.

**FACILITIES**

- We noticed that the investigative team had trouble obtaining records. The Union has been faced with this same challenge over the last several years. We have requested information and help through:
  - Informal conversations/meetings with BARC and NEA leadership
  - The Labor-Management Relations Committee (LMRC) with BARC Leadership (4 years)
  - Information Requests (formal and informal) that would help assess and advocate for employee

safety and health (chiller maintenance, potable water surveys, etc.)
    - The lack of a qualified Industrial Hygienist to comply with Workers' Right to Know laws (unidentified exposures to chemicals, physical hazards, biologicals, etc)

- Water and wastewater treatment
    - Employees alleged fraudulent submission of records to state/Federal authorities from 2017-20.
    - Alarm systems designed for employee safety and water quality have been inoperable for years.
    - Employees were punished (suspended) when they spoke up about these conditions and falsified records. They were angry and may have not verbalized their concerns and issues in the "correct" and "professional" manner, but NO ONE in leadership listened to the facts. Another example of the failure to utilize bidirectional conversations to solve issues before they escalate.

- Fume hoods are still not functioning properly in several buildings (ex. B. 010A, B. 001, etc.). This is creating a safety and health issue for employees as well as exposing sensitive research to unknown compounds that could impact data. How can data published under these conditions be repeatable?

- Research experiments can be impacted by temperature. Certain chemical and biochemical processes are extremely temperature sensitive and cannot be conducted inside of an incubator or growth chamber. Poor environment controls within our structures can lead to lower quality data, undue mental/physical stress on employees, increased sick/annual leave, etc.

- Non-Facility Services employees have been reprimanded and forced to take additional training due to card suspensions for making purchases that Facility personnel could not after THEIR credit cards were suspended.

- No potable water for employees in most buildings since 2018 and it has not been made clear *which* buildings have had water testing conducted and been cleared and which ones have not. Employees are paying out of their own pockets for their potable water after being "told" the building water was fine so the Agency would no longer cover the cost of providing water. However, when results of water testing were requested, no clear indications of its potability have been provided so employees continue to pay for drink

- Building 229 - tarp covers the top of the building because the roof has needed to be replaced for over two years. We were told by an employee that the cost to change the tarp every few weeks is $33k. The building is barely 20 years old.

- BARC has been operating in a state of emergency for so long that management has added a line item in the budget for emergencies. Proactive processes are not being conveyed to employees. Real and workable/modifiable Standard Operating Procedures are not established, but employees are being held accountable for not implementing these unknown/unestablished protocols and procedures.

- Planning, preventive maintenance, life-cycle preparation and replacement, are just a few of the many areas of deficiency in BARC Facilities services.

**<u>MANAGEMENT/LEADERSHIP</u>**

- The investigative team recognized the failures, over many years, of the BARC leadership to properly maintain the facility for the safety and health of personnel and the integrity of the research. We have heard from Management and Leadership on many occasions that, "We are frustrated too." We have no idea what they are frustrated about. Our issues and concerns seem to get drowned out with *their* frustrations, so they can't hear what's really going on.

- The same people who oversaw years of decline and failures, not only maintained their positions/grades, some got promoted. This is not only a waste of taxpayer money (they are occupying a position that a qualified employee should), but it also diminishes the drive and morale of the employees who remain and are dedicated to the mission. The leadership we trusted to fix the deplorable conditions, are the very ones who were contributing to the problems with their incompetence and apathy.

- Acting, detailing, and new hires encompass most of the current leadership team. BARC has not completely imploded due ONLY to the dedicated career employees who retain the institutional knowledge of the facility. This is being continuously threatened by the increasing use of contractors instead of filling vacant positions with qualified Federal employees.

- Leadership has failed to support managers in key positions. BARC could greatly benefit from hiring qualified WS and GS positions in areas such as Farm Ops and Animal Caretakers. Heavy administrative duties are leading to poor research oversight and assessments by these key people. WSs, vital to research integrity, are spending time on contracting, employee issues, ARMPS, etc, instead of supporting scientists with their research designs and implementation.

- Research Leaders at BARC were told by upper management to tell their subordinates "how" to fill out the FEVS so that BARC will look better. The upper leadership continuously blamed the Research Leaders for the systemic issues and wanted them to take the heat for the dereliction at the top. Meanwhile, the BARC Director who oversaw the vast majority of BARC's decline, was promoted to the Area level while the dedicated employees at BARC struggled to keep research afloat in an ever-present unsafe and unhealthy environment.

- Incompetence and bad behavior are rewarded, while employee sacrifices go unnoticed, and even punished:
    - For years, the BARC Director was indifferent to concerns and evidence of the poor workplace conditions brought to his attention on many platforms and through multiple levels. Some of the well documented complaints include:
        - Ignored lack of accountability in Facilities
        - Work orders open for months/years
        - Work orders closed/deleted when issues were still not addressed
        - Blamed building occupants for the two whole-building floods. Occupants complained and submitted work order requests for years prior to either of the two floods. For years, the BARC Manager for the Operations and Maintenance Unit (OMU) allegedly mismanaged funds, took work/duties away from his own subordinates and gave them to contractors he knew, destroyed government property, unauthorized occupation of a Federal facility, falsifying financial documents, etc.

- One-way emails to employees about issues or instructions *<u>are</u>* "communication", but BARC is in *desperate* need of continuous **<u>conversations</u>** between and among all levels. Information, suggestions, and feedback should have well-defined avenues and levels of accountability. Currently, this is not happening.

- After years of "communication" from the BARC leadership, the conditions continued to decline. As the rhetoric about "improving communication" increased, the conditions at BARC continued to decrease exponentially. Bidirectional conversations MUST be implemented and sustained in order for BARC to get out of this mess. The leadership did nothing in any meaningful manner when serious issues were "communicated" to them clearly and often. A few of the many examples include:
    - Repeated complaints about work orders not being filled and/or unanswered requests for services

and repairs, including but certainly not limited to, Building 007 before/during/after the two floods,
  - Repeated complaints about unidentified odors, substances in vents, water leaks, non-working elevators, temperature regulation, etc
  - Repeated complaints about water issues (pipes bursting, toilets inoperable, brown water, flooded animal pens, etc.)
  - Repeated complaints about electrical issues and insufficient power in rooms already overpopulated with employees and/or supplies

- Official Time, by statute, is afforded to the Union in order to properly represent Bargaining Unit Employees and further the Agency's mission. Since the Whistleblowers spoke up in March 2023, Union representatives and other employees who verbalized concerns about the conditions at BARC have experienced various levels and forms of retaliation, including, but not limited to:

  - Halting contract negotiations after statements were made in reference to emails and verbal interactions being retaliatory in nature

  - Union representatives were denied the use of Official Time in lieu of their Annual Leave in order to continue to prepare for negotiations.

  - Employees were harassed, reprimanded, and terminated when they verbalized the challenges they were/are facing with the working conditions at BARC.

  - Because of the fear of denial of Official Time and Credit Hours, and the impact on our performance, the Whistleblowers reviewed the entire report and drafted these responses on <u>our own time.</u>

- The BARC and NEA Leadership seems to be focused on things that do not get BARC out of this mess. Their energy would be better served on substance rather than the optics, but this is not/has not been the case.

  - One of many examples occurred on Monday, June 10, 2024, when seven high-level BARC and NEA leaders spent three hours following Union Representatives around the campus as we took Congressional staffers to meet Bargaining Unit Employees and see their poor working conditions. While BARC is crumbling and research is being delayed and/or failing altogether, the leadership wasted resources and time watching, and perceivably intimidating, the Union and the employees we represent for three hours, on a hot day in the middle of June.

  - There were Congressional visits to BARC, and the Union was not invited to attend any of these visits, hence we made our own request to Congressional staffers. The Agency tried to take over the visit we set up with staffers, even after establishing their own visits with no Union attendance.

  - Committees are formed just for the sake of saying a committee was formed. Some of the numerous examples include:

    - Water committee - after the water at BARC was deemed undrinkable (2018)

    - ARS Project Sync - Retention Team

    - Engagement Committee

    - Year of the RL

**SAFETY, HEALTH AND SECURITY**

- Despite the Agency claiming that the OSHA-required Occupational Medical Surveillance Program (OMSP) is operational (after being inoperational for four years) the logistics are not in place for employees to utilize this program in order to monitor their exposures, health, fitness for duty, physicals for certifications, etc. The previous onsite OMSP location is now a vacant and unusable building, and there are no other suitable buildings on the 6,000+ acre, 400 structure campus. Employees must fill out 13 pages, submit them to the SOHU, access the link sent back from SOHU for signing additional forms, make an appointment with one of three clinics, all located an hour away from BARC (Washington D.C. and suburbs). At a time when understaffing and insufficient expertise is impacting the employees and research, this entire process can take an entire day or more to complete.

- Employees do not trust that their medical records will be secured because of previous unauthorized releases of personal information, the onsite storage conditions at BARC, the apathy seen by leadership, and the lack of accountability as it concerns employee workplace conditions.

- Employees do not feel safe at BARC. A few examples include:
    - The U.S. Park Police won't come to BARC because they are afraid they will not get paid.
    - The Fire Department will not respond to some emergencies at BARC because of the lack of water pressure on the campus and alarms that continuously sound because of faulty installation, wiring, or age.
    - Multiple buildings are on fire watch at any given time (see the previous section about concerns that were not addressed in the report).
    - The secured back gate was wide open for over five years. (recently "repaired", but still glitchy)
    - Lack of visible security all over campus.

- BARC Management appears to lack the knowledge and expertise to implement and adhere to established OSHA regulations;
    - Potable water
    - Confined space training - which has still not been conducted because of the age of the equipment. The contractor that management hired to conduct this training indicated that the training could not be adequately performed because the equipment was decades old.
    - Proper maintenance of fire suppression systems all over the campus
    - Right to Know Law - Employees have been and continue to be exposed to numerous unknowns all over the facility. We have years of documented requests for assistance in identifying exposures in multiple buildings, with no response/data/procedures. The onsite "Industrial Hygienist" would not respond to any requests for help for many years. We had no one knowledgeable to go to. We are still not sure if the recently hired safety person is able to assist or not on issues such as these, or even how we go about requesting their help.

**VACANCIES/PERSONNEL/HR**

- The Whistleblowers have lived through several Agency reorganizations. Employees get misinformation and incorrect information about how to properly function during/after these reorganizations. Leadership changes are not clearly defined and explained to employees so that a uniform understanding of how to properly carry out their duties is conveyed. Processes, points-of-contact, timelines, and levels of responsibility are poorly defined, and employees have faced reprimands for not adhering to unknown policies and procedures.

- Vacant positions are being used to offset costs for multi year contracts. In order to continue to fund these contracts, the positions need to be kept vacant. It's an endless loop that will be difficult to end. This is yet another example of what an Inspector General could investigate.

- The hiring process is not designed to bring in qualified employees in a timely manner:
  - We are not-competitive, or even on par, with comparable job series outside of BARC (ex. WGs at BARC are paid less than private/public sector employees who are performing the same duties).
  - HR does not appear to maximize available technology to expedite the hiring process (i.e. negotiating a signing bonus/salary with a potential candidate via Zoom/Teams using the breakout rooms for privacy concerns)
  - Not utilizing Career Ladders to retain employees within the Agency

- The number of scientific employees has dwindled over the past 10 years and this impacts research. The number of qualified scientific support staff who remain at BARC has severely dwindled as well. Positions are filled at a GS-7, with little to no promotional potential or Merit Promotion positions advertised.

- Top level positions are filled, but not with qualified and experienced people who know how to run a facility such as BARC. Vital boots-on-the-ground positions are going vacant for years, partially due to the financial obligations inherent in the multi-year contracts.

- Per Article XII of our CBA, we are able to observe hiring panels for Bargaining Unit positions. We have been on several panels tasked with filling the same position vacancy. Over the past several years, many employees have left BARC after only a few months (sometimes weeks) because of the conditions and lack of leadership. This leaves the remaining employees overworked, overstressed, and less efficient.

**WHISTLEBLOWER-SPECIFIC CONCERNS**

- The lack of a financial expert on the team of investigators. Many of our allegations and problems we have seen at BARC could have very strong ties to the mismanagement of funds and lack of financial accountability. Missing important financial data points in this report support this concern. Credit card ratifications, hiring under-experienced employees, and poor contracting have run rampant for the past several years, leading to severe impacts on employee safety/health and research integrity
  - Example - The roof on Building 229 [Poultry building] has needed to be completely replaced for more than two years. From verbal information given to the Whistleblowers, the tarp covering the entire roof so that the leaks into the building are minimized costs approximately $33,000 every six to eight weeks. This has been going on for almost two years.)

- Denial of Official Time to advocate for improving conditions at BARC and for Bargaining Unit Employees. All comments for this report were performed on our own (personal) time. **No Official time was requested or given to review and respond to this report** Because of emails indicating that no work could be performed outside of set hours and Credit Hours would be denied, we were concerned about requesting any Official Time for the purpose of reviewing and commenting on this document. We have heard of instructions being given to supervisors of when to deny Official Time irrespective of any conflicts with workload (specific situations). Which has caused quite a bit of confusion for Union Reps and supervisors of Union Reps. Official Time has initially been denied for other legal representation functions because supervisors did not understand what the Agency was asking them to do or what the statute covered. Threats of disciplinary actions if personal time is utilized are documented.

- From our understanding, the **official** time-keeping system for the Department does not have the ability for Union representatives to request **Official Time** for lawful representational functions. To our knowledge, this is the only duty-related time that cannot be requested and approved in the Department's official time-keeping system. Union representatives are still required to submit and maintain inefficient paper requests and copies for lawful representational functions.

- We are concerned that there have been no discernible consequences to the Agency's leadership for not maintaining proper records and documentation. The Union has requested records "which [are] is normally maintained by the agency in the regular course of business," (5 CFR § 7114) both verbally and in writing, that were not provided. This report shows that the investigators faced the same challenges in obtaining important records and documentation. Lack of access to these records erodes the Union's ability to lawfully advocate for our Bargaining Unit Employees, and therefore can impact the efficiency of the Agency, the safety/health of its employees/tenants/visitors, and the products and services provided to its shareholders and stakeholders.

- Attempts by leadership to systematically degrade the hard-fought relationship between the Union and middle-management (Research Leaders, Scientists, etc) have been made very clear over the past few months. Conversations have begun with middle/upper management, only to be quashed a few days later ( example .. established regular meetings with Safety and Union reps to see what issues can be addressed jointly).

- Years of past practices removed. These practices were embraced by middle-management over several years because it provided support and guidance to supervisors about how to avoid conflicts with our CBA when the BARC Leadership was silent.
  - Ex. Cease and Desist attending hiring panels to provide information for Bargaining Unit Employees, Hiring Officials, and panel members. Many potential conflicts with the CBA were avoided because we were able to discuss issues with the panel in real time.

- Continuous accusations of delaying the negotiation process despite unfulfilled and repeated requests to the Agency negotiators for policies, information, and subject matter experts for almost a year. Many documents we requested months ago have still not been provided.

- The Whistleblowers provided the Investigators with a list of employees who had first-hand knowledge of serious issues on campus. To our knowledge, only two were interviewed.

- Employee work-life balance and personal mental well-being were not clearly tied to the deplorable conditions. Mental health is not a subject to be ignored. The lack of investing in an environment that supports mental health and well-being has become a serious safety concern for all employees.
  - Employees with health conditions are forced to work in environments that come with potentially very serious health concerns. OMSP is not readily available to monitor their health and well-being. Employees are potentially exposing their families and friends to these hazards when they work unprotected and these substances are transported home on their clothes. These are not things they work with, these are substances borne out of neglect and mismanagement.
  - Exposure to unknown and potentially dangerous substances on a regular basis is both physically and mentally stressful. Employees have no idea what they and their families are potentially being exposed to, and even more importantly, have no support to help them identify (Industrial Hygiene) and monitor their exposure (OMSP)

- Tenants and other agencies to which we provide service, indirectly generate revenue for our mission. To our knowledge, none of the tenants and service recipients were interviewed. These tenants/service recipients can help the facility offset some of the infrastructure costs, especially at a time when we are told that funding is a big issue. Again, this could be further supported with an in depth investigation by financial experts (OIG).
  - Current Tenants/Service receivers:
    - APHIS, EPA, NRCS
  - Departed Tenants/Service receivers:

        - U.S. Treasury, USGS, MDA, NRCS, FDA

- We are very disappointed that we met with the Department investigators only once. Because of time constraints and the vast amount of information/evidence/documentation we accumulated over the past three-four years, one six-hour session was insufficient.

- Managers and supervisors who have overseen numerous disasters and made many of the decisions leading to such disasters, are not seemingly held accountable. Some continue to serve in leadership positions, either at BARC or transferred to other USDA locations. This is not REAL accountability, and employees are very aware. This not only erodes the morale of employees within the Agency, it calls into question the competence of Agency leadership in the eyes of stakeholders, shareholders, and end-users.

**WHISTLEBLOWER QUESTIONS**

- Will the Office of the Inspector General FOLLOW THE MONEY? We are VERY concerned that none of the Dept Investigators had financial expertise. We cited "Gross Mismanagement" and "Gross Waste of Funds" in our Whistleblower complaint. We don't see indication in this report that this was investigated, as evidenced by the lack of a forensic financial analyst (or the like).

- The proposed Tiger Teams seem to be another committee designed for the "optics".
    - Will they work cooperatively and meaningfully with the Union and all BARC employees to address systemic and ongoing issues?
    - Will employees be able to anonymously provide feedback and updates to the Tiger Teams?
    - Will they address the lack of law/rule/regulation/policy knowledge and understanding within the BARC leadership?

- Did the investigators examine the potential high turnover rate for employees at BARC and the impacts this continues to have on the Agency's mission, employee morale, and the safety and health of employees, visitors, shareholders, and stakeholders?

- Maximo is a comprehensive program! A previous Facilities Manager called it "The Cadillac" of ticketing and inventory software. Will Maximo be utilized at or close to its full potential so that actual issues can be addressed?

- Will our Facilities staff be expanded to include critical occupational series (i.e Facilities Operations - GS-1640, Building Management - GS-1176, etc.)that are currently not present or not in a sufficient number?

- ***What ELSE can we do to help bring BARC back to the world-class facility it used to be?***

**IN CONCLUSION**

The Whistleblowers spoke up because of our never-ending passion for BARC and the work we can do, and have done. Our combined service time to ARS/BARC is 97 years. Almost a century of dedication and passion for all things ARS/BARC, its research, innovation, and especially its people. We could not stand by and watch the sacrifices and hard work of so many people who came before us, burn to the ground, along with future innovation and ground-breaking discoveries.

BARC's deterioration did not occur overnight, and we acknowledge that substantive and sustainable improvements will not be made overnight. However, they will not be made ***at all***, if the leadership is only interested in checking boxes and excluding Union Representatives and dedicated employees from conversations and solutions. Since the Department launched its investigation of BARC, we have seen some attempts to improve the conditions, and we want to give credit where it is due. "Attempts" is the key word though. A bandaid on a bullet-hole is an "attempt" to repair the wound, but it doesn't mean it's actually fixed. We are seeing a lot of band-aids (i.e. quick "fixes" like the fire suppression systems, the lack of an on site/operational OMSP, or accountability within the leadership not just with the boots-on-the-ground employees), but not many sutures.

BARC/Agency leadership continue to fail to recognize that the Union is here to help. We only blew the proverbial "whistle" because years of meetings, discussions, Information Requests, emails, grievances, etc. were overseeing a continued decline in the conditions at BARC. Our traditional efforts were not helping to change the course of the downward spiral. We had to change tactics if we were going to contribute in any meaningful way to bringing it back.

The Whistleblowers have adopted the motto, "NO MORE COMMUNICATING!" **We MUST have meaningful CONVERSATIONS, where all sides are FULLY invested in making BARC fully functional again!** Conversations are multi-directional, and when used openly and honestly, can become an avenue for ideas/resources/expertise to troubleshoot and implement real solutions. Leadership, Union, employees, shareholders, experts, investigators, Department leadership, Congress … We aim to bring to the table ANYONE who wants to help!

On behalf of all the dedicated employees of BARC, the Whistleblowers wish to thank all who responded to our cries for help and guided us on this daunting journey. Thank you for taking the time to read and assist us.

**United States Department of Agriculture**

**United States Department of Agriculture**

**Washington, DC 20250-9600**

September 24, 2024

**TO:** Xochitl Torres Small
Deputy Secretary, USDA

Kevin Shea
Senior Advisor to the Deputy Secretary, USDA

**FROM:** [redacted]
Team Lead, Forest Service Research & Development [redacted]

[redacted]
Senior Advisor for Management & Operations
Office of Human Resources Management

**SUBJECT:** Addendum to the Report of Investigation INV202300001 for the Administrative Investigation of the Beltsville Agricultural Research Center (BARC)

On March 29, 2024, the U.S. Department of Agriculture (USDA) submitted a report detailing the findings of an administrative investigation into accepted whistleblower disclosures concerning the Agricultural Research Service (ARS), Beltsville Agricultural Research Center (BARC) facility that had been referred to the Department by the U.S. Office of Special Counsel (OSC) – i.e., OSC File Nos. DI-23-000706, -000708, and -000719. A multi-disciplinary team led by the USDA Forest Service (FS) and Departmental Administration's Office of Human Resource Management (OHRM) conducted the investigation into the whistleblowers' claims that BARC leadership had failed to properly maintain facilities, resulting in an unsafe work environment and improper handling of research. On September 5, 2024, OSC requested that USDA clarify its findings concerning *Allegation #3* in which the whistleblowers alleged that [BARC's] "unsafe and deteriorating conditions have resulted in the loss and improper handling of scientific equipment, research, and data."

The initial Report of Investigation, dated March 25, 2024, provided multiple examples within the section addressing *Allegation #3* where equipment, research, and data had seemingly been negatively impacted by conditions within specific buildings at BARC (Ex. 37-7,8,9,20,23). It was clear that the physical condition of numerous facilities has damaged scientific equipment, derailed and delayed research studies, and resulted in increased costs to research operations at BARC. Whereas the investigative team (Team) substantiated negative impact to the research process due to unsafe and deteriorating facility conditions, we were not able to substantiate a quantifiable loss of scientific data or research that was permanent and irretrievable. It is common protocol in laboratory research environments to build redundancy into research projects and studies including replicating samples and data to provide backup to sampling and information. Such redundancy of existing samples and data, even with the loss of some samples, enables the research projects to continue. As such, the Team placed particular emphasis on defining the word

AN EQUAL OPPORTUNITY EMPLOYER

'loss" as equating or being synonymous to an irretrievable or permanent unavailability data occurrence.

Despite employing a consistent line of questioning attempting to elicit dispositive information concerning *Allegation #3* throughout all interviews conducted, BARC and NEA officials – including scientific, administrative, and facilities staff – were not able to provide artifacts reflecting direct and quantifiable occurrences of irretrievable loss of data due to facility conditions. When loss of data and/or equipment was acknowledged or inferred in referenced memorandums of conversation and exhibits, it was subsequently determined that the perceived "loss" was typically retrieved due to either data backups and redundancy or the ability to shift work to other existing similar equipment or laboratory environments. Aging equipment that staff believed was lost to lapsed or insufficient maintenance was anecdotal and no independent review by the Team was possible that could substantiate that such alleged loss was caused by a specific event in the facility or action/inaction by leadership or management.

Additional Explanation on Provided Examples:

- The Acting BARC Center Director (Ex. 37-7) acknowledged that an undated incident of a lack of power caused animals to be too cold and therefore unusable for data collection; the nuance of our position is that this event did not constitute irretrievable loss of data, but rather a loss or compromise of the ability to collect data in that event.

- The Acting BARC Assistant Director (Ex. 37-9) stated that he lost equipment due to excessive heat, but was always able to salvage the contents, so research materials were not lost. Also, it was not possible to substantiate that the alleged excessive seasonal heat was the cause of the failure of the equipment. It was acknowledged that the cold boxes "have not worked properly for years" and from visual inspection by the Team, the units were several decades old. It was not possible to determine the level of preventative maintenance performed (if any) on the cold boxes over their life, and preventative maintenance responsibility in a research organization commonly falls to a mix of scientists, research staff, facilities maintenance, and leadership/administrative personnel. Without knowing the history of the maintenance of the cold boxes, we could not substantiate that the alleged excessive heat was the sole cause of the equipment loss.

- The Research Leader (Ex. 37-20) spoke of research being lost or damaged because of contracting problems, heating and cooling system failures, and power outages. However, he consistently maintained that his research was more negatively impacted by poor contracting than facility deficiencies. Further, he was not able to provide any information or artifacts about lost samples or data that could not be retrieved from redundant sources.

- The NEA Director stated (Ex. 37-23) that there was a concern that research progress was definitely impacted as insect colonies had to be moved following the Building 007 (B007) flooding event. To prepare this Addendum submission, the Team requested any additional information related to those specimens from the NEA Director. On September 18, 2024, the NEA Director provided additional information on the impact of the flood to

the insect colonies in B007. Three insect colonies were being reared in B007 under quarantine/containment conditions when the flood event occurred December 2022. Two of the colonies were destroyed at the time of B007's closure and not reestablished at BARC, though records demonstrate that identical specimens are available for both colonies from other accessible insectaries that ARS's Invasive Insect Biocontrol & Behavior Laboratory (IIBBL) program operates in California and the Virginia Tech campus. ("IIBBL-colonies-summary.xlsx"). The third colony which is comprised of the cotton seed bug (*Oxycarenus hyalinipennis*) was moved to a location that could provide quarantine/containment at Fort Detrick located in nearby Frederick, Maryland.

It is clear that these colonies were negatively impacted by the flood. Two were lost but not representative of irretrievable research loss as the specimens could be readily obtained from other insectaries. The cotton seed bug was not lost – irretrievably or otherwise – but a negative impact was experienced. Because the insect was under APHIS permitted quarantine, scientists had to move insects under great precaution to their new location while adhering to strict quarantine guidelines – i.e., insects were packed within containment; double-sealed in plastic containers inside of a sealed shipping box; moved in government vehicle to Frederick, where it was opened within their quarantine/containment and placed in an existing rearing chamber. Research was negatively impacted as documented in "IIBBL-colonies-summary.xlsx" where it was noted: "One major impact to IIBBL research is that no research could be conducted for over one year while cotton seed bug was in Frederick, only maintenance rearing to keep cotton seed bug alive". Although research was delayed for over one year, insects were not irretrievably lost. In the same excel document, 12 other non-quarantined insect colonies are also noted as having been affected by the B007 flood event. Nine of the colonies were moved to other locations, and 3 were abandoned but appear obtainable from other sources.

- The NEA Director stated (Ex. 37-23) that leadership paid for a forensic accounting of a reported loss of 17 years' worth of stored computer data in the building 007 flood event, but that all data was shown to be recovered. This follows the Team's position that research and data was negatively impacted, but not irretrievably lost.

## Additional Clarification: BARC B007 Flooding and Impact to Research

BARC B007 housed two research units: Hydrology and Remote Sensing Laboratory (HRSL) and the Invasive Insect Biocontrol and Behavior Laboratory (IIBBL). For each of the impacted research units, there are 3 components to the aftermath of the BARC B007 flood in December 2022 that was caused by a frozen pipe burst.

**Hydrology and Remote Sensing Laboratory (HRSL)**

1. Initial Impact
    a. The flood damaged HRSL servers that contained 17 years of Long-Term Agroecosystem Research (LTAR) data.
    b. The research unit lost approximately $55,000 worth of servers and computer equipment due to flood damage and feared the LTAR data was lost as well.
2. Actions Taken and Adjustments Made
    a. Immediate action was taken to protect the remaining IT assets in B007.
    b. New equipment was purchased, and one alternative laboratory was made available.
    c. A data recovery contractor was hired to retrieve the data and all files have been recovered with no loss of data.
    d. Researchers have continued their work, but the restricted laboratory space has impacted sample preparation and some tasks. The unit has refocused on field and remote sensing work to meet project goals.
3. Impact and Lessons Learned
    a. The research unit has been able to maintain research efforts and productivity.
    b. Coordinating with ARS SCINET team to leverage offsite SCINET high speed computing and storage as back up. Alternative, off-site backup is very costly at the volume necessary to provide full backup.

**Invasive Insect Biocontrol and Behavior Laboratory (IIBBL)**

1. Initial Impact
    a. The research unit had 15 insect colonies in the building, four were APHIS permitted, and three of these were maintained under quarantine/containment conditions.
    b. The flood itself did not impact the colonies but IIBBL was required to destroy 2 of the colonies reared in quarantine because there was no APHIS approved quarantine/containment space at BARC outside of B007. One colony was moved to an alternate quarantine/containment site in Frederick, MD for one year and has since been moved back to BARC. Some tasks were not able to be resumed immediately, including insect pest pheromone attractant activities, insect pest chemical synthesis work, insect cell culture activities, molecular biopesticide research related to the destroyed insect colonies, and several aspects of tick research.

   c. Of the remaining 12 colonies, 9 were moved to alternate locations at BARC and 3 were released or destroyed (these insects were endemic to the area).
   d. The unit lost some laboratory equipment, supplies, computer equipment and peripherals.
2. Actions Taken and Adjustments Made
   a. Moved personnel to alternative office space.
   b. Incorporated IIBBL lab and office space needs in the renovation of two buildings (B002 and B005). The renovation began in FY2023 and will be completed in FY 2025 and FY2026 respectively.
   c. ARS invested $412,000 to replace the lost laboratory equipment, molecular reagents, computer equipment and peripherals in FY 2023.
   d. The research unit adjusted activities to use field collected insects for bioassays where appropriate, focused on tick research on field collections and monitoring, and conducted chemical ecology activities with collaborators.
3. Impact and Lessons Learned
   a. Project goals and milestones have been adjusted to reflect the lack of live insects needed to evaluate molecular biopesticides.
   b. Specifically for FY 2024:
      i. One IIBBL project met all milestones.
      ii. The second project has met 11 of 14 milestones and 3 were not met on time as a result of the flood.
   c. While the loss of the 2 quarantine insect colonies has impacted project timelines and the completion of milestones, overall, research in IIBBL is continuing and most milestones have been achieved.
   d. Fully funded BARC Master Plan Phase 1 will provide the infrastructure (steam and water) needed to reestablish the lost colonies in Headhouse B11 quarantine space.
   e. Planning should include critical contingency space such as wet laboratories and quarantined space to handle emergency situations.

**Overall Lessons Learned**
The flood occurred because fire suppression sprinkler pipes froze and burst. Several factors can contribute to frozen pipes. To prevent future instances, BARC has implemented new preventative maintenance protocols, has upgraded the boilers and steam supply, and ensured that fire alarm systems are working in all buildings.

American Federation
of Government Employees

November 22, 2024

**The Office of the Special Counsel**
**Reference: Evidence, Findings, and Conclusions of the second USDA Report on the Beltsville Agricultural Research Center (BARC) by the American Federation of Government Employees (AFGE) Local 3147**

First, we want to thank those who supported, guided, and encouraged us as we worked through the process of filing a complaint with the Office of Special Counsel. So many were integral in helping us successfully compile supporting documentation and work with the BARC Leadership team to take corrective steps so that the nation's largest agricultural research facility could continue to develop innovative solutions to maintain America's position as a world leader in the agricultural industry.

As the Whistleblowers, Union Representatives, and dedicated employees of BARC, we are encouraged and grateful for the progress ARS and BARC leaders have made thus far. The hiring of a new and highly competent Facilities Director has been the most impactful step in our opinion. Employees are seeing real improvements and not just empty promises. The new Facilities Director and the new BARC Director seem to make a very focused and effective team.

Some improvements employees are experiencing include:

- Long-standing repairs are being performed and in some cases completed:
  - Replacement of the entire roof on the Poultry Building (B. 329)
  - Fire Suppression Systems are back online after being down for several years
  - Dangerous steam lines have been capped and full repairs are scheduled
  - Potable water in most buildings is now operational
  - Increase in the number of Safety and Environmental staff
  - Some of the buildings that have been abandoned for years are finally slated for demolition
  - Proper equipment to conduct Confined Space training has been procured and the relevant employees are scheduled to begin this important safety training
  - Elevators that were not functioning for several years have been repaired. A few are still not fully operational, but the majority are now working

We still have several significant concerns in regards to BARC and hope to continue engaging with the Agency's leadership team to find some workable resolutions.

Some of our ongoing concerns include:

- Though we agree with the investigator's assessment that data and resources were not "irretrievable" after catastrophic events because of built-in redundancy, we are still concerned that the investigators placed little significance on delays in the research, costing the taxpayers money and hindering access to innovation.

- As the boots-on-the-ground for many of the things related to employee needs and concerns, the Union has been repeatedly denied the time to engage with employees in order to better glean how effective some of the solutions have been.

- On the surface, the ARS Leadership team appears to be "strengthening collaboration" with the Union and the Bargaining Unit Employees we represent. However:
  - Union representatives have not been included as active members of key Tiger Teams related to BARC. Of the ten (10) Tiger Teams addressing issues at BARC, on paper the Union is represented on four teams. To date, the Union has only been afforded the opportunity to participate in meetings for two of the ten Tiger Teams.
  - The Union has not been afforded the opportunity to obtain and provide regular and recurring feedback about whether these accomplishments are real and implemented to the extent the Agency Leadership has claimed.

- The ARS Leadership has not explicitly acknowledged the dedication and sacrifices made every day by BARC employees working under challenging conditions in order to perform vital work for our country and its citizens.

- The lack of ready access to the Occupational Medical Surveillance Program, or OMSP (an OSHA requirement) is still very troublesome. BARC employees have been denied this critical onsite service for more than four years. The Agency Leadership

has noted the reestablishment of the OMSP as a completed accomplishment, but it continues to be out of reach of most employees because of the difficulty in signing up (the associated paper is 13 pages long), scheduling an appointment at an offsite location, and coordinating with supervisors to attend appointments during their duty hours.

- The lack of accurate occupancy lists for each building is a safety concern and creates confusion and misinformation. Employees are frequently relocated to temporary space and the occupancy list is not updated to reflect their presence. This means they may not be aware of critical building outages, delayed services, or misdelivery of goods.

IN CONCLUSION:

We are supportive of the steps the Agency has taken thus far. The reviewing of the documentation associated with the progress and status of the items in the chart will take time and should be monitored on an ongoing basis. Many of the serious issues at BARC did not happen overnight and we are aware of the fact that they will take time to address. As Union Representatives, we can request specific documentation from the Agency on the many points in the charts contained in this latest iteration of the Department report, and follow up with the Agency with informal inquiries during our Labor-Management Relations Committee meetings and formal Information Requests.

Sincerely,

[redacted]

President, AFGE Local 3147

[redacted]

Vice President, AFGE Local 3147

[redacted]

Secretary, AFGE Local 3147

USDA, Agricultural Research Service
Henry A. Wallace Beltsville Agricultural Research Center
10300 Baltimore Ave, Building 426A, Cubicle #8, BARC-East
Beltsville, MD 20705

AFGE
PROUD TO MAKE AMERICA WORK
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES · AFL-CIO

U.S. OFFICE OF SPECIAL COUNSEL
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

The Special Counsel

June 25, 2025

The President
The White House
Washington, D.C. 20500

Re: OSC File Nos. DI-23-000706, DI-23-000708, and DI-23-000719

Dear Mr. President:

I am forwarding to you reports transmitted to the Office of Special Counsel (OSC) by the Department of Agriculture (USDA) in response to the Special Counsel's referral of a disclosure of wrongdoing at the Agricultural Research Service (ARS), Beltsville Agricultural Research Center (BARC), Beltsville, Maryland. OSC has reviewed the disclosure, agency reports, and whistleblower comments, and, in accordance with 5 U.S.C. § 1213(e), I have determined that the reports contain the information required by statute and the findings appear reasonable.[1] The following is a summary of the allegations, USDA's findings, and the whistleblowers' comments in response.

Whistleblowers [redacted], BARC employees who consented to the release of their names, disclosed that BARC leadership failed to provide employees a workplace free from recognized hazards as required by 29 U.S.C. § 654. They alleged that BARC leadership failed to adequately address complaints concerning workplace conditions since 2017 resulting in unsafe conditions throughout its approximately 300 buildings and structures. For example, the whistleblowers alleged that the elevator in building 001 was frequently out of service or trapped employees when considered operational. The whistleblowers also alleged that the entire campus was frequently without running water, the temperature in most buildings was poorly regulated, many buildings had water damage or flooding from unstable plumbing, and dozens of buildings had not had working fire suppression systems since 2021. The whistleblowers alleged the unsafe and deteriorating conditions at BARC have resulted in the loss and improper handling of scientific equipment, research, and data.

---

[1] The whistleblowers' allegations were referred to former Secretary of Agriculture Thomas J. Vilsack for investigation pursuant to 5 U.S.C. § 1213(c) and (d). Secretary Vilsack assigned a multi-disciplinary team led by the USDA Forest Service and USDA Office of Human Resource Management to conduct the investigation.

The agency investigation largely substantiated the whistleblowers' allegations, finding pervasive safety deficiencies in many of the facilities and structures at BARC, including a general lack of housekeeping; excessive dirt and grime; flaking and peeling paint; damaged flooring; active and post flooding and other water intrusions; mold; and a lack of potable water. The agency determined that because the facility did not have Operation and Maintenance plans or a current Facility Master Plan for its infrastructure, staff were merely reacting to problems after they occurred. The agency found that BARC facilities employees did not have the required tools and equipment for necessary maintenance and repair of buildings and structures. Inadequate staffing, poor communication, and the lack of necessary training for employees in facilities management positions also contributed to the failure to implement preventative maintenance on BARC buildings and facilities. Based on the general safety and facility deficiencies found throughout the property, coupled with noted failures to meet or maintain existing compliant accessibility features, the agency determined that BARC leadership was in violation of 29 CFR 1910.146 *et seq.*, the Architectural Barriers Act of 1968, and the Rehabilitation Act of 1973.

The agency did not substantiate that unsafe and deteriorating conditions at BARC resulted in the loss and improper handling of scientific equipment, research, and data. The agency explained that although the investigative team concluded that the condition of the facilities damaged scientific equipment, derailed and delayed research studies, and resulted in increased costs to research operations at BARC, they found no evidence of irretrievable research loss and, thus, could not substantiate the allegation.

In response to the agency findings, former Secretary Vilseck directed the transfer of $50 million previously allocated for a new building at another ARS location to BARC for crucial repairs and modernization to ensure employee safety and health. In addition, agency leadership established an Oversight and Support Team and an Executive Response Team to provide USDA and ARS oversight to the response efforts and ensure timely and successful completion of the 60 recommended corrective actions. To date, many corrective actions have been completed, for example, a new permanent BARC Director has been selected and the Executive Response Team has developed a new BARC Master Plan to plan, prioritize, and modernize future workspace and aligned the new Master Plan with ARS 2024 Capital Investment Strategy.

In their comments, the whistleblowers expressed their appreciation for the efforts and consideration given by the USDA Investigators and indicated that the agency has made a good start addressing the ever-deteriorating conditions at BARC. They highlighted that the hiring of new and highly competent BARC and Facilities Directors allowed employees to see real improvements at the facility.

The whistleblowers disagree with the agency's conclusion that research was not affected by the lack of leadership and inadequate infrastructure. They maintain that the

continuous failure of essential functions at the facility had a negative impact on the agency's research mission. The whistleblowers acknowledged that many pervasive and systemic issues were identified in the agency investigation, but identified additional issues the reports did not address and recommended that a forensic financial investigation be conducted to fully account for the facility's negligence and waste of taxpayer money.

The agency concluded that many of the problems at BARC have accumulated over decades due to inadequate funding from Congress to repair, maintain, and modernize BARC, as well as ARS laboratories and research centers nationwide. The agency identified $190 million in deferred maintenance needs at BARC. However, as noted by the whistleblowers, years of inefficient facility management have likely resulted in wasteful spending. I am encouraged to see that the corrective actions include a plan to move BARC employees from 23 buildings to 11 modernized buildings. I urge USDA leadership to consider whether the facility deficiencies can be addressed through more efficient management and spending, rather than relying solely on an increase in funding.

I thank the whistleblowers for bringing these allegations to OSC. Given the significance of the whistleblowers' disclosures and the agency's comprehensive response, OSC recommends that the USDA recognize their contributions to improve government efficiency and the safety of BARC workers and consider issuing a monetary award to them.

As required by 5 U.S.C. § 1213(e)(3), I have sent a copy of this letter, the agency reports, and whistleblower comments to the Chairmen and Ranking Members of the Senate Committee on Agriculture, Nutrition, and Forestry and House Committee on Agriculture. OSC has also filed redacted copies of these documents and the letter referring the matter to the Secretary in our public file, which is available online at www.osc.gov. This matter is now closed.

Respectfully,

Charles N. Baldis

Charles N. Baldis
*Senior Counsel and Designee*
*of Acting Special Counsel Jamieson Greer*

Enclosures