# EXHIBIT 3

United States Department of Agriculture

# USDA's Proposal to Reorganize and Relocate the Economic Research Service and National Institute of Food and Agriculture



**Inspection Report 91801-0001-23**

**August 2019**

OFFICE OF INSPECTOR GENERAL

## IMPORTANT NOTICE

This audit report contains sensitive information that has been redacted for public release, due to privacy concerns.

# USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture

## Inspection Report 91801-0001-23

OIG performed an inspection to determine USDA's authority and compliance with requirements to initiate the realignment of ERS and relocation of ERS and NIFA offices.

## OBJECTIVE

Our inspection objectives were to determine USDA's legal and budgetary authority to execute (1) the realignment of ERS under OCE; and (2) the relocation of ERS and NIFA offices. We also were to determine USDA's adherence to any established procedures relating to agency realignment and relocation and procedures associated with cost benefit analyses (including factors such as staff recruitment and retention, access to agency services, and cost efficiencies).

## REVIEWED

We reviewed relevant statutes, Departmental regulations, and other guidance related to the proposed actions, Congressional communications, and documentation used for decision-making. We also met with appropriate officials.

## RECOMMENDS

We recommend that the Department: (1) obtain the Office of the General Counsel's opinion regarding USDA's compliance with relevant appropriations provisions set forth in the Omnibus Act, including whether there was any corresponding violation of the Antideficiency Act ; (2) take appropriate action if any Antideficiency Act violations occurred; (3) obtain Congressional approval, as required, prior to obligating and/or expending for reprogramming or transferring additional funds for the relocation of ERS and NIFA; and (4) evaluate the need to clarify the Departmental regulation.

## WHAT OIG FOUND

On August 9, 2018, the Department of Agriculture (USDA or the Department) announced a proposal to: (1) realign the Economic Research Service (ERS) under the Office of the Chief Economist (OCE), which reports to the Office of the Secretary; and (2) relocate ERS and National Institute of Food and Agriculture (NIFA) offices. In response to a Congressional request, we initiated an inspection of the Department's legal and budgetary authority to execute these actions, and to determine the Department's adherence to any established procedures relating to agency realignment and relocation and procedures associated with cost benefit analyses.

The Reorganization Plan No. 2 of 1953 provides the Department with the legal authority to realign ERS under OCE and relocate ERS and NIFA offices. However, while the General Provisions of the Consolidated Appropriations Act, 2018 (Omnibus Act) provides certain budgetary authorities to the Department, there are established limitations on such authorities to realign or relocate offices. Further, the Department has not obtained Congressional approval, as required by Section 717(a) of the Omnibus Act, and has not complied with the reporting deadline requirement in Section 753 of the Omnibus Act.

Lastly, the Department has a Departmental Regulation (DR) regarding realignment and relocation, DR-1010-01, "Organization Planning, Review and Approval," but stated it was not applicable in this case. The Department should evaluate the need to clarify this regulation to ensure the same procedures are followed when considering organizational changes, regardless of the agency or office proposing the change. We did not identify any other procedures applicable to agency realignments and relocations in order to be able to determine the Department's adherence, including any procedures associated with cost benefit analyses for the actions within the scope of our review.

As noted in its response, the Department respectfully disagrees with OIG's questioning of USDA's budget authority regarding the relocation of ERS and NIFA. The Department states that its actions comply fully with all applicable laws and that the budgetary provisions cited in the report requiring committee approval are unconstitutional. In addition, the response stated that the views of all three branches of Government support the Department's position.

However, the Department's current position regarding the applicability of the committee approval provisions is not consistent with prior positions taken by the Department. To ensure consistent treatment going forward, this change should be communicated to leaders at the Sub-Cabinet and Agency levels. We accepted the Department's management decisions for four of the report's five recommendations.

United States Department of Agriculture
Office of Inspector General
Washington, D.C. 20250

DATE: August 1, 2019

AUDIT NUMBER: 91801-0001-23

TO: Donald K. Bice
Deputy Assistant Secretary
Office of the Assistant Secretary for Administration

FROM: Gil H. Harden
Assistant Inspector General for Audit

SUBJECT: USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture

This report presents the results of the subject review. The Office of the General Counsel (OGC) opinion, dated July 19, 2019, provided in response to the official draft is included in its entirety at the end of the report. We have incorporated excerpts from the OGC opinion, as well as the Office of Inspector General's position, into the relevant sections of the report. Based on the OGC opinion, we accept management decision on Recommendations 1, 2, 3, and 5. We are unable to accept management decision on Recommendation 4. The documentation and action needed to reach management decision for this recommendation is described under the relevant OIG Position section.

In accordance with Departmental Regulation 1720-1, please furnish a reply within 60 days describing the corrective actions taken or planned, and timeframes for implementing the recommendation for which management decision has not been reached. Please note that the regulation requires management decision to be reached on all recommendation within 6 months from report issuance, and final action needs to be taken within 1 year of each management decision to prevent being listed in the Department's annual Agency Financial Report. Please follow your internal agency procedures in forwarding final action correspondence to the Office of the Chief Financial Officer.

We appreciate the courtesies and cooperation extended to us by you and members of your staff during our inspection fieldwork and subsequent discussions. This report contains publicly available information and will be posted in its entirety to our website (http://www.usda.gov/oig) in the near future.

## Table of Contents

**Background and Objectives ........................................................................ 1**

**Section 1: USDA's Legal and Budgetary Authority to Realign ERS under OCE ........................................................................................................ 3**

**Section 2: USDA's Legal and Budgetary Authority to Relocate ERS and NIFA Offices ........................................................................................... 5**

**Recommendation 1 ................................................................7**

**Recommendation 2 ................................................................8**

**Recommendation 3 ................................................................8**

**Recommendation 4 ................................................................9**

**Section 3: USDA's Adherence to Any Established Procedures Relating to Agency Realignment and Relocation, and Procedures Associated with Cost Benefit Analyses ............................................................................... 11**

**Recommendation 5 ................................................................12**

**Scope and Methodology........................................................................ 13**

**Abbreviations ........................................................................................ 15**

**Agency's Response ................................................................................ 17**

# Background and Objectives

## Background

On August 9, 2018, the Department notified Congress of its plan to realign[1] the Economic Research Service (ERS)[2] under the Office of the Chief Economist (OCE),[3] which reports to the Office of the Secretary, and to explore options to relocate most ERS and National Institute of Food and Agriculture (NIFA) employees outside of the D.C. metro region.[4,5] ERS is a statistical agency that provides research and analysis on a broad range of economic and policy topics. NIFA funds and provides leadership for research, education, and extension programs that address national agricultural priorities.

The Department's stated goals for the proposed realignment and relocation are to: (1) improve USDA's ability to attract and retain highly qualified staff with interests in agriculture, (2) place certain USDA resources geographically closer to many of its stakeholders, and (3) benefit American taxpayers via savings on employment costs and rent, which would therefore help retain employees, even in light of tightening budgets.[6]

On August 15, 2018, the Department published a Notice in the *Federal Register* that requested expressions of interest from State and local governments, industry, academia, and interested parties and organizations regarding potential sites for a proposed new headquarters location for ERS and/or NIFA.[7] On October 22, 2018, the Department entered into a contract with a private contractor. The private contractor was to assist in the relocation efforts by reviewing the expressions of interest. Through interagency agreements, ERS and NIFA each reimbursed the Department for half of the total nearly $339,311 contract award, at approximately $169,655 each.[8]

---

[1] In describing the reorganization of ERS under OCE, the Department has often referred to this action as a "realignment." For purposes of clarity, we refer to such action as a realignment in this report.
[2] ERS is currently under USDA's Research, Education, and Economics mission area, which is dedicated to the creation of a safe, sustainable, and competitive U.S. food and fiber system, as well as strong communities, families, and youth, through integrated research, analysis, and education.
[3] OCE advises the Secretary of Agriculture on the economic implications of policies and programs affecting the U.S. food and fiber system and rural areas.
[4] The Honorable Sonny Perdue, Secretary of Agriculture, Letters to the Honorable Robert Aderholt, Chairman, and Honorable Sanford Bishop, Jr., Ranking Member, of the United States House Committee on Appropriations' Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies (Aug. 9, 2018).
[5] The Honorable Sonny Perdue, Secretary of Agriculture, Letters to the Honorable John Hoeven, Chairman, and Honorable Jeff Merkley, Ranking Member, of the United States Senate Committee on Appropriations' Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies (Aug. 9, 2018).
[6] USDA Press, *USDA to Realign ERS with Chief Economist, Relocate ERS & NIFA Outside DC*, Release No. 0162.18 (Aug. 9, 2018), https://www.usda.gov/media/press-releases/2018/08/09/usda-realign-ers-chief-economist-relocate-ers-nifa-outside-dc.
[7] Notice of Request for Expression of Interest for Potential Sites for Headquarters Office Locations, 83 *Fed. Reg.* 40499 (Aug. 15, 2018).
[8] The contract award was for $339,310.60. ERS and NIFA reimbursed the Department for its share of the costs associated with the contract in the amount of $169,655.30 each.

Within a month of its announcement, the Department received the following Congressional communications:

- On August 30, 2018, members of the U.S. House Committee on Appropriations' Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies wrote the Secretary to express their concerns about the proposed relocation and requested information justifying it.[9]
- On September 7, 2018, members of the U.S. Senate Committee on Agriculture, Nutrition, and Forestry wrote the Secretary to express their stakeholders' concerns regarding the potential impacts of the proposed realignment and relocation. Committee members additionally requested that the Department provide its legal authority to realign ERS under OCE.[10]

On September 26, 2018, two members of Congress requested that the Office of Inspector General (OIG) review the statutory authorities and supporting rationale for the realignment of ERS and relocation of ERS and NIFA.[11] In response, on November 1, 2018, we initiated this inspection of the proposed realignment of ERS and the relocation of ERS and NIFA offices.

## Objectives

Our inspection objectives were to determine USDA's legal and budgetary authority to execute: (1) the realignment of ERS under OCE; and (2) the relocation of ERS and NIFA offices. We also were to determine USDA's adherence to any established procedures relating to agency realignment and relocation, and procedures associated with cost benefit analyses (including factors such as staff recruitment and retention, access to agency services, and cost efficiencies).

As further described in the Scope and Methodology section of this report, we conducted this work in accordance with the Council of the Inspectors General on Integrity and Efficiency's (CIGIE) *Quality Standards for Inspection and Evaluation*.

---

[9] The Honorable Sanford D. Bishop Jr. and Honorable Rosa DeLauro, Honorable Chellie Pingree, and Honorable Mark Pocan, Letter to the Honorable Sonny Perdue, Secretary of Agriculture from Ranking Member and Members of the U.S. House Committee on Appropriations' Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies (Aug. 30, 2018).
[10] The Honorable Pat Roberts and Honorable Debbie Stabenow, Letter to the Honorable Sonny Perdue, Secretary of Agriculture from the Chairman and Ranking Member of the U.S. Senate Committee on Agriculture, Nutrition, and Forestry (Sept. 7, 2018).
[11] The Honorable Steny H. Hoyer, House Minority Whip, and Honorable Eleanor Holmes Norton, Letter to the Honorable Phyllis K. Fong (Sept. 26, 2018).

## Section 1: USDA's Legal and Budgetary Authority to Realign ERS under OCE

### *Does the Department Have the Legal Authority to Execute the Realignment of ERS Under OCE?*

According to Departmental officials, the Department relied on the Reorganization Plan No. 2 of 1953 (Reorganization Plan) as the basis for its legal authority to realign ERS under OCE.

Specifically, the Department cited Section 4, Delegation of Functions, of the Reorganization Plan, which states:

> (a) [the] Secretary of Agriculture may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of Agriculture of any function of the Secretary, including any function transferred to the Secretary by the provisions of this reorganization plan.
>
> (b) To the extent that the carrying out of subsection (a) of this section involves the assignment of major functions or major groups of functions to major constituent organizational units of the Department of Agriculture, now or hereafter existing, or to the heads or other officers thereof, and to the extent deemed practicable by the Secretary, he shall give appropriate advance public notice of delegations of functions proposed to be made by him and shall afford appropriate opportunity for interested persons and groups to place before the Department of Agriculture their views with respect to such proposed delegations.
>
> (c) In carrying out subsection (a) of this section the Secretary shall seek to simplify and make efficient the operation of the Department of Agriculture, to place the administration of farm programs close to the State and local levels, and to adapt the administration of the programs of the Department to regional, State, and local conditions.[12]

We found that the Reorganization Plan provides the Department the legal authority to make operational decisions that include the realignment of agencies within the Department.

### *Does the Department Have the Budgetary Authority to Execute the Realignment of ERS Under OCE?*

According to Departmental officials, the Department relied on the Reorganization Plan as the basis for its budgetary authority to incur transfers of funds to implement realignment efforts. While we limited the scope of our inspection to reviewing activities that occurred prior to November 1, 2018, we confirmed that, as of May 2019, no funds have been spent, and the realignment of ERS under OCE has not yet occurred.

[12] 7 U.S.C. § 2201 note (2018) (Sec. 4. Delegation of Functions).

However, other authorities also affect the Department's ability to reprogram or transfer funds.[13] Specifically, Section 717(a) of the Omnibus Act states:

> None of the funds provided by this Act, or provided by previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in the current fiscal year, or provided from any accounts in the Treasury derived by the collection of fees available to the agency funded by this Act, shall be available for obligation or expenditure through a reprogramming, transfer of funds, or reimbursements as authorized by the Economy Act, or in the case of the Department of Agriculture, through the use of the authority provided by section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or Section 8 of Public Law 89–106 (7 U.S.C. 2263), that –
>
> > (1) creates new programs;
> > (2) eliminates a program, project, or activity;
> > (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted;
> > (4) relocates an office or employees;
> > (5) reorganizes offices, programs, or activities; or
> > (6) contracts out or privatizes any functions or activities presently performed by Federal employees;
>
> unless the Secretary of Agriculture . . . notifies in writing and receives approval from the Committees on Appropriations of both Houses of Congress at least 30 days in advance of the reprogramming of such funds or the use of such authority.[14]

On August 9, 2018, the Department provided its notification of the proposed realignment of ERS under OCE to the appropriate Committees on Appropriations' Subcommittees of both Houses of Congress.[15,16] The Department, however, has not received Congressional approval, as mandated by Section 717(a). Therefore, if the Department's realignment of ERS under OCE requires the reprogramming or transfer of funds, the Department would need to obtain prior Congressional approval 30 days in advance of any such reprogramming or transfer.

---

[13] A reprogramming of funds is the shifting of funds within an appropriation for purposes other than those contemplated at the time of appropriation. A transfer of funds is the shifting of funds between appropriations. Government Accountability Office (GAO), *Principles of Federal Appropriations Law, Chapter 2, The Legal Framework, Fourth Edition 2016 Revision*, GAO-16-464SP (Mar. 2016).
[14] Consolidated Appropriations Act, 2018, Pub. L. 115-141, Div. A, Title VII, 132 Stat. 348, 385.
[15] The Honorable Sonny Perdue, Secretary of Agriculture, Letters to the Honorable John Hoeven, Chairman, and Honorable Jeff Merkley, Ranking Member, of the U. S. Senate Committee on Appropriations' Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies (Aug. 9, 2018).
[16] The Honorable Sonny Perdue, Secretary of Agriculture, Letters to the Honorable Robert Aderholt, Chairman, and Honorable Sanford Bishop, Jr., Ranking Member, of the U. S. House Committee on Appropriations' Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies (Aug. 9, 2018).

# Section 2: USDA's Legal and Budgetary Authority to Relocate ERS and NIFA Offices

## *Does the Department Have the Legal Authority to Relocate ERS and NIFA Offices?*

The Department identified Section 4 of the Reorganization Plan[17] as the basis for its legal authority to relocate ERS and NIFA offices. The Department also provided, as additional authority, the General Services Administration's (GSA) Federal Management Regulation, which states: "[e]ach Federal agency is responsible for identifying the delineated area within which it wishes to locate specific activities, consistent with its mission and program requirements, and in accordance with all applicable statutes, regulations, and policies."[18]

We found that these authorities provide the Secretary with the legal authority to make management decisions to relocate ERS and NIFA offices.

## *Does the Department Have the Budgetary Authority to Relocate ERS Offices?*

Congress has not appropriated funding specifically for the relocation of ERS offices. The Department informed us that it relied on the Reorganization Plan as the basis for its budgetary authority to incur transfers of funds to implement activities to relocate agency offices.[19]

However, other authorities also affect the Department's budgetary authority. Specifically, Section 717(a) of the Omnibus Act requires the Department to provide written notice to the Committees on Appropriations of both Houses of Congress at least 30 days prior to reprogramming or transferring funds to relocate an office or its employees.[20] According to the Department, its August 9, 2018, letters notified Congress of its proposal to relocate ERS offices. In the letters, the Department mentioned that it would engage private sector assistance in its search for a new location and would be using funds appropriated in the Omnibus Act for its search. However, Section 717(a) of the Omnibus Act also requires the Department to receive approval from Congress prior to the expenditure of funds for the relocation of an office or its employees.[21]

On October 22, 2018, without receiving prior Congressional approval, the Department obligated approximately $169,655 in ERS funds for a private contractor to review expressions of interest from the public, submitted in response to the Department's August 15, 2018, *Federal Register* notice soliciting expressions of interest related to the relocation. While we recognize that the Department notified Congress as required, Section 717(a) also requires that the Department receive Congressional approval prior to its reprogramming and use of appropriated funds for the purpose of such relocation. That prior approval did not appear to have been granted. This

---

[17] 7 U.S.C. § 2201 note (2018) (Sec. 4. Delegation of Functions).
[18] 41 C.F.R. § 102-83.10 (2005).
[19] 7 U.S.C. § 2201 note (2018) (Sec. 4. Incidental Transfers).
[20] P.L. 115-141, 132 Stat. 348, 385 (2018).
[21] P.L. 115-141, 132 Stat. 348, 385 (2018).

obligation of funds may have also violated the Antideficiency Act (ADA), which prohibits Government employees from involving the Federal Government in a contract or obligation for the payment of money before an appropriation is made.[22]

### *Does the Department Have the Budgetary Authority to Relocate NIFA Offices?*

The Department informed us that it relied on the Reorganization Plan as the basis for its budgetary authority to incur transfers of funds to implement activities to relocate agency offices.[23] The Department also noted that NIFA was provided $6 million for relocation expenses in Section 753 of the Omnibus Act.[24] On August 9, 2018, the Department sent letters to the appropriate Subcomittees of the Committees on Appropriations of the House of Representatives and the Senate, announcing the realignment and relocation.[25,26] The Department used approximately $169,655 of the $6 million appropriation to hire a private contractor to review expressions of interest from the public, submitted in response to the Department's August 15, 2018, *Federal Register* notice soliciting expressions of interest related to the relocation.

Section 753 of the Omnibus Act states:

> For an additional amount for "National Institute of Food and Agriculture—Research and Education Activities," $6,000,000, to be available until expended, for relocation expenses and for the alteration and repair of leased buildings and improvements pursuant to 7 U.S.C. 2250: *Provided*, That not later than 60 days after enactment of this Act, the Secretary of Agriculture shall submit a report to the Committees on Appropriations of the House of Representatives and the Senate detailing the planned uses of this funding.[27]

Thus, Section 753 imposed requirements on the availability of the $6 million appropriation. The Department was required to submit a report to Congress within 60 days of the March 23, 2018, enactment of the Act. According to the Department, its August 9, 2018, letters notified Congress of its proposal to relocate NIFA offices and use funds provided in the Omnibus Act for this purpose. In the letters, the Department mentioned that it would engage private sector assistance in its search for a new location. However, approximately 139 days elapsed between the March 23, 2018, enactment of the Omnibus Act and the date the Department submitted its letters to Congress.

---

[22] 31 U.S.C. § 1341(a)(1)(B) (2019).
[23] 7 U.S.C. § 2201 note (2018) (Sec. 5. Incidental Transfers).
[24] P.L. 115-141, 132 Stat. 348, 394 (2018).
[25] The Honorable Sonny Perdue, Secretary of Agriculture, Letters to the Honorable John Hoeven, Chairman, and Honorable Jeff Merkley, Ranking Member, of the U.S. Senate Committee on Appropriations' Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies (Aug. 9, 2018).
[26] The Honorable Sonny Perdue, Secretary of Agriculture, Letters to the Honorable Robert Aderholt, Chairman, and Honorable Sanford Bishop, Jr., Ranking Member, of the U. S. House Committee on Appropriations' Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies (Aug. 9, 2018).
[27] P.L. 115-141, 132 Stat. 348, 394 (2018).

Accordingly, the obligation of a portion of the $6 million to initiate an assessment related to NIFA's relocation may have violated the ADA, which prohibits Government employees from making or authorizing an expenditure or obligation exceeding an amount available for the expenditure in an appropriation or fund for the expenditure or obligation, and from involving the Federal Government in a contract or obligation for the payment of money before an appropriation is made.[28]

Additionally, we note that Section 717(a) of the Omnibus Act requires the Department to provide written notice to the Committees on Appropriations of both Houses of Congress at least 30 days prior to reprogramming or transferring funds to relocate an office or its employees. Section 717(a) also requires the Department to receive approval from Congress prior to the expenditure of funds for the relocation of an office or its employees.[29] Accordingly, if the Department's relocation of NIFA offices requires the reprogramming or transfer of funds, the Department must notify in writing and receive approval from the Committees on Appropriations of both Houses of Congress at least 30 days in advance of the reprogramming of such funds.

In summary, we found that the Department may not have the budgetary authority to obligate appropriated funds related to the relocation of ERS offices. The Department did not receive Congressional approval prior to obligating funds related to such relocations; this may have violated Section 717(a) of the Omnibus Act and the ADA.[30] We also found that the Department did not have the budgetary authority to obligate appropriated funds related to the relocation of NIFA offices because it did not meet the 60-day reporting deadline requirement in Section 753; this also may have violated the ADA. Further, pursuant to Section 717(a), if the Department's relocation of NIFA offices requires the reprogramming or transfer of funds, the Department must notify in writing and receive approval from the Committees on Appropriations of both Houses of Congress at least 30 days in advance of the transfer or reprogramming of such funds.

We recommend that the Department consult with the Office of the General Counsel (OGC) to determine if the Department's actions complied with the appropriations provisions of the Omnibus Act and whether any corresponding ADA violations have occurred. If so, the Department should take appropriate action. Additionally, we recommend that the Department obtain Congressional approval prior to obligating and/or expending for reprogramming or transfer of any additional funds related to the relocation of ERS and NIFA offices.

## Recommendation 1

Obtain OGC's legal opinion regarding the Department's compliance with the appropriations provisions of the Omnibus Act, as well as whether there was any corresponding violation of the ADA in its obligation of appropriated ERS funds for contract work related to the relocation of agency offices.

---

[28] 31 U.S.C. §§ 1341(a)(1)(A)–(B) (2019).
[29] P.L. 115-141, 132 Stat. 348, 385 (2018).
[30] 31 U.S.C. §§ 1341(a)(1)(A)–(B) (2019).

## Agency Response

The Department obtained an OGC legal opinion, dated July 19, 2019, regarding its compliance with appropriations provisions of the Omnibus Act, including whether there was any ADA violation involving the obligation of appropriated ERS funds for contract work related to the relocation of agency offices. This opinion is included in its entirety in the Agency Response section of this report.

## OIG Position

We accept the Department's management decision to obtain the OGC opinion.

## Recommendation 2

Obtain OGC's legal opinion regarding the Department's compliance with the appropriations provisions of the Omnibus Act, as well as whether there was any corresponding violation of the ADA, in its obligation of appropriated NIFA funds for contract work related to the relocation of agency offices.

## Agency Response

The Department obtained an OGC legal opinion, dated July 19, 2019, regarding its compliance with appropriations provisions of the Omnibus Act, including whether there was any ADA violation involving the obligation of appropriated NIFA funds for contract work related to the relocation of agency offices. This opinion is included in its entirety in the Agency Response section of this report.

## OIG Position

We accept the Department's management decision to obtain the OGC opinion.

## Recommendation 3

Take appropriate action if an ADA violation has occurred.

## Agency Response

As noted in response to Recommendations 1 and 2, the Department obtained an OGC legal opinion, dated July 19, 2019. OGC's legal opinion concluded that the Department complied with the applicable appropriations provisions and, therefore, there were no resulting ADA violations.

## OIG Position

We accept the Department's management decision to rely on OGC's opinion on the appropriate actions to take.

## Recommendation 4

Obtain Congressional approval, as required, prior to obligating and/or expending for reprogramming or transferring additional funds related to the relocation of ERS and NIFA offices.

## Agency Response

The Department obtained an OGC legal opinion, dated July 19, 2019, which concluded that the "committee approval" provisions of Section 717(a) of the FY 2018 Appropriations Act are unconstitutional and are without legal effect. The Department states that Supreme Court, Office of Legal Counsel, and Government Accountability Office (GAO) precedents support their position. The Department provided advance notification to the committees before obligating funds for office reorganizations and relocations to the extent they involve a reprogramming or the use of the identified interagency agreement or transfer authorities. The Department states that it is not required to obtain committee approval of such actions.

## OIG Position

As stated above, the Department takes the position that the "committee approval" provisions of Section 717(a) are unconstitutional and are without legal effect. However, OIG notes that such provisions have been included in relevant appropriations acts since 2015, and that the Department has previously taken the position that provisions, such as those found in Section 717(a), are binding upon the Department. In recent litigation in *Bread for the City, Inc. v. USDA*, a non-profit group sought to compel the Department to purchase and distribute additional food under the Emergency Food Assistance Program.[31] In its Memorandum in Support of Motion to Dismiss the case, the Department argued that prior to reprogramming funds for such a purpose, it was "obligated to seek approval from the Committees on Appropriations of both Houses of Congress," as "required by the 2015 Appropriations Act. *See* Pub. L. No. 113-235, Sec. 719."[32] The Department explained that "[i]f the committees deny the request, USDA is barred from expending the funds."[33] The Department reiterated this argument on appeal in its Brief for Appellees, quoting section 719(b) of the 2015 Appropriations Act (and pointing out that the 2016 Appropriations Act had the same language).[34]

---

[31] Bread for the City, Inc. v. United States Dep't of Agric., 211 F. Supp. 3d 327 (D.D.C. 2016), aff'd sub nom. Bread for the City v. United States Dep't of Agric., 872 F.3d 622 (D.C. Cir. 2017).
[32] Memorandum in Support of Motion to Dismiss at 17, Bread for the City, Inc. v. United States Dep't of Agric., 211 F. Supp. 3d 327, (D.D.C. Dec. 18, 2015) (No. 15—CV-01591).
[33] *Id*. at 17.
[34] Brief for Appellee at 11, Bread for the City v. United States Dep't of Agric., (872 F.3d 622) (D.C. Cir Apr. 19, 2017) (No. 16-5329).

The language in Section 719 of the 2015 and Section 717 of the 2016 Appropriations Acts is substantially similar to the language found in Section 717(a) of the 2018 Appropriations Act relevant here, requiring notification and approval. However, the Department is now taking the position that this language is unconstitutional. Therefore, the Department's current and prior positions regarding the applicability of "committee approval" provisions, such as those found in Section 717(a), are not consistent. To reach management decision on this recommendation and to ensure consistent treatment going forward, the Department needs to communicate, in writing, this change of interpretation to USDA leaders at the Sub-Cabinet and Agency levels.

# Section 3: USDA's Adherence to Any Established Procedures Relating to Agency Realignment and Relocation, and Procedures Associated with Cost Benefit Analyses

## *Did the Department Adhere to Any Established Procedures Relating to Agency Realignment, Relocation, and Cost Benefit Analyses?*

The Department has an established Departmental Regulation that outlines policies and procedures for organizational changes, including realignments and relocations.[35] The Departmental Regulation states that it "applies to all USDA Mission Areas, agencies, and staff offices."[36] However, a Department official stated that this regulation was not applicable to these circumstances, because it applies only to situations when a mission area, agency, or office requests an organizational change, not when the Office of the Secretary initiates the change. The Department also stated that in this case, the Secretary initiated organizational changes within the Department based on the Office of Management and Budget's comprehensive plan to reorganize Executive Branch departments and agencies, which focuses on restructuring or merging functions, improving organizational efficiency and effectiveness, and better managing agency workforces.[37] After examining relevant Departmental and Government-wide guidance, we did not identify any other procedures applicable to agency realignments or relocations by which we could determine the Department's adherence, including any procedures associated with cost benefit analyses, regarding its actions within the scope of our review.[38]

While the current Departmental Regulation was identified by the Department as not being applicable to organizational changes initiated by the Office of the Secretary,[39] we believe that adopting the approach outlined within the regulation would be beneficial for all such proposed actions going forward because it is intended to provide a structured process to facilitate the implementation of organizational changes throughout the Department. Accordingly, we believe that the Department should evaluate the need to clarify its Departmental regulation to ensure the same procedures are followed when considering organizational changes related to realignment and relocation, regardless of the USDA agency or office proposing the change.

Although we identified no established procedures relating to the Department's realignment, relocation or cost-benefit analysis, in response to our request, the Department provided us with documentation supporting its stated goals for relocating ERS and NIFA. These goals were to: (1) improve its ability to attract and retain highly qualified staff with training and interests in agriculture, (2) place important USDA resources closer to stakeholders who live and work

---

[35] USDA Departmental Regulation DR 1010-001, Organization Planning, Review, and Approval (Jan. 4, 2018).
[36] USDA Departmental Regulation DR 1010-001, Sec. 3, Scope.
[37] Office of Management and Budget M-17-22, *Comprehensive Plan for Reforming the Federal Government and Reducing the Federal Civilian Workforce* (April 12, 2017).
[38] The scope of our review covered the Department's actions prior to November 1, 2018, and did not include any actions or decisions made after this date.
[39] USDA Departmental Regulation DR 1010-001, Sec. 3, Scope.

outside the National Capital Region, and (3) benefit the American taxpayers with potential savings on employment and facility costs.[40]

## Recommendation 5

Evaluate the need to clarify Departmental regulation to ensure the same procedures are followed when considering organizational changes related to realignment and relocation, regardless of the USDA agency or office proposing the change.

## Agency Response

The Department obtained an OGC legal opinion, dated July 19, 2019, which concluded that "the Secretary maintains significant discretion to set Departmental policies." The Department states that on January 4, 2018, DR 1010-001 was revised to specify "what reorganization and relocation decisions had to be approved by the Secretary but did not in any way suggest that such decisions of the Secretary himself were required to be effectuated after the presentation of a DR 1010 package."

The OGC opinion further states that "[a]lthough the scope of DR 1010-001 applies to all "USDA Mission Areas, agencies, and staff offices," (DR 1010-001 § 3) the Secretary retains discretion as a legal and policy matter to deviate from the specific procedures set forth in the DR in specific situations. The Secretary's retained discretion includes approving a reorganization or implementing certain elements of a reorganization and then subsequently documenting those approvals or changes in accordance with the review procedures set forth in DR 1010-001." Therefore, with respect to Recommendation 5, the Department concluded that "although the Department could evaluate potential changes to DR 1010-001 . . . such amendments would not be necessary to address the Secretary's existing authority to set policy and procedures regarding Departmental reorganizations."

## OIG Position

The Department, through OGC's legal opinion, provided its evaluation of the need to clarify Departmental regulations related to reorganizations as requested in Recommendation 5. We accept the Department's management decision on this recommendation.

---

[40] The Honorable Sonny Perdue, Letter to the Honorable Pat Roberts, Chairman, and Honorable Debbie Stabenow, Ranking Member of the United States Senate Committee on Agriculture, Nutrition, and Forestry (Sept. 20, 2018).

## Scope and Methodology

We conducted an inspection of the Department's proposal to: (1) realign ERS under OCE; and (2) relocate ERS and NIFA offices. We also attempted to determine USDA's adherence to any established procedures relating to agency realignment and relocations, and procedures associated with cost benefit analyses (including factors such as staff recruitment and retention, access to agency services, and cost efficiencies). An inspection follows CIGIE's *Quality Standards for Inspection and Evaluation,*[41] unlike an audit, which is conducted according to Generally Accepted Government Auditing Standards.[42]

Our inspection scope covered the Department's actions on these proposals prior to November 1, 2018, which is the date OIG notified the Department's Office of the Assistant Secretary for Administration of its intention to conduct this inspection. Since the proposal to realign ERS and relocate ERS and NIFA offices was still ongoing at that point, we did not include any actions or decisions made after November 1, 2018, within our scope period. Instead, we focused on the guidance that existed and the available documentation for the agency realignment and relocations contained in the Department's proposal as announced on August 9, 2018.[43]

In order to meet our objectives, we reviewed Departmental guidance for agency realignments and relocations; met with members of Departmental leadership tasked with providing information to the Secretary; reviewed Governmentwide regulations and guidance related to agency realignment, relocation, and leasing; reviewed the Department's Congressional communications; and reviewed supporting documentation for the three stated goals of the proposed relocation. We conducted our fieldwork from November 2018 through May 2019.

To accomplish our inspection objectives, we:

- met with Departmental management to discuss guidance and procedures for agency realignment and relocation;
- met with OCE to review supporting documentation used to produce a preliminary cost benefit analysis to inform relocation decisions;
- met with NIFA officials to discuss prior leasing work performed and Departmental relocation communication;
- met with USDA's OGC to gain an understanding of the Secretary's budgetary and legal authority concerning agency realignments and relocations;
- reviewed supporting documentation for Departmental communications with Congress, including staff recruiting and retention, access to agency services, and cost efficiencies;
- reviewed available Governmental guidance for agency decisionmaking related to a proposed office relocation; and

[41] CIGIE, *Quality Standards for Inspection and Evaluation* (Jan. 2012).
[42] Generally Accepted Government Auditing Standards are issued by GAO.
[43] USDA Press, "USDA to Realign ERS with Chief Economist, Relocate ERS & NIFA Outside DC," Release No. 0162.18 (Aug. 9, 2018), https://www.usda.gov/media/press-releases/2018/08/09/usda-realign-ers-chief-economist-relocate-ers-nifa-outside-dc.

- consulted GSA regarding cost benefit analysis requirements related to proposing a relocation for agency offices.

We conducted this inspection in accordance with CIGIE's *Quality Standards for Inspection and Evaluation*. These standards require that we plan and perform the inspection to obtain sufficient, appropriate evidence to provide a reasonable basis for our conclusions and recommendations based on our review objectives. We believe that the evidence obtained provides a reasonable basis for our conclusions and recommendations based on our review.

## Abbreviations

ADA ........................................Antideficiency Act
CIGIE .....................................Council of the Inspectors General on Integrity and Efficiency
DR ..........................................Departmental Regulation
ERS ........................................Economic Research Service
GAO .......................................Government Accountability Office
GSA........................................General Services Administration
NIFA ......................................National Institute of Food and Agriculture
OCE........................................Office of the Chief Economist
OGC .......................................Office of General Counsel
OIG ........................................Office of Inspector General
USDA.....................................Department of Agriculture

# AGENCY'S
# RESPONSE TO INSPECTION REPORT

USDA

United States Department of Agriculture

Office of the General Counsel

Washington, D.C. 20250-1400

STEPHEN ALEXANDER VADEN
GENERAL COUNSEL

July 19, 2019

**MEMORANDUM FOR:** PHYLISS K. FONG
INSPECTOR GENERAL
OFFICE OF INSPECTOR GENERAL

**SUBJECT:** USDA'S PROPOSAL TO REALIGN AND RELOCATE THE ECONOMIC RESEARCH SERVICE AND NATIONAL INSTITUTE OF FOOD AND AGRICULTURE (OIG AUDIT NO. 91801-0001-23)

This letter, including the attached memorandum from the Office of the General Counsel, provides the management response to the June 19, 2019 official draft inspection report ("Official Draft")[1] prepared by the Office of Inspector General.[2] For the reasons summarized below and discussed in detail in the accompanying memorandum, we respectfully disagree with the Official Draft's questioning of USDA's budgetary authority regarding the relocation of ERS and NIFA. The Department's actions comply fully with all applicable laws. The views of all three branches of government — the Supreme Court, the Department of Justice, and the Government Accountability Office, an arm of Congress — all support the Department's position. OIG's suggestion otherwise ignores these precedents dating back nearly forty years. The other questions raised by the Official Draft are either moot or are answered by the attached memorandum. In short, the Department had full legal authority to relocate ERS and NIFA; the Official Draft concedes that point; and the budgetary provisions cited by the Official Draft requiring committee approval are unconstitutional.

**Answers in Brief.** The Department has, as recommended by OIG, obtained a legal opinion from the Office of the General Counsel answering OIG's questions. As discussed in detail in the attached memorandum, OGC has opined as follows:

> **Section 1:** The Official Draft concedes the Secretary of Agriculture ("Secretary") has the requisite legal authority to execute a realignment of ERS to OCE. Official Draft at 5.

---

[1] The Official Draft is attached to the Memorandum from Gil H. Harden, Assistant Inspector General for Audit, OIG, to Donald K. Bice, Deputy Assistant Secretary for Administration, re: "USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture" (June 19, 2019).

[2] Certain generally accepted acronyms are used throughout the Official Draft and our memoranda: Office of the General Counsel ("OGC"); Office of Inspector General ("OIG"); United States Department of Agriculture ("USDA" or "Department"); Economic Research Service ("ERS"); Research, Education, and Economics ("REE"); Office of the Chief Economist ("OCE"); National Institute of Food and Agriculture ("NIFA"); and Antideficiency Act ("ADA").

The Secretary has determined not to realign ERS from the REE Mission Area to OCE; therefore, the questions raised in Section 1 of the OIG Official Draft are moot. Section 3 of the Official Draft is similarly moot to the extent it questions such a realignment of ERS. Had the Secretary elected to realign ERS, for the reasons discussed below concerning the Official Draft's Section 2, he would have the requisite authority to do so. Because the questions raised in the Official Draft's Section 1 are moot and OIG did not recommend that USDA obtain a legal opinion regarding realignment, Section 1 is not further addressed below.

**Section 2:** The Secretary has the requisite legal and budgetary authority to relocate ERS and NIFA. Indeed, the Official Draft concedes that the Secretary has the requisite **legal** authority to relocate ERS and NIFA. Official Draft at 7.

As to budgetary authority, in relocating ERS and NIFA, the Secretary relied on statutory provisions that grant him the authority to expend the necessary funds. Those provisions have language providing budgetary authority for such expenditures, provided there is notice given to, and approval granted by, the appropriations committees in each house of Congress to make those expenditures. The Secretary furnished the requisite notice; the Secretary need not secure approval.

Nearly forty years ago, the Supreme Court held in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983), that any statutory mechanism permitting one house of Congress to invalidate a decision by the Executive Branch is unconstitutional because it violates the constitutional requirement of bicameralism and presentment to the President. Action taken or not taken by one house — or, as here, one committee of one house — cannot prevent the Executive Branch from exercising powers already delegated by Congress to it.

The Department of Justice's Office of Legal Counsel has confirmed that *Chadha* bars Congressional attempts to "bind the actions of executive or administrative officials that have not been approved by both houses and presented to the President," including so-called "committee approval" provisions purporting to prohibit "the expenditure of funds for some purpose, but allowing a future expression of approval by committee action to remove the prohibition."[3] As explained by that Office during the Clinton Administration:

> [a] statutory provision conditioning the executive's ability to take action on approval by one or both houses of Congress **or by a congressional committee** is as invalid as a provision enabling one of these bodies to 'veto' executive action, and for the same reason: it is a legislative attempt to exercise authority beyond the legislative sphere in a mode not conforming to the requirements of bicameralism and presentment *see, e.g., Am. Fed'n of Gov't Emps. v. Pierce*, 697 F.2d 303, 306 (D.C. Cir. 1982).

[3] *See* Department of Justice, OLC, "The Constitutional Separation of Powers Between the President and Congress," 20 U.S. Op. Off. Legal Counsel 124, 1996 WL 876050, at *8-9 (May 7, 1996).

20 U.S. Op. Off. Legal Counsel 124, 124, 1996 WL 876050, at *8 n.39 (emphasis added).

So uncontroversial is the unconstitutionality of the approval provision discussed in the Official Draft that, despite Congress's passage of such unconstitutional language, **Congress itself has acknowledged that committee approval provisions are invalid**. The Government Accountability Office, an arm of Congress, states as much in its *GAO Redbook* discussing Federal appropriations law:

> Some statutory reprogramming restrictions also provide for committee approval. As in the case of transfer, under the Supreme Court's decision in *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919 (1983), **statutory committee approval or veto provisions are no longer permissible.**[4]

Thus, the Department has complied with applicable law by providing Congress with the notice it called for in appropriations legislation. USDA is not required to abide by unconstitutional laws. Therefore, the Department declines OIG's recommendation to ignore Supreme Court, Office of Legal Counsel, and Government Accountability Office precedent and seek congressional committee approval of the relocations.

Congress appropriated $6 million for relocation of NIFA; those funds were not subject to any condition precedent for their availability; and they did not lapse.

Accordingly, for these reasons, the Department complied with the applicable appropriations provisions and no Antideficiency Act violations occurred.

**Section 3:** The Secretary followed the procedures applicable to the Office of the Secretary when undertaking this agency realignment and relocation.

The attached memorandum sets forth in greater detail the OGC legal opinion requested by OIG as a response to the Official Draft's Recommendations 1 and 2 regarding the legal and budgetary authority for relocation of ERS and NIFA and also provides the Department's response addressing the remaining Recommendations 3, 4, and 5.

In closing, the Department acted fully in accordance with applicable law and procedure governing each of the issues raised by OIG's Official Draft.

Thank you for the opportunity to address your questions.

[4] GAO, *Principles of Federal Appropriations Law,* 4th ed., ch. 2, § B.7.b, GAO-16-464SP, at 2-46 (Mar. 2016) (emphasis added). Note that GAO recently, in a fiscal law annual conference attended by OGC staff, reiterated that *Chadha* made these approval requirements unconstitutional.

USDA

United States Department of Agriculture

Office of the General Counsel

Washington, D.C. 20250-1400

STEPHEN ALEXANDER VADEN
GENERAL COUNSEL

July 19, 2019

**MEMORANDUM FOR:** GIL H. HARDEN
ASSISTANT INSPECTOR GENERAL FOR AUDIT
OFFICE OF INSPECTOR GENERAL

**SUBJECT:** USDA'S PROPOSAL TO REALIGN AND RELOCATE THE ECONOMIC RESEARCH SERVICE AND NATIONAL INSTITUTE OF FOOD AND AGRICULTURE
(OIG AUDIT NO. 91801-0001-23)

This memorandum provides the opinion of the Office of the General Counsel on certain issues raised in the June 19, 2019, official draft inspection report ("Official Draft")[1] prepared by the Office of Inspector General.[2] For the reasons set forth below, it is the opinion of OGC that the Department acted fully in accordance with applicable law and procedure governing each of the issues raised by OIG's Official Draft. OGC's conclusion is consistent with the views of all three branches of the Federal Government. The Supreme Court long ago decided that the notice procedure the Department followed to reorganize itself was lawful. The Supreme Court struck down as unconstitutional a one-house, legislative veto of otherwise authorized Executive Branch action. The Department of Justice's Office of Legal Counsel and Congress's Government Accountability Office ("GAO") likewise have accepted this well-established constitutional principle. The Official Draft's other questions are either moot, having been overcome by events, or are answered by the below opinion.

**Questions Presented.** The Official Draft questions the legal and budgetary authority of USDA to manage itself in three respects:

> **Section 1** questions USDA's authority to realign ERS under OCE.
>
> **Section 2** questions USDA's budgetary authority and compliance with various appropriations acts to relocate ERS and NIFA offices.

---

[1] The Official Draft is attached to the Memorandum from Gil H. Harden, Assistant Inspector General for Audit, OIG, to Donald K. Bice, Deputy Assistant Secretary for Administration, re: "USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture" (June 19, 2019).

[2] Certain generally accepted acronyms are used throughout the Official Draft and this memorandum: Office of the General Counsel ("OGC"); Office of Inspector General ("OIG"); United States Department of Agriculture ("USDA" or "Department"); Economic Research Service ("ERS"); Research, Education, and Economics ("REE"); Office of the Chief Economist ("OCE"); National Institute of Food and Agriculture ("NIFA"); and Antideficiency Act ("ADA").

**Section 3** questions USDA's adherence to internal, self-imposed procedures on agency realignments, relocations, and associated cost-benefit analyses.

**Answers in Brief.** As indicated more fully below, OGC renders the following legal opinion, addressing each of these questions:

**Section 1:** The Official Draft concedes that the Secretary of Agriculture ("Secretary") has the requisite **legal** authority to execute a realignment of ERS to OCE. Official Draft, at 5. The Secretary nonetheless determined not to realign ERS from the REE Mission Area to OCE; therefore, the questions raised in Section 1 of the OIG Official Draft are moot. In addition, Section 3 of the Official Draft is similarly moot to the extent it questions such a realignment of ERS. Had the Secretary elected to so realign ERS, for the reasons discussed below concerning the Official Draft's Section 2, he would have the requisite authority to do so. Because the questions raised in the Official Draft's Section 1 are moot and OIG did not recommend that USDA obtain a legal opinion regarding realignment, Section 1 is not further addressed.

**Section 2:** The Secretary has the requisite legal and budgetary authority to relocate ERS and NIFA. The Official Draft concedes that the Secretary has the requisite **legal** authority to relocate ERS and NIFA. Official Draft, at 7. In relocating ERS and NIFA, the Secretary relied on statutory provisions that grant him the authority to expend the necessary funds. Those provisions have language providing budgetary authority for such expenditures, provided there is notice given to, and approval granted by, Congress to make those expenditures. The Secretary gave the requisite notice. Regarding approval, the Supreme Court long ago held that legislative vetoes, requiring a **second** approval by one house of Congress after a statute has been enacted, are unconstitutional and have no legal effect. I rely on well-settled case law, starting with *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983), where the Supreme Court held that any statutory mechanism permitting one house of Congress to invalidate a decision by the Executive Branch is unconstitutional because it violates the constitutional requirement of bicameralism and presentment to the President. In addition, I conclude as a legal matter that $6 million was appropriated for relocation of NIFA; those funds were not subject to any condition precedent for their availability; and they did not lapse. Accordingly, the Department did not violate the ADA.

**Section 3:** The Secretary followed the procedures applicable to the Office of the Secretary when undertaking this agency organizational action.

The OIG Official Draft also made two specific recommendations implicating OGC. It directed the Department to obtain an OGC legal opinion regarding the Department's compliance with certain appropriations provisions, including whether there were any ADA violations involving the obligation of funds for contract work related to the relocation of ERS and NIFA. I conclude that the Department complied with the applicable appropriations provisions and that no ADA violations occurred.

## Background

On August 9, 2018, the Department announced its intention to realign ERS from the REE Mission Area to OCE and to relocate ERS and NIFA outside the National Capital Region.[3] On that same date, the Department provided notification of the proposed realignment and relocations to the Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies of the House and the Senate Committee on Appropriations.

On August 15, 2018, the Department published a notice in the *Federal Register* requesting expressions of interest from State and local governments, industry, academia, and other interested parties and organizations for potential locations that would accommodate the construction or lease and operation of joint or separate ERS and NIFA headquarters facilities.[4]

On October 22, 2018, the Department entered into a contract with a private vendor to review the expressions of interest submitted in response to the *Federal Register* notice. The total contract award was $339,310.60, with ERS and NIFA each contributing $169,655.30.

On November 1, 2018, in response to a request from two members of Congress, OIG initiated the subject inspection. As part of the OIG inspection, OGC has already provided your office two legal memoranda in response to specific requests for information.[5]

The Official Draft contains five recommendations concerning (1) USDA's legal and budgetary authority to realign ERS and relocate ERS and NIFA and (2) USDA's adherence to established reorganization procedures. Official Draft Recommendations 1 and 2 direct the Department to obtain an OGC legal opinion. Sections I and II of this memorandum provide those legal opinions. Section III of this memorandum addresses the remaining Official Draft Recommendations 3, 4, and 5.

### I. OIG Official Draft Recommendation 1:

> Obtain OGC's legal opinion regarding the Department's compliance with the appropriations provisions of the Omnibus Act, as well as whether there was any corresponding violation of the ADA [Antideficiency Act] in its obligation of appropriated ERS funds for contract work related to the relocation of agency offices.

---

[3] Press Release, "USDA to Realign ERS with Chief Economist, Relocate ERS & NIFA Outside DC," *available at* https://www.usda.gov/media/press-releases/2018/08/09/usda-realign-ers-chief-economist-relocate-ers-nifa-outside-dc (Aug. 9, 2018).

[4] *See* 83 Fed. Reg. 40499 (Aug. 15, 2018).

[5] Memorandum to Gil Harden, Assistant Inspector General for Audit, OIG, from L. Benjamin Young, Jr., Associate General Counsel, General Law and Research Division, OGC, re: "Legal Authority to Reorganize and Relocate the Economic Research Service and National Institute of Food and Agriculture" (Dec. 6, 2018); Memorandum to [redacted] Assistant Counsel, OIG, from L. Benjamin Young, Jr., re: "Section 717 Approval Requirement Is Unconstitutional" (Dec. 17, 2018).

Recommendation 1 questions whether the Department has budgetary authority to relocate ERS outside of the National Capital Region. The Department possesses such budgetary authority.

The Official Draft concludes that the obligation of ERS appropriations — specifically the obligation of approximately $169,655 in ERS funds for a contractor to review the expressions of interest for new ERS and NIFA headquarters locations — violated section 717(a) of the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2018 ("FY 2018 Appropriations Act").[6] OIG concludes that, although the Department provided notification to Congress on August 9, 2018, the Department did not obtain the requisite committee approval. Accordingly, OIG concludes that the obligation of funds may have violated the ADA, which prohibits Federal employees from involving the Federal Government in a contract or the obligation of money in advance of an appropriation. 31 U.S.C. § 1341(a)(1)(B). *See* Official Draft, at 7-8.

As discussed below, the Department did not fail to obtain any required approval to reorganize itself. This conclusion is consistent with the Constitution and the opinions of the Supreme Court, the Department of Justice's Office of Legal Counsel, and Congress's GAO, all of which hold that the type of one-house approval requirement or legislative veto underpinning OIG's recommendation is unconstitutional.

### A. The Supreme Court Has Invalidated the Type of One-House Veto upon Which OIG's Draft Recommendation Relies.

OIG's conclusion ignores Supreme Court precedent dating back nearly forty years. The approval language referenced in the Official Draft is unconstitutional. Section 717(a) of the FY 2018 Appropriations Act provides:

> SEC. 717. (a) None of the funds provided by this Act, or provided by previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in the current fiscal year, or provided from any accounts in the Treasury derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming, transfer of funds, or reimbursements as authorized by the Economy Act, or in the case of the Department of Agriculture, through use of the authority provided by section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or section 8 of Public Law 89-106 (7 U.S.C. 2263), that—
> (1) creates new programs;
> (2) eliminates a program, project, or activity;
> (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted;
> (4) relocates an office or employees;
> (5) reorganizes offices, programs, or activities; or
> (6) contracts out or privatizes any functions or activities presently performed by Federal

[6] The FY 2018 Appropriations Act was enacted on March 23, 2018, as division A of the Consolidated Appropriations Act, 2018, Pub. L. 115-141. For ease of reference, the Official Draft refers to that act as the "Omnibus Act." Section 717(a) continued to apply in FY 2019 (when the contract was awarded) to appropriations made available under the Continuing Appropriations Act, 2019, division C of the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. 115-245, enacted on September 28, 2018.

> employees;
> unless the Secretary of Agriculture . . . notifies in writing **and receives approval from** the Committees on Appropriations of both Houses of Congress at least 30 days in advance of the reprogramming of such funds or the use of such authority.

Emphasis added.

The legally problematic provision emphasized above is the provision that gives one house of Congress the ability to "veto" the other house, or even the President, by way of requiring a second approval, in this case by the named committees. Such provisions have been ruled unconstitutional and without legal effect since the Supreme Court invalidated similar provisions in the landmark case of *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983).

In *Chadha*, the Supreme Court reviewed a provision of the Immigration and Nationality Act that authorized either the House of Representatives or the Senate, by resolution, to invalidate a decision of the Attorney General — an Executive Branch official — to suspend the deportation of an alien. At issue in *Chadha* was a decision of the U.S. Department of Justice's Immigration and Naturalization Service ("INS") to suspend the deportation of Mr. Chadha, an alien who had overstayed his nonimmigrant student visa. Under the statute, after the Attorney General submitted a report of the INS decision to Congress, the House of Representatives passed a resolution opposing the suspension of the deportation. The House resolution was not submitted to the Senate for a vote or presented to the President for his signature. After passage of the House resolution, INS ordered Chadha's deportation. *Id.* at 923-28. On review, the Supreme Court held that the Immigration and Nationality Act provision authorizing one house of Congress, by resolution, to invalidate a decision of the Executive Branch was unconstitutional because it impermissibly allowed one house of Congress to veto a decision of the Executive Branch in violation of the constitutional requirement for bicameral passage and presentment to the President. *Id.* at 951-59; *see* U.S. CONST. art. I, §§ 1 and 7.

*Chadha* stands for the well-established principle of constitutional law that Congress may only bind through a law passed by both of its houses and presentment to the President. *Id.* In contrast, where one house alone is authorized to perform an act, the Constitution so states. *Compare* U.S. CONST. art. I, § 7, cls. 1 and 2 (although revenue bills must originate in the House of Representatives, House *and* Senate passage are still required), *with id.*, art. II, § 2, cl. 2 (requiring advice and consent only of the Senate for the ratification of treaties *and* requiring advice and consent only of the Senate for certain Presidential appointments) *and id.*, art. I, § 2, cl. 5 (providing that the House of Representatives shall have the sole power of impeachment). Thus, in the absence of an explicit constitutional grant of authority to only one house of Congress to take an action, Congress may only act with the concurrence of *both* houses of Congress and presentment of the legislation to the President. In common parlance, if Congress disagrees with an action of the Executive Branch, its only remedy is to pass a law. *See, e.g.*, 5 U.S.C. § 801, *et seq.* (Congressional Review Act provides Congress the authority to disapprove certain administrative rules if Congress passes a joint resolution of disapproval that is signed by the President, or if Congress overrides a Presidential veto).

The withholding of "approval" by one committee of one house of Congress is insufficient to enact a law. It is therefore unconstitutional to require such approval before the Executive Branch may take an action it is otherwise legally authorized to take. *See Chadha*, 462 U.S. at 951-59. The Executive Branch is under no obligation to enforce or follow unconstitutional laws.[7]

Much like in *Chadha*, OIG's draft recommendation relies on an unconstitutional requirement that would allow one house to veto an Executive Branch action, here USDA's reorganizing two agencies. Section 717(a) of the FY 2018 Appropriations Act is even more inconsistent with the Constitution in that its requirement for notice and **approval** does not even require a house act to veto Executive Branch action. Instead, it purports to permit just one **committee** in either of the houses to block the Department from an action the Department is otherwise authorized to take. The Supreme Court's *Chadha* holding applies with even greater force here to invalidate reliance on section 717(a)'s single-committee veto. If one house of Congress cannot veto Executive Branch action, neither can one committee of one house of Congress do so.

### B. The Department of Justice, Office of Legal Counsel, Has Opined That a One-House Veto Like Section 717(a)'s Committee Approval Language Is Unconstitutional.

As the Department of Justice's Office of Legal Counsel has explained, the unconstitutionality of the legislative veto mechanism invalidated by the Supreme Court in *Chadha* applies to attempts by Congress to "bind the actions of executive or administrative officials that have not been approved by both houses and presented to the President," including so-called "committee approval" provisions purporting to prohibit "the expenditure of funds for some purpose, but allowing a future expression of approval by committee action to remove the prohibition."[8]

In the nearly forty years since *Chadha*, the Executive Branch has consistently found that all such legislative veto provisions are null and void, including appropriations acts provisions such as the one cited by OIG. For example, with respect to a Housing and Urban Development appropriations act, the Office of Legal Counsel opined that a provision requiring committee approval before implementing an agency reorganization was unconstitutional and did not prevent

---

[7] The Executive Branch has no obligation to carry out unconstitutional laws. In *Myers v. United States*, 272 U.S. 52 (1926), the Supreme Court upheld the President's assertion that the statute at issue was unconstitutional and did not suggest that the President had acted improperly in refusing to comply with the unconstitutional law. Of more recent vintage, in *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868 (1991), the Justices addressing the issue stated that the President has "the power to veto encroaching laws . . . or even to disregard them when they are unconstitutional." *Id.* at 906 (Scalia, J., concurring). *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring) (recognizing existence of President's authority to act contrary to a statutory command).

[8] *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 132-33 (1996). As explained by the Office of Legal Counsel, "[a] statutory provision conditioning the executive's ability to take action on approval by one or both houses of Congress **or by a congressional committee** is as invalid as a provision enabling one of these bodies to 'veto' executive action, and for the same reason: it is a legislative attempt to exercise authority beyond the legislative sphere in a mode not conforming to the requirements of bicameralism and presentment." *Id.* at 8, n.39 (emphasis added); *see, e.g.*, *Am. Fed'n of Gov't Emps. v. Pierce*, 697 F.2d 303, 306 (D.C. Cir. 1982).

the expenditure that the approval was meant to control.[9] Congress — whether by resolution of one or both houses of Congress or by one or more committees — may not "impose new legal responsibilities or limitations on the Executive Branch unless the resolution is first adopted by both Houses of Congress and presented to the President for approval or veto."[10] Congressional attempts to "control the execution of the laws by an executive agency" through such committee approval provisions violate the constitutional principle of separation of powers.[11]

### C. Congress's Government Accountability Office Agrees That Statutory Committee Approval Provisions Are No Longer Permissible After *Chadha*.

The unconstitutionality of approval provisions is such an accepted fact that, despite its repeated passage of these unconstitutional laws, Congress itself has acknowledged that approval provisions are invalid. GAO, an arm of Congress, states as much in its *GAO Redbook*:

> Some statutory reprogramming restrictions also provide for committee approval. As in the case of transfer, under the Supreme Court's decision in *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919 (1983), **statutory committee approval or veto provisions are no longer permissible.**[12]

### D. In Contrast with Committee Approval Language, the Department's Report-and-Wait Practice Is Consistent with Long-Established Legal Principles.

In the case of section 717(a), the unconstitutional committee approval language is severable from the remainder of that section, leaving the constitutional portions intact. The Supreme Court has made it "well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (internal quotations and citations omitted). "[A] court should refrain from invalidating more of the statute than is necessary . . . . [W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." *Id.* (internal quotations and citations omitted). Section 717(a) does not indicate that Congress would not have enacted its 2018 appropriation law if the one committee veto provision were unconstitutional (as had already been established by the Court's 1983 *Chadha* decision). The result is that, although the Department is still directed to provide advance notice of certain proposed actions to Congress and allow time (in this case 30 days) for a response, any objection to the proposed action would not be legally binding unless enacted through a statute. That section 717(a) can operate

---

[9] Department of Justice, OLC, "Constitutionality of Committee Approval Provision in Department of Housing and Urban Development Appropriations Act," 6 OLC 591, 1982 WL 170727, at *1 (Oct. 27, 1982). In *Pierce*, the U.S. Court of Appeals for the D.C. Circuit agreed, finding the committee approval provision addressed by the OLC opinion to be unconstitutional and, therefore, not a bar to the agency reorganization. 697 F.2d at 305-08.
[10] 6 OLC 591, 1982 WL 170727, at *1.
[11] *Id.*
[12] GAO, *Principles of Federal Appropriations Law,* 4th ed., ch. 2, § B.7.b, GAO-16-464SP, at 2-46 (Mar. 2016) (emphasis added). I note that GAO recently, in a fiscal law annual conference attended by my staff, reiterated that *Chadha* made these approval requirements unconstitutional.

independently of the unconstitutional approval language is clear given that Congress, before FY 2015, regularly required only committee notification.[13] In essence, the Department treats section 717(a) as a "report-and-wait" provision.[14] This is consistent with the long-standing practice of the Executive Branch. As the Office of Legal Counsel has stated, there is a "consistent view of the Executive with regard to 'committee approval' provisions in appropriations acts that substantive authority to which such 'committee approval' provisions are attached will be exercised and that the 'committee approval' provisions will be treated essentially as requiring only that the committees be **informed** of action taken or to be taken by the Executive."[15]

This "report-and-wait" approach to unconstitutional committee approval provisions is not new. It has been used repeatedly by the Department to provide advance notification to Congress of reorganizations. It is entirely consistent with the position of the Department of Justice and with the well-settled case law discussed above regarding the severing of unconstitutional provisions while leaving the constitutional portions intact.

The Secretary provided the requisite notice consistent with section 717(a). To the extent that section 717(a) contains language that would require the Department to obtain committee **approval** for the obligation of funds to carry out the ERS relocation, I reach the same conclusion as the Supreme Court, the Office of Legal Counsel, and Congress's GAO have: The provision is unconstitutional and of no effect. It therefore does not prohibit the Department from carrying out the relocation in the absence of committee approval. Accordingly, the Department did not enter into the contract or obligate funds in advance of an appropriation and, therefore, did not violate the ADA.

---

[13] *See, e.g.*, Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2014, Pub. L. 113-76, div. A, §§ 721(a), (d) (requiring the Secretary to notify the appropriations committees and receive written or electronic mail confirmation of receipt of such notification prior to using funds for certain purposes); Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2010, Pub. L. 111-80, § 712(a) (requiring the Secretary to notify the appropriations committees prior to using funds for certain purposes).

[14] *See, e.g.*, *Chadha*, 462 U.S. at 931-35 (severing the unconstitutional one-house veto provision and leaving the remainder of the statute in place). In essence, *Chadha* retained the congressional notification and waiting period requirement of the statute, viewing it as a permissible "report-and-wait" provision. *Id.* at 935, nn.8-9. *Cf. Alaska Airlines*, 480 U.S. at 689-90 (severing the unconstitutional legislative veto provision of statute — including the "report-and-wait" language of that provision — but noting that the statute already contained a separate, permissible "report-and-wait" requirement).

[15] Department of Justice, OLC, "Exercise of Transfer Authority Under § 110 of H.J. Res. 370," 6 OLC 520, 1982 WL 170717, at *4 (Sept. 2, 1982) (emphasis added) (opining that appropriations provision requiring committee approval for certain transfers was severable from the substantive transfer authority). *See also, e.g.*, "Severability and Duration of Appropriations Rider Concerning Frozen Poultry Regulations," 20 OLC 232, 1996 WL 1185160 (June 4, 1996) (opining that appropriations provision authorizing committee approval of any proposed revised USDA regulation was severable from the substantive authority prohibiting implementation of the existing regulation unless Congress enacts a law specifically directing the Secretary to promulgate the regulation). *Cf.* "Severability of Legislative Veto Provision," 15 OLC 49, 1991 WL 499886 (Feb. 28, 1991) (opining that statutory provision containing a one-house veto provision regarding certain military procurements — including the "report-and-wait" language — was severable in its entirety due to the lack of any congressional intent that the provision could operate independently of the one-house veto language).

## II. OIG Official Draft Recommendation 2

> Obtain OGC's legal opinion regarding the Department's compliance with the appropriations provisions of the Omnibus Act, as well as whether there was any corresponding violation of the ADA [Antideficiency Act], in its obligation of appropriated NIFA funds for contract work related to the relocation of agency offices.

Recommendation 2 asks whether the Department has budgetary authority to relocate NIFA outside of the National Capital Region.[16] The Department possesses such budgetary authority. For the reasons already discussed in relation to OIG Recommendation 1, the Secretary provided the requisite notification to Congress for NIFA as well as ERS, and thus the Department did not violate the ADA regarding section 717(a) for NIFA.

Recommendation 2 of the Official Draft also misguidedly questions whether the Department failed to comply with another provision of the FY 2018 Appropriations Act. Section 753 of the Act provides:

> SEC. 753. For an additional amount for "National Institute of Food and Agriculture—Research and Education Activities," $6,000,000, to be available until expended, for relocation expenses and for the alteration and repair of leased buildings and improvements pursuant to 7 U.S.C. 2250: *Provided*, That not later than 60 days after enactment of this Act, the Secretary of Agriculture shall submit a report to the Committees on Appropriations of the House of Representatives and the Senate detailing the planned uses of this funding.

The Official Draft mistakenly concludes that the proviso in section 753 "imposed requirements on the availability of the $6 million appropriation."[17] *See* Official Draft, at 8-9. For the reasons detailed below, OIG misunderstands the clear import of section 753's plain language. Section 753's language does not raise an ADA concern.

The Constitution places the "purse strings" with Congress. The Department of Justice's Office of Legal Counsel has long recognized that Congress "may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted and impose conditions in respect to its use."[18] Because Congress recognizes that the language it uses plays such an important role and must be given effect, Congress often

---

[16] The Official Draft concludes that the obligation of NIFA appropriations — specifically the obligation of approximately $169,655 in NIFA funds for a contractor to review the expressions of interest regarding the new ERS and NIFA headquarters locations — violated section 717(a) of the FY 2018 Appropriations Act. OIG concludes that, although the Department provided notification to Congress on August 9, 2018, the Department did not obtain the requisite committee approval. Accordingly, OIG mistakenly asserts that the obligation of funds may have violated the ADA prohibition on involving the Federal Government in a contract or the obligation of money in advance of an appropriation. 31 U.S.C. § 1341(a)(1)(B). *See* Official Draft, at 8-9.

[17] In addition to citing the ADA prohibition on involving the Federal Government in a contract or obligation for the payment of money in advance of an appropriation (31 U.S.C. § 1341(a)(1)(B)), OIG also cites the ADA prohibition on making or authorizing an expenditure or obligation exceeding the amount available in an appropriation (31 U.S.C. § 1341(a)(1)(A)). *See* Official Draft, at 9 n.28.

[18] Department of Justice, OLC, "Constitutionality of the Rohrabacher Amendment," 2001 WL 37126561, at * 1 (July 25, 2001).

includes limiting language in its appropriations measures to impose conditions on an appropriation. In each of these instances, and in the broader context of appropriations, the language Congress uses in its enactments must govern a provision's effect.

For purposes of this discussion, three of the primary types of provisos that Congress uses include simple conditions on the use of appropriations; conditions precedent; and independent substantive directives to the agency.

Examples of simple conditions on the use of funds include the following:

- Section 704 of the FY 2018 Appropriations Act is a recurring general provision that prohibits funds from being used to pay negotiated indirect cost rates in excess of 10 percent on certain cooperative agreements ("No funds appropriated by this Act may be used to pay negotiated indirect cost rates on cooperative agreements or similar arrangements between [USDA] and nonprofit institutions in excess of 10 percent of the total direct cost of the agreement when the purpose of such cooperative arrangements is to carry out programs of mutual interest between the two parties. . . .").[19]

- The appropriation for NIFA's "Research and Education Activities" account includes a proviso capping the amount of funds available for paying certain administrative costs ("*Provided further*, That not more than 5 percent of the amounts made available by this or any other Act to carry out the Agriculture and Food Research Initiative under 7 U.S.C. 450i(b) may be retained by the Secretary of Agriculture to pay administrative costs incurred by the Secretary in carrying out that authority.").[20]

A condition precedent is another type of limiting language Congress may include in an appropriations measure. A condition precedent requires the receiving agency to meet a criterion (or criteria) to ensure the availability of the conditioned funds. Examples of conditions precedent include the following:

- Section 717(a) of the FY 2018 Appropriations Act, quoted in Section I above, conditions the availability of funds for certain purposes on advance notification to Congress (prohibiting the use of certain authorities to carry out specified actions "**unless** the Secretary . . . notifies [Congress] at least 30 days in **advance**").[21]

- The appropriation for the Farm Service Agency's ("FSA") "Salaries and Expenses" account includes a proviso containing a condition precedent on the availability of the appropriation for information technology related to farm program delivery ("*Provided*, That not more than 50 percent of the $78,013,000 made available under this heading for information technology related to farm program delivery . . . may be obligated **until** the Secretary submits to the Committees on Appropriations of both Houses of Congress, and receives written or electronic notification of receipt from such Committees of, a plan for

[19] FY 2018 Appropriations Act, § 704, Pub. L. 115-141, div. A, 132 Stat. 382.
[20] *Id.* at 132 Stat. 355.
[21] *Id.* at 132 Stat. 385 (emphasis added).

expenditure . . .").[22]

In each of these conditions precedent, the nature of the restriction imposed is evident from the language Congress uses.

GAO's recent attention to conditions precedent illustrates the extent to which the express language Congress uses controls. The Environmental Protection Agency's ("EPA") relevant appropriations act prohibited the obligation and expenditure of funds for office furnishings or redecorations in excess of $5,000 "**unless advance notice** of such furnishing or redecoration is transmitted to [Congress]."[23] GAO found that EPA violated the ADA when it obligated funds in excess of $5,000 to install a new soundproof privacy booth in the Administrator's office because EPA failed to provide the requisite notice to Congress. According to GAO, EPA violated a clear condition precedent. In another recent decision, GAO determined that the Department of Homeland Security violated the ADA when it reprogrammed funds in violation of a general provision in the relevant appropriations act prohibiting the obligation and expenditure of funds in excess of certain thresholds "**unless** [Congress is] notified 15 days in **advance** of such reprogramming of funds."[24] GAO found ADA violations in each of these cases because Congress included express provisions — the phrase "unless" — that **prohibited** the obligation and expenditure of funds without advance notification to Congress. GAO rightly placed emphasis on the plain text of the limitation — in each of these instances, a clear condition precedent.

Congress also regularly includes provisos in an appropriations act that do not set conditions on the use of an appropriation or set a condition precedent. Instead, provisos often provide additional substantive direction to the agency related to, but not conditioning, the appropriation. In other words, the proviso itself — for instance, the drafting convention "Provided, That" — does not necessarily set a condition precedent on an appropriation's availability. The following provisos' language provide clear examples of substantive direction:

- Section 779 of the FY 2018 Appropriations Act appropriated funds to the Rural Utilities Service to carry out a new broadband loan and grant pilot program and included a proviso directing the agency to take a specific action related to that program ("*Provided further*, That the Rural Utility Service is directed to expedite program delivery methods that would implement this section[.]").[25]

---

[22] *Id.* at 132 Stat. 360 (emphasis added).
[23] GAO, Comptroller General, "U.S. Environmental Protection Agency—Installation of Soundproof Privacy Booth," B-329603, 2018 WL 1790777 (Apr. 16, 2018) (emphasis added). *See also, e.g.*, "Federal Maritime Commission—Failure to Comply with Statutory Notification Requirement and the Antideficiency Act," B-327432, 2016 WL 3548873 (June 30, 2016) (construing similar provision). Though of persuasive value, GAO decisions do not bind Executive Branch agencies. *See, e.g.*, Department of Justice, OLC, "Permissibility of Small Business Administration Regulations Implementing the Historically Underutilized Business Zone, 8(a) Business Development, and Service-Disabled Veteran-Owned Small Business Concern Programs," 2009 WL 2870163, at *11 (Aug. 21, 2009).
[24] GAO, Comptroller General, "U.S. Secret Service—Statutory Restriction on Availability of Funds Involving Presidential Candidate Nominee Protection," B-319009, 2010 WL 1709148 (Apr. 27, 2010) (emphasis added).
[25] FY 2018 Appropriations Act, 132 Stat. 399.

- In appropriating one-year funds to FSA's "Salaries and Expenses" account, Congress included a proviso directing FSA to submit a report by the end of the fiscal year regarding certain projects ("*Provided further*, That the agency shall submit a report by the end of the fourth quarter of fiscal year 2018 to the Committees on Appropriations and the Government Accountability Office . . . .").[26]

The first example is merely a direction to the agency to expedite program delivery; it contains no language setting a condition precedent on the availability of the appropriation. The second example, which involves an appropriation with a subsequent reporting requirement, is also clearly distinguishable from a condition precedent because the relevant section omits any preconditional language, such as "unless" or "until." As these examples demonstrate, only in those instances where Congress uses express, clear, and conditional language does a proviso become a condition precedent.

The Supreme Court itself has recognized that a proviso in an appropriations act can function independently of the principal clause to which the proviso is attached. In *Republic of Iraq v. Beaty*,[27] the Court construed a general provision in the Emergency Wartime Supplemental Appropriations Act, 2003, Pub. L. 108-11, authorizing the President to suspend application of any provision of the Iraq Sanctions Act of 1990 and an attached proviso authorizing the President to make inapplicable, with respect to Iraq, certain other provisions of law. The Supreme Court rejected the lower court's "highly sophisticated effort to construe the proviso as a limitation upon the principal clause."[28] The Court continued:

> It is true that the 'general office of a proviso is to except something from the enacting clause, or to qualify and restrain its generality. . . .' But its general (and perhaps appropriate) office is not, alas, its exclusive use. Use of a proviso 'to state a general, independent rule' . . . may be lazy drafting, but is hardly a novelty. . . . [A] proviso is sometimes used 'to introduce independent legislation. . . .' We think that was its office here. The principal clause granted the President a power; the second proviso purported to grant him an *additional* power. It was not, on any fair reading, an exception to, qualification of, or restraint on the principal power.[29]

In other words, under *Beaty*, simply because Congress uses the drafting convention "Provided, That," it does not necessarily follow that the proviso constitutes a restraint on the authority provided by the principal clause.

Attention to the express language of section 753 demonstrates it does not operate as a condition precedent. Instead, section 753 does two distinct things. First, it provides an additional $6 million in budget authority to NIFA for relocation and other expenses. Second, it provides a substantive direction to the Secretary to submit a report to the Committees on Appropriations on

---

[26] *Id.* at 132 Stat. 360-61.
[27] 556 U.S. 848 (2009).
[28] *Id.* at 858.
[29] *Id.* (citations omitted; emphasis in original).

the planned uses of the funding not later than 60 days after the date of enactment of the FY 2018 Appropriations Act. Congress provided the $6 million in budget authority to NIFA on enactment of the FY 2018 Appropriations Act on March 23, 2018. The provision of the $6 million in budget authority is not contingent on submission of the report; Congress did not expressly include any such condition. In the language of *Beaty*, the proviso "was not, on any fair reading, an exception to, qualification of, or restraint on the principal power."[30]

Not only did Congress fail to include any express condition precedent, but also the language Congress used in section 753 does not resemble the kind it typically includes to impose a condition precedent. Had Congress intended to condition the availability of the $6 million on the submission of the report, Congress could have used explicit preconditional language like it used in the FSA proviso discussed above restricting the obligation of funds for information technology related to farm program delivery "until" Congress receives notification. When Congress wants to condition the availability of an appropriation on the occurrence of a specified event, it does so expressly. It included no such express condition in section 753. Although section 753 directs the Secretary to submit a report within 60 days of March 23, 2018, detailing the intended uses of the funding, the specific appropriation did not lapse on the 61st day absent reporting or notification. Simply put, the language Congress uses matters. And in this instance, the reporting requirement is not a condition on the availability of the appropriation. Congress chose not to include such language.

For the foregoing reasons, the obligation of a portion of the $6 million appropriation for the contract did not violate the ADA because the obligation did not exceed the amount available for that purpose and did not constitute an obligation for the payment of money in advance of an appropriation.

## III. OIG Official Draft Recommendations 3, 4, and 5

Although not directly related to the request for a legal opinion from OGC, OGC addresses the remaining Recommendations 3, 4, and 5 from the Official Draft.

Recommendation 3 provides as follows:

> Take appropriate action if an ADA violation has occurred.

As explained above in sections I and II, the Department has complied with applicable appropriations provisions and, therefore, there are no resulting ADA violations.

Recommendation 4 provides:

> Obtain Congressional approval, as required, prior to obligating and/or expending for reprogramming or transferring additional funds related to the relocation of ERS and NIFA offices.

---

[30] *Id.*

As explained above in sections I and II, the "committee approval" provisions of section 717(a) of the FY 2018 Appropriations Act are unconstitutional and are without legal effect. Supreme Court, Office of Legal Counsel, and GAO precedents confirm this. The Department provided advance notification to the committees before obligating funds for office reorganizations and relocations to the extent they involve a reprogramming or the use of the identified interagency agreement or transfer authorities. The Department is not required to obtain committee approval of such actions.

Draft Recommendation 5 provides as follows:

> Evaluate the need to clarify Departmental regulation to ensure the same procedures are followed when considering organizational changes related to realignment and relocation, regardless of the USDA agency or office proposing the change.

The Official Draft states that OIG "attempted to determine USDA's adherence to any established procedures relating to agency realignment and relocations, and procedures associated with cost benefit analyses (including factors such as staff recruitment and retention, access to agency services, and cost efficiencies)." Official Draft, at 13. OIG concludes that adopting the approach outlined in Departmental Regulation ("DR") 1010-001, "Organization Planning, Review, and Approval" (Jan. 4, 2018), "would be beneficial for all such proposed actions going forward because it is intended to provide a structured process to facilitate the implementation of organizational changes throughout the Department." *Id.* at 11. However, the Official Draft misunderstands the Secretary's authority to initiate organizational changes.

As the head of the Department, the Secretary is authorized to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." 5 U.S.C § 301. As explained in DR 0100-001, "Departmental Directives System" (Jan. 4, 2018), a DR generally provides "policies, procedures, and guidance which have general applicability to employees and two or more USDA agencies or staff offices," and specifically to "promulgate Departmental policy; delegate authority; establish responsibility; establish statutory or interagency committees; and/or prescribe high-level procedures governing USDA activities and operations." DR 0100-001, §§ 3, 4.a(1). In short, unless constrained by law, the Secretary maintains significant discretion to set Departmental policies.

As an extension of the Secretary's discretion to set internal policies, he may delegate certain determinations to subordinate Department personnel. Regarding the DR at issue in Recommendation 5, the Secretary delegated the authority to "[f]ormulate and issue Department policy, standards, rules, and regulations relating to human resources management" to the Assistant Secretary for Administration (7 C.F.R. § 2.24(a)(4)(i)), which is further delegated to the Director of the Office of Human Resources Management ("OHRM") (7 C.F.R. § 2.91(a)(1)). Under that delegation of authority, OHRM issued DR 1010-001 to describe "the policy and actions for making changes to organizational structures within [USDA]." DR 1010-001, § 1. On January 4, 2018, OHRM promulgated a revised version of the DR 1010-001 that specified what reorganization and relocation decisions had to be approved by the Secretary but did not in any

way suggest that such decisions of the Secretary himself were required to be effectuated after the presentation of a DR 1010 package. DR 1010-001 does not set a process for organizational changes at the expense of the Secretary's authority.

Although the scope of DR 1010-001 applies to all "USDA Mission Areas, agencies, and staff offices" (DR 1010-001, § 3), the Secretary retains discretion as a legal and policy matter to deviate from the specific procedures set forth in the DR in specific situations. The Secretary's retained discretion includes approving a reorganization or implementing certain elements of a reorganization and then subsequently documenting those approvals or changes in accordance with the review procedures set forth in DR 1010-001. The Department's prior policy and procedures confirm that the Secretary maintains such discretion. In fact, the prior DR 1010-001 (dated July 20, 2006) expressly provided in section 7 that "[o]rganizational changes that are authorized by the Secretary will be documented in the form of a Secretary's Memorandum." The prior DR expressly recognized the discretion the Secretary retains.

Prior Secretaries exercised discretion with respect to organizational changes. For instance, on July 29, 2009, former Secretary Tom Vilsack signed a high-level reorganization chart for the new Departmental Management Mission Area. On September 8, 2009, Secretary Vilsack issued an undated Secretary's Memorandum implementing the changes reflected in the chart to be effective October 1, 2009. In an undated memorandum, Deputy Assistant Secretary for Administration Alma Hobbs notified agency heads and included as an attachment FAQs dated September 15, 2009, which included FAQ #12:

> *12. What is the timeline for implementing the new Departmental Management?*
> Secretary Vilsack has created the new Departmental Management with his signed memorandum and organizational chart. This new organization will begin October 1, 2009, with most personnel changes effective October 11, that date of the first pay period of the new fiscal year. **Further detailed announcements will be made by office leadership regarding specific changes in some of the offices within Department Management in the coming weeks.**

Italics in original; bold emphasis added.

Secretaries have initiated other reorganizations without a prior DR 1010 package being completed, too. Examples include:

- On November 3, 2009, Secretary Vilsack, without a prior DR 1010 package, signed SM 1064-001 establishing the Office of Advocacy and Outreach that required personnel reorganization from other agencies.

- Secretary Perdue on May 11, 2017, without a prior DR 1010 package, signed SM 1067-017 establishing the new Trade and Foreign Agricultural Affairs Mission Area and the new Farm Production and Conservation Mission Area to which the Natural Resources Conservation Service was transferred from the Natural Resources and Environment Mission Area.

- Finally, Secretary Perdue on November 14, 2017, signed SM 1067-018 that required consolidated business centers in each mission area, merged the Grain Inspection, Packers, and Stockyards Administration into the Agricultural Marketing Service ("AMS"), and consolidated commodity procurement in AMS, as well as other changes, that required personnel realignments that were not preceded by a DR 1010 package.

Each of the above examples demonstrates that Secretaries retain discretion to initiate reorganizations without completing a DR 1010 package. Any other approach baselessly undercuts the Secretary's authority to oversee the Department.

In sum, for the foregoing reasons, it is the opinion of OGC that the Department acted fully in accordance with applicable law and procedure governing each of the issues raised by OIG's Official Draft. Furthermore, although the Department could evaluate potential changes to DR 1010-001, as suggested in Recommendation 5, such amendments would not be necessary to address the Secretary's existing authority to set policy and procedures regarding Departmental reorganizations.

Thank you for the opportunity to address your questions.

Learn more about USDA OIG
Visit our website: www.usda.gov/oig/index.htm
Follow us on Twitter: @OIGUSDA

How to Report Suspected Wrongdoing in USDA Programs

Fraud, Waste, and Abuse
File complaint online: www.usda.gov/oig/hotline.htm

Monday–Friday, 9:00 a.m.– 3:00 p.m. ET
In Washington, DC 202-690-1622
Outside DC 800-424-9121
TDD (Call Collect) 202-690-1202

Bribes or Gratuities
202-720-7257 (24 hours)



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

All photographs are from USDA's Flickr site and are in the public domain.