UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,<br>Defendants. | Case No. 26-cv-09976-VC<br>**ORDER GRANTING MOTION FOR STAY UNDER 5 U.S.C. § 705**<br>Re: Dkt. No. 5 |

This case is about efforts by the United States Department of Agriculture to reorganize itself by shutting down offices and relocating employees. The plaintiffs, including unions that represent affected federal workers, seek a preliminary ruling that would prevent USDA from taking those actions while this litigation is pending. The plaintiffs' primary argument is that the reorganization activities are prohibited by the congressional appropriations statutes that fund USDA and that the reorganization activities are therefore "unlawful" within the meaning of the Administrative Procedure Act.

In these appropriations statutes, Congress specified that USDA may not "reprogram" any funds for reorganization. But the statutes go on to state that this prohibition can be overcome when the agency notifies the House and Senate Appropriations Committees of a particular reorganization activity and obtains permission from those committees to proceed. This raises two questions that are central to the merits of this case.

First, is USDA currently "reprogramming" money to fund its efforts to shut down offices and relocate employees? The answer to that question is almost certainly yes. The law deems funds

to be reprogrammed if an agency uses them for a purpose not contemplated by Congress at the time the appropriation was made. Congress did not contemplate USDA using its appropriated funds to shut down offices or relocate employees. To the contrary, Congress was actively working to restrict the agency's ability to do so.

The second question relates to the statutory language that permits the House and Senate Appropriations Committees to override the default prohibition on reprogramming funds for reorganization activities by approving a particular expenditure proposal from the agency. Both sides agree that this committee-approval language is unconstitutional, so the question is whether and how that language should be severed from the rest of the statutes. USDA contends the statutes should be severed in a way that would give the agency blanket permission to reprogram funds for the purpose of shutting down offices and relocating employees. But it's highly unlikely Congress would have wanted the statutes to operate that way in the event that a court found the committee-approval provision unconstitutional. All available evidence suggests that Congress would have wanted the default prohibition to remain in place.

Thus, what's left after the statutes are severed are congressional restrictions on reprogramming funds for reorganization expenditures. And USDA has almost certainly been violating those restrictions. For this reason, and for the additional reasons discussed below, preliminary relief is necessary to protect the congressional prerogative, prevent irreparable harm to federal employees, and vindicate the public interest.

This leads to a third question, which relates not to the merits but to the scope of preliminary relief. Under section 706 of the APA, courts are generally required, at the conclusion of the litigation, to "set aside" unlawful agency action. Under section 705, courts have discretion to issue preliminary relief—in other words, relief that will apply while the litigation is pending and before the court has an opportunity to decide whether to "set aside" the potentially unlawful agency action. USDA argues that this Court may not temporarily stay the reorganization activities altogether, as any relief must be limited to protecting employees represented by the union plaintiffs who brought this case. That is wrong. For starters, it's contrary to the text of the APA. Section 705

contains no limitation on the scope of preliminary relief; to the contrary, it says that a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. USDA's position is also contrary to the very purpose of preliminary relief: to preserve the ability of a court to order the relief the plaintiff is likely entitled to at the end of the case. Without broad authority under section 705 to temporarily pause unlawful agency action, if an agency completed the challenged action before the litigation ended, a court would be unable to issue the final relief that section 706 often requires. It thus makes no sense to graft onto section 705 an atextual limitation on issuing universal relief on a temporary basis.

To be sure, the Ninth Circuit has used language that, while ambiguous, could be interpreted as saying that the scope of preliminary relief courts may issue pursuant to section 705 is narrower than the scope of permanent relief they may issue at the end of an APA case. But there is also Ninth Circuit case law squarely rejecting this notion. Under these circumstances, as discussed more fully in Section VII, this Court will proceed on the understanding that it has discretion to temporarily halt all the reorganization activities that likely violate the appropriations statutes. And that's what this ruling will require.

It's worth emphasizing that the temporal scope of this relief could end up being quite short. The relevant appropriations statutes are set to expire in less than two months. If the agency wishes to move forward with its plans to close offices and relocate employees, it will soon have the opportunity to convince Congress of the merits of those plans. Congress, if it agrees, can choose not to extend the restrictions at issue in this case. But until then, USDA is preliminarily enjoined from spending appropriated funds on the challenged office closures and employee relocations.

# I

## A

In early 2025, President Trump issued an executive order directing a "critical transformation" of the federal government—one designed to stamp out "waste, bloat, and insularity." Executive Order No. 14210, 90 Fed. Reg. 9669, 9669 (Feb. 11, 2025). The executive order tasked the President's subordinates with devising plans to cut the number of federal employees. *See id.* at 9669–70. The directors of the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) subsequently sent a memo to the heads of federal agencies, directing them to submit plans for how they would downsize and reorganize agency workforces. *American Federation of Government Employees v. Trump*, 2025 WL 2614698, at *1 (N.D. Cal. Sep. 9, 2025). Unions representing federal employees, as well as local governments and nonprofits, sued to enjoin implementation of the executive order. That case remains pending before a different judge of this Court.

This case grew out of that broader challenge to the Trump Administration's downsizing efforts. As in that case, the plaintiffs here are led by federal-employee unions and are joined by a collection of local governments and nonprofits.[1] But the focus of this case is much narrower. Here, the plaintiffs seek to enjoin only one cabinet-level agency, the United States Department of Agriculture, from implementing a plan to close or relocate its offices and employees. *See* Dkt. No. 5-61, Ex. B; Dkt. No. 5-62, Ex. A. If implemented, the planned reorganization activities will likely put thousands of USDA employees to the choice of relocating far from their current home—often to a different state—or losing their job. *See, e.g.*, Dkt. No. 5-7, Ex. B.

---

[1] The union plaintiffs include: the American Federation of Government Employees; American Federation of State County and Municipal Employees; National Federation of Federal Employees; and National Treasury Employees Union. They represent bargaining-unit employees and have dues-paying members at each of the following USDA components: Forest Service; Food and Nutrition Administration; Research, Education, and Economics mission area; Foreign Agricultural Service; Rural Development mission area; Farm Production and Conservation mission area; Office of the General Counsel; and Office of the Assistant Secretary for Civil Rights.

USDA announced its plan to reorganize in the summer of 2025. The agency published a memo laying out a roadmap for the reorganization, which it described as part of USDA's "process of reducing its workforce."[2] Dkt. No. 5-61, Ex. B at 2. The memo explained that four pillars would guide the agency's reorganization: (1) aligning the agency's workforce with financial resources and priorities, (2) relocating employees outside of the Washington, D.C. area, (3) trimming bureaucracy, and (4) consolidating support functions. *Id.* at 2–4.

Following the announcement and memo, the Senate Committee on Agriculture, Nutrition, and Forestry held a hearing on the proposed reorganization, and members of Congress sent USDA letters raising concerns about forced employee relocations. *See* Dkt. No. 5-60, Exs. A–D. Shortly after, USDA proposed a significantly reduced fiscal year 2026 budget that was consistent with reduced staffing and other cuts. *See* Dkt. No. 5-1 ("Mot.") at 4–5; Dkt. No. 79 ("Reply") at 12; Dkt. No. 71 ("Opp.") at 6. Congress ultimately rejected USDA's proposed budget reductions and funded USDA above FY2025 levels. Pub. L. No. 119-37, Div. B (2025); Dkt. No. 5-61, Ex. C at 8. In the same appropriations statute, Congress also restricted USDA's use of funds to perform the sort of reorganizations and relocations the agency had been planning, specifying that USDA was barred from "reprogramming" funds to undertake these activities without first obtaining approval from the House and Senate Appropriations Committees:

> None of the funds provided by this Act, or provided by previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in the current fiscal year, or provided from any accounts in the Treasury derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming, transfer of funds, or reimbursements as authorized by the Economy Act, or in the case of the Department of Agriculture, through use of the authority provided by section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or section 8 of Public Law 89-106 (7 U.S.C. 2263), that—
>
> (1) creates new programs;
>
> (2) eliminates a program, project, or activity;

[2] Agency leadership has since adopted a different position, stating that "[a]ll current USDA employees will have a position in the Department" and that the agency "has no current plans to conduct any Reductions in Force." Dkt. No. 71-1 ¶ 19.

> (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted;
> (4) relocates an office or employees;
> (5) reorganizes offices, programs, or activities; or
> (6) contracts out or privatizes any functions or activities presently performed by Federal employees;
>
> unless the Secretary of Agriculture or the Secretary of Health and Human Services . . . notifies in writing and receives approval from the Committees on Appropriations of both Houses of Congress at least 30 days in advance of the reprogramming of such funds or the use of such authority.

Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, Div. B, § 716(a), 139 Stat. 495, 544 (2025). Section 716(a) is one of several provisions that limit USDA's use of appropriated funds to reorganize. *See id.* § 716(b) (no use of funds through a reprogramming that "reduces . . . numbers of personnel by 10 percent" "for any existing program, project, or activity" without committee notice and approval); *id.* § 716(d) (no use of funds for "realigning or reorganizing new, current, or vacant positions or agency activities or functions to establish a center, office, branch, or similar entity with five or more personnel" or for "carrying out activities or functions that were not described in the budget request" without thirty-day notice); *id.* § 771 (no use of funds to "close or consolidate the resources or locations of any existing Agricultural Research Service laboratories and facilities" without committee notice and approval); *id.* § 779 (no use of funds to "close" or effectively close Natural Resources Conservation Service or Rural Development mission area field offices without committee notice and approval). The definition of "reprogramming" for all these sections is the one traditionally used in the budget process: "the utilization of funds in an appropriation account for purposes other than those contemplated at the time of appropriation." Dkt. No. 5-61, Ex. E; *see also* U.S. Government Accountability Office, GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process 85 (2005) (hereinafter GAO Budget Glossary).

A similar restriction applies to USDA's Forest Service, which is funded through a different appropriations statute. Section 421 of the Interior and Environment Appropriations Act provides:

> None of the funds made available in this Act, in this and prior fiscal years, may be reprogrammed without the advance notification and approval of the House and Senate Committees on Appropriations in accordance with the reprogramming procedures contained in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act).

Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, Div. C, § 421, 140 Stat. 5, 163 (2026). The explanatory statement incorporated into section 421 defines "reprogramming" to "consist of any significant departure from the program described in the agency's budget justifications," including "all proposed reorganizations or other workforce actions . . . which affect a total of 10 staff members or 10 percent of the staffing of an affected program or office, whichever is less, even without a change in funding." Dkt. No. 5-61, Ex. D at 8. Workforce actions, for purposes of reprogramming, include "workforce restructure[s], reshaping[s], transfer[s] of functions, [and] bureau-wide downsizing[s]" as well as "closures, consolidations, and relocations of offices, facilities, and laboratories." *Id.* The explanatory statement also provides that a reprogramming generally must be submitted in writing to the Appropriations Committees before implementation if it "exceeds $1,000,000 annually or results in an increase or decrease of more than 10 percent annually in affected programs or projects, whichever amount is less." *Id.* at 9.

The restrictions in sections 716(a) and 421 were initially set to expire on September 30, 2026, but Congress recently extended them until December 11, 2026, through what is commonly known as a "Continuing Resolution." *See* Pub. L. No. 119-103, Div. A., §§ 101, 103, 106 (2026).

Notwithstanding these restrictions, and without approval from the House and Senate Appropriations Committees, USDA has begun a phased implementation of the planned reorganization activities. As relevant to this case, USDA has started reorganizing eight component organizations within the agency: the Food and Nutrition Administration; the Forest Service; the Research, Education, and Economics mission area; the Foreign Agricultural Service; the Rural Development mission area; the Farm Preservation and Conservation mission area; the Office of the General Counsel; and the Office of the Assistant Secretary for Civil Rights. *See* Mot. at 2, 7–14.

As the first step of these reorganizations, USDA notified Congress of its plans. For each component except the Forest Service, the agency sent a letter to Congress clarifying that it intends to close offices, relocate employees, or both. *See* Dkt. No. 72-2 at 9–16 (Research, Education, and Economics mission area); *id.* at 36–39 (Food and Nutrition Administration); *id.* at 17–35 (Office of the General Counsel); *id.* at 40–41 (Foreign Agricultural Service); *id.* at 42–44 (Farm Production and Conservation mission area); *id.* at 45–49 (Rural Development mission area); *id.* at 58–59 (Office of the Assistant Secretary for Civil Rights). USDA orally notified Congress about the Forest Service's reorganization; the record does not include the content of that communication. *See* Dkt. No. 5-62, Ex. D at 2.

In three of its letters to the Senate Appropriations Committee—regarding reorganizations at the Food and Nutrition Administration; the Research, Education, and Economics mission area; and the Office of the General Counsel—USDA specified that the reorganization would require reprogramming or transferring funds (or both). Dkt. No. 72-2 at 9, 17, 36. One of these three—the Research, Education, and Economics letter—stated explicitly that notice was being provided to Congress pursuant to section 716. *Id.* at 9. A different letter—for the Farm Production and Conservation mission area—disclaimed any reprogramming or transferring. *Id.* at 44. The remaining letters concerning reorganizations at the affected components are silent on the issue. *See id.* at 40–41, 45–49, 58–59.

After sending these letters to the House and Senate Appropriations Committees (but again, without receiving approval), USDA took further steps to implement the reorganizations. Some employees have received letters notifying them of mandatory relocation—specifically, employees at the Research, Education, and Economics mission area; the Forest Service; and the Office of the General Counsel. Dkt. No. 5-7 ¶¶ 10–13; Dkt. No. 5-19 ¶ 14; Dkt. No. 5-62, Ex. H ¶ 110. And the Forest Service, the Food and Nutrition Administration, and the Foreign Agricultural Service have communicated to employees that they will receive relocation letters soon. *See* Dkt. No. 5-19 ¶ 14; Dkt. No. 5-20 ¶ 12; Dkt. No. 5-6 ¶¶ 23–26. Moreover, USDA has begun bargaining with the unions representing affected employees about the rollout of employee relocations; the agency has

made it clear, however, that it is unwilling to negotiate whether relocations will occur at all. *See, e.g.*, Dkt. No. 5-18 ¶¶ 4–9.

If implemented, USDA's planned reorganization activities would significantly reshape the affected components. Consider two examples. The Food and Nutrition Administration (FNA) administers nutrition-assistance programs that promote access to healthy and affordable food. Dkt. No. 5-27 ¶ 6. One such program—the Supplemental Nutrition Assistance Program, or SNAP—provides food benefits to 38 million low-income Americans each month. Dkt. No. 5-55 ¶ 5. Another—the Special Supplemental Nutrition Program for Women, Infants, and Children, or WIC—provides food assistance to forty percent of infants nationwide. *Id.* USDA is planning to close all seven FNA regional offices as well as the Retailer Operations and Compliance Office, and to relocate the employees who work at those offices into five new "hub" cities. Dkt. No. 5-27 ¶¶ 18–19. Those relocations may affect up to 870 of the roughly 1,200 current FNA employees. *Id.* ¶ 14; Mot. at 8. In a recent employee survey, the vast majority of respondents said that they are unlikely to opt to relocate, including 90 percent of respondents working on Supplemental Nutrition and Safety Programs like WIC. *See* Mot. at 8; Dkt. No. 5-27 ¶¶ 24–30. SNAP would probably also see significant employee attrition—81 percent of respondents working on SNAP said that they would likely decline relocation. *Id.* ¶ 26.

A similar scene is unfolding at the Forest Service, which stewards 193 million acres of federal land across 154 National Forests and twenty National Grasslands. *See* Dkt. No. 5-17 ¶¶ 5–6. Part of that stewardship involves preventing and fighting wildfires. Dkt. No. 5-17 ¶ 6. USDA plans to relocate the Forest Service's headquarters from Washington, D.C. to Salt Lake City, Utah. *Id.* ¶ 14. The agency also intends to close all nine regional offices, with many functions shifted to fifteen state offices and a network of operational service centers (although USDA has said that employees at three of the regional offices won't be transferred outside of their local commuting areas). *See* Dkt. No. 5-61, Ex. I; Dkt. No. 71-1 ¶¶ 49, 178–79. USDA will also shutter twenty-three Forest Service research facilities around the nation and centralize operations in a single research organization based out of Fort Collins, Colorado, though employees at the research

facilities won't be required to move outside their local commuting areas. Dkt. No. 5-61, Ex. I; Dkt. No. 71-1 at 193. In March, the Forest Service sent letters to more than 6,000 employees notifying them of the planned reorganization and informing them that they were being considered for mandatory relocation. *See* Dkt. No. 5-17 ¶¶ 16–18. Although it's unclear how many employees USDA plans to actually relocate, if the relocations are allowed to proceed, it's likely that many affected employees will decline to move and will instead leave the Forest Service. *See* Dkt. No. 5-18 ¶ 22.

**B**

Unions representing USDA employees, as well as local governments and nonprofit organizations, sued to stop the office closures and employee relocations at the eight challenged components. The plaintiffs now seek a stay under the Administrative Procedure Act (APA) to block the closures and relocations while this lawsuit is pending. *See* 5 U.S.C. § 705. In light of the restrictions Congress imposed on USDA's ability to reorganize, the plaintiffs assert that USDA's planned office closures and employee relocations are not in accordance with law and thus violate the APA. *See* 5 U.S.C. § 706(2)(A)–(C). The plaintiffs also assert that the closures and relocations violate the APA because USDA acted in an arbitrary and capricious fashion, failing to consider the impact of its reorganization actions on its ability to perform statutorily mandated functions. *See id.* § 706(2)(A).

Under section 705 of the APA, a reviewing court may, to the extent necessary to prevent irreparable injury, "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The standard for a section 705 stay is the same as for a preliminary injunction. *National TPS Alliance v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025). The plaintiffs must show (1) a likelihood of success on the merits; (2) a likelihood that they will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id.* at 1015–16. Where the government is a party, the third and

fourth factors merge. *Id.* at 1016.

## II

Before defending the office closures and relocations on the merits, USDA makes several arguments for why this Court lacks jurisdiction over the plaintiffs' claims. They all lack merit.

***Final Agency Action.*** First, USDA argues that the plaintiffs have not challenged final agency actions and that this precludes APA review. Opp. at 9–11. An action must satisfy two conditions to be considered final under the APA. "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *San Francisco Herring Association v. Department of the Interior*, 946 F.3d 564, 577 (9th Cir. 2019) (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016)).

The closures and relocations check both boxes. First, USDA has consummated its decision-making process. For each component, the agency has informed Congress of the reorganization actions it intends to take. *See* Dkt. No. 71-2; Dkt. No. 5-62, Ex. D. It has published information about the reorganizations on its website. Opp. at 4. And it has "put its declared position into action" by beginning to send relocation letters to agency employees and by engaging in collective bargaining about the reorganization's impact and implementation. *San Francisco Herring Association*, 946 F.3d at 578; *see, e.g.*, Dkt. No. 5-7, Ex. B; Dkt. No. 5-18 ¶¶ 4–8. This combination of notice and initial execution confirms that USDA's decision-making process is complete for APA purposes. *See San Francisco Herring Association*, 946 F.3d at 579.

Second, the closures and relocations determine obligations and impose legal consequences: Affected employees have been given deadlines by which they must report to new offices or face termination. *See, e.g.*, Dkt. No. 5-7, Ex. B.

The government argues that instead of challenging final agency actions, the plaintiffs have mounted an improper "programmatic" challenge to USDA's restructuring. Opp. at 9–11. That is

wrong. Prohibited programmatic challenges fail to target "discrete" agency actions; they "seek *wholesale* improvement" of a broader agency initiative. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990). By contrast, the plaintiffs have challenged specific decisions made as part of USDA's reorganization efforts, including decisions to close certain offices and relocate certain employees.

***Preclusion by the Civil Service Reform Act.*** USDA next argues that the Civil Service Reform Act (CSRA) precludes the plaintiffs' claims. A "special statutory review scheme" can implicitly preclude district-court jurisdiction over challenges to federal agency action. *Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175, 185 (2023). Here, USDA points to the CSRA's creation of two administrative bodies: the Merit Systems Protection Board (MSPB), which reviews claims by federal employees arising out of specific adverse actions taken against them by their employer, and the Federal Labor Relations Authority (FLRA), which reviews issues relating to unfair labor practices and the duty to bargain in good faith. *See American Federation of Government Employees v. Trump*, 139 F.4th 1020, 1030–31 (9th Cir. 2025); 5 U.S.C. §§ 7512–7513, 7701; *id.* §§ 7105, 7117–7118.

USDA is wrong that the union plaintiffs' claims must be channeled through this administrative-review framework for personnel actions. The Ninth Circuit has recognized that the MSPB and FLRA lack authority and expertise over constitutional and statutory challenges to structural agency-reorganization directives like those at issue here. *American Federation of Government Employees*, 139 F.4th at 1030–32. Channeling these claims would thus preclude meaningful judicial review: "[A]lthough some federal employees might be able to challenge their terminations in individual proceedings before the MSPB, that would not obviate the need to address their constitutional and statutory claims—which . . . allege injury not from this or that employment action but from subjection to unlawful executive authority." *Id.* at 1032 (citation modified) (quoting *Axon*, 598 U.S. at 195).[3]

[3] The Ninth Circuit's opinion in *American Federation of Government Employees* also considered challenges to—and declined to disrupt a preliminary injunction of—President Trump's executive

***Preclusion by the Antideficiency Act.*** USDA's argument that the Antideficiency Act precludes the plaintiffs' APA challenge fails too. The Antideficiency Act operationalizes the Constitution's Appropriations Clause by prohibiting the Executive from expending funds not appropriated by Congress. 31 U.S.C. § 1341. The Act imposes certain reporting requirements on the executive branch, *id.* § 1351, and violations expose an employee to administrative discipline and may carry criminal penalties, *id.* §§ 1349–1350. Although the Department of Justice is responsible for prosecuting violations, it has never brought such charges in the history of the Act. *See* U.S. Government Accountability Office, GAO-21-538T, Testimony before the House Committee on the Budget—Proposals to Reinforce Congress's Constitutional Power of the Purse 6 (2021). These provisions are far from a "complex and delicate administrative scheme" evincing congressional intent to preclude APA suits. *Block v. Community Nutrition Institute*, 467 U.S. 340, 348 (1984). Rather, the Antideficiency Act establishes a limited internal-compliance scheme within the executive branch. Its reliance on executive-branch officials to identify violations means it provides no relief when an agency decides as a matter of policy that its actions do not violate an appropriations statute. *Neguse v. U.S. Immigration & Customs Enforcement*, 813 F. Supp. 3d 45, 89 (D.D.C. 2025); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 222–23 (2012). It is unlikely Congress intended the Antideficiency Act to place in the hands of the Executive the exclusive responsibility to enforce Congress's appropriations restrictions.[4]

---

order directing reductions in force and a joint OPM and OMB memo providing implementation guidance. 139 F.4th at 1028. In granting an emergency stay application, the Supreme Court stated that the government was likely to succeed in arguing that the executive order and memo were lawful. *Trump v. American Federation of Government Employees*, 145 S. Ct. 2635, 2635 (2025) (per curiam). This conclusion about the merits did not address the Ninth Circuit's conclusion regarding the threshold CSRA preclusion issue. And in any event, the Supreme Court order concerned only the executive order and OPM/OMB memorandum; it "express[ed] no view on the legality of any Agency RIF and Reorganization Plan," which are the closer analogies to the USDA actions at issue here. *Id.*

[4] USDA makes two additional arguments for Antideficiency Act preclusion, both of which are unpersuasive. *See* Opp. at 17–18. First, its argument that the Act does not provide a private right of action is beside the point. The plaintiffs don't seek to enforce the Antideficiency Act; they seek APA review of USDA's actions. "Where a statute imposes obligations on a federal agency but the

***Agency Action Committed to Agency Discretion.*** USDA's final threshold argument is that the planned office closures and employee relocations fall into the narrow exception to judicial review for agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). It's true that discretionary decisions underlie USDA's reorganization plans. But the committed-to-agency-discretion exception "does not preclude judicial review of *all* discretionary decisions because the APA itself 'command[s] that courts set aside agency action that is an abuse of discretion.'" *Jajati v. U.S. Customs & Border Protection*, 102 F.4th 1011, 1016 (9th Cir. 2024) (quoting *Department of Commerce v. New York*, 588 U.S. 752, 772 (2019)). Instead, only in "rare instances in which there is 'truly no law to apply'" does section 701(a)(2) preclude APA review. *Id.* at 1017 (quoting *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019)). Far from lacking judicially manageable standards, the appropriations statute here prohibits expenditures for a defined set of reorganization activities. *See, e.g.*, Pub. L. No. 119-37, Div. B, § 716(a). USDA's point that allocations of lump-sum appropriations are decisions committed to agency discretion is correct, but irrelevant to this issue. While lump-sum appropriations aim to give an agency flexibility in determining how to spend funds, statutory provisions called appropriations riders, like the restrictions here, constrain agency discretion. *See Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993); *see also id.* at 193 ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by

---

obligations do not 'give rise to a "private" right of action against the federal government, an aggrieved party may pursue its remedy under the APA.'" *California v. Trump*, 963 F.3d 926, 941 (9th Cir. 2020) (citation modified) (quoting *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005)). Second, USDA's reliance on cases suggesting that the Impoundment Control Act (ICA) may preclude APA review is unconvincing. The ICA concerns different subject matter (the Executive's refusal to spend appropriated funds) than the Antideficiency Act and establishes an entirely different "complex scheme of interbranch dialogue" under which the Comptroller General can investigate and sue executive-branch officials for violations. *Global Health Council v. Trump*, 153 F.4th 1, 18–19 (D.C. Cir. 2025); 2 U.S.C. § 687; *see Neguse*, 813 F. Supp. 3d at 88–89. By contrast, the only role for Congress in the Antideficiency Act is the requirement that agencies detect and then report violations to the President, Congress, and the Comptroller General; responsibility to investigate and enforce violations lies within the executive branch alone. 31 U.S.C. §§ 1349–1351.

putting restrictions in the operative statutes . . . .”).

### III

Turning to the merits, the core question is whether the challenged reorganization activities are lawful. USDA argues that the office closures and employee relocations are lawful because they are authorized by the Reorganization Plan No. 2 of 1953, which “gives the Secretary broad authority to reorganize the Department.” *See* Opp. at 16–17 (citing 7 U.S.C. § 2201 note). But even if that statute authorizes USDA to perform the closures and relocations (and it’s not clear that it does), that does not supersede any restrictions Congress has subsequently imposed on USDA, such as the spending restrictions in sections 716(a) and 421. *Cf. United States v. McIntosh*, 833 F.3d 1163, 1177, 1179 (9th Cir. 2016).

The initial question, then, is whether section 716(a) and section 421 apply to the reorganization activities USDA has begun to undertake. Section 716(a) prohibits USDA from spending funds “through a reprogramming” that “eliminates a program, project, or activity,” “relocates an office or employees,” or “reorganizes offices, programs, or activities” without committee notification and approval. Pub. L. No. 119-37, Div. B, § 716(a). And section 421 prohibits USDA from “reprogramm[ing]” funds appropriated to the Forest Service without committee notification and approval. Pub. L. No. 119-74, Div. C, § 421. In either case, the issue boils down to whether USDA’s spending on its planned office closures and employee relocations amounts to a “reprogramming.” Because section 716(a) and section 421 define reprogramming differently, the reorganization activities must be analyzed against each section separately.

But before turning to that analysis, it’s useful to discuss a few features of the appropriations process. Congress exercises its constitutional power of the purse by enacting appropriations, which designate public funds for agencies to spend on specified purposes. *Consumer Financial Protection Bureau v. Community Financial Services Association of America, Limited*, 601 U.S. 416, 426–27 (2024). For most agencies, including USDA, Congress provides this funding on an annual basis. *Id.* at 421. In these acts, each paragraph authorizing an agency to incur obligations

and make payments for some purpose is an "appropriation account." GAO Budget Glossary at 2.

The appropriations process constrains how agencies spend funds from these accounts in a few relevant ways. Most obviously, each appropriation account sets a cap: An agency may not make expenditures that exceed the amount set by Congress. 31 U.S.C. § 1341(a)(1)(A). In addition, agencies may expend funds only for the statutory purpose for which Congress made the appropriation, unless otherwise provided by law. *Id.* § 1301(a). As a result, transferring funds between appropriation accounts is prohibited without express statutory authority. *Id.* § 1532. And lastly, Congress sometimes uses appropriations riders to prohibit use of funds for some particular activity. *See McIntosh*, 833 F.3d at 1172; GAO Budget Glossary at 14, 64.

These constraints on agency spending mostly flow from an appropriation's statutory purpose, as established in the text of the operative statute. Congress might specify a purpose by, say, providing some amount of "funds to carry out Program A." An agency can't use those funds to carry out Program B—at least, not without some explicit transfer authority. But the agency can probably use the funds for a number of different expenses associated with Program A.

That said, even if the appropriations statute itself doesn't communicate any further detail, Congress often has a more particular plan in mind. For example, it might indicate in a committee report that it expects the agency to distribute the Program A appropriation across Activities 1 and 2. While Congress certainly intends for the agency to adhere to these expectations, they are not legally binding.[5] Absent some other restriction, an agency in this situation has broad discretion to reallocate funds in the Program A account across Activities 1 and 2 as it sees fit, so long as the obligations remain consistent with the account's statutory purpose (Program A). *Lincoln*, 508 U.S. at 192–93. It could even move Program A funds to some third activity that Congress didn't consider at all, as long as that activity is also part of Program A. This reallocation of funds within

[5] To be clear, such restrictions are not legally binding if they appear only in legislative history, such as a committee report, and are not incorporated into an appropriations statute. *See McIntosh*, 833 F.3d at 1178–79. When restrictions appear in or are incorporated into an appropriations statute, they are legally binding.

a single account, for purposes other than those contemplated by Congress at the time of the appropriation, is called "reprogramming." GAO Budget Glossary at 85. Unlike "transfers" between appropriation accounts, which are generally prohibited, reprogramming is generally permitted. *See Lincoln*, 508 U.S. at 192–93; U.S. Government Accountability Office, GAO-16-464SP, Principles of Federal Appropriations Law 2-44 (4th ed. 2016) (hereinafter GAO Red Book). However, Congress can, and often does, override this default rule by enacting restrictions on reprogramming funds. *Id.* at 2-45. The appropriations provisions at issue here include such restrictions.

***Reprogramming Under Section 716(a).*** Section 716(a) restricts USDA's ability to reprogram funds for spending on certain activities: to relocate offices or employees; to reorganize offices, programs, or activities; or to eliminate programs, projects, or activities. To reprogram funds for these purposes, USDA must first obtain approval from the House and Senate Appropriations Committees. USDA argues that although its reorganization activities squarely fall within section 716(a)'s list of activities for which reprogramming is prohibited, its planned spending on those activities would not constitute "reprogramming" and thus does not trigger the provision's committee-approval requirement. But the available evidence points strongly in the other direction.[6]

Section 716(a) does not adopt a unique definition of reprogramming. Its accompanying explanatory statement defines the term as it's usually used in the budget process: "the utilization of funds in an appropriation account for purposes other than those contemplated at the time of

[6] The reorganization actions might well also require transfers of funds (that is, moving money between appropriation accounts rather than within appropriation accounts), which section 716(a) also prohibits without committee notice and approval. The plaintiffs make this argument, but there is no record evidence one way or another as to which accounts USDA is spending from. So, at least for now, the Court takes USDA at its word that it has not and will not transfer funds between accounts, and instead assesses only the parties' arguments as to reprogramming. Additionally, section 716(a) restricts the use of several other funding tools to effectuate the prohibited activities, including reimbursements under the Economy Act and some other USDA-specific budgetary flexibilities. Both sides agree that none of those mechanisms are implicated here. *See* Dkt. No. 103 at 2 n.1.

appropriation." Dkt. No. 5-61, Ex. E at 1; *see also* GAO Budget Glossary at 85. Determining whether a reprogramming has occurred thus requires identifying (1) the purposes for which Congress thought the agency would use the funds when it appropriated them and (2) the purposes for which the agency now intends to use the funds. If those purposes are not the same, the agency is reprogramming funds.

USDA now intends to use appropriated funds to close offices and relocate employees. That much is clear. But determining the purposes Congress originally envisioned for those appropriations—and whether those purposes included office closures and employee relocations—is more complicated. Where an appropriations statute sets out lump-sum appropriations, its text "sheds little light on whether a particular shifting of funds is indeed a reprogramming." GAO Red Book at 2-46. That's because the whole point of a lump-sum appropriation is that it doesn't spell out how Congress expects the agency to spend the funds. *Id.* at 2-44 to -46; *see also Lincoln*, 508 U.S. at 192. In other words, the statutory text is often not helpful in identifying congressional intent because it doesn't separate appropriations into discrete subdivisions, even where Congress intends for the agency to distribute a given appropriation across programs in a particular way.

Identifying a reprogramming thus requires looking to other sources to determine Congress's expectations. Those expectations can be gleaned from programmatic subdivisions set forth in committee reports, particularly joint explanatory statements; agency documents; and the President's budget submission. U.S. Government Accountability Office, Decision B-330108 at 3–4 (Dec. 23, 2020); GAO Red Book at 2-46. These subdivisions help establish a baseline of what Congress thought the funds would be used for at the time it appropriated them. Any departure from this baseline signals that a reprogramming has occurred.[7]

[7] This framework is employed by GAO when considering whether an agency reprogrammed funds. *See, e.g.*, GAO Decision B-330108 at 3–5. It's appropriate to adopt GAO's framework here, both because of GAO's expertise in the area of appropriations law, and because Congress adopted GAO's definition of "reprogramming" in the explanatory statement to this appropriations act. *See U.S. Department of Navy v. Federal Labor Relations Authority*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (describing GAO opinions as expert and persuasive and then applying a GAO doctrine to an appropriations-law issue); Dkt. No. 5-61, Ex. E at 1.

The explanatory statement, agency documents, and President's budget submission associated with the appropriations statute at issue show that Congress almost certainly did not intend for these funds to be used for office closures or employee relocations at the time it appropriated them.

First, the explanatory statement accompanying this appropriations statute supports that the challenged actions are funded through reprogrammings. As far as committee reports go, explanatory statements are particularly useful evidence of congressional expectations, since they jointly describe the final text of an appropriations bill to which both Houses of Congress agreed. *See* GAO Decision B-330108 at 4; GAO Red Book at 1-50. Here, the high-level directives in the explanatory statement are not helpful, as they simply adopt the GAO definition of "reprogramming." Dkt. No. 5-61, Ex. E at 1. But the statements accompanying each relevant appropriation help illuminate Congress's expectations insofar as they provide subdivisions for the funds at issue. *See* GAO Decision B-330108 at 3–4. For example, the explanatory statement subdivides the appropriation for SNAP across a list of objects, including benefits, specified administrative costs, and particular programs. Dkt. No. 104 at 2. About half of the relevant appropriations have a similar list of subdivisions in the explanatory statement. *See* Dkt. No. 104. And nowhere does the explanatory statement delineate reorganization (or office closures or employee relocations) as a permissible object of any appropriation. *Id.* The absence of subdivisions pertaining to reorganization activities in the explanatory statement supports the notion that Congress did not expect USDA to use its lump-sum appropriations for those activities.

Second, the primary agency budget documents available here—USDA's letters notifying Appropriations Committee members of its planned reorganization—suggest that the agency understands itself to be departing from the baseline subdivisions expected by Congress. *See* Opp. at 4; Dkt. No. 72-2. Of the seven letters in the record pertaining to component reorganizations challenged in this litigation, three say that the proposed relocation and reorganization steps would require reprogramming (and/or transfers) of appropriations. *See* Dkt. No. 72-2 at 9, 17, 36. Three letters do not mention reprogramming implications either way. *See id.* at 40–41, 45–49, 58–59.

One letter—pertaining to the challenged reorganization of the Farm Production and Conservation mission area—claims that proposed organizational changes will not require reprogramming, but without explaining why. *See id.* at 44. USDA has not identified any meaningful distinctions among the activities that these letters specified would involve reprogramming, the activities identified in letters that were silent on the issue of reprogramming, and the activities identified in the one letter that said without explanation that reprogramming was unnecessary. Nor is there any meaningful difference in the statutory language for each relevant appropriation account. Accordingly, although the agency's treatment of the reprogramming issue in these letters was sloppy, the letters cut slightly in favor of the conclusion that reprogramming is taking place.[8]

The third and final source of intel as to congressional expectations is the President's FY2026 budget submission. Although perhaps one could have inferred from the proposed cuts to the USDA budget that the agency was contemplating some kind of office closures and employee terminations, the proposal made no explicit mention of any sort of reorganization at all. It subdivided proposed appropriations into programmatic categories, but none of these categories flagged the agency's reorganization plans. *See* Dkt. No. 5-61, Ex. Q. The absence of any mention of USDA's reorganization plans stands in contrast to the agency's recent FY2027 submission. The new budget request asks for an additional $55 million to manage staff relocations, reflected in a specific line item for Agriculture Buildings and Facilities. U.S. Department of Agriculture, FY 2027 Budget Summary 71, 76 (2026). Moreover, even if USDA was attempting to implicitly signal its reorganization plans by proposing steep budget cuts for FY2026, Congress rejected those cuts.

---

[8] Turning to these letters to infer USDA's understanding of reprogrammings is necessary because of the agency budget documents *not* before the Court. In the appropriations statute, Congress required USDA to submit an "obligation plan" within thirty days detailing the programs, projects, and activities on which each appropriation account would be spent, and provided that "such obligation plan shall serve as the baseline for reprogramming notifications for the purposes of section 716." Pub. L. No. 119-37, Div. B, § 721. Given that statutory directive, this obligation plan could be a critical piece of evidence as to whether USDA deviated from Congress's expectations for how it would spend its appropriations. Unfortunately, though, this obligation plan is not public, and it is unclear whether USDA ever prepared it. The agency has not submitted or even referenced this plan throughout multiple rounds of briefing. *See* Dkt. No. 103 at 4 n.6.

*Compare* Dkt. No. 5-61, Ex. Q at 1 (proposing $6.7 billion budget cut), *with* Pub. L. No. 119-37, Div. B (funding USDA above FY2025 levels).

Taken together, all this is strong evidence that USDA's planned reorganization activities deviate from Congress's expectations at the time it appropriated the funds. Any spending on these reorganization activities thus constitutes reprogramming and triggers section 716(a).[9]

***Reprogramming Under Section 421.*** Section 421 prohibits USDA from reprogramming funds appropriated to the Forest Service without committee notification and approval. The task here is the same as with section 716(a): to determine whether spending on USDA's planned reorganization activities at the Forest Service constitutes reprogramming. The difference is that Congress adopted a definition of "reprogramming" that is specific to section 421. Unlike the standard definition that applies to section 716(a), section 421's definition provides concrete criteria for what constitutes a reprogramming. So the analysis here is simpler.

Section 421 incorporates a statute-specific definition of reprogramming provided in the appropriation act's explanatory statement. *See* Dkt. No. 5-61, Ex. D at 7–9. The "Reprogramming Guidelines" in that explanatory statement define reprogramming to include "any significant departure from the program described in the agency's budget justifications," which "includes all proposed reorganizations or other workforce actions" that "affect a total of 10 staff members or 10 percent of the staffing of an affected program or office, whichever is less, even without a change in funding." *Id.* at 8. The explanatory statement defines applicable workforce actions to include "workforce restructure[s], reshaping[s], transfer[s] of functions, [and] bureau-wide downsizing[s]" as well as "closures, consolidations, and relocations of offices, facilities, and laboratories." *Id.* Under the statute's Reprogramming Guidelines, USDA must submit a planned reprogramming to the House and Senate Appropriations Committees "in writing prior to implementation if it exceeds

[9] This conclusion is consistent with how USDA has understood reprogrammings in the past. In 2019, the agency's Office of Inspector General found that because "Congress ha[d] not appropriated funding specifically for the relocation of" USDA's Economic Research Services offices, the agency's spending on those relocations was a reprogramming of funds that implicated the appropriation statute's committee-approval requirement. Dkt. No. 82-3 at 15.

$1,000,000 annually or results in an increase or decrease of more than 10 percent annually in affected programs or projects, whichever amount is less." *Id.* at 9.

There is no doubt that spending on USDA's planned reorganization activities at the Forest Service satisfies this definition of reprogramming. By the agency's own admission, USDA intends to move the Forest Service's headquarters from Washington, D.C. to Salt Lake City, Utah; to close all nine regional offices and transition functions to fifteen state offices and a network of operational service centers; and to close twenty-three research and development facilities in favor of a single organization based in Fort Collins, Colorado. Dkt. No. 71-1 ¶¶ 176–79, 182, 193. The plaintiffs have submitted evidence that approximately 6,500 employees received letters from the Forest Service notifying them that they might be affected by the planned reorganization. Dkt. No. 5-17 ¶ 16. USDA offers a different number: As of September 14, 2026, the agency estimates that, at most, 250 Forest Service employees will be relocated outside of their local commuting area. Dkt. No. 71-1 ¶ 165. Regardless of which of those figures more accurately captures the actual impact of USDA's planned relocations, those relocations (and the related office closures/relocations) certainly affect more than ten staff members and therefore fall within the definition of reprogramming. *See* Dkt. No. 5-61, Ex. D at 8. These activities are thus prohibited by section 421 absent congressional notification and approval.

USDA tries to complicate the analysis with the meritless argument that section 421 incorporated only one portion of the Reprogramming Guidelines. *See* Dkt. No. 100 at 12–13. While USDA is correct that language in an explanatory statement is binding law only if it is incorporated into the appropriations statute, it is wrong that section 421 incorporated the Reprogramming Guidelines so narrowly. *See Oregon Council for Humanities v. U.S. DOGE Service*, 794 F. Supp. 3d 840, 873 (D. Or. 2025).

Section 421 reads: "None of the funds made available in this Act, in this and prior fiscal years, may be reprogrammed without the advance notification and approval of the House and Senate Committees on Appropriations *in accordance with the reprogramming procedures contained in the explanatory statement* . . . ." Pub. L. No. 119-74, Div. C, § 421 (emphasis added).

USDA asserts that because "in accordance with the reprogramming procedures" immediately follows the clause requiring "advance notification and approval" of the Appropriations Committees, section 421 incorporates the explanatory statement only to the extent it deals with committee notification or approval. The one portion of the explanatory statement that fits the bill, USDA contends, is the provision requiring written notice of a reprogramming where "it exceeds $1,000,000 annually" or changes spending on an affected program or project by more than ten percent. Dkt. No. 100 at 13; *see* Dkt. No. 5-61, Ex. D at 9.

Although section 421 certainly could have been more artfully drafted, USDA's interpretation of that provision runs headfirst into its text and history. Congress adopted this provision to restrict USDA's ability to unilaterally reorganize the Forest Service without congressional buy-in. Over the past ten years, Congress has progressively ratcheted up that restriction both by expanding the definition of reprogramming—in the explanatory statement—to include additional types of reorganization activities in FY2018 and, two years later, by converting section 421 from a notice-only to a notice-and-approval provision. *See* Mot. at 18 n.11; Dkt. No. 5-62, Ex. L at 5; Dkt. No. 103 at 13 & n.12. The prospect of Congress taking those steps, including modifying the scope of reprogramming in the explanatory statement, all to incorporate only one, unrelated portion of the explanatory statement makes no sense. Nor does it make sense that Congress would have incorporated the explanatory statement to the effect of *narrowing* section 421's scope. Under USDA's interpretation, section 421's reference to the explanatory statement effectively writes the approval requirement out of the statute and replaces it with the explanatory statement's written-notice requirement. Lastly, it's not at all clear that the written-notice requirement is the only "reprogramming procedure[]" in the explanatory statement. *See* Pub. L. No. 119-74, Div. C, § 421. For example, the explanatory statement also provides that any "reprogramming request submitted to the Committees on Appropriations shall include a description of anticipated benefits, including anticipated efficiencies and cost-savings, as well as a description of anticipated personnel impacts and funding changes anticipated to implement the proposal" and that "[e]xcept under the most urgent situations, reprogramming should not be

employed to initiate new programs or increase allocations specifically denied or limited by Congress, or to decrease allocations specifically increased by the Congress." *See* Dkt. No. 5-61, Ex. D at 8–9. Those provisions—along with the explanatory statement's substantive definition of a reprogramming—are "reprogramming procedures" just as much as the written-notice requirement.

**IV**

Sections 716(a) and 421 both contain "escape hatch" provisions that permit the House and Senate Appropriations Committees to grant USDA one-off exceptions to the general prohibition on reorganizing. Section 716(a) provides that none of USDA's appropriated funds can be used for a reprogramming that "relocates an office or employees" or "reorganizes offices, programs, or activities" unless USDA notifies Congress and receives approval from both the House and Senate Appropriations Committees at least thirty days in advance of implementation. Pub. L. No. 119-37, Div. B, § 716(a). And section 421 provides that none of the Forest Service's appropriated funds "may be reprogrammed without the advance notification and approval of the House and Senate Committees on Appropriations." Pub. L. No. 119-74, Div. C, § 421.

As both sides agree, these committee-approval clauses are unconstitutional. To take legislative action, Congress must act "in conformity with . . . the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President." *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 958 (1983). These approval clauses authorize just two congressional committees—"the Committees on Appropriations of both Houses of Congress"—to grant USDA exceptions from the general prohibitions on reorganization activities. Pub. L. No. 119-37, Div. B, § 716(a). And granting such exceptions is no doubt legislative action. *See Chadha*, 462 U.S. at 952 (explaining that legislative action is "action that ha[s] the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch"). At base, then, this scheme authorizes legislative action by only two congressional committees, without the bicameral passage and presentment required by the

Constitution. *See* U.S. Const. art. I, § 1; *id.* § 7, cls. 2, 3; *Chadha*, 462 U.S. at 955–59.

The task becomes determining whether those clauses can be severed from the rest of their respective sections. "Invalid portions of a federal statute are to be severed '[u]nless it is evident that the Legislature would not have enacted'" the statute without its unconstitutional portions. *National Mining Association v. Zinke*, 877 F.3d 845, 861 (9th Cir. 2017) (quoting *Chadha*, 462 U.S. at 931–32). Any portions of the statute that are "(1) constitutionally valid, (2) capable of functioning independently, and (3) consistent with Congress' basic objectives in enacting the statute" must be retained. *United States v. Booker*, 543 U.S. 220, 258–59 (2005) (citation modified).

Each side proposes a different way to sever the unconstitutional clauses from the rest of the statute. USDA contends that only the approval requirements should be severed and that both the substantive prohibitions and the notification requirements should be retained. *See* Opp. at 24. This would permit USDA to reorganize so long as it notifies Congress of its plans, as it has already done. The plaintiffs contend that the committee-notice and the committee-approval clauses should both be severed, leaving only the substantive prohibitions. *See* Mot. at 16–17; Reply at 11–12. This would create a prohibition on the specified reorganization actions unless Congress lifted the prohibition by further legislation. The question is "which of the two . . . remedial approaches is the more compatible with the Legislature's intent." *Booker*, 543 U.S. at 246; *see also id.* (severability is fundamentally a question of "legislative intent").

As a preliminary matter, USDA repeatedly characterizes the committee-approval clauses as "legislative vetoes" like the one struck down in *Chadha*. That's a mistake, and it's a mistake that pervades USDA's severability analysis. With a legislative veto, Congress gives the executive branch authority to act but improperly reserves the right for Congress (or subparts of Congress) to prevent the Executive from exercising that authority in a particular instance without satisfying bicameralism and presentment. The committee-approval clauses here work the opposite way: Section 716(a) and section 421 prohibit reorganizing activities, and the committee-approval clauses provide an escape hatch by which the Appropriations Committees can give permission to

act in an otherwise prohibited manner on a case-by-case basis. In other words, with a legislative veto, the default is that the executive branch is authorized to act, whereas with a committee-approval clause, the default is that the executive branch is prohibited from acting. It's no surprise that courts will typically sever a provision containing a legislative veto by returning to the default: permission to act. *See, e.g.*, *Chadha*, 462 U.S. at 931–35, *National Mining Association*, 877 F.3d at 861–66. With a provision involving a committee-approval clause, though, returning to the default means that the Executive is prohibited from acting. Thus, from the get-go, the text of sections 716(a) and 421 cuts against the argument that the statute should be reformed to give the agency blanket permission to spend appropriations on closing offices and relocating employees.

Perhaps one could imagine a committee-approval provision having a particular context and history that would support a conclusion that Congress would have wanted its default prohibition turned into blanket permission in the event the approval provision were deemed unconstitutional. But here, the context and legislative history only support severing the statute in the most natural way—severing the exception to the prohibition and retaining the prohibition itself.

First, surrounding statutory provisions indicate that controlling and restricting USDA's ability to reorganize was a significant issue for Congress. The FY2026 appropriations statute for the agency contains several other provisions aimed at restricting USDA's use of funds to reorganize its component agencies. *See* Pub. L. No. 119-37, Div. B, § 716(b) (restricting, in certain circumstances, use of funds "through a reprogramming" that "reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by Congress"); *id.* § 716(d) (restricting use of funds to "realign[] or reorganize[] new, current, or vacant positions or agency activities or functions to establish a center, office, branch, or similar entity with five or more personnel"); *id.* § 771 (restricting use of funds "to close or consolidate the resources or locations of any existing Agricultural Research Service laboratories and facilities"); *id.* § 779 (restricting use of funds "to close Natural Resources Conservation Service or Rural Development mission area field offices or to permanently relocate any field-based employees of those agencies that would result in an office with two or fewer employees").

Second, comparing sections 716(a) and 421 to the other restrictions Congress imposed on USDA and other federal agencies in this same appropriations legislation shows that Congress intended for sections 716(a) and 421 to have real teeth. Throughout the FY2026 appropriations legislation, Congress adopted "notice-and-wait," or notice-only, provisions that permit the agencies to take restricted action by default. *See, e.g.*, Pub. L. No. 119-37, Div. D, § 201 (permitting the Department of Veterans Affairs to transfer funds between specified appropriations once the VA notifies the Appropriations Committees and thirty days have passed); *id.* § 252 (permitting the VA to spend unobligated funds on construction of Veterans Health Administration medical facilities once the VA notifies the Appropriations Committees and thirty days have passed); Pub. L. No. 119-74, Div. A, § 103 (permitting the Department of Commerce to transfer funds between appropriation accounts so long as the Secretary notifies the Appropriations Committees fifteen days in advance of any otherwise-unauthorized acquisition or disposal of capital assets). Congress even adopted a notice-and-wait clause for one provision restricting USDA's ability to take certain reorganization actions. *See* Pub. L. No. 119-37, Div. B, § 716(d). But when it came to sections 716(a) and 421, Congress opted for the more restrictive committee-approval provisions. Congress must be presumed to understand the difference between provisions that default to permitting the government to take restricted action and provisions that set the opposite default, especially where Congress demonstrates—in the very same statute—that it knows how to draft both types of provisions. *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022).

Turning to legislative history, section 716(a) was once a mere notice-and-wait provision that permitted USDA to reorganize so long as it notified Congress. But in 2014, Congress grew frustrated with USDA "violat[ing] long-standing notification requirements" and converted section 716(a) into a committee-approval provision—the version in effect today. 160 Cong. Rec. 17805 (2014) (statement of Rep. Hal Rogers). *Compare* Pub. L. No. 113-76, Div. A, § 721(a) (2013) (notice-only provision for FY2014), *with* Pub. L. No. 113-235, Div. A, § 719(a) (2014) (notice-and-approval provision for FY2015). Congress transformed section 421 in the same way in 2020,

in direct response to the fact that USDA was "continuing to work to implement . . . a Comprehensive Plan for Reorganizing the Executive Branch." Dkt. No. 5-62, Ex. L at 5; *see also* Mot. at 18 n.11. Simply put, Congress converted both these provisions from "you can go ahead and do it unless we step in to stop you" to "you can't do this unless you ask our permission and we give it to you." The result must be understood as part of a years-long effort by Congress to rein in USDA's ability to reorganize without congressional buy-in.

For all these reasons, USDA's proposal—to sever the approval requirements while retaining the notification requirement and giving blanket permission to reorganize—is "at odds with Congress' expressed intention to control rather than authorize" USDA's activities. *City of New Haven v. United States*, 809 F.2d 900, 908 (D.C. Cir. 1987) (declining to retain a notification requirement where doing so would "create a presumption in favor of" agency authority in the face of clear congressional intent to limit agency authority); *see also National Mining Association*, 877 F.3d at 864–65 ("The question is whether the statute's text or historical context makes it evident that Congress would have preferred no statute at all." (citation modified)).

On the flip side, the plaintiffs' proposal "function[s] in a manner consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (emphasis omitted). As explained above, Congress sought, through sections 716(a) and 421 and the other restrictions, to limit USDA's ability to reorganize. There is no doubt that the plaintiffs' proposal, which would impose on USDA an absolute prohibition on reorganization, advances that mission. The only remaining question is whether there is any evidence suggesting that Congress would not have restricted USDA's use of funds to reorganize if it knew that the Appropriations Committees would not be able to permit reorganization on a one-off basis. *Cf. Alaska Airlines*, 480 U.S. at 685 (considering, in the mirror-image context of a legislative veto, whether "Congress would have been unwilling to make the delegation without a strong oversight mechanism"). If that were the case, one might expect to see, for example, legislative history emphasizing the flexibility afforded by the committee-approval language. Not only is there no such evidence, the legislative history of the FY2026 appropriations statute doesn't mention the approval language at all. And as already

noted, Congress first enacted this requirement to rein in USDA's reorganization authority. *See* 160 Cong. Rec. 17805. In short, there is no evidence from which to conclude that Congress wouldn't have imposed these restrictions absent the ability to grant exceptions by committee vote.

The cases considering the severability of legislative vetoes indirectly support severing the committee-approval clauses here in a manner that leaves the substantive prohibitions intact. Those cases conclude that legislative vetoes are generally severable, at least in part because "[t]here is an obvious substitute for the legislative veto: the ordinary process of legislation." *National Mining Association*, 877 F.3d at 862. "Nothing (except the need to muster sufficient votes) prevents Congress from revoking" the authority it granted to the agency by passing legislation that nullifies the agency's action, presenting that legislation to the President, and (if necessary) overriding the President's veto. *Id.* The same logic applies here: At any time, Congress could approve USDA's specific reorganization proposals (in the face of a general prohibition on reprogramming funds to reorganize) by passing legislation. In fact, the logic applies with even greater force here than in the legislative-veto context. In the case of a legislative veto, the likelihood that Congress will need to override a presidential veto to pass nullifying legislation is quite high because Congress is attempting to negate action that the executive branch wanted to take. Passing such legislation might realistically require a veto-proof majority. But in the case of a provision that prohibits executive-branch activity absent congressional approval, there is almost no prospect of a presidential veto. After all, the legislation in this scenario would seek to allow the Executive the authority to do something it wants to do.

Against all this, USDA invokes *American Federation of Government Employees v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982). In *Pierce*, the D.C. Circuit considered the severability of a committee-approval provision and reached the result USDA seeks here: After severance, the provision's default prohibition on agency action was converted to blanket permission. *Id.* at 306–08. As a preliminary matter, for the reasons discussed earlier, the D.C. Circuit erred in characterizing the committee-approval provision as a "legislative veto." It appears what the court really meant to say was that the committee-approval clause was no less unconstitutional than a

legislative veto. But more importantly, the reasoning employed in *Pierce* cashes out completely differently in the context of the statutes here. *Pierce* declined to reform the statute to create "an absolute prohibition on [agency] reorganization" because the Senate Appropriations Committee had "clearly expressed reservations about" such a prohibition in the drafting process. *Id.* at 307. After passing an appropriations bill containing no prohibition at all, that committee stated that it believed the House's bill, which prohibited reorganization absent committee approval, was "overly restrictive and [would] impair the Department's ability to institute management improvements and cost savings." *Id.* at 307 (quoting S. Rep. No. 97-549, at 29 (1982)). Those reservations resulted in Congress dialing back the reorganization prohibition in the final statute: The prohibition was retained, but it was amended to expire partway through the fiscal year. *Id.* The court in *Pierce* concluded that the Senate Appropriations Committee's reservations "cast[] grave doubt on any supposition that the Senate would have agreed to an absolute prohibition." *Id.* Here, there is both no evidence that either House was concerned about the reorganization restrictions imposed on USDA and considerable evidence that, for years, Congress sought to impose real restrictions on USDA's ability to reorganize.

USDA also argues that the plaintiffs' proposal "invalidat[es] more of the statute than necessary." Opp. at 24. It's true that Congress included in these provisions two separate oversight mechanisms—notice and approval—and that those mechanisms can function independently. It's also true that, as a general rule, a "court should refrain from invalidating more of the statute than necessary." *Alaska Airlines*, 480 U.S. at 684 (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)). But that just begs the question. When severing a statute, a court must ensure that what remains "will function in a manner consistent with the intent of Congress." *Id.* at 685 (emphasis omitted). For all the reasons stated above, a notice-only statute that establishes a default rule in favor of reorganization does not accord with Congress's intent to restrict USDA's reorganizing efforts.[10]

[10] Both sides seem to agree that, in addition to sections 716(a) and 421, a third provision of the FY2026 appropriations legislation, section 771, is also implicated by some of USDA's planned

Once the committee-approval clauses are severed, sections 716(a) and 421 become blanket prohibitions on reprogramming funds for certain reorganization activities, including the office closures and employee relocations at issue here. Accordingly, the plaintiffs have shown a likelihood of success on the merits of their claim that the closures and relocations are contrary to law.[11]

## V

USDA's office closures and employee relocations are likely to cause the union plaintiffs imminent and irreparable harm in the absence of an injunction. These plaintiffs represent

---

reorganization activities. *See* Pub. L. No. 119-37, Div. B, § 771. That provision prohibits USDA's use of any appropriated funds "to close or consolidate the resources or locations of any existing Agricultural Research Service laboratories and facilities without prior notification and approval of" the Appropriations Committees. *Id.* The Agricultural Research Service is housed within USDA's Research, Education, and Economics mission area, one of the eight components at issue here. The provision prohibits all closures and consolidations, not only those effectuated through reprogramming, so there is no need to conduct a reprogramming analysis. And there is no reason to sever the provision's committee-approval clause differently than for sections 716(a) and 421, as explained in Section IV. Thus, sections 716(a) and 771 doubly prohibit USDA's authority to reprogram funds for USDA's planned closures and consolidations at ARS.

[11] It also appears that the plaintiffs have, at a minimum, raised serious questions going to their arbitrary-and-capricious claim. Where an agency contemplates forced relocations of thousands of its employees—necessarily resulting in considerable employee attrition—the impact of that attrition on the agency's ability to perform its statutorily mandated functions seems likely to be an important consideration. *See Motor Vehicle Manufacturers Association, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983); *see also Victim Rights Law Center v. U.S. Department of Education*, 788 F. Supp. 3d 70, 92 (D. Mass. 2025). Even if the employees who most directly perform an agency's key functions are not themselves relocated, forced relocations of this magnitude carry the possibility of affecting those employees indirectly, such as by hamstringing their administrative support. An agency considering office closures and employee relocations like those at issue here at least ought to consider whether the key functions of each affected component will be impacted and to explain why or why not. And if the reorganization will have a short-term programmatic impact, the agency ought to explain why the upside outweighs the downside. USDA's argument that it now expects to relocate only around two percent of the agency's entire workforce is beside the point. Opp. at 29. Putting aside the fact that the precise number of employees seems to be a moving target, for the purpose of evaluating whether employee attrition will impede USDA's ability to perform its statutorily mandated function, the relevant figure is the number of relocated employees—and the rate of resulting attrition—at each respective component, not agency-wide. That is especially true here, where the rate of employee relocations at any one component may be quite high. At the Food and Nutrition Administration, for example, the relocations appear potentially poised to affect up to—or even more than—seventy percent of the component's employees. *See* Mot. at 8.

thousands of USDA employees who now "face the impending loss of their jobs, wages, and health benefits" because they cannot relocate far from their homes. Mot. at 22–23. The harm associated with that job loss is irreparable because even back pay "cannot account for harms resulting from loss of income in the interim or for gaps in health-and childcare that accompany job loss." *American Federation of Government Employees*, 139 F.4th at 1040; *see also Yick v. Bank of America, N.A.*, 539 F. Supp. 3d 1023, 1025–26 (N.D. Cal. 2021) (financial harm is irreparable where it would "seriously hinder the ability of [the plaintiffs] to feed their families and keep a roof over their heads" or "cause them to be evicted, go hungry, or be denied necessary medical care" in the same way that "companies can establish irreparable harm by showing that losing money will likely cause them to shut down"). And the harm is imminent because USDA has already begun sending relocation letters to affected employees, with deadlines to report to their new duty stations as early as September 21, 2026. *See* Mot. at 23.

**VI**

With respect to the balance of equities and the public interest, the Court has no view on whether USDA's planned reorganization is a good idea or a bad one. Perhaps USDA is organized in an inefficient or outdated fashion, such that the harm some employees would suffer from a reorganization could be outweighed by the potential benefit to the taxpayers, not to mention citizens who interact with the agency more directly. But on this record, the balance of equities and the public interest strongly support an injunction. First, this is not one of those preliminary-relief motions where the plaintiff has merely raised "serious questions" going to the merits. *See Pacito v. Trump*, 169 F.4th 895, 919 (9th Cir. 2026). It is overwhelmingly likely that USDA's planned closures and relocations violate Congress's express restrictions on those activities. There is no public interest in allowing the government to violate federal law. To the contrary, the public interest is served by preventing the Executive from violating the APA by spending money on an activity that Congress has prohibited. *See id.* at 938–39; *cf. California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

The public interest further tilts in favor of the plaintiffs because USDA's reorganization efforts risk disrupting programs on which many Americans depend. The Food and Nutrition Administration, through programs like SNAP and WIC, provides food to low-income families, including millions of children and infants. Dkt. No. 5-27 ¶ 6; Dkt. No. 5-55 ¶ 5. And the Forest Service is charged with preventing and fighting wildfires, which can devastate not only federal forests and grasslands but also the people and property that surround them. Dkt. No. 5-17 ¶ 6. There is at least some risk that USDA's office closures and employee relocations would impede these components' ability to carry out their critical functions. Dkt. No. 5-29 ¶¶ 12–15; Dkt. No. 5-39 ¶ 14. And as discussed in footnote 11, it does not appear USDA has conducted any analysis to show that these risks are not real or are outweighed by any potential benefits.

Nor has USDA offered any convincing arguments that it would be significantly harmed by a temporary preservation of the status quo. Much of what USDA complains of amounts to self-inflicted harm caused by its decision to proceed with an unlawful reorganization effort. *See* Opp. at 34 (contending that a stay would force USDA to "pay for the operation and maintenance of dual facilities" and would impede its "ability to comply with the [union] agreements USDA has already completed"). Also, it seems that USDA already delayed implementation of the planned reorganization activities by several months. *See* Compl. ¶¶ 40–44; Mot. at 3–4. Viewed in that context, the additional delay that results from this stay poses a minimal burden on the agency.

Finally, the statutory language restricting USDA's reorganization activities expires in about two months, on December 11, 2026. *See* Pub. L. No. 119-103, Div. A, §§ 101, 103, 106 (2026). At that time, presumably Congress will consider a continuing resolution to keep the government running. If USDA wishes to move forward with the now-stayed reorganization activities, it can ask Congress to change the language of the next appropriations statute, either to give USDA broader spending authority or to express disagreement with the severability analysis set forth in this ruling.

**VII**

The union plaintiffs are thus entitled to a stay under section 705 of the APA. The final question involves the scope of that relief. USDA contends the stay should apply only to employees who are represented by the union plaintiffs, meaning that USDA could continue to violate the appropriations statutes by relocating all other agency employees. By contrast, the plaintiffs argue for a stay that applies to all employees subject to the challenged actions in the eight affected component organizations, thereby broadly preventing USDA from proceeding with any of the unlawful reorganizations while the litigation is pending.

In *Trump v. CASA, Inc.*, the Supreme Court held that in a typical case between a private plaintiff and the government, federal courts lack the authority to issue universal relief—that is, relief that benefits everyone affected by the challenged government action. 606 U.S. 831, 837 (2025). That's because, in most cases, Congress has not authorized federal courts to issue universal relief. *Id.* at 841–47. As a general rule, then, courts may grant relief that extends only to the plaintiff who challenges the government action. *See id.* at 843–44.

However, there remain at least three scenarios where district courts are authorized to issue relief that protects non-parties from government action.

First, issuing an injunction that protects non-parties may be appropriate to afford complete relief to the parties in the case. In *CASA*, the Court gave the example of a nuisance case seeking to prevent someone from playing their music too loud. *Id.* at 851–52. By definition, a court can afford that plaintiff complete relief only by ordering the defendant to turn down the music. That order benefits the plaintiff, but it incidentally benefits all the plaintiff's neighbors who might have been affected by the loud music too, even though they didn't challenge it in court. In a practical sense, though not a legal one, the order operates like a universal injunction. *See id.* at 852.

Second, when a court has certified a class of all people who are likely to be affected by the challenged government conduct, it may issue an injunction that applies to that class. *Id.* at 849–50. When such a class is certified consistent with the requirements of Rule 23 of the Federal Rules of

Civil Procedure, it means that all those people have become parties to the case, and the injunction protects them all. So, once the Rule 23 procedural hurdles are cleared, this class-wide relief operates somewhat like a universal injunction, in that it extends relief beyond the named parties. *See id.* at 848–49.

And third, by not extending its holding to APA cases, *CASA* declined to disrupt the general understanding that the APA authorizes federal courts to universally vacate federal agency action. *See id.* at 847 n.10. The congressional authorization to issue universal relief that is lacking in non-APA cases like *CASA* is plainly present in APA cases. Section 706 of the APA provides that, at the end of a case, the court "shall" (not may) "hold unlawful and set aside agency action" when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The plain language of this provision authorizes federal courts to issue rulings that entirely "set aside" an agency action, thereby preventing the government from taking action against anyone who might be affected, regardless of whether they are a party to the case. *See Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 603 U.S. 799, 829–30 (2024) (Kavanaugh, J., concurring). Accordingly, the Ninth Circuit has long observed that vacatur is the "default remedy" available at the end of an APA case. *Montana Wildlife Federation v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025); *see also Natural Grocers v. Rollins*, 157 F.4th 1143, 1170 n.7 (9th Cir. 2025) (citing *Corner Post*, 603 U.S. at 833–43 (Kavanaugh, J., concurring)). In turn, section 705 authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or preserve status or rights" while the case is pending. 5 U.S.C. § 705. This language authorizes courts to temporarily enjoin agency action (or, to use the parlance of APA case law, to "stay" agency action) until it can reach a decision about whether it should "set aside" that action under section 706.

Because section 706 contemplates universal vacatur, and section 705 is designed to maintain the possibility of effective relief under section 706, it should be clear that a stay under section 705 can operate universally. But in the wake of *CASA*, the Ninth Circuit has made things more confusing than necessary. The primary culprit is *Immigrant Defenders Law Center v. Noem*,

which involved a challenge to the Trump Administration's "Remain in Mexico" policy. 145 F.4th 972 (9th Cir. 2025), *overruled in part on unrelated grounds by Arizona Alliance for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026). Although the panel in *Immigrant Defenders* concluded that the plaintiff organization was likely to prevail on its APA claim, it declined to issue a universal stay because one was not necessary to afford complete relief to the plaintiff organization's clients. *Id.* at 995–96. It's unclear if the panel meant that this principle must always apply in the section 705 context, or just that courts should consider the concept whenever exercising discretion to issue preliminary relief. If the panel meant the former, that would be clearly wrong. The quintessential purpose of preliminary relief is to allow a court to preserve the court's ability to order the relief to which the plaintiff is entitled at the end of the case. *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020); *see also Lackey v. Stinnie*, 604 U.S. 192, 200–01 (2025). If an agency adopts an unlawful or arbitrary policy that it can implement before the litigation will resolve, a section 705 stay ensures the court can ultimately issue the final relief to which a plaintiff will likely be entitled under section 706. Since that final relief includes a court order "setting aside," or vacating, the agency action, *see National Grocers*, 157 F.4th at 1170 n.7, section 705 obviously authorizes courts to issue stays that temporarily halt agency action altogether. In fact, it may sometimes be an abuse of discretion for a court to decline to stay agency action in its entirety, because a narrower stay may prevent the plaintiff from obtaining the relief to which they are entitled at the end of the case.

Next, in *National TPS Alliance v Noem*, the Ninth Circuit concluded that an organization representing Venezuelan Temporary Protected Status holders could obtain a nationwide stay under section 705. 150 F.4th 1000, 1029 (9th Cir. 2025). First, the panel said that the complete-relief principle was satisfied (although it's not quite clear why, as relief theoretically could have been limited to the subset of people who were members of the plaintiff organization in that case). *Id.* at 1028. Second, the panel said that limiting relief to the organization's members was "not a workable solution under the TPS statute." *Id.* This second justification for a universal stay under section 705 might be interpreted as suggesting that even if not necessary to provide complete relief to the

parties before the court, it might still sometimes be appropriate to issue one. Or perhaps *National TPS Alliance* meant to suggest that the complete-relief principle is a box that must be checked in the context of section 705. Again, the opinion is ambiguous, but if it meant the latter, that's wrong.

Finally and most recently, in *Novedades Y Servicios, Inc. v. Financial Crimes Enforcement Network*, a panel of the Ninth Circuit upheld a district court's decision to issue a section 705 stay protecting targets of a government regulation who were not parties to the lawsuit. 181 F.4th 961, 981–82 (9th Cir. 2026). The panel did not grapple with the cases discussed above, beyond a brief cite to *Immigrant Defenders*'s acknowledgement that *CASA* declined to extend its holding to the APA context. *Id.* at 982. Instead, it simply explained that under the plain language of section 705, courts have the authority to preliminarily "set aside" agency action pending final adjudication of an APA claim because the "scope of interim relief under [s]ection 705 is consistent with the scope of final relief under" section 706. *Id.* at 981–82.

As mentioned earlier, this potentially conflicting Ninth Circuit case law makes what would otherwise be a straightforward issue more confusing. Normally, when faced with an intra-circuit conflict, district courts follow the first ruling. *See Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 991 (D. Ariz. 2015). But as mentioned, the first ruling here, *Immigrant Defenders*, was unclear as to whether district courts are outright precluded from issuing preliminary relief protecting non-parties absent satisfaction of the complete-relief principle in section 705 cases, or simply ought to consider that principle when exercising the discretion that section 705 gives them. The same is true of *National TPS Alliance*, the second ruling. By contrast, the third ruling, *Novedades*, was clear that district courts have the discretion to issue preliminary relief under section 705 that's as broad as the final relief section 706 calls upon them to issue. Not only is that ruling clear, but as discussed above, it's correct. Accordingly, the Court will not interpret the ambiguous language from *Immigrant Defenders* and *National TPS Alliance* as reading into section 705 an atextual bar on universal stays of agency action except in situations where it would be necessary to afford complete relief to the plaintiffs. The Court will simply apply the *Novedades* ruling and proceed on the understanding that it has discretion to stay agency action in its entirety

under section 705.

And on the facts of this case, the most appropriate remedy is indeed to stay USDA's reorganization expenditures, full stop. It would be contrary to the public interest to require USDA to keep some employees in their current offices—preventing closure of those offices—while allowing the agency to move other employees to new offices, as this would require expenditure of congressionally appropriated funds on two offices with two sets of employees rather than one. Indeed, that result runs counter to USDA's own goal of consolidating offices and agency functions. Moreover, if the agency were permitted to implement its reorganization plan with respect to all employees except those represented by the union plaintiffs, it may be impossible to award the union plaintiffs the relief to which they are likely entitled at the end of the case: universal relief under section 706 that prevents USDA from spending money in violation of the appropriations statutes. Much of the damage will already have been done.

* * *

In light of the foregoing, and pursuant to this Court's authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights," 5 U.S.C. § 705, it is hereby ordered that:

1. <u>Agricultural Research Service (ARS)</u>. Defendants USDA and Rollins and their officers, agents, servants, employees, and attorneys, and all persons acting by, through, under, or in concert with the defendants, are enjoined and stayed from closing or consolidating the resources or locations of any ARS laboratory or facility including the Beltsville Agricultural Research Center. The defendants are further enjoined from relocating or reassigning the employees or their positions or functions for any such ARS laboratory or facility to different and/or new locations outside the local commuting area, including by issuing or enforcing "management directed reassignment" (MDR) letters or any other notice or directive of reassignment or relocation in whole or in part, including any deadlines in those letters.

2. <u>United States Forest Service</u>. Defendants USDA and Rollins and their officers, agents,

servants, employees, and attorneys, and all persons acting by, through, under, or in concert with the defendants, are enjoined and stayed from (a) closing or eliminating offices or (b) relocating or reassigning employees or their positions or functions to different and/or new locations outside the local commuting area, including by issuing or enforcing MDR letters or any other notice or directive of reassignment or relocation in whole or in part, including any deadlines in those letters at the Forest Service.

3. Remaining USDA Components Challenged by the Plaintiffs' Motion. Defendants USDA and Rollins and their officers, agents, servants, employees, and attorneys, and all persons acting by, through, under, or in concert with the defendants, are enjoined and stayed from (a) closing or eliminating offices or (b) relocating or reassigning employees or their positions or functions to different and/or new locations outside the local commuting area, including by issuing or enforcing MDR letters or any other notice or directive of reassignment or relocation in whole or in part, including any deadlines in those letters at the: Food and Nutrition Administration; Research, Education, and Economics mission area; Foreign Agricultural Service; Rural Development mission area; Farm Production and Conservation mission area; Office of the General Counsel; and Office of the Assistant Secretary for Civil Rights.

4. Notwithstanding the foregoing, this order does not enjoin the defendants from:

a. relocating or reassigning USDA employees currently located within the National Capital Region[12] to other local offices or locations also located within the National Capital Region, or closing offices, programs, or facilities in the National Capital Region from which all employees have been relocated or reassigned to other local offices or locations within the National Capital Region;

b. reassigning a covered employee who applies or applied to a job announcement on USAJobs or other internal agency merit-hiring application processes, is selected for the position, and accepts the position, provided that the

[12] *See* 40 U.S.C. § 8702(3).

reassignment is unrelated to the reorganization activities stayed by paragraphs 1 through 3;

5. For purposes of this order, "local commuting area" means "the geographic area that usually constitutes one area for employment purposes. It includes any population center (or two or more neighboring ones) and the surrounding localities in which people live and can reasonably be expected to travel back and forth daily to their usual employment." 5 C.F.R. § 351.203.

6. For purposes of this order, "offices" does not include physical locations that were empty of staff as of the date of the congressional notification letter for the relevant USDA component (which are either in April or June 2026).

7. This order does not require the defendants to return employees who were relocated pursuant to the reorganization activities stayed by paragraphs 1 through 3 and began work at their new duty station prior to this Court's first administrative stay order on September 14, 2026, to their original duty station or enjoin the defendants from issuing any associated relocation incentive or payment entitlements to those employees.

8. Within two business days, the defendants shall provide notice of this order to all USDA employees working at USDA components included in paragraphs 1 through 3, and any labor organization representing any of those affected USDA employees, including by email notification that includes this order, and by posting this order on the USDA Reorganization website (https://www.usda.gov/about-usda/reorganization) and any webpage of any affected component agency dedicated to the reorganization activities stayed by paragraphs 1 through 3.

9. Within seven business days, the defendants shall file a declaration verifying that they have complied with this order and setting forth the steps they have taken to do so.

**IT IS SO ORDERED.**

Dated: October 13, 2026

VINCE CHHABRIA
United States District Judge