**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,<br><br>Defendants. | Case 3:26-cv-09976-VC<br><br>**DECLARATION OF THOMAS M. SCHULTZ, JR. IN SUPPORT OF DEFENDANTS' MOTION FOR STAY PENDING APPEAL** |

I, Thomas M. Schultz, Jr., declare as follows:

**Introduction**

1. I am the Chief of the United States Forest Service (Forest Service). I have served as the Chief of the Forest Service since March 2025.

2. Prior to serving as Chief of the Forest Service, I served as vice president of resources and government affairs at the Idaho Forest Group from January 2018 until the time I became the Chief of the Forest Service. In this role, I led timber procurement operations and oversaw the sourcing of more than 600 million board feet of logs annually from state, federal and private lands in Idaho, Montana, Washington and Oregon. I oversaw efforts to mitigate the impacts of wildfire on more than 40,000 acres of timberland annually in the Inland Northwest by implementing silvicultural treatments to improve forest health and reduce the risk of catastrophic wildfire across private, state, and federal lands.

3. Before my role at the Idaho Forest Group, I served as the Director of the Idaho Department of Lands for 6.5 years where I served as the chief fire official for Idaho and directed the wildfire protection of 6.3 million acres of forests. I also served for over 13 years in multiple roles in the Montana Department of Natural Resources and Conservation. I have a Masters in Forestry from the University of Montana.

4. In my role as Chief of the Forest Service, I lead a workforce of approximately 32,000 employees that sustainably manages 193 million acres of national forests and grasslands, operates the world's largest wildland fire and forestry research organization, and works with tribes, states and other partners to manage America's forests for the benefit of all people, today and into the future.

5. I have reviewed the stay order and other court filings for this case.

**Drivers of the Forest Service Reorganization**

6. The drivers of the Forest Service reorganization were three-fold. First, the Forest Service could no longer afford its workforce. Second, the Forest Service could not afford its facilities within the funding levels it receives. Third, the Forest Service structure did not

meet its current needs. Recognition of the need to change the Forest Service organizational structure spans nearly two decades.

7. On March 31, 2026, Forest Service Associate Chief Chris French notified Congressional staff on the House and Senate Committees on Appropriations – Interior, Environment, and Related Agencies, House Committee on Natural Resources, and the Senate Committee on Energy and Natural Resources of plans to reorganize offices and functions affecting the Natural Resources and Environment Mission Area.

8. Under the Forest Service reorganization plans, the Forest Service estimated that no more than 250 employees, or approximately 0.78 percent, of the Forest Service would receive a Management Directed Reassignment (MDR) that required relocation outside of an employee's local commuting area.

9. The impact of the Stay Order is not limited to the Forest Service reorganization and now jeopardizes day-to-day operations of the agency including, but not limited to, the agency's ability to manage its wildland fire and avalanche monitoring operations.

**Forest Service Workforce Affordability**

10. In 2024, the Forest Service faced a $100 million FY 2025 deficit and a projected $200–$300 million FY 2026 shortfall, making significant workforce reductions unavoidable. Previous Secretary Thomas Vilsack instructed the Forest Service to analyze its salary shortfalls, take necessary short terms actions, and identify approaches to right size the agency. This analysis identified the need to reduce by nearly 7,500 employees and three implementation alternatives that would minimize reductions to on-the-ground field staff. These implementation alternatives became the foundation of the current reorganization efforts.

11. Beginning in April 2024, Forest Service leadership—in coordination with the Secretary and Deputy Secretary—approved initial measures to address the projected deficit including a hiring freeze (except for essential health and safety positions), reduced travel and training, and eliminated hiring of roughly 3,000 non-fire seasonal employees to align

the workforce with available funding. The Forest Service rescinded 350 tentative job offers.

12. On August 26, 2024, USDA submitted to the Office of Management and Budget a report entitled "The Case for Investing in America's Forests" that identified that Forest Service was at financial breaking point to carry out its Congressional mandates unless significant investment was made.

13. In the fall of 2024, the Forest Service took action to avoid disruptive reduction-in-force actions by requesting stand-alone Voluntary Early Retirement Authority (VERA) and Voluntary Separation Incentive Payment (VSIP) authority from the Office of Personnel Management. The authority was approved on January 17, 2025. The VERA and VSIP authorities, paired with the Deferred Resignation Program, resulted in enough voluntary separations to alleviate the imminent budget shortfalls.

14. The Forest Service was able to begin limited external hiring in 2026 commensurate with its current enacted budget after two years of a hiring freeze for permanent non-wildland fire positions. Hiring levels are directly tied to the Forest Service's subcategories of appropriated budget: Fire (WFSE), National Forest System (NFSE), Research (FRSE), State and Private (SPSE), and Operations (FSSE) with each subcategory hiring based on availability of funds and anticipated FY 2027 appropriations.

15. However, the Forest Service cannot afford to operate or fill the positions in its legacy region-based structure and completion of Forest Service's reorganization is imperative for its long-term viability. The Forest Service cannot afford the 3,000 plus position legacy Region and National Office structure.

**Forest Service Facilities**

16. Deferred maintenance across the Forest Service buildings has grown to $3 billion, making it fiscally unsustainable to retain facilities that the agency cannot adequately maintain. The agency's facilities footprint is significantly larger than can be supported under current Congressional appropriations, which have declined by approximately $37 million from fiscal year 2025 to fiscal year 2026. Forest Service facility maintenance and

office lease expenditures are restricted to a single appropriation from congress. Since 2024, the Forest Service identified that its total lease costs would exceed its Congressional funding by the end of 2026, leaving no funds for facility maintenance and creating a critical need to reduce lease costs across the agency.

17. Forest Service administrative offices and firefighter housing conditions are often in poor condition due to significant maintenance shortfalls. Reducing the overall facilities footprint is necessary to ensure that resources are directed to locations and buildings that best support mission delivery, field-level capacity, and long-term sustainability. Staffing and facilities budgets are separate, and the closure of a facility does not eliminate or discontinue mission work. In many cases, employees can continue delivering programs and services from other local offices, service centers, or forest units as the reorganization

18. As part of the facility plan, the Forest Service is not shutting down any of its experimental forests and ranges.

19. Under paragraph 2 of the Stay Order and as it relates to the Forest Service, USDA is "enjoined and stayed from (a) closing or eliminating offices." The stay order forces the Forest Service to keep offices and facilities open even if they are vacant and even though the Forest Service cannot afford the costs.

20. Regular, needed, and sensible facility closures are needed to keep other facilities open. For example, the breadth of this order is keeping the Forest Service from transferring the McClellan training center to the state of California and forcing the Forest Service to maintain a three million dollar lease.

21. In another example, the Geographic Coordination Center located in Portland was scheduled to be moved into a lower cost, yet, more appropriate center location within the commuting area. Employees would not have had to relocate outside the Portland commuting area to work at the new location. Given the order, the Forest Service cannot complete that change, and will need to keep the existing higher-cost lease.

**Forest Service Structural Changes**

22. The Forest Service is a large field-based organization, and the approximately 25,000 field employees who work on the 174 National Forests and Grasslands covering 193 million acres are not directly impacted by the Forest Service reorganization plans, although they are impacted by the stay order.

23. The assessment of alternatives to the Forest Service organizational structure began almost 20 years ago. Recognizing growing challenges, in 2007, the Forest Service engaged in an intensive study and transformation proposal to fundamentally restructure the organization.

24. The primary impacts of the reorganization plans are at the Washington Office, Regional Office and Research and Development Station level. The reorganization includes relocating the agency's headquarters from Washington, DC to Salt Lake City, Utah, transitioning from a regional model to a state-based leadership model, realigning fire authorities to the Chief Fire and Safety Officer, establishing a network of operational services housed within a Service Center, and unifying the agency's research program under a single national program.

25. The Forest Service is moving from its current nine Regional Offices to 15 streamlined State Offices. The current Regional Offices have disparate structures with siloed technical capability and services. The State Office model will focus on enabling Forests and Districts to accomplish work at the local level.

26. The State Offices will be supported by operational services housed in a Service Center that will provide technical support and expertise to Forests and Districts. Previously, the Forest and Districts relied on disparate technical centers or strike teams housed in regional offices or the Washington Office. With the formalization of the operational services housed within a Service Center, all Forests and Districts will have consistent access to technical services and expertise.

27. The Forest Service will consolidate its multiple research stations into one unified Research and Development organization, headquartered in Fort Collins, Colorado, and led by a single research director. The consolidation of the Research and Development

administrative structure will enable the Forest Service to preserve its appropriations for researchers and their research and statutory research requirements including the Forest Inventory and Analysis program. Research and the researchers that conduct the research will continue to be geographically dispersed.

28. The Forest Service will align fire authorities to the Chief Fire and Safety Officer, who reports directly to the Chief. Specifically, the realignment shifts Fire Management authorities from the Regional Foresters to the Chief Fire and Safety Officer. Fire resources at the Forest and District levels will remain in place and in their existing structure under this realignment. Local units, incident commanders and agency administrators will continue operations as normal. Geographic Area Directors will now take their guidance directly from the Chief Fire and Safety Officer, ensuring consistent leadership and direction across all geographic areas.

29. The Forest Service is realigning its organizational structure to strengthen local leadership, streamline operations, and improve mission delivery. This realignment is designed to modernize the agency and enhance its ability to serve communities and manage national forest resources effectively.

**Forest Service Reorganization Implementation**

30. The Forest Service's reorganization was informed by extensive employee engagement and reflects a careful, iterative process rather than an arbitrary or unilateral decision. The Forest Service held two national summits involving hundreds of employees, which resulted in the formation of 15 sub-teams, a national reorganization team, and a recommending team that provided final proposals to me. Following the announcement of the reorganization, the agency continued its employee engagement through multiple all-employee town halls, an employee feedback and suggestion tool, and more than 40 employee-based design teams and focus groups.

31. The Forest Service and the National Federation of Federal Employees (NFFE)-Forest Service Council executed the reorganization agreement on June 12, 2026, with the agency head approval, in accordance with 5 U.S.C. § 7114(c), dated June 15, 2026.

32. After announcing its reorganization, the Forest Service finalized its leadership structure and is well underway in implementing this structure.

33. The Forest Service realigned its fire authorities under the Chief Fire and Safety Officer. This realignment shifted authorities from the Regional Foresters to the Chief Fire and Safety Officer. The stay impacts the ability of the Forest Service to staff the Chief Fire and Safety Officer organization with the most qualified individuals since no employee can be reassigned outside of their local commuting area.

34. On August 24, 2026, the Forest Service announced the selection of five Senior Executive Service (SES) leaders who will serve in the new organizational structure: the Chief Strategy and Performance Officer, Chief Fire and Safety Officer, Chief Field Operations Officer, Chief Finance and Administration Officer, and Deputy Chief Finance and Administration Officer.

35. On August 31, 2026, The Forest Service announced the selection of twenty additional SES leaders who will serve in the new organizational structure: the Chief of Staff; Deputy Chief of Staff; Deputy Chief of Strategy Management Deputy Chief of Strategic Planning, Budget and, Accountability; Deputy Chief of Finance and Administration; Associate Chief of Finance and Audit, Director of Human Resources Management; Director of Business Services Center; Acting Director of Research and Development; two Deputy Directors for Research and Development; Director of Job Corps; Director of Cooperative Forestry; Deputy Chief of Field Operations East; State Director of Oregon; State Director of Colorado; State Director of New Mexico; State Director of Lake States; and State Director of Ozark/Gulf Coast.

36. The Forest Service has announced, selected and issued job offers for other State Director positions and these appointments will be finalized in the coming days after approval by the Office of Personnel Management.

37. The Forest Service is finalizing the matching of the remainder of its GS 14 and GS 15 personnel into its new organizational structure.

**Impact of the Stay Order on Forest Service Operations**

38. The Forest Service workforce has historically been a highly mobile workforce with many employees moving multiple times throughout their career—to include lateral movements (reassignments) to a position at their same grade—across forests, regions and to the headquarters function to gain additional experience and skills. Reassignments often benefit both the employee and agency by matching employee personal and professional needs with overall needs of the agency to fill staffing gaps. The Forest Service regularly processes an average of over 2,500 reassignments per year.

39. As noted above, the Forest Service cannot afford to fill its legacy organizational structure. The Forest Service reorganization provided a pathway to a financially viable organization with sufficient service delivery capacity to the field. In implementing the reorganization, the Forest Service intended to leverage all available human resources including internal hiring announcements, voluntary reassignments, and, where necessary, management directed reassignments. However, the Stay Order prevents the Forest Service from managing its personnel resources by limiting its ability to reassign its employees.

40. The impacts of the Stay Order expand beyond Reorganization. Wildland fire management requires national coordination across districts, forests, states, geographic areas and other federal, state, local and tribal entities. Reassignment is a critical tool for assigning and moving qualified and experienced personnel in our wildland fire organization and the key management staff that provide oversight and risk management to these emergency and high-risk operations. Examples of key management roles required to oversee wildland fire management include District Rangers, Forest Supervisors, Fire Management Officers, Hot Shot Superintendents and their deputies. Without the ability to fill these positions beyond the commuting area, the stability of the oversight and leadership structure for wildland firefighting is at risk. Forest Service needs to be able to recruit for these critical positions outside the commuting area to ensure the best qualified candidates with proven experience can apply.

41. The U.S. Forest Service deploys a massive, multi-tiered wildfire workforce and equipment fleet composed of more than 28,000 trained wildfire responders; 90 interagency Hotshot crews; 40 Type 2 initial attack crews; hundreds of contracted crews; 900 agency fire engines backed by thousands of contracted engines and heavy machinery; and over 400 large firefighting aircraft, including air tankers, helicopters, and water-scooping planes. The National Interagency Fire Center (NIFC), located in Boise, Idaho, functions as the control center for all of wildland fire operations.

42. Most employees at NIFC have held different wildland fire positions across different Forest Service units before coming to NIFC. When a vacancy occurs at NIFC, wildland fire outbreaks do not stop. The Forest Services needs to move experienced staff to immediately oversee the aircraft, training, weather forecasting, deployments, and interagency coordination necessary to provide safe delivery of the entire wildland fire program.

43. The Stay Order limits reassigning employees, even when it is initiated by the employee, highly complicates our ability to deliver this national security response.

44. The Forest Service has a large number of employees who are not “firefighters” but are persons who have completed intensive training and hold certifications qualifying them for various roles in wildland firefighting, including frontline firefighting, support logistics, and emergency response coordination. These individuals are referred to as “red-carded employees” to distinguish them as qualified to conduct collateral duties to support firefighting efforts across the country. Approximately 10,000 employees are red-carded and are key to enabling the agency to staff firefighting efforts appropriately. The Forest Service regularly permanently assigns and reassigns firefighters and collateral duty (red-carded) employees to duty stations outside of their local commuting area.

45. Fire season varies by geographic region and can extend throughout much of the year. Currently the Forest Service is actively fighting fires in the Gulf Coast and California and utilizes red-card employees in these current activities. In addition, the Forest Service has established plans for numerous prescribed fires throughout the West, Gulf states, and

Southeast. Annually, the Forest Service uses prescribed burns for fire mitigation purposes on millions of acres. Prescribed fire is carried out during conditions that are safe. The primary period of this activity is October -March. Currently, the agency is prescribe firing an average of 30,000 acres per week. This number will increase every week through this period as the prescribed fire activity in the south hits its peak in late winter and early spring.

46. Under the district court's order, the Forest Service can use short term and temporary deployment responses for wildland fire and prescribed fire incidents, but the order limits our ability to fill the permanent positions including supervisors and other key management officials for wildland fire and prescribed fire.

47. For example, locally, the key management official that deploys wildland fire response and is responsible for the overall operation of wildfire or prescribed fire is a Fire Management Officer (FMO). Currently, the agency has 25 FMOs and Assistant Fire Management Officers vacant. Voluntary reassignments of qualified and experienced employees are a common method the Forest Service uses to fill these positions. Under the Stay Order, the Forest Service cannot reassign someone into this role that is outside the commuting area.

48. This prohibition will impact the Forest Service's ability to carry out needed wildland fuels reduction work (prescribed fire) because the proper oversight and resources are not available. Forest Service's ability to conduct prescribed fire operations will be compromised on the following 20 Forests/Forest Service Units with vacant FMO and Assistant FMO positions: Hoosier; Mongongahela; White Mountains; Boise; Humboldt/Toiyabe; Payette; Uinta/Wasatch/Cache; Bitterroot; Custer-Gallatin; Dakota Prairie Grasslands; Kootenai; Lassen; Sequoia; Chattahoochee-Oconee; George Washington & Jefferson; Land Between the Lakes; National Forests and Grasslands in Texas; National Forests in Alabama; and Prescott. The level of impact depends on the specific scope and risk associated with each planned prescribed fire.

49. The Forest Service can deploy "red card" employees to work on short-term assignments for 21 days. The 21-day assignments are insufficient to meet FS needs for proper risk management and oversight of the current prescribed burn season. Plans fluctuate due to weather and can shift by several days, meaning that reassigning employees for a short 3-week period introduces unacceptable disruption and risk in permanent oversight roles need to execute this program.

50. In addition to impacts on wildland fire, the Stay Order also impacts avalanche early warning system operations. The Forest Service permits 122 downhill ski areas. These areas represent a quarter of all ski resorts in the United States, and contain more than 60 percent of the overall capacity available in the U.S. With more than 40 million visits to these resorts annually, the areas represent $3.5 billion in direct spending and revenue to the communities they serve. To ensure the safety of these operations, the Forest Service operates and supports 14 avalanche centers that provide for the forecasting and mitigation of avalanches throughout the west.

51. 18 avalanche center positions are targeted to be advertised, to include 10 avalanche center leads and directors which are primarily filled from within the Forest Service. Due to the Stay Order, the Forest Service will only be able to consider employees from the local commuting area for the positions. As a result of this stay order, the leadership provided by the 10 center leads will likely not be in place for this year's avalanche season.

**Summary**

52. The Forest Service has relied on a variety of human resources tools including the reassignment of its workforce to deliver its critical mission. The Stay Order jeopardizes the viability of Forest Service operations and hampers the ability of the Forest Service to reorganize the agency to enable it to be financially sustainable. The Forest Service simply can no longer afford to operate its legacy structure and facilities and returning to the status quo is not an option.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 30, 2026

Thomas M. Schultz, Jr.